UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'08 CIV 4906

———————————————————— x

MARK GRAY, Individually and on Behalf of    :
All Others Similarly Situated,

                    Plaintiff,

    vs.

NEXCEN BRANDS, INC., DAVID S. OROS,
ROBERT W. D'LOREN and DAVID
MEISTER,

               Defendants.

———————————————————— x

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES
LAWS

DEMAND FOR JURY TRIAL

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by NexCen Brands, Inc. ("NexCen" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of NexCen between May 10, 2007 and May 19, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Mark Gray, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of NexCen at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant NexCen operates as a brand management and franchising company in the United States and internationally. The Company owns, licenses, franchises, and markets a portfolio of brands, including Bill Blass, Waverly, The Athlete's Foot, Shoebox New York, Great American Cookies, MaggieMoo's, Marble Slab Creamery, Pretzel Time, and Pretzelmaker.

8.    (a)    Defendant David S. Oros ("Oros") is the Founder of the Company and was, at all relevant times, Chairman of NexCen.

(b)    Defendant Robert W. D'Loren ("D'Loren") is, and was at all relevant times, Chief Executive Officer and President of NexCen.

(c)    Defendant David Meister ("Meister") was Chief Financial Officer of Nexcen until March 25, 2008.

(d)    Defendants Oros, D'Loren and Meister are collectively referred to herein as the "Individual Defendants."

9.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of NexCen, were privy to confidential and proprietary information concerning NexCen, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning NexCen, as discussed in detail below. Because of their positions with NexCen, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of

directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of NexCen's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on The NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to NexCen's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and

future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of NexCen's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of NexCen common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding NexCen's business, operations, management and the intrinsic value of NexCen securities; (ii) allowed Defendant Oros and another Company insiders to collectively sell 264,783 shares of their personally-held NexCen common stock for gross proceeds in excess of $3.3 million; (iii) enabled the Company to complete certain acquisitions using its credit facility and artificially-inflated stock as consideration; and (iv) caused Plaintiff and members of the Class (defined below) to purchase NexCen's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of NexCen between May 10, 2007 and May 19, 2008, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NexCen common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NexCen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of NexCen;

(c)    whether the price of NexCen common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    Defendant NexCen describes itself as a "vertically integrated global brand management company focused on assembling a diversified portfolio of intellectual-property-centric companies operating in the consumer branded products and franchise industries. The company owns, licenses, franchises and markets a growing portfolio of consumer and franchise brands including The Athlete's Foot, Bill Blass, Great American Cookies, MaggieMoo's, Marble Slab Creamery, Pretzel Time, Pretzelmaker, Shoebox New York and Waverly."

21.    The Class Period begins on May 10, 2007. On that date, NexCen issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007. For the quarter, the Company reported licensing, royalty and franchise fee revenues of $3.9 million and a net loss, which includes income from discontinued operations of $447,000, of $198,000. Defendant D'Loren, commenting on the results, stated, in pertinent part, as follows:

> I am pleased with the continued growth in our brand portfolio. We made great progress in the quarter in integrating our existing portfolio of brands, as well as, with respect to entering into a definitive agreement to acquire a leading home furnishings brand, Waverly. On an annualized basis, Waverly generates $9 million in royalty revenue, diversifies our brand portfolio and compliments our Bill Blass home business. Also, we have new franchise agreements for The Athlete's Foot in 3 countries, Sweden, Egypt, and Lebanon. In the past 9 months, we have acquired 5 brands that are expected to generate in excess of $1 billion in annual retail sales that consists of over 1,150 franchised stores, with over 500 new stores in the pipeline, we now conduct business in 45 countries. We remain focused on executing our business plan of leveraging our brands across our three operating verticals to generate organic and synergistic growth and plan to continue on our course of acquiring from 3 to 5 companies per year.

With regard to the Company's 2007 financial guidance, the press release stated, in pertinent part, as follows:

- 6 -

2007 Guidance

Taking into account revenue generated by the Company's existing brands, including Waverly, **the Company is reaffirming revenue guidance for the full year of 2007 of between $38 and $42 million and EPS guidance of $0.12 to $0.14 per fully diluted share.** These amounts do not reflect any additional acquisitions that might be completed in 2007, although the Company anticipates that it will continue to make acquisitions through the remainder of 2007. **Assuming that no other acquisitions are completed, the Company estimates that EPS would be $0.19 to $0.21 per fully diluted share on a forward twelve month basis.** [Emphasis added.]

22.    On August 6, 2007, the Company issued a press release announcing that it borrowed $22 million from its existing $150 million debt financing facility to finance the intellectual property (IP) assets of Waverly. Defendant D'Loren, commenting on the financing, stated, in pertinent part, as follows:

With an established financing platform firmly in place, NexCen can successfully complete transactions that could otherwise be more difficult to conclude. We are confident that this facility will continue to give us the ability to grow and execute our business plan.

The press release continued, in pertinent part, as follows:

As previously announced, NexCen entered into a master loan agreement arranged by BTMU Capital Corporation to support the Company's strategic goals by providing capital for the acquisition of IP centric companies in its three operating verticals.

\*       \*       \*

The master loan agreement with BTMU Capital Corporation allows for borrowings up to $150 million. Draws under the agreement of $26.5 million and $27.3 million were used to leverage NexCen's acquisitions of The Athlete's Foot and Bill Blass, respectively. The Waverly draw-down was on terms consistent with the existing agreement of LIBOR plus 240 basis points, or approximately 7.75%, payable in five years.

Theodore J. Gaffney, Executive Vice President of BTMU Capital Corporation, commented: "We are excited about our growing relationship with NexCen Brands and its recent business activities. This facility is a win-win for both parties in that it will allow NexCen to continue to finance future acquisitions under the terms of the master loan agreement and build a well-diversified pool of assets. Once an adequate level of diversity is achieved, it will allow us to arrange a refinancing through a term loan facility."

23.     On August 7, 2007, the Company issued a press release announcing that it acquired the assets of Pretzel Time Franchising, LLC and Pretzelmaker Franchising, LLC, which were wholly owned subsidiaries of Mrs. Fields Famous Brands, LLC.  The combined purchase price for the transaction was $29.4 million, and consisted of $22.1 million of cash, and NexCen common stock valued at approximately $7.3 million.

24.     On August 9, 2007, NexCen issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007.  For the quarter, the Company reported total revenues of $8.9 million and a net loss of $245,000, or $0.01 per diluted share.  Defendant D'Loren, commenting on the results, stated, in pertinent part, as follows:

> I am extremely gratified by the extent of our accomplishments and our ability to quickly become operationally profitable.  During the quarter, we directed a considerable amount of effort toward building NexCen's operating infrastructure and improving the depth of our management team, including the addition of new presidents in our QSR and home businesses.  It is important for shareholders to understand that our goal is to make accretive and synergistic acquisitions, and to support and grow each of our operating verticals.  I believe that we made great strides in advancing these goals during the quarter.
>
> I am pleased about the recent acquisition of Pretzel Time and Pretzelmaker, as these brands and their related products mark the beginning of the Company's revenue growth strategy for its ice cream QSR concepts.
>
> One of the most exciting events during the second quarter took place at our TAF Global Franchise Convention in Las Vegas in June, where we introduced our vision for the future of The Athlete's Foot ("TAF") to approximately 70 TAF franchisees, representing over 600 stores throughout the world.  We presented an innovative, modular merchandising system that will allow each store location to more closely align its product offering with local demographics and buying tastes.  In addition, we introduced our new line of high margin, TAF branded apparel.  Both of these introductions were received enthusiastically by the franchisees in attendance.  Adding to our excitement about TAF was the recent signing of an agreement with an existing TAF area developer, to open a minimum of 100 new domestic stores over the next 14 years.

25.     On September 7, 2007, the Company issued a press release announcing that it borrowed $16 million from its existing $150 million debt financing facility to finance the intellectual

property (IP) assets of Pretzel Time and Pretzelmaker. Defendant D'Loren, commenting on the financing, stated, in pertinent part, as follows;

> With an established financing platform firmly in place, NexCen can successfully complete transactions that would otherwise be more difficult to conclude. We are confident that this facility will continue to give us the ability to grow and execute our business plan.

26.     The statements referenced above in ¶¶21, 22, 24 and 25 were materially false and misleading because they failed to disclose that the Company's financial condition was substantially weakening as it struggled to service its debt.

27.     On November 8, 2007, NexCen issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007. For the quarter, the Company reported total revenues of $11.3 million and net income of $117,000. Defendant D'Loren, commenting on the results, stated, in pertinent part, as follows:

> I am extremely pleased with the favorable advancements of our company during the third quarter. The investments we have made in our brands, people and infrastructure are now beginning to show results. I remain confident that we have developed an extremely robust and scaleable operating platform from which to grow our business.

> During the quarter, we experienced positive momentum within each of our operating segments," continued Mr. D'Loren. In retail franchising, our rebranding efforts at The Athlete's Foot (TAF) have been met with strong acceptance as evidenced by the signing of three separate area development agreements to open a minimum of 130 stores in the United States and Sweden. In addition, we are delighted to have aligned ourselves with Li & Fung, a global supply chain manager to retailers, to serve as our manufacturing and distribution partner for Taftec(TM), the new TAF branded apparel line. In our quick service restaurant (QSR) segment, we acquired Pretzel Time and Pretzelmaker, doubling the number of brands in our QSR portfolio, which provides us strong cross-selling opportunities within our existing locations. In our consumer branded products segment, Bill Blass significantly advanced its licensing efforts, first through a licensing agreement with The Global Fur Group to manufacture and distribute luxury fur products under the Bill Blass label; and second through an exclusive licensing agreement with Mondani to manufacture and distribute handbags, small leather goods and cosmetic toiletry cases. We believe these agreements reflect the underlying strength of the Bill Blass brand and our ability to broaden the scope of this preeminent name in luxury fashion.

With regard to the Company's financial guidance, the press release stated, in pertinent part, as follows:

> The company expects full year Non-GAAP net income to be in the range of $0.11 to $0.13 per diluted share for 2007 and $0.19 to $0.21 per diluted share for 2008, assuming no additional acquisitions.

28.     Upon this news, on the next trading day, shares of the Company's stock fell $1.39 per share, or 24%, to close at $4.33 per share, on heavy trading volume. Defendants, however, continued to conceal the true condition of the Company and its business.

29.     On January 29, 2008, the Company issued a press release announcing that it acquired the Great American Cookie Company from Mrs. Fields Famous Brands, LLC. The purchase price of the transaction was $93.7 million, and consisted of approximately $89.0 million of cash and NexCen common stock valued at approximately $4.7 million. With regard to the acquisition, Defendant D'Loren stated, in pertinent part, as follows:

> Great American Cookies is a great opportunity for us to enter the cookie business with a premium cookie brand that has grown consistently over the years. The brand is representative of the acquisition opportunities NexCen has targeted to grow our QSR segment and to increase sales in our existing ice cream and pretzel concepts. The addition of this brand to our QSR portfolio provides NexCen with nearly 300 additional doors for the delivery of quality treat products, and broadens our franchise offering for interested franchisees, both domestically and internationally.

Moreover, the press release stated:

> For a portion of the purchase price, NexCen accessed its debt facility with BTMU Capital Corporation, which was increased from $150 million to $181 million. Theodore J. Gaffney, Executive Vice President of BTMU Capital Corporation, commented: "We are pleased with our relationship with NexCen Brands and its recent business activities. Our facility has continued to allow NexCen to finance its acquisitions under the terms of the master loan agreement and build a well diversified pool of assets."

With regard to its 2008 financial guidance, the press release stated that the Company "revised its guidance to non-GAAP EPS range of $0.27 - $0.30 per share."

- 10 -

30.    On March 14, 2008, NexCen issued a press release announcing its financial results for the fourth quarter and year end of 2007, the period ended December 31, 2007. For the quarter, the Company reported revenue of $10.3 million and a GAAP net loss of $3.8 million, or $0.07 per share. Defendant D'Loren, commenting on the results, stated, in pertinent part, as follows:

> We have now completed the first year of our long-term plan to acquire and manage internationally-recognized franchise and consumer brands, and we have made dramatic progress. We have acquired nine strong brands. We have assembled a first-class team of experienced professionals at NexCen – and partnered with industry-leading designers, manufacturers, and franchise operators worldwide.
>
> From a financial perspective, we earned $0.09 per share on a non-GAAP basis, two cents short of our goal for 2007. But we have an additional $0.07 per share of net deferred revenue on our balance sheet, reflecting $4.7 million of franchise sales that have already been made, but cannot be recognized as revenue until the stores are opened.
>
> Looking ahead, our emphasis will be on marketing, franchise sales, and operational excellence, which will drive cash flow and profitability. At the same time, we intend to continue to acquire complementary brands. We will maintain our disciplined approach to acquisitions, buying companies only if they immediately add to shareholder value. We are very excited about our business and the many opportunities that we are pursuing.

With regard to the Company's financial guidance for 2008, the press release stated that the Company "is reaffirming the current expectations of earning $0.27 to $0.30 per diluted share on a non-GAAP basis in 2008." Moreover, with regard to the Company's acquisition financing, the press release stated, in pertinent part, as follows:

> Our objective is to acquire from three to five brands per year in 2008 and 2009. Our acquisitions are financed with a combination of debt, cash on hand, and stock. We currently have borrowed the full amount under our $180 million credit facility with BTMU Capital Corporation. We are exploring opportunities to convert this credit facility into a long-term, fixed-rate security. Our management team has a successful track record of underwriting and placing securities of this nature in various economic environments. Therefore, we expect to continue to have access to capital.

31.    Upon this news, shares of the Company's stock fell $0.67 per share, or 20% over the next four trading days, to close at $2.83 per share, on heavy trading volume.

32.    On March 21, 2008, the Company issued a press release announcing that Defendant Meister was leaving the Company and would be replaced by Kenneth J. Hall, who was named as Executive Vice President, Chief Financial Officer and Treasurer.

33.    On or about March 21, 2008, the Company filed its Form 10-K with the SEC. With regard to the Great American Cookies acquisition, the annual report stated, in pertinent part, as follows:

> Great American Cookies
>
> Founded in 1977 on the strength of an old family chocolate chip cookie recipe, Great American Cookies has set the standard for gourmet cookie sales in shopping centers nationwide. With a strategy and quality product that has propelled over 30 years of growth, Great American Cookies now leads as the mall-based cookie system with approximately 300 franchised units primarily located in the continental United States.
>
> On January 29, 2008, we acquired substantially all of the assets of Great American Cookie Company Franchising, LLC and Great American Manufacturing, LLC for the purchase price of approximately $93.65 million, consisting of $89 million in cash and $4.65 million of our common stock (approximately 1.1 million shares which were valued at $4.23 per share, the closing price per share of our common stock the day immediately prior to the closing date. To finance the acquisition, we borrowed $70 million under the BTMU Credit Facility, which was increased from $150 million to $181 million at that time.
>
> Our total borrowing to date under the BTMU Credit Facility is approximately $181 million. Repayments of our borrowings through December 31, 2007 totaled $1.2 million. For a discussion of risks associated with borrowings, see Item 1A. Risk Factors under the caption "Risks of Our Business - Any failure to meet our debt obligations would adversely affect our business and financial condition."
>
> * * *
>
> **Any failure to meet our debt obligations would adversely affect our business and financial condition.**
>
> On March 12, 2007, we entered into a $150 million master loan agreement with BTMU Capital Corporation ("BTMU"). In connection with the financing of our acquisition of Great American Cookies on January 29, 2008, we increased the maximum amount of borrowing that may be outstanding at any one time from $150 million to $181 million and modified certain defined terms used in the original loan documentation and related documents to take into account the Company's acquisition

of real estate assets in the Great American Cookies transaction. **With the exception of these changes, the increase to the BTMU Credit Facility is substantially on the same terms as the original credit facility.**

As of March 14, 2008, we have approximately $179 million of long-term debt outstanding under the master loan agreement with BTMU. Interest rates for our master loan agreement vary based upon changes in the debt service coverage ratio, which is the outstanding balance compared to operating revenue of the underlying collateral, and based changes in the London Interbank Offering Rate ("LIBOR").

Our master loan agreement contains affirmative and negative covenants customary for senior secured credit facilities, including, among other things, restrictions on indebtedness, liens, fundamental changes, loans, acquisitions, capital expenditures, restricted payments, transactions with affiliates, common stock repurchases, dividends and other payment restrictions affecting subsidiaries and sale leaseback transactions. Although these covenants are limited to the collateral-holding entities and do not apply to the Company itself, our failure to comply with the financial and other restrictive covenants relating to our indebtedness could result in a default under the indebtedness, which could materially adversely affect our business, financial condition and results of operations. These restrictions may also limit our ability to operate our businesses and may prohibit or limit our ability to enhance our operations or take advantage of potential business opportunities as they arise.

As a result of our indebtedness, a substantial portion of cash flow from our operations is needed to pay principal and interest. This reduces the cash available to finance our operations and other business activities and could limit our flexibility in planning for or reacting to changes in our business. Although the master loan agreement does not restrict our ability to obtain future financings, it may limit our ability to do so, which could negatively impact our business, financial condition, results of operations and growth. The amount of our debt may also cause us to be more vulnerable to economic downturns and adverse developments in our business. [Emphasis added.]

With regard to the Company's liquidity and capital resources, the annual report stated, in pertinent part, as follow:

As of December 31, 2007, we had available cash on hand of approximately $46 million. We used approximately $22 million of this balance in connection with the acquisition of Great American Cookies in January 2008. We were able to increase our BTMU Credit Facility to $181 million (as discussed below) to finance the remainder of the acquisition costs. **We anticipate that cash on hand and cash generated from operations will provide us with sufficient liquidity to meet the expenses of operations, including our debt service obligations, for at least the next twelve months.** As discussed below, additional sources of capital will be needed to fund additional acquisitions, even taking into account anticipated cash flows from operations. [Emphasis added.]

With regard to the Company's loan agreement with BTMU Capital Corporation, the annual report

stated, in pertinent part, as follows:

> On March 12, 2007, NexCen Acquisition Corp. ("the Issuer"), a wholly owned
> subsidiary of the Company, entered into a master loan agreement with BTMU
> Capital Corporation. This master loan agreement provides for borrowings pursuant to
> the issuance of a single class of notes to the Issuer and its wholly-owned subsidiaries
> ("Co-Issuers") which are jointly and severally liable for payments required under the
> notes. The assets of the Issuer and Co-Issuers, which consist of the respective IP
> assets and the related royalty revenues and trade receivables, are pledged as collateral
> security under each note, and secure the obligations of the Issuer and all Co-Issuers
> under all of the notes. The notes are non-recourse to NexCen Brands, Inc. Each note
> is repayable in full after five years.
>
> Substantially all revenues earned by the company are remitted to "lockbox accounts"
> that have been established in connection with the agreement (See Note 2(d)). The
> facility has no expiration date and can be terminated by the Co-Issuers upon thirty
> days notice and by BTMU Capital Corporation by electing not to fund future
> advances; however, each note funding maintains its respective maturity date. The
> agreement provides for certain restrictions on the Issuer and Co-Issuers, including
> limitations on payment of dividends and expenditures on fixed assets. The maximum
> aggregate amount of borrowings that may be outstanding at any one time under the
> agreement is $150 million. **In January, 2008, this limit was increased to $181**
> **million when we acquired Great American Cookie. The borrowing rate is**
> **LIBOR plus an interest rate margin, which ranges from 1.50% to 3.00%.**
> **However, a portion of the notes relating to Great American Cookies for $35**
> **million is priced at LIBOR plus 3.50%.** The Company may refinance all or part of
> the notes with no pre-payment penalties. This allows us to refresh available
> borrowing capacity under the facility, such as by completing securitization
> transactions involving certain of our acquired IP assets and using the proceeds from
> these transactions to repay notes under the master loan agreement. The borrowing
> rate is based on 3-month LIBOR which is a floating rate. The LIBOR rate resets
> every 90 days. [Emphasis added.]

34.    The statements referenced above in ¶¶27, 29, 30 and 33 were materially false and

misleading when made because they misrepresented and failed to disclose the following adverse

material facts:

(a)    that the Company was able to finance a portion of the Great American

Cookies acquisition by agreeing to an accelerated-redemption feature, which would force the

Company to pay back half of its borrowing by a certain date;

(b)    that the Company was unable to comply with this accelerated-redemption feature, which would reduce the amount of cash available to the Company;

(c)    that the Company had no reasonable basis for its earnings guidance for fiscal 2008; and

(d)    as a result of the foregoing, the Company's ability to continue as a going concern was in serious doubt.

35.    Then, on May 19, 2008, the Company issued a press release announcing that it "expects to amend the company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007." Moreover, the Company announced that it "is actively exploring all strategic alternatives to enhance its liquidity, including potential capital market transactions, the possible sale of one or more of its businesses, and discussions with the company's lender." In that regard, the press release stated, in pertinent part, as follows:

In the course of preparing its first quarter 2008 10-Q and following the appointment of its new Chief Financial Officer, the company conducted a review of its prior public filings, including the terms of the January 2008 amendments to its bank credit facility. NexCen's bank credit facility with BTMU Capital Corporation was amended in January 2008 at the time of the acquisition of the Great American Cookie business. The amendments allowed NexCen to borrow an additional $70 million to finance a portion of the acquisition purchase price and included an accelerated-redemption feature applicable to $35 million of the $70 million. Specifically, the amendments require that the $35 million be reduced to $5 million by October 17, 2008. **The company concluded that disclosures regarding the accelerated-redemption feature of its bank credit facility, as well as other changes that reduced the amount of cash available to the company for general use, were not contained in the company's 2007 Annual Report on Form 10-K or the January 29, 2008 Current Report on Form 8-K filed in connection with the acquisition of Great American Cookies.**

**Based on information that is now known, the company believes that there is substantial doubt about its ability to continue as a going concern, and pending completion of an independent review discussed below, that this substantial doubt also may have existed at the time the company filed its 2007 10-K.** The company is continuing to review all of the relevant facts and circumstances. To assist in evaluating and resolving these matters, the audit committee of the company's Board of Directors has retained independent counsel to conduct an

- 15 -

independent review of the situation. The company has concluded that its 2007 financial statements should no longer be relied upon and no reliance should be placed upon KPMG's audit report dated March 20, 2008, or its report dated March 20, 2008 on the effectiveness of internal control over financial reporting as of December 31, 2007, as contained in the company's 2007 10-K.

The company will determine what changes need to be made to its 2007 10-K and expects the changes may include additional footnote disclosure in the audited financial statements regarding amendments to its bank credit facility, footnote disclosure regarding going concern considerations, and updates to certain other disclosures relating to the amendments to the bank credit facility and the company's liquidity and financial condition. KPMG is also expected to amend its audit report dated March 20, 2008. However, the company does not expect there to be any changes to its 2007 financial results.

The company is notifying The Nasdaq Stock Market that it will not timely file its first quarter 2008 10-Q with the Securities Exchange Commission. As a result of the delayed filing, NexCen will not be in compliance with the Nasdaq Marketplace Rule 4310(c)(14) that requires that the company timely file all required reports with the SEC to satisfy continued listing. [Emphasis added.]

36.    On May 19, 2008, the Company also announced its preliminary first quarter 2008 operating results. For the quarter, the Company expects revenues of $13.9 million. Moreover, the Company announced that its prior financial guidance for 2008 "is no longer applicable."

37.    Upon this news, shares of the Company's stock fell $1.95 per share, or 77%, to close at $0.58 per share, on heavy trading volume.

38.    The markets for NexCen common stock were open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, NexCen's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired NexCen common stock relying upon the integrity of the market price of NexCen common stock and market information relating to NexCen, and have been damaged thereby.

39.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of NexCen common stock, by publicly issuing false and misleading statements

- 16 -

and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

40.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about NexCen's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of NexCen and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

41.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NexCen, their control over, and/or receipt and/or modification of NexCen's allegedly materially misleading misstatements, and/or their associations

with the Company which made them privy to confidential proprietary information concerning NexCen, participated in the fraudulent scheme alleged herein.

42.     Defendants were further motivated to engage in this course of conduct in order to allow Defendant Oros and another Company insider to collectively sell 264,783 shares of their personally-held NexCen common stock for gross proceeds in excess of $3.3 million. Moreover, the Company was able to complete certain acquisitions, including the Great American Cookies acquisition, using its credit facility and artificially-inflated stock as consideration. The insider shares sold during the Class Period are set forth more fully in the following chart:

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| JACK DUNN | 5/16/2007 | 15,000 | $11.73 | $175,950 |
| | 5/17/2007 | 85,000 | $11.57 | $983,450 |
| | | 100,000 | | $1,159,400 |
| | | | | |
| DAVID OROS | 6/1/2007 | 81,736 | $13.00 | $1,062,568 |
| | 6/1/2007 | 9,704 | $13.01 | $126,249 |
| | 6/1/2007 | 5,500 | $13.05 | $71,775 |
| | 6/1/2007 | 4,300 | $13.06 | $56,158 |
| | 6/1/2007 | 3,900 | $13.02 | $50,778 |
| | 6/1/2007 | 3,300 | $13.04 | $43,032 |
| | 6/1/2007 | 2,200 | $13.03 | $28,666 |
| | 6/1/2007 | 1,900 | $13.10 | $24,890 |
| | 6/1/2007 | 1,800 | $13.08 | $23,544 |
| | 6/1/2007 | 1,254 | $13.09 | $16,415 |
| | 6/1/2007 | 800 | $13.11 | $10,488 |
| | 6/1/2007 | 400 | $13.07 | $5,228 |
| | 6/1/2007 | 100 | $13.16 | $1,316 |
| | 6/4/2007 | 12,811 | $13.00 | $166,543 |
| | 6/4/2007 | 4,989 | $13.03 | $65,007 |
| | 6/4/2007 | 3,800 | $13.01 | $49,438 |
| | 6/4/2007 | 2,300 | $13.01 | $29,923 |
| | 6/4/2007 | 1,170 | $13.04 | $15,257 |
| | 6/4/2007 | 971 | $13.05 | $12,672 |
| | 6/4/2007 | 259 | $13.02 | $3,372 |
| | 6/5/2007 | 7,356 | $12.91 | $94,966 |
| | 6/5/2007 | 3,473 | $12.90 | $44,802 |
| | 6/5/2007 | 3,060 | $12.81 | $39,199 |
| | 6/5/2007 | 2,900 | $12.82 | $37,178 |
| | 6/5/2007 | 1,300 | $13.00 | $16,900 |
| | 6/5/2007 | 800 | $13.02 | $10,416 |
| | 6/5/2007 | 700 | $12.89 | $9,023 |
| | 6/5/2007 | 700 | $12.88 | $9,016 |
| | 6/5/2007 | 700 | $12.84 | $8,988 |

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
|         | 6/5/2007 | 400 | $12.85 | $5,140 |
|         | 6/5/2007 | 200 | $12.87 | $2,574 |
|         |          | 164,783 |        | $2,141,519 |
|         |          |         |        |            |
|         | Total:   | 264,783 |        | $3,300,919 |

### Loss Causation/Economic Loss

43.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of NexCen common stock and operated as a fraud or deceit on Class Period purchasers of NexCen common stock by failing to disclose that the Company was able to finance a portion of the Great American Cookies acquisition by agreeing to an accelerated-redemption feature, which would force the Company to pay back half of its borrowing by a certain date. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of NexCen common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of NexCen common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

44.    By failing to disclose that the Company was able to finance a portion of the Great American Cookies acquisition by agreeing to an accelerated-redemption feature, which would force the Company to pay back half of its borrowing by a certain date, among other things, Defendants presented a misleading picture of NexCen's business and prospects. Defendants' false and misleading statements had the intended effect and caused NexCen common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $12.98 per share on June 4, 2007.

45.    As a direct result of Defendants' disclosures on November 8, 2007, March 14, 2008 and May 19, 2008, the price of NexCen common stock fell precipitously, falling 95% from its Class

Period high. These disclosures removed the inflation from the price of NexCen common stock, causing real economic loss to investors who had purchased NexCen common stock during the Class Period.

46.    The precipitous decline in the price of NexCen common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in NexCen common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of NexCen common stock and the subsequent significant decline in the value of NexCen common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

47.    At all relevant times, the market for NexCen common stock was an efficient market for the following reasons, among others:

(a)    NexCen common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, NexCen filed periodic public reports with the SEC and the NASDAQ;

(c)    NexCen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national

circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    NexCen was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48.    As a result of the foregoing, the market for NexCen common stock promptly digested current information regarding NexCen from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of NexCen common stock during the Class Period suffered similar injury through their purchase of NexCen common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NexCen who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

50.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

53.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NexCen common stock. Plaintiff and the Class would not have purchased NexCen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

54.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of NexCen common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

55.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.    The Individual Defendants acted as controlling persons of NexCen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of NexCen, and their ownership of NexCen stock, the Individual Defendants had the power and authority to cause NexCen to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  May 28, 2008

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

SAMUEL H. RUDMAN

SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, CO  80203
Telephone: 303/861-1764
303/395-0393 (fax)

HOLZER, HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL DEES
1117 Perimeter Center West, Suite E-107
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

- 24 -

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.    The undersigned has reviewed the complaint and approves its filing.

2.    The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.    The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The undersigned's purchases and sales of NexCen Brands, Inc. (NASDAQ: NEXC) common stock between May 10, 2007 and May 19, 2008, inclusive, are as follows:

| Transaction Date(s) | # of Shares | Buy or Sell | Price Per Share |
|---|---|---|---|
| 3/10/08 | 92 | Buy | $3.15 |

5.    During the three years prior to the date of this Certificate, the undersigned has sought to serve or served as a representative party for a class in the following actions under the federal securities laws:

6.    The undersigned will not accept any payment for serving as a representative party on behalf of the class beyond the undersigned's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.   Executed this 27th day of May 2008.

_____
[signature]

_____
Please print name.

MARK Gray