## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE NEXCEN BRANDS, INC.
SECURITIES LITIGATION

This document relates to:  all actions

Master File No. 1:08-cv-04906-AKH

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**COHEN MILSTEIN SELLERS
   & TOLL PLLC**

**Catherine A. Torell (CT-0905)**
**150 East 52nd Street, Thirtieth Floor**
**New York, New York 10022**
**Tel: (212) 838-7797**
**Fax: (212) 838-7745**

**Lisa M. Mezzetti (LM-5105)**
**Avi S. Garbow (*pro hac vice*)**
**Anna K. Ryon (*pro hac vice*)**
**1100 New York Avenue, N.W.**
**West Tower, Suite 500**
**Washington, D.C. 20005**
**Tel:  (202) 408-4600**
**Fax: (202) 408-4699**

*Lead Counsel for Plaintiffs*

Lead Plaintiff Vincent Granatelli ("Plaintiff"), individually and on behalf of all other persons or entities that purchased and/or acquired the common stock of NexCen Brands, Inc. ("NexCen" or the "Company") between March 13, 2007 and May 19, 2008 (the "Class Period"), by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, upon facts obtained through the investigation by his counsel, and upon information and belief as to all other matters.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1.  This is a federal class action on behalf of purchasers of NexCen securities during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  NexCen is a brand acquisition and management company with a focus on companies operating in the consumer branded products and franchise industries.  In November 2006, NexCen made its first major brand acquisition – The Athlete's Foot – and began to pursue and close a series of major cash-intensive acquisitions in the ensuing months.

3.  Beginning in March 2007, and continuing throughout the Class Period, NexCen and the Individual Defendants repeatedly heralded as the Company's primary business objective the acquisition of three to five businesses per year, with transaction sizes generally in excess of $50 million total enterprise value.  They touted this "IP business" as a model that did not require substantial operating or capital costs, and one that would allow the Company to maintain "maximum operational and financial flexibility."

4.  To finance its stated acquisition strategy, NexCen announced on March 13, 2007 that it entered into a $150 million Credit Facility ("Credit Facility") with BTMU Capital

Corporation ("BTMU"). NexCen immediately drew down a loan of $26.5 million from the Credit Facility, and announced that each draw under the Credit Facility would have a five-year repayment term.

5.    Throughout 2007, while continuing to draw down nearly $60 million more from its Credit Facility, NexCen told investors that the combination of cash on hand and available borrowings under the Credit Facility would provide sufficient liquidity to meet current operations and planned growth for the following year.

6.    In 2007, the Company grew exponentially, all the while emphasizing the adequacy of its cash and cash equivalents coupled with readily accessible capital. The Company and the Individual Defendants were rewarded as the Company's stock price climbed through the middle of 2007.

7.     Defendant Robert W. D'Loren ("D'Loren") was especially motivated to tout the Company's growth and see a rise in its stock price. As a result of a prior merger involving NexCen's predecessor, D'Loren stood to receive millions in contingent compensation should the Company meet specific stock price and performance targets. Promoting a steady stream of good news to investors, the Company met these price and performance targets in mid-2007, and D'Loren and others were awarded an earn-out payment valued at over $27 million in September 2007. D'Loren received, directly or indirectly, over 80% of that huge sum.

8.    The Company continued its pattern of exuberant growth. To finance more acquisitions, on January 29, 2008, the Company entered into an Amendment to the Credit Facility ("Amended Credit Facility") that increased the total amount of the Credit Facility from $150 million to $181 million. Significantly, NexCen and certain of the Individual Defendants

reported that the Amended Credit Facility had substantially the same terms as the original Credit Facility, with a five-year draw repayment requirement.

9.     This information was false because, unknown to the investing public, NexCen and the Individual Defendants failed to disclose that the Amended Credit Facility actually contained key changes to the original Credit Facility that grossly impacted the Company's ability to operate as a going concern.  These important new loan terms included:  (i) an accelerated-redemption feature requiring $35 million of the loan to be reduced to $5 million by October 17, 2008 (the "Accelerated Redemption Feature"); (ii) a requirement that previously accrued but unpaid interest be paid; and (iii) terms restricting cash flow from revenue so that it was not available to fund operating expenses.

10.     In its Form 10-K issued on March 21, 2008, NexCen reported revenues of $34,295,000 and operating expenses of $32,105,000, meaning the Company's revenues were only sufficient to cover operating expenses.  With $19 million in cash on hand as of March 14, 2008, as then reported by NexCen, the Company had no reasonable prospect of being able to make a $30 million payment in October, 2008 to BTMU, as required by the Accelerated Redemption Feature of the Amended Credit Facility.

11.     Nevertheless, the Company persisted in publicly touting its "financial flexibility," favorable cashflow and liquidity, and intent to acquire three to five businesses per year in 2008 and 2009.

12.     Ultimately, the breadth and scope of the securities fraud Defendants perpetrated became too great to conceal.  On May 19, 2008, the end of the Class Period, the Company announced that:

(1)    the Amended Credit Facility included the Accelerated Redemption Feature, which NexCen would be unable to comply with;

(2)    the Company would face a cash shortage of $7-10 million in July, 2008;

(3)    the Company's 2007 financial results could no longer be relied upon; and

(4)    there was "substantial doubt" about the Company's ability to continue as a going concern.

13.    This unexpected adverse news shocked the market, causing the Company's shares to plummet $1.95 per share, or 77.08 percent, to close on May 19, 2008 at $0.58 per share, on unusually heavy trading volume.

14.    A year later, on August 11, 2009, the Company issued a Form 10-K/A, amending its Annual Report for 2007 (the "Restatement").  In the Restatement, the Company admitted that it had not disclosed the terms of the Amended Credit Facility, that it lacked adequate internal controls to ensure accurate disclosures, and that substantial doubt about the Company's ability to continue as a going concern existed as of the date of the original Annual Report for 2007.

15.    During the Class Period, NexCen's stock price reached a high of $13.18 per share.  While NexCen's stock price was inflated due to the Defendants' misconduct, NexCen insiders unloaded their shares of Company stock, reaping more than $17 million in proceeds.  In addition, as stated before, D'Loren had already received the bulk of a $27 million earn-out payment due to the stock price inflation.

16.    As a result of Defendants' fraudulent acts and omissions, and the consequential decline in the market value of the Company's common stock upon disclosure of Defendants' fraud, Lead Plaintiff and other Class Members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains a principal executive office in this Judicial District.

20.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

21.    Lead Plaintiff Vincent Granatelli purchased NexCen securities at artificially inflated prices during the Class Period and has been damaged thereby.  On March 5, 2009, this Court entered an order appointing Vincent Granatelli as Lead Plaintiff in this class action.

B.    **Defendants**

22.    Defendant NexCen is a Delaware Corporation with its principal executive offices located at 1330 Avenue of the Americas, New York, New York.  NexCen operates as a brand management and franchising company in the U.S. and abroad.  The Company licenses and franchises brand and intellectual property.  At all relevant times herein, the Company's common stock was traded on the NASDAQ Global Market under ticker "NEXC."

23.    Defendant Robert W. D'Loren ("D'Loren") at all relevant times herein was the Company's President, Chief Executive Officer, and a Director.  He is a Certified Public Accountant.  Upon information and belief, on August 15, 2008, D'Loren was forced to resign from the Company as CEO and as a Director as a result of the fraud.

24.    Defendant David B. Meister ("Meister") served as the Company's Chief Financial Officer from the beginning of the Class Period until March 21, 2008. He is a Certified Public Accountant.  Upon information and belief, the Company terminated Meister as a result of the fraud on or about March 21, 2008.

25.    David S. Oros ("Oros") at all relevant times herein served as the Chairman of the Company's Board of Directors, and continues to serve in that position.

26.    D'Loren, Meister, and Oros are collectively referred to hereinafter as the "Individual Defendants."

27.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control and did control the contents of NexCen's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Defendants and others acting at their direction.

### IV.    PLAINTIFF'S INVESTIGATION AND CONFIDENTIAL SOURCES

28.    Plaintiff's allegations are based, in part, upon the investigation of counsel, which included, among other things, reviews of public filings with the SEC by NexCen, press releases, publicly available trading information, and articles in the general and financial press.

29.    Plaintiff's allegations are also based upon information provided by several former employees of NexCen with knowledge of the Company's financial and accounting practices, including but not limited to the following confidential witnesses:

- Confidential Witness No. 1 ("CW1") is a former NexCen employee who served as the director of business-to-business transaction in NexCen Franchise Management, Inc., the franchising subsidiary of NexCen, from September 2007 through June 2008.  CW1 worked closely with Defendants D'Loren and Meister, and was involved in the negotiation of franchise agreements and acquisition due diligence.  CW1 also frequently participated in weekly executive management meetings (or conference calls) involving Defendants D'Loren and Meister;

- Confidential Witness No. 2 ("CW2") is a former NexCen employee who served as a Vice President, General Merchandising Manager of The Athlete's Foot brand at NexCen Franchise Management, Inc. from November 2006 through June 2008. In that capacity, CW2 reported to the President of NexCen Franchise Management, Inc., and was responsible for, among other things, marketing and financial management relating to The Athlete's Foot brand. CW2 also participated in certain of the weekly executive management meetings;

- Confidential Witness No. 3 ("CW3") is a former NexCen employee who worked in the accounts receivable department of NexCen Franchise Management, Inc. from December 2007 through July 2008. CW3 reported to the Chief Financial Officer of NexCen Franchise Management, Inc.;

- Confidential Witness No. 4 ("CW4") is a former NexCen employee who served as a senior financial analyst in the mergers and acquisitions field from July 2006 through August 2008. In that capacity, CW4 performed due diligence and financial analysis of proposed and consummated mergers or acquisitions. In December 2007, CW4 assumed additional treasury-related functions, including cash flow and credit facility analysis;

- Confidential Witness No. 5 ("CW5") is a former NexCen employee who worked in the accounts receivable department in Norcross,

Georgia, from February 2008 through May 2008.  In that capacity, CW5 reported directly to the Controller;

- Confidential Witness No. 6 ("CW6") is a former NexCen employee who served as a financial analyst at the Company from July 2007 through July 2008.  Among other responsibilities, CW6 assisted on the due diligence of a major brand acquisition by NexCen in January 2008;

- Confidential Witness No. 7 ("CW7") is a former NexCen employee who served as the Chief Financial Officer for NexCen Franchise Management, Inc. from June 2007 through May 2008.  In that capacity, CW7 reported directly to Defendant Meister.

## V.  <u>SUBSTANTIVE ALLEGATIONS</u>

### A.  <u>The Lure of the Multi-Million Dollar Earn-out Payment and NexCen's Quick Growth Strategy</u>

30.    Prior to June 2006, the Company's predecessor, Aether Holdings, Inc. ("Aether"), managed a portfolio of mortgage-backed securities through its wholly-owned subsidiary, Aether Systems, Inc.  Defendant Oros was the Chief Executive Officer of Aether Holdings, Inc.

31.    In June 2006, Aether acquired UCC Capital Corp. ("UCC"), which provided strategic advice and structured finance solutions to intellectual property centric companies, for in excess of $10 million.  Robert D'Loren, who was UCC's President and Chief Executive Officer, was named the new Chief Executive Officer of Aether.

32.    As part of the merger agreement between Aether and UCC (hereinafter "NexCen-UCC Merger Agreement"), D'Loren and UCC shareholders could receive an additional $10 million plus an additional 2.5 million shares of the Company.  This earn-out was contingent upon

the Company meeting certain performance measures, including average stock price and annualized Adjusted EBITDA.

33.     D'Loren, and entities owned or controlled by him, held in excess of 80% of the pre-merger UCC stock, and therefore were positioned to be the primary beneficiaries of any future earn-out payments.

34.     At the time of the merger, D'Loren stated that "Aether will transform from being an acquirer of firms to being a brand acquisitions firm and will use UCC as its captive finance and M&A adviser."

35.     In September 2006, Aether hired David Meister as its Chief Financial Officer.

36.     In October 2006, Aether changed its name to NexCen Brands, Inc., with its business now solely focused on brand acquisition. NexCen explained its focus in its 2007 Annual Report, stating that it is "continuously evaluating various other potential acquisitions and [is] actively exploring opportunities to acquire additional IP-centric businesses." Currently, NexCen owns and licenses seven franchised brands – The Athlete's Foot and Shoebox New York sell retail footwear and accessories; and Marble Slab Creamery, MaggieMoo's, Pretzel Time, Pretzelmaker, and Great American Cookies are considered Quick Service Restaurants. During portions of the Class Period, NexCen also acquired or owned Waverly and Bill Blass.

37.     The Company operated out of offices located in New York, New York, and Norcross, Georgia. While its headquarters and corporate office was in New York City, the Company's brands were relocated to Norcross, where it reportedly established a single hub for training, research, and development.

38.    Senior Company management, including Defendants D'Loren and Meister, met weekly in person and via videoconference.  According to CW7, who participated in these weekly upper management calls, financial reconciliation matters were discussed regularly.

39.    In November 2006, NexCen made its first major brand acquisition when it acquired Athlete's Foot Brands, LLC.  The purchase price consisted of approximately $42.1 million in cash and $9.2 million in the Company's common stock.  NexCen, and D'Loren in particular, had grand plans to transform the shoe company into a major international sports-lifestyle hub.

40.    As of year-end 2006, the Company reported in excess of $84 million in cash and cash equivalents, having sold all of its mortgage-backed securities investments for cash, with no reported debt.

41.    As of December 31, 2006, none of the performance targets set forth in the NexCen-UCC Merger Agreement had been met.

42.    In February 2007, the Company significantly expanded by acquiring Bill Blass Holding Co, Inc., MaggieMoo's International, LLC, and Marble Slab Creamery, Inc.  To finance these acquisitions, NexCen intended to borrow money secured by the newly-acquired brand assets.

43.    NexCen generally financed its acquisitions through cash on hand, debt, and equity.  The Company was rapidly burning through the balance sheet cash it had leftover from Aether's sale of its mortgage-backed securities assets.

44.    As for the debt portion of the brand acquisitions, on March 13, 2007, the Company announced in a press release that it had entered into a master loan agreement arranged by BTMU that allowed for borrowings up to $150 million. The Company announced that it

would initially receive a loan of $26.5 million under this Credit Facility, leveraged by The Athlete's Foot assets.  The Company also announced, "Each draw under the agreement will have a five-year term."  With regard to the Credit Facility, Defendant D'Loren painted a rosy picture of the Company's financial status, saying, "With this loan facility, BTMU Capital Corporation is enabling our company to move quickly with flexibility in our activities. . . . This new facility will enhance the way we operate and position us well for 2007."

45.     In a conference call on March 14, 2007, Defendant D'Loren elaborated on the rosy picture of the Company's financial status, indicating that difficult economic conditions did not affect NexCen's finances:

> While the current market environment is extremely difficult and requires caution, we expect to continue to have access to capital.  We are exploring a number of options to convert our BTMU credit facility into a long-term fixed-rate security.  Our management team is highly experienced in structuring and placing securities of this nature in both good and difficult climates, similar in many ways to the current environment.

46.     On March 16, 2007, NexCen filed its Form 10-K for the fiscal year ended December 31, 2006.  In that Form 10-K, the Company described its business model as one that requires few financial resources to operate:

> We operate our IP business in what we call a "value net" business model. This model does not require us to incur substantial operating or capital costs in running our business, as we do not (and do not plan to) manufacture, warehouse or distribute the branded products associated with the IP we acquire (or build stores in the case of franchise operations). . . .  ***We believe that this business model mitigates -- or transfers to third parties -- the risks related to working capital*** (i.e. inventory and receivables) and capital expenditures. ***We believe that this model allows us to maintain maximum operational and financial flexibility and positions us to succeed in today's competitive global economy.***  (emphasis added).

47.    The Form 10-K further stated that this business model allowed the Company to continue to expand:

> Since June 2006, we have acquired four IP-centric companies.  We have also been (and expect to continue to be) in active discussions with other potential acquisition candidates.  Our objective is to acquire 3 to 5 businesses or significant groups of IP assets per year, with transaction sized generally in excess of $50 million total enterprise value.  (emphasis added).

48.    The Company continued in the 2006 Form 10-K to represent that it had sufficient cash flow to execute its business plan, stating, "We believe that the combination of cash on hand and available borrowings under this new credit facility will provide us with sufficient liquidity to meet current operations and planned business growth for at least the next twelve months."

49.    The 2006 Form 10-K stated, "We have established disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors."

50.    The Individual Defendants all signed the 2006 Form 10-K.

51.    In the 2006 Form 10-K, Defendants D'Loren and Meister signed a report on internal control over financial reporting in which they stated, "[W]e concluded that the Company's internal control over financial reporting was effective as of December 31, 2006."

52.    Defendants D'Loren and Meister also signed Sarbanes-Oxley certifications included with the 2006 Form 10-K stating:

> 1.    I have reviewed this report on Form 10-K of NexCen Brands, Inc.;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to

state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and we have:

     (a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     (b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     (c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     (d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent

fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

53.    On March 21, 2007, the Company issued revenue guidance for the full year 2007 of between $38 and $42 million and EPS guidance of $0.12 to $0.14 per fully diluted share.

54.    As of March 31, 2007, none of the performance targets set forth in the NexCen-UCC Merger Agreement had been met.

55.    In merely three months, from November 2006 through February 2007, NexCen had gone from owning no major brand assets to owning four large international franchise operations: The Athlete's Foot, Bill Blass, Maggie Moo's, and Marble Slab Creamery.

56.    It was becoming clear to persons within the Company that its management was unable to handle the new businesses. According to CW1 and CW2, NexCen executives, including Defendants D'Loren and Meister, did not understand the franchise business.

Furthermore, according to CW7, the Company "acquired too much, too soon, to get everything integrated."

57.    In May 2007 the Company continued to expand by acquiring the home furnishings brand Waverly.

58.    On May 10, 2007, NexCen filed a Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2007.  The Company reported cash and cash equivalent assets of $37.9 million – less than half the amount it had at year-end 2006 – and long-term debt of $25.5 million.  In its Form 10-Q, the Company continued to represent that its finances were sufficiently stable to support its business plan:

> Although we had $83 million of cash on hand at December 31, 2006, we concluded that securing an additional source of liquidity was important to ensure our continued ability to fund acquisitions and the expansion of our business. Accordingly, on March 12, 2007 we entered into a new $150 million bank credit facility . . . ***We believe that the combination of cash on hand and available borrowings under this new credit facility will provide us with sufficient liquidity to meet current operations and planned business growth for at least the next twelve months.***  (emphasis added).

59.    The May 10, 2007 Form 10-Q also stated, "We have established disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors."

60.    Defendant Meister signed the Form 10-Q filed on May 10, 2007.

61.    Defendants D'Loren and Meister certified the financial information presented in the Quarterly Report and the accuracy of the Company's reported financial results and efficacy

of the Company's internal controls as required by Sarbanes-Oxley, as set forth in ¶ 52, above, and incorporated by reference, herein.

62.    In a press release issued on May 10, 2007 accompanying the Form 10-Q, Defendant D'Loren reiterated the Company's expansion plans, stating, "We remain focused on executing our business plan of leveraging our brands across our three operating verticals to generate organic and synergistic growth and plan to continue on our course of acquiring from 3 to 5 companies per year."

63.    In that press release, the Company also reaffirmed its revenue guidance for the full year of 2007 of between $38 and $42 million and EPS guidance of $0.12 to $0.14 per fully diluted share.

64.    In a conference call on May 11, 2007, Defendant D'Loren again repeated the Company's expansion plan, stating, "We will continue to leverage our existing outstanding NexCen team with M&A professionals to make further acquisitions in the future that provides strategic growth opportunities for NexCen and plans to stay on course making 3 to 5 acquisitions per year."

65.    Spending and expansion continued to outpace revenue.  The Company hired public relations firms for its brands, made deals with celebrity endorsers, and even sponsored a Global Franchise Convention for The Athlete's Foot, held at the Venetian Casino and Hotel in Las Vegas in June 2007.

66.    On August 6, 2007, the Company issued a press release announcing that it borrowed $22 million from its existing $150 million credit facility to finance the purchase of the intellectual property (IP) assets of Waverly.  The press release continued to portray the Company as having sufficient financial resources to support its business model, stating:

> Robert W. D'Loren, President and CEO of NexCen, commented, "With an established financing platform firmly in place, NexCen can successfully complete transactions that could otherwise be more difficult to conclude. We are confident that this facility will continue to give us the ability to grow and execute our business plan." (emphasis added).

67.     The Company continued to expand, and on August 7, 2007 it purchased the intellectual property assets of Pretzel Time Franchising, LLC ("Pretzel Time") and Pretzelmaker Franchising, LLC ("Pretzelmaker").

68.     On August 9, 2007, the Company filed a Form 10-Q for the three months ended June 30, 2007.  In that Form 10-Q, the Company stated, "We have established disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors."

69.     Defendant Meister signed the Form 10-Q filed on August 9, 2007.

70.     Defendants D'Loren and Meister certified the financial information presented in the Form 10-Q and the accuracy of the Company's reported financial results and efficacy of the Company's internal controls as required by Sarbanes-Oxley, as set forth in ¶ 52, above, and incorporated by reference, herein.

71.     Significantly, NexCen's stock price, having eclipsed $10 per share for the first time on February 15, 2007, averaged over that benchmark figure between April 4 and July 23, 2007.  Accordingly, and as reported by the Company in its Form 10-Q, all of the stock trading price thresholds for payment of the contingent consideration set forth in the NexCen-UCC Merger Agreement were satisfied.  The entire amount of the contingent consideration as part of the NexCen-UCC merger would be earned and become payable upon the NexCen Board's

approval of the Company's Adjusted EBITDA calculation, which had to be at least $2.5 million in a quarter.  NexCen reported that its Adjusted EBITDA for the quarter ending June 30, 2007 was in excess of $2.6 million.

72.    On August 10, 2007, the Company issued a press release related to its Form 10-Q filed on August 9, 2007.  In that press release, the Company publicly presented for the first time EBITDA, a measure that it not meant to conform to Generally Accepted Accounting Principles (GAAP).  The Company explained that EBITDA provides "a measure to demonstrate cash flow available for the payment of debt service."

73.    On the contrary, EBITDA is a measure of profits that ignores certain expenses that must be paid for a company to remain in business, such as taxes, interest, changes in working capital, and capital expenditures.  Because of the exclusion of these items, EBITDA is a misleading indicator of the Company's cash flow.

74.    In fact, in a series of SEC comment letters culminating on August 18, 2008, the SEC required the Company to cease its EBITDA disclosures relating to the demonstration of "cash flow available from continuing operations for the payment of debt service."  The SEC noted that it was *inappropriate* to disclose that NexCen's non-GAAP measures are measures of debt service capacity.

75.    On August 10, 2007, the Company conducted a conference call related to its Form 10-Q filed on August 9, 2007.  In that call, Defendant Meister presented the Company as having sufficient access to cash to continue expanding as planned, despite worsening economic conditions:

> Our existing $150 million line of credit with BTMU is a LIBOR-based line that is not subject to credit spread risk. We believe that the line will enable us to execute our current acquisition plan in addition to having access to this

> existing credit facility, we are highly confident that our
> proven capital markets expertise in the highly specialized
> area of IP asset backed securities in both favorable and
> unfavorable economic climates and our proven track record
> structure transparent investment grade rated transactions
> will enable us to finance and continue to grow our business
> through future acquisitions.  (emphasis added).
>
> NexCen expects to continue to leverage our M&A
> professionals to make additional acquisitions and we expect
> to remain on course to make 3-5 acquisitions per year.
> (emphasis added).

76.     Remarkably, in that same conference call, Defendant D'Loren reassured investors

that the tightening credit markets would actually help NexCen:

> I think that quite frankly the more difficult things become
> in the credit markets.  I think the more opportunity there
> will be out there for us. . . . So I think if the credit markets
> tighten up a bit, it would be a good thing for us given the
> expertise that our team has.  (emphasis added).

77.     On September 5, 2007, NexCen's Board of Directors determined that based on the

Company's stock performance and adjusted annualized earnings calculations, that all

performance targets in the NexCen-UCC Merger Agreement had been satisfied.  As a result, in

September 2007, former UCC shareholders, most notably including Defendant D'Loren,

received the contingent consideration of 2.5 million shares of NexCen common stock valued at

$6.87 per share and $10 million in cash, totaling approximately $27.2 million.

78.     On September 7, 2007, the Company issued a press release announcing that it

borrowed an additional $16 million from its existing $150 million debt financing to facilitate the

acquisition of IP assets of Pretzel Time and Pretzelmaker and reiterating the sufficiency of its

access to capital:

> Robert W. D'Loren, President and CEO of NexCen,
> commented, "With an established financing platform firmly
> in place, NexCen can successfully complete transactions

> that would otherwise be more difficult to conclude. We are
> confident that this facility will continue to give us the
> ability to grow and execute our business plan." (emphasis
> added).

79.     On November 8, 2007, the Company issued a press release announcing its results

for Third Quarter 2007 ended September 30, 2007.  The announcement continued to paint a rosy

picture of the Company's financial status and its access to cash from the Credit Facility:

> As of September 30, 2007, NexCen had cash and cash
> equivalents of $29.4 million, total assets of $337.7 million,
> debt of $91.3 million and stockholders' equity of $194.0
> million. Debt was 32% of total capital (22% based on
> current market capitalization). On November 7, 2007,
> NexCen borrowed an additional $19.0 million under its
> existing credit facility. The additional borrowing is secured
> by the assets of MaggieMoo's and Marble Slab and
> increased cash and debt to approximately $50 million and
> $110 million, respectively.  (emphasis added).

80.     The November 8, 2007 press release also reported EBITDA for the quarter ended

September 30, 2007 of $3,929,000 and repeated its explanation, false as it was, that EBITDA

provides a "measure to demonstrate cash flow available from continuing operations for the

payment of debt service."

81.     In a conference call on November 8, 2007, discussing results for the quarter ended

September 30, 2007, Defendant Meister represented the Company as having access to cash

resources and discussing a $19 million draw on the Credit Facility made that day:

> [W]e borrowed $91.8 million during the nine months,
> secured by the assets of The Athlete's Foot, Bill Blass,
> Waverly and the Pretzel brands under our credit facility
> with Bank of Tokyo. . . . After today's borrowing of 19
> million, we currently have approximately 40 million of
> available capacity under our credit facility and
> approximately 50 million of cash on hand.  We will term
> out of the BTMU facility when we reach 150 million of
> outstanding debt.  (emphasis added).

82.    During that conference call, Jim Chartier of Monness, Crespi, Hardt, & Co., Inc.,

asked a question about the $19 million draw, and the following exchange ensued between him,

Defendant Meister, and James Haran ("Haran"), the Company's Executive Vice President, M&A

and Operations at the time:

> Chartier:    Okay.  And then I noticed that you drew – I guess is there any reason that you would draw down on your line of credit today?  Is there anything that you need that $19 million for other than an acquisition?
>
> Haran:    ***We don't need it immediately.***  But as you know, we do leverage our brands, our assets and it was just in the normal course of leveraging the ice creams.  (emphasis added).
>
> Chartier:    But if you're going to pay a 6 or 7.5% interest rate, and then only be able to earn maybe 3% on the cash on the balance sheet, why do it today?
>
> Meister:    But we earn about 5%, Jim, first of all, on our excess cash.  So differential is a little smaller.  And it's just –
>
> Haran:    Jim, strategically, we would not draw down on our lines unless we thought we had a use for the cash.  (emphasis added).

83.    In a Form 10-Q filed on November 9, 2007 for the period ending September 30,

2007, the Company again represented that it had sufficient access to capital to sustain its

operations:

> Although we had more than $83 million of cash on hand at December 31, 2006, we concluded that securing an additional source of liquidity was important to ensure our continued ability to fund acquisitions and the expansion of our business. Accordingly, on March 12, 2007 we entered into a new $150 million bank credit facility . . . We believe that the combination of cash on hand and available borrowings under this new credit facility will provide us with sufficient liquidity to meet current operations and planned business growth for at least the next twelve months. (emphasis added).

84. In that Form 10-Q, the Company stated, "We have established disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors."

85. Defendant Meister signed the Form 10-Q filed on November 9, 2007.

86. Defendants D'Loren and Meister certified the financial information presented in the Form 10-Q and the accuracy of the Company's reported financial results and efficacy of the Company's internal controls as required by Sarbanes-Oxley, as set forth in ¶ 52, above, and incorporated by reference, herein.

87. As reported in an article about NexCen in the Wall Street Journal on November 28, 2007, Defendant D'Loren insisted that NexCen's financing of its acquisitions was immune to the credit markets because they are backed by NexCen's fixed and predictable inflow of fees.

88. As discussed below, the credit market would play a significant role in NexCen's downfall, and D'Loren and others at the Company in actuality had little handle on the franchise fees the Company heavily relied upon for its revenue stream.

**B.    While the Company Publicly Touts its Financial Position, Internal Cash Shortages Threaten its Viability**

89. In spite of the Defendants' public statements concerning the financial health of the Company and its adequate cashflow, internally employees were reporting disturbing trends.

90. According to CW3, NexCen Franchise Management, Inc.'s Chief Financial Officer was so concerned about the Company's cashflow situation in December 2007 that he was fearful that the Company would not be able to meet its monthly payroll obligations. The Company, CW3 stated, was "dying for cash" at the end of 2007. CW1 also confirmed that

NexCen executives, including Defendants D'Loren and Meister, knew by December 2007 that the Company "did not have enough income generation to make payroll."

91.    Part of the cashflow problem was attributable to NexCen's poor financial recordkeeping.  In some cases, managers with responsibility for particular brand assets could not identify how many franchised stores the Company owned, and from whom fees were to be collected.  For example, NexCen Franchise Management Inc.'s CFO told CW3 that "[w]e've owned Marble Slab for a year and I don't know how many restaurants we have."  CW5 confirmed that in the year following NexCen's acquisition of Marble Slab Creamery, Company accountants were "finding stores that were not on [the Company's] ledger."

92.    This problem was exacerbated when NexCen announced revenue projections based upon faulty recordkeeping and internal revenue collection deficiencies.

93.    CW3 determined that NexCen had failed to collect over $13 million in franchise fees just relating to Marble Slab Creamery and Maggie Moo's stores.  Senior Company management was made aware of these discrepancies in late 2007 during their weekly management conference calls, according to both CW1 and CW2.

94.    CW1 stated that NexCen did not have accurate cash flow reporting and had "no handle on any of its brands."

95.    Franchises for all of NexCen brands were even withholding significant payments of franchise fees because they claimed that the Company was failing to support the franchisees.

96.    According to CW7, there were problems with the timeliness and accuracy of the reconciliation of franchise fees.  For example, CW7 estimated that approximately 30% of the Marble Slab and Athlete's Foot franchisees were delinquent on paying the Company franchise fees.

97.    In fact, NexCen's annual operating income attributable to its flagship acquisition, The Athlete's Foot, declined nearly 50% from 2006 to 2007, from $4.5 million to $2.4 million. In the fourth quarter of 2007, The Athlete's Foot only accounted for a paltry $110,000 of the Company's operating income.

98.    These revenue recordkeeping and collection problems coincided with enormous increases in NexCen's operating expenses.  As a result of the Company's acquisition shopping spree in 2007, its number of employees increased that year from 36 to 107.

99.    As a result, NexCen's operating expenses grew from $10.4 million in 2006 to $32.6 million in 2007, a 213% increase.  This increase was primarily due to a nearly $20 million increase in the Company's Selling, General & Administrative expenses, which reflected the impact of the prior year's acquisitions.

100.    CW7 told CW3 "to collect every dollar you can.  Work as many hours as you can and collect as much as you can."

101.    In October or November 2007, CW7 also approached Defendant Meister about the need to improve the Company's accounting system and to hire more knowledgeable staff. While CW7 repeatedly told Defendant Meister that the situation was not adequate, Defendant Meister refused to authorize any changes.

102.    In December 2007, Defendant D'Loren told Company employees, including CW1, that D'Loren would thereafter be the only person to disclose matters regarding NexCen's cashflow to the Company's Board of Directors.

103.    While in the throes of severe cash shortage – unreported to the investing public – and while experiencing significant difficulties in managing its portfolio of brands, NexCen decided to continue its acquisition spree.

C.     **NexCen Amends its Credit Facility to Make Largest Acquisition Yet**

104.     On January 29, 2008, the Company acquired substantially all of the assets of Great American Cookie Company Franchising, LLC ("GAC") in a transaction valued at over $93 million. The purchase price made this acquisition the largest in the Company's history.

105.     Because the cash payment associated with the GAC acquisition significantly exceeded the cash and cash equivalents then reported by NexCen, the Company had to seek capital elsewhere. On January 29, 2008, the Company amended its Credit Facility with BTMU and immediately drew down millions to finance the GAC deal. The amendment was signed by Defendant Meister. According to CW6, Defendants D'Loren and Meister were each involved in negotiating the terms of the Amended Credit Facility.

106.     That same day, the Company issued a press release pertaining to the Company's acquisition of Great American Cookie Company, and it also announced its agreement to the Amended Credit Facility:

> NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has acquired the Great American Cookie Company ("Great American Cookies") from Mrs. Fields Famous Brands, LLC ("Mrs. Fields"). The purchase price of the transaction is $93.7 million, and consists of approximately $89.0 million of cash and NexCen common stock valued at approximately $4.7 million.
>
> ***For a portion of the purchase price, NexCen accessed its debt facility with BTMU Capital Corporation, which was increased from $150 million to $181 million.***

107.     The corresponding Form 8-K filed with the SEC on January 29, 2008 provided additional detail about amendment to the Credit Facility. The Form 8-K stated in relevant part:

> The amendment (the "Amendment") to the Original Loan Documentation and related documents *increases the maximum amount of borrowing that may be outstanding thereunder at any one time from $150 million to $181 million and modifies as a consequence of the Company's acquisition*

> *of real estate assets, certain defined terms used in the Original Loan Documentation and related documents.* **With the exception of these changes, the Amendment contains substantially the same terms as the Original Loan Documentation**. (emphasis added).

108.    The January 29, 2008 Form 8-K referred readers to the attached Exhibit 10.4 for further details on the amendment to the Credit Facility.  However, the "Omnibus Amendment" attached as Exhibit 10.4 included only a portion of the amended terms, and failed to disclose additional amended material terms, as detailed below.  The additional material terms were contained in a "Security Supplement Agreement" that was not filed by the Company until May 19, 2008 as an Exhibit to a Form 8-K.

109.    On January 30, 2008, the Company conducted a conference call relating to the January 28, 2008 announcement.  During that call, Defendant D'Loren continued to reassure investors that the tightening credit markets would not affect NexCen:

> We would also like to reassure investors that ***in spite of the turmoil, which continues to affect the credit market, we have been able to finance acquisitions under favorable terms***.  Also, if you will recall, that our debt is secured by our brands and their related cash flow, and we have an outstanding banker in BTMU Capital Corporation.
>
> The Great American Cookies transaction was funded with 75% debt, our total debt is now approximately $180 million and our LIBOR-based interest rate is less than 6.5%.  ***We do not anticipate that we will experience any problems accessing capital for future acquisitions.***    (emphasis added).

110.    When specifically asked what the terms of the amended credit facility were during the conference call, Defendant D'Loren responded:

> It's – ***the terms are the same***, you know with LIBOR dropping . . . it's a very favorable environment for us.  ***It's a five-year facility*** and BTMU has been just outstanding in meeting our needs.  (emphasis added).

111.    During the conference call, D'Loren also addressed the Company's business plan, stating, "We're on plan.  The plan for NexCen has been three to five acquisitions per year."

112.    On March 14, 2008, NexCen announced its results for fiscal 2007 in a press release.  The press release reiterated the Company's continued access to capital despite the tightening credit market:

> **Our objective is to acquire from three to five brands per year in 2008 and 2009**.  Our acquisitions are financed with a combination of debt, cash on hand, and stock. We currently have borrowed the full amount under our $180 million credit facility with BTMU Capital Corporation. We are exploring opportunities to convert this credit facility into a long-term, fixed-rate security. Our management team has a successful track record of underwriting and placing securities of this nature in various economic environments. Therefore, we expect to continue to have access to capital. (emphasis added).

113.    On March 14, 2008, NexCen held a conference call discussing its results for fiscal 2007.  During that call, D'Loren spoke of the Company's ability to finance acquisitions even in difficult financial times, stating:

> *While the current market environment is extremely difficult and requires caution, we expect to continue to have access to capital*.  We are exploring a number of options to convert our BTMU credit facility into a long-term fixed rate security. *Our management team is highly experienced in structuring and placing securities of this nature in both good and difficult climates*, similar in many ways to the current environment.  If this long-term financing is completed, the plan is to bring our BTMU credit facility down to zero and have it available for future acquisitions as well as identifying additional lines of credit to support future growth through acquisitions.  (emphasis added).

114.    On March 14, 2008, the Company also issued a press release related to its financial results for fiscal 2007.  The press release reported Adjusted EBITDA for the three

months ended December 31, 2007 of $2,605,000 and for the twelve months ended December 31, 2007 of $8,800,000.  The press release explained, falsely, that EBITDA provides a "measure to demonstrate cash flow available from continuing operations for the payment of debt service."

115.    On March 21, 2008, the Company filed its annual report for fiscal 2007 on Form 10-K with the SEC.  In that Form 10-K, the Company continued to describe its business model as one that requires few financial resources to operate:

> We operate our brand management and franchising business in what we call a "value net" business model. ***This model does not require us to incur substantial operating or capital costs in running our business***, as we generally do not manufacture, warehouse or distribute the branded products associated with the IP we acquire or build stores in the case of franchise operations. . . . ***We also believe that this model allows us to maintain maximum operational and financial flexibility and positions us to succeed in today's competitive global economy.***  (emphasis added).

116.    The Form 10-K further represented that this business model allowed the Company to continue to expand:

> Since June 2006, we have acquired and integrated nine IP-centric companies, fulfilling our stated objective of acquiring 3 to 5 businesses or significant IP assets per year. ***We have also been (and expect to continue to be) in active discussions with other potential acquisition candidates. We intend to maintain our objective of 3 to 5 acquisitions per year in 2008 and 2009, with transaction sizes generally in excess of $50 million total enterprise value.*** (emphasis added).

117.    In that same Form 10-K, the Company repeated its depiction of the Company's finances as stable, with sufficient access to capital:

> As of December 31, 2007, we had available cash on hand of approximately $46 million. We used approximately $22 million of this balance in connection with the acquisition of Great American Cookies in January 2008. We were able to increase our BTMU Credit Facility to $181 million (as

discussed below) to finance the remainder of the acquisition costs. *We anticipate that cash on hand and cash generated from operations will provide us with sufficient liquidity to meet the expenses of operations, including our debt service obligations, for at least the next twelve months.* As discussed below, additional sources of capital will be needed to fund additional acquisitions, even taking into account anticipated cash flows from operations. (emphasis added).

118.    The Form 10-K also discussed the Credit Facility, stating in relevant part:

On March 12, 2007, we entered into a $150 million master loan agreement with BTMU Capital Corporation ("BTMU"). In connection with the financing of our acquisition of Great American Cookies *on January 29, 2008, we increased the maximum amount of borrowing that may be outstanding at any one time from $150 million to $181 million and modified certain defined terms used in the original loan documentation and related documents to take into account the Company's acquisition of real estate assets in the Great American Cookies transaction. With the exception of these changes, the increase to the BTMU Credit Facility is substantially on the same terms as the original credit facility.*  (emphasis added).

*             *             *

*Each note is repayable in full after five years.* Substantially all revenues earned by the company are remitted to "lockbox accounts" that have been established in connection with the agreement . . . The borrowing rate is LIBOR plus an interest rate margin, which ranges from 1.50% to 3.00%. *However, a portion of the notes relating to Great American Cookies for $35 million is priced at LIBOR plus 3.50%.*  (emphasis added).

*             *             *

In January 2008, the Company amended its existing bank credit facility, originally entered into on March 12, 2007 pursuant to a security agreement and a note funding agreement with BTMU Capital Corporation. *The amendment to the Original Loan Documentation and related documents increases the maximum amount of borrowing that may be outstanding thereunder at any one*

> time from $150 million to $181 million and modifies as a consequence of the Company's acquisition of real estate assets, certain defined terms used in the Original Loan Documentation and related documents. **With the exception of these changes, the Amendment contains substantially the same terms as the Original Loan Documentation.** (emphasis added).

119.    The Company also represented in the Form 10-K that it had continued access to capital:

> As of March 14, 2008, **we had approximately $19 million of cash on hand (excluding restricted cash)** after borrowing $181 million under the BTMU Credit Facility, which we entered into on March 12, 2007 and which was amended on January 29, 2008 to increase the maximum amount of borrowings that may be outstanding thereunder at any one time from $150 million to $181 million. (emphasis added).

120.    The 2007 Annual Report stated, "We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in reports that we file or submit under the Securities Exchange Act of 1934 (the 'Exchange Act') is recorded, processed, summarized, and reported within the specified time periods and that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate."

121.    The Individual Defendants all signed the 2007 Form 10-K.

122.    Defendants D'Loren and Meister certified the financial information presented in the Form 10-K and the accuracy of the Company's reported financial results and efficacy of the Company's internal controls as required by Sarbanes-Oxley, as set forth in ¶ 52, above, and incorporated by reference, herein.

123.    On March 21, 2008, the Company suddenly replaced Defendant Meister as CFO, appointing Kenneth Hall in his place.

124.    In late March and early April 2007, D'Loren spent approximately two weeks in NexCen's Norcross office.  CW1 and others worked overtime reviewing prior Company earnings statements, as it was clear that the fees actually collected from franchisees did not match the revenues in the Company's reported financial filings.

### D.    The House of Cards Falls – NexCen Admits it Cannot Make Previously-Undisclosed Payments on its Amended Credit Facility

125.    On the morning of May 19, 2008, before the market opened, the Company issued a press release *admitting* that the Company failed to disclose in its January 29, 2008 Form 8-K and 2007 Form 10-K the Accelerated Redemption Feature in the Amended Credit Facility, as well as other changes that reduced the amount of cash available to the Company for general use. The press release states in relevant part:

> NexCen's bank credit facility with BTMU Capital Corporation was amended in January 2008 at the time of the acquisition of the Great American Cookie business. The amendments allowed NexCen to borrow an additional $70 million to finance a portion of the acquisition purchase price and included an accelerated-redemption feature applicable to $35 million of the $70 million. ***Specifically, the amendments require that the $35 million be reduced to $5 million by October 17, 2008. The company concluded that disclosures regarding the accelerated-redemption feature of its bank credit facility, as well as other changes that reduced the amount of cash available to the company for general use, were not contained in the company's 2007 Annual Report on Form 10-K or the January 29, 2008 Current Report on Form 8-K filed*** in connection with the acquisition of Great American Cookies.

126.    In the same press release, the Company also revealed that it had doubts about its ability to continue as a going concern, stating:

> Based on information that is now known, ***the company believes that there is substantial doubt about its ability to continue as a going concern***, and pending completion of an independent review discussed below, that ***this***

> *substantial doubt also may have existed at the time the*
> *company filed its 2007 10-K.*

127.    Finally, the press release revealed that NexCen would need to restate its financial results for 2007:

> The company has concluded that ***its 2007 financial***
> ***statements should no longer be relied upon*** and no
> reliance should be placed upon KPMG's audit report dated
> March 20, 2008, or its report dated March 20, 2008 on the
> effectiveness of internal control over financial reporting as
> of December 31, 2007, as contained in the company's 2007
> 10-K.  (emphasis added)

128.    A Form 8-K filed with the SEC on May 19, 2008, revealed additional previously undisclosed information concerning the amendments to the Credit Facility, including:

> (a)    the Company would face a cash shortfall of $7-10 million *before* the
> accelerated redemption feature was taken into account;

> (b)    distributions to the Company from revenue placed in lockbox
> accounts, which had previously taken priority over payments to
> BTMU, would be subordinated to payments to BTMU to pay
> accrued but previously unpaid interest as well as required principal
> amortization payments;

> (c)    all funds remaining in the lockbox accounts after distributions to the
> Company would be applied to the $35 million subject to the
> accelerated redemption feature;

> (d)    the principal amount outstanding on March 31, 2008 that was subject
> to the accelerated redemption feature was approximately $33
> million; and

> (e)    an estimated principal payment of $21 million would be necessary to
> reduce the $35 million to $5 million on October 17, 2008.

129.    Defendants *admitted* that material amendments to the Credit Facility had not been disclosed on several instances, including in a conference call on May 19, 2008, when Defendant D'Loren stated that "In light of first quarter 2008 performance and revised preliminary cash flow forecasts prepared earlier this month under the direction of our new CFO, we focused attention

on the terms of the amendments to our bank credit facility.  ***These had not been discussed in our prior public filings.***"  (emphasis added).

130.    In that same conference call, Defendant D'Loren continued to explain the previously undisclosed amendments and their devastating impact on the Company:

> Specifically, these terms included various changes to the priority of cash distributions from lockbox accounts established in connection with the bank credit facility.  The terms also included an accelerated-redemption feature applicable to 35 million of the 70 million that was borrowed in January 2008 in connection with the Cookie acquisition.
>
> The January 2008 amendments subordinated a portion of these distributions to the payment of certain amounts to the bank lenders.  These included accrued but unpaid interest and required principal amortization payments under the bank credit facility.  The amendments also provided that after payment of the subordinated amounts to the company, all remaining collected cash from our franchise businesses and the factory that was not needed to operate those businesses would be applied to reduce the principle of the 35 million accelerated-redemption feature.
>
> These changes to the cash distribution priorities in the bank credit facility were intended to provide the lenders with greater assurance of receiving regular interest and principal amortization payments and to accelerate prepayment of the factory noted.  Of course, ***they have the additional effect of substantially reducing the amount of operating cash flow from the company's franchise businesses***.  As a result, ***the company faces a near-term operating cash shortfall***.  Further under this accelerated-redemption feature, we estimate a principal repayment of approximately 21 million will need to be made in October 2008 to reduce the loan to a $5 million balance.  (emphasis added).

131.    Defendants also *admitted* that their financial statements for 2007 were false and misleading on several instances, including in the following statements in a conference call on May 19, 2008, made by D'Loren:

> However, at this time *we have concluded that the audited financial statements for 2007 that were in the 10-K should no longer be relied upon*.
>
> At this time, we expect that the changes may include . . . a footnote relating to going concern considerations, and updates relating to the company's liquidity and financial condition. (emphasis added).

132.    The May 19, 2008 announcement caused the Company's stock to fall $1.95 per share on May 19, 2008, or 77% from its closing price of $2.53 per share the previous trading day, on heavy volume.

### E.    Company is Forced to Drastically Cut Workforce, Re-Negotiate its Credit Facility, and Issue a Restatement for Fiscal Year 2007 Financials

133.    With its precarious liquidity problem now known to investors and its stock price in free fall, the Company began to reverse its growth trends.

134.    In May 2008, the Company began terminating several high ranking executives, including Joseph DiMura, Executive Vice President, Chief Marketing Officer, who was terminated on May 23, 2008, and Charles A. Zona, Executive Vice President, Brand Management and Licensing, who was terminated on May 30, 2008.

135.    On May 30, 2008, the Company issued a press release announcing that it was exploring strategic alternatives, including the possible sale of one or more of its businesses.

136.    In that same press release, the Company also announced a drastic 25% reduction of its New York-based workforce.

137.    The Company later reduced its Norcross, Georgia-based staff by approximately 8%.

138.    On August 15, 2008, Defendant D'Loren resigned, effective that day, from his positions as President and Chief Executive Officer of NexCen.

139. Beginning in August 2008, several Directors left the Company's Board, including Jack Rovner, who resigned on August 29, 200; Jack B. Dunn IV, who resigned on September 25, 2008; and Marvin Traub, who resigned on December 4, 2008.

140. On August 18, 2008, Defendants again *admitted* that material amendments to the credit facility were undisclosed prior to May 19, 2008, in a Form 8-K filed with the SEC:

> Certain members of the Company's senior management (i) failed to advise the board of directors of material changes in the terms of the financing the Great American Cookies acquisition after the board had approved terms previously presented to it and (ii) ***made serious errors with respect to public disclosures regarding the terms of the financing and their impact on the Company's financial condition*** that were contained in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on January 29, 2008 and in the Company's Annual Report on Form 10-K for the year ended December 31, 2007, as originally filed with the Securities and Exchange Commission on March 21, 2008. (emphasis added).

## F.    SEC Action

141. On August 4, 2008, the SEC sent a letter to NexCen addressing several of its concerns with the Company's financial reporting. Among those concerns was the Company's presentation of EBITDA in press releases and accompanying representation that EBITDA demonstrated a measure of the Company's cash flow available to service debt. In this letter, the SEC informed NexCen that it "does not appear appropriate to disclose that your non-GAAP measures are measures of debt service capacity," and ordered the Company to cease using EBITDA as an indication of cash flow available to service debt.

142. On March 17, 2009, the Company learned that the SEC had begun a formal investigation on October 21, 2008.

143.    As a result of the Company's failure to comply with its listing requirements, NASDAQ suspended trading of NexCen common stock on January 13, 2009, and delisted the Company on February 13, 2009.

### G.    Modification of the Credit Facility

144.    On August 15, 2008, NexCen restructured its Amended Credit Facility, replacing all prior agreements and revising the terms of the obligations on the remaining debt, which totaled $175.5 million at that time.  Key features of the amendment included:

     (a)    elimination of the October, 2008 balloon payment;

     (b)    elimination of mandatory principal payments for the remainder of 2008;

     (c)    interest rate incentives for the Company to sell the Bill Blass and Waverly brands; and

     (d)    breaking down the remaining debt into three tranches with maturation dates in 2009, 2011, and 2013.

145.    When it announced these changes to the Amended Credit Facility, NexCen also reported, "No additional borrowings are permitted and the facility remains secured by substantially all of the assets of the borrower subsidiaries."

146.    On October 6, 2008, NexCen announced that it had completed the sale of Waverly, and used the proceeds to pay off all outstanding Waverly debt and make a prepayment of $2.6 million of debt associated with Bill Blass.

147.    On December 24, 2008, NexCen completed the sale of Bill Blass.  The proceeds of the sale were insufficient to pay down the Bill Blass Brand Note, and a Deficiency Note was entered for the remaining balance of $14.3 million.  The Amended Credit Facility was amended to, *inter alia*, extend the maturity date from January 1, 2010 to July 31, 2013 and defer scheduled principal payments until the maturity date.

148.    On January 27 2009, the Company obtained an additional modification to the Amended Credit Facility which reduced the fixed interest rate applicable to a portion of the Company's debt.

149.    On July 15, 2009, the Company once again obtained a modification to the Amended Credit Facility, which, *inter alia*, increased certain operating expenditure limits, reduced debt service coverage ratio requirements, reduced free cash flow margin requirements, extended the time period to provide valuation repots, and waived certain potential defaults.

## H.    Restatement of 2007 Financial Results

150.    Defendants also admitted that their financial statements for 2007 were false and misleading, by way of filing restated financial results for 2007 included in a Form 10-K/A with the SEC on August 11, 2009[1] ("the Restatement").  Therein, Defendants admitted that they failed to include adequate disclosures regarding certain features of the January 2008 amendment of its Credit Facility, in relevant part:

> The Audit Committee directed independent counsel to review the events and circumstances surrounding the January 2008 Amendment to the Original BTMUCC Credit Facility and the public disclosures regarding that amendment. . . . the Audit Committee reached the following key conclusions:
>
> • Certain members of the Company's senior management (i) failed to advise the Board of Directors of material changes in the terms of the financing of the Great American Cookies acquisition after the Board of Directors had approved terms previously presented to it and (ii)

---

[1]    NexCen previously filed a Form 10-K/A Amendment No.1 with the SEC on April 29, 2008 "solely to include the information required by Part III of Form 10-K pursuant to General Instruction G(3) of Form 10-K because the Company's definitive proxy statement for its 2008 annual meeting [would] be filed more than 120 days after the end of the Company's fiscal year." Additionally, the Form 10-K/A Amendment No. 1 also included certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. References to NexCen's "Form 10-K/A" included throughout this Complaint refer specifically to Amendment No. 2, as filed on August 11, 2009.

*made serious errors with respect to public disclosures regarding the terms of the financing and their impact on the Company's financial condition* that were contained in the Company's Current Report on Form 8-K filed with the SEC on January 29, 2008 and in the Company's Original 10-K, filed with the SEC on March 21, 2008. (emphasis added).

*        *        *

As previously disclosed in a Current Report on Form 8-K filed on May 19, 2008, in preparing our Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, we determined that *certain aspects of a January 2008 amendment to our bank credit facility (the "January 2008 Amendment") were not adequately discussed in our prior public filings*, including the Current Report on Form 8-K filed on January 29, 2008 or the Annual Report on Form 10-K for the fiscal year ended December 31, 2007, which was originally filed with the Securities and Exchange Commission on March 21, 2008 (the "Original 10-K") and subsequently amended by Amendment No. 1 filed on April 29, 2008 (the "First Amendment"). *We further concluded that the effect of the January 2008 Amendment on the Company's financial condition and liquidity raised substantial doubt about our ability to continue as a going concern*. . . . In Part I, Item 1 – *Business*, and in other applicable sections of this Amendment No. 2 to the Annual Report on Form 10-K/A (the "Second Amendment"), **we have revised the disclosure that appeared in the Original 10-K and the First Amendment to take account of the changes that we have made to our business, our strategy, our senior management and our bank credit facility since the end of 2007**.

### Adjustments Related to the January 2008 Amendment

The January 2008 Amendment was entered into and went into effect in 2008 and therefore did not affect the amounts reported in the Consolidated Financial Statements as of December 31, 2007. Nonetheless, the Original 10-K contained discussions of the January 2008 Amendment in the Notes to the Consolidated Financial Statements related to "Long-Term Debt" and "Subsequent Events." Moreover, Management's Discussion and Analysis of Financial

Condition and Results of Operations ("MD&A") in the Original 10-K contained discussions regarding the Company's financial condition and liquidity. In this Second Amendment, **we have revised the disclosure that appeared in these portions of the Original 10-K to reflect our subsequent reconsideration of the terms of the January 2008 Amendment and their effect on the Company's financial condition and liquidity as of the filing date of our Original 10-K**, before the credit facility was restructured on August 15, 2008 and further amended in late 2008 and 2009. . . . *We have concluded that there was substantial doubt about our ability to continue as a going concern as of December 31, 2007*. Our Consolidated Financial Statements, however, assume that we will continue as a going concern, and do not contain any adjustments that might result if we were unable to continue as a going concern. (emphasis added).

151.    Moreover, KPMG's audit opinion contained in NexCen's 2007 Form 10-K/A included an explanatory paragraph which stated, in relevant part:

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the consolidated financial statements, *the Company faces certain liquidity uncertainties that raise substantial doubt about its ability to continue as a going concern*. (emphasis added).

152.    GAAP reserves the term "restatement" only for the revision of financial statements to correct material errors in those previously reported financial statements. Statement of Financial Accounting Standard ("FAS") 154 Accounting Changes and Error Corrections ("FAS 154") ¶¶ 2, B30. As previously noted, NexCen filed restated financial statements for the year ended December 31, 2007 in a Form 10-K/A on August 11, 2009. NexCen's restatement of its previously filed financial statements was necessitated by its original disclosures omitting material information and being in violation of GAAP and SEC disclosure requirements as set forth above. FAS 154 provides guidance for when a company is required to restate its previously issued financial statements. FAS 154 states, in relevant part:

> Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by **restating** the prior period [sic] financial statements.  FAS 154, ¶ 25 (emphasis added).

153.    Further, FAS 154 describes an error in financial statements as follows:

> **Error in previously issued financial statements** – an error in recognition, measurement, presentation, or **disclosure in financial statements** resulting from mathematical mistakes, mistakes in the application of GAAP, or **oversight or misuse of facts that existed at the time the financial statements were prepared**.  FAS 154, ¶ 2h (certain emphasis in original; certain emphasis added).

154.    Furthermore, FAS 154 specifically states that it applies to **material** corrections of errors. FAS 154 states, "The provisions of this Statement need not be applied to immaterial items." (emphasis omitted).  Thus, only those items bearing a material impact should cause a Company to restate its previously-issued financial statements.  A restatement is, therefore, in effect, an admission of a material misstatement in previously-issued financial statements.

## VI.    GAAP VIOLATIONS

155.    Ultimately, the financial statements of NexCen were restated as a result of material disclosures that were omitted in violation of GAAP. [2]

156.    The SEC requires that publicly-traded companies such as NexCen prepare financial statements in accordance with GAAP;[3] violations of GAAP, therefore, result in violations of SEC reporting requirements.  GAAP is defined by the American Institute of Certified Public Accountants' ("AICPA") Auditing Standards Board ("ASB"), in Statement on Auditing Standards ("AU") § 411, *The Meaning of Present Fairly in Conformity with Generally*

---

[2]    NexCen's Form 8-K filed May 19, 2008 indicated the errors resulted from "…disclosures…[that] were neither contained in the Company's Current Report on Form 8-K filed with the [SEC] on January 29, 2008 nor the Company's Annual Report on Form 10-K for the year ended December 31, 2007, as originally filed with the [SEC] on March 21, 2008."

[3]    17 C.F.R. § 210.4-01(a)(1)

*Accepted Accounting Principles in the Independent Auditor's Report* ("AU 411"), in the following manner:

> The phrase "generally accepted accounting principles" is a technical accounting term that encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules, and procedures provide a standard by which to measure financial presentations. AU 411, ¶ 2.

157. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are ***presumed to be misleading or inaccurate***, despite footnote or other disclosure. 17 C.F.R. § 210.4-01(a)(1). SEC Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the latest annual financial statements. 17 C.F.R. § 210.10-01(a).

158. In addition to the requirement to present financial statements in conformity with GAAP and SEC reporting requirements, the Securities Exchange Act of 1934, as amended, requires every registrant to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions of the Company. 15 U.S.C. § 78(m).

159. Financial statements are a central feature of financial reporting and are a principal means of communicating accounting information to parties external to an entity, such as investors. Statement of Financial Accounting Concepts ("FASCON") No. 1, *Objectives of Financial Reporting by Business Enterprises* ("FASCON 1"), ¶ 6. **Financial statements are intended to be read in conjunction with the notes to the financial statements ("footnotes"). Footnote disclosures are an integral part of financial statements that are prepared in**

**conformity with GAAP**.    FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), states, in relevant part:

> Although financial statements have essentially the same objectives as financial reporting, some useful information is better provided by financial statements and some is better provided, or can only be provided, by notes to financial statements or by supplementary information or other means of financial reporting:
>
> - Information disclosed in notes or parenthetically on the face of financial statements, such as significant accounting policies or alternative measures for assets or liabilities, **amplifies or explains information recognized in the financial statements.** That sort of information is **essential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance with generally accepted accounting principles**.
>
> - Supplementary information, such as disclosures of the effects of changing prices, and other means of financial reporting, such as management discussion and analysis, add information to that in the financial statements or notes, including information that may be relevant but that does not meet all recognition criteria. (FASCON 5, ¶ 7) (emphasis added.) (footnotes omitted.)

160.    The presentation of financial statements in conformity with GAAP, therefore, includes **adequate disclosure of material matters**.    AU § 431, *Adequacy of Disclosure in Financial Statements* ("AU 431"), ¶ 2 (emphasis added).

161.    The underlying objectives and characteristics of financial reporting under GAAP provide that information reported in financial statements, **including disclosures**, be **useful**, **relevant**, **reliable**, **complete**, **free from bias**, and **assist financial statement users in making rational business and economic decisions**.  Accordingly, FASCON 1 states, in relevant part:

Financial reporting is not an end in itself but is intended to provide information that is **useful in making business and economic decisions**-for making reasoned choices among alternative uses of scarce resources in the conduct of business and economic activities. Thus, the objectives set forth stem largely from the needs of those for whom the information is intended, which in turn depend significantly on the nature of the economic activities and decisions with which the users are involved.  FASCON 1, ¶ 9 (emphasis added).

The effectiveness of individuals, enterprises, markets, and government in allocating scarce resources among competing uses is enhanced if those who make economic decisions have information that reflects the relative standing and performance of business enterprises to assist them in evaluating alternative courses of action and the expected returns, costs, and risks of each. **The function of financial reporting is to provide information that is useful to those who make economic decisions about business enterprises and about investments in or loans to business enterprises**.  FASCON 1, ¶ 16 (emphasis added).

The role of financial reporting in the economy is to provide information that is **useful in making business and economic decisions**, not to determine what those decisions should be…The role of financial reporting requires it to provide **enhanced, neutral, or unbiased information**. FASCON 1, ¶ 33 (emphasis added).

Financial reporting should provide information that is **useful** to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions. The information should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence. FASCON 1, ¶ 34 (emphasis added).

Financial reporting should provide information to help present and potential investors and creditors and other users in assessing the amounts, timing, and uncertainty of prospective cash receipts from dividends or interest and the proceeds from the sale, redemption, or maturity of securities or loans. **The prospects for those cash receipts**

> **are affected by an enterprise's ability to generate
> enough cash to meet its obligations when** due. . . . Thus,
> financial reporting should provide information to help
> investors, creditors, and others assess the amounts, timing,
> and uncertainty of prospective net cash inflows to the
> related enterprise.   FASCON 1, ¶ 37 (emphasis added)
> (footnote omitted).

162.    Beyond the aforementioned general disclosure requirements, GAAP also requires

specific disclosures related to a Company's liquidity. Specifically, FASCON 1 states, in relevant

part:

> Financial reporting should provide information about an
> enterprise's **economic resources**, obligations, and owner's
> equity. That information helps investors, creditors, and
> others identify the enterprise's financial strengths and
> weaknesses and **assess its liquidity and
> solvency**…Moreover, [information about resources,
> obligations, and owner's equity] provides direct indications
> of the cash flow potentials of some resources and of the
> **cash needed to satisfy many, if not most, obligations**.
> FASCON 1, ¶ 41 (emphasis added).

163.    Moreover, beyond the aforementioned GAAP disclosure requirements, the SEC

also requires certain disclosures be included in registrants' financial statements. Specifically,

SEC Regulation S-K states that the *Management's Discussion and Analysis of Financial

Condition and Results of Operations* ("MD&A") section of a company's filing with the SEC

"…shall focus specifically on material events and uncertainties known to management that

would **cause reported financial information not to be necessarily indicative of future

operating results or of future financial condition**."   17 C.F.R. § 229.303, *Instructions to

Paragraph 303(a)* (emphasis added).

164.    Furthermore, with specific regards to **liquidity**, SEC Regulation S-K states the

that the MD&A section of a company's filing with the SEC shall, in relevant part:  "**Identify any

known** trends or any known demands, **commitments**, events or uncertainties that will result in

or that are **reasonably likely to result** in the registrant's **liquidity** increasing or **decreasing** in any material way." 17 C.F.R. § 229.303(a)(1) (emphasis added).

165.    Additionally, SEC Regulation S-X requires specific disclosures related to a company's current liabilities and long-term debt.[4]    SEC Regulation S-X states the following relating to the disclosure of current liabilities, in relevant part:   "State separately amounts payable to (1) banks for borrowing; (2) factors or other institutions for borrowings."   17 C.F.R. § 210.5-02.19.

166.    Additional disclosures required in an entity's financial statements are described in Generally Accepted Auditing Standards ("GAAS").   AU § 341, *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern* ("AU 341"), states, in relevant part:

> Continuation of an entity as a going concern is assumed in financial reporting in the **absence of significant information to the contrary**. Ordinarily, **information that significantly contradicts the going concern assumption relates to the entity's ability to continue to meet its obligations as they become due** without substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions. (AU 341, ¶ 1) (Emphasis added.)

167.    AU 341 further provides information on the possible disclosures included in a company's financial statements when there is substantial doubt about an entity's ability to continue as a going concern. AU 341 states that some of the information that might be disclosed includes, in relevant part:

> •    Pertinent conditions and events giving rise to the assessment of substantial doubt about the entity's

---

[4]       Article 5 of SEC Regulation S-X is applicable for financial statements filed for Commercial and Industrial Companies, which are defined as financial statements for all persons except (a) Registered investment companies, (b) employee stock purchase, savings and similar plans, (c) Insurance companies, (d) Bank holding companies and banks, and (e) Brokers and dealers when filing Form X-17A-5.  17 C.F.R. § 210.5-01.

ability to continue as a going concern for a reasonable period of time;

- The possible effects of such conditions and events;

- Management's evaluation of the significance of those conditions and events and any mitigating factors;

- Possible discontinuance of operations;

- Management's plans (including relevant prospective financial information); and

- Information about the recoverability or classification of recorded asset amounts or the amounts or classification of liabilities.  AU 341, ¶ 10 (emphasis added) (footnote omitted).

168.    It is the responsibility of a company's management to ensure the fair presentation of financial statements in conformity with GAAP, as well as to establish and maintain a sufficient system of internal controls. GAAS describes the role of a company's management in establishing and maintaining internal controls. Specifically, AU § 110, *Responsibilities and Functions of the Independent Auditor* ("AU 110"), states that management's responsibility includes establishing and maintaining internal controls.  AU 110 states, in relevant part:

The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements.   ***Management is responsible*** for adopting sound accounting policies and ***for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions*** (as well as events and conditions) ***consistent with management's assertions embodied in the financial statements***. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.   AU 110, ¶ 3 (emphasis added) (footnote omitted).

169.    Furthermore, beginning in 2002, an entity's management is required under Rule 302 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") to provide certifications relating to the company's internal control over financial reporting.  Additionally, section 404 of the Sarbanes-Oxley Act requires an entity's management to assess and report on the effectiveness of the company's internal control, as referenced in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard ("AS") No. 5, *An Audit of Internal Control over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 5").  AS 5 defines management's assessment, in relevant part:

> Management's assessment is the assessment described in Item 308(a)(3) of [SEC] Regulations S-B and S-K that is included in management's annual report on internal control over financial reporting.  AS 5, ¶ A6 (emphasis removed) (footnote omitted).

170.    SEC Regulation S-K requires management to provide an annual report on internal control over financial reporting.  17 C.F.R. § 229.308.  Regulation S-K states that management's assessment must contain the following, in relevant part:

> 1.    A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;

> 2.    A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting;

> 3.    Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management.  17 C.F.R. § 229.308 (emphasis added).

171.    Additionally, AS 5 defines a material weakness, in relevant part as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a ***reasonable possibility***[5] that a ***material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis***.  AS 5, ¶ A7 (certain emphasis in original; certain emphasis added) (footnote added).

172.    The undisclosed adverse information concealed by Defendants during the Class Period, as set forth in this Complaint, is the type of information which, according to GAAP, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.  Defendants' failure to disclose adverse information during the Class Period and detailed above was in violation of GAAP and Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).  By failing to file financial statements with the U.S. SEC that conformed to GAAP (and the rules and regulations of the SEC), Defendants repeatedly disseminated financial statements that are "presumed to be misleading or inaccurate."

## VII.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

173.    During the Class Period, Defendants caused the Company to issue false and misleading statements which were included in, among other things, Forms 10-K and 10-Q filed with the SEC from March 2007 through and including May 18, 2008, and in press releases and other statements disseminated to the public.

174.    On March 16, 2007, NexCen filed its Form 10-K for the fiscal year ended December 31, 2006.  On May 10, 2007, August 9, 2007, and on November 9, 2007, NexCen filed Forms 10-Q for the 1st, 2nd and 3rd quarters of fiscal year 2007, respectively.  Those SEC

---

[5]    As 5 further states that "reasonable possibility" of an event is "when the likelihood of the event either 'reasonably possible' or 'probable'" as each term is defined in FAS No. 5, *Accounting for Contingencies* ("FAS 5").

filings, and various press releases and publicly-made statements concerning them, as set forth in greater detail in Section V. A., were each materially false and misleading when made, and were known by the Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     The Company continued to state its intent to plan to acquire three to five businesses in 2007 with transaction sizes generally in excess of $50 million, and that cash on hand and cash generated from operations would provide the Company with sufficient liquidity to meet the expenses of operations, including debt service obligations, for at least the ensuing twelve months, when it had no reasonable basis for such projections due to, among other things, increasing operating expenses, and insufficient franchisee revenue;

(b)     The Company failed to disclose that there was a significant doubt regarding the Company's ability to continue as a going concern;

(c)     The Company reported that it had established and maintained adequate internal controls, and signed Sarbanes-Oxley certifications, when it had material weaknesses that caused its internal control over financial reporting to be ineffective.

175.     On January 29, 2008, NexCen filed a Form 8-K with the SEC, and issued a press release concerning the Amended Credit Facility.  On March 21, 2008, NexCen filed its Form 10-K for the fiscal year ended December 31, 2007.  Those SEC filings, and various press releases and publicly-made statements concerning them, as set forth in greater detail in Section V. C., were each materially false and misleading when made, and were known by the Defendants to be

false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

    (a)    The Company entered into the Amended Credit Facility and falsely and misleadingly described it as a five-year term facility with substantially the same terms as the original Credit Facility.  Defendants knew of or recklessly disregarded the existence of, and did not disclose, the following material terms of the Amended Credit Facility:

        (i)    distributions to the Company from revenue placed in lockbox accounts, which had previously taken priority over payments to BTMU, would be subordinated to payments to BTMU to pay accrued but previously unpaid interest as well as required principal amortization payments;

        (ii)    all funds remaining in the lockbox accounts after distributions to the Company would be applied to the $35 million subject to the accelerated redemption feature;

        (iii)    the principal amount outstanding on March 31, 2008 that was subject to the accelerated redemption feature was approximately $33 million; and

        (iv)    an estimated principal payment of $21 million would be necessary to reduce the $35 million to $5 million on October 17, 2008;

    (b)    The Company continued to state its intent to plan to acquire three to five businesses in 2008 with transaction sizes generally in excess of $50 million, and that cash on hand and cash generated from operations would provide the Company with sufficient liquidity to meet the expenses of operations, including debt service obligations, for at least the ensuing twelve months, when the Company expected to face a cash shortage in the summer of 2008 of $7-10 million;

    (c)    The Company failed to disclose that there was a significant doubt

regarding the Company's ability to continue as a going concern;

(d)     The Company reported that it had established and maintained adequate internal controls, and signed Sarbanes-Oxley certifications, when it had material weaknesses that caused its internal control over financial reporting to be ineffective, including, as reported in its 2007 Form 10-K/A:

    (i)     The Company had a diffused management structure that lacked sufficient clarity as to the roles and responsibilities of senior management, including for communications with the Board of Directors, oversight of the Company's legal matters that impact the Company's consolidated financial statements and other public disclosures, and oversight of financial planning, analysis and reporting. As a result, information that impacted financial reporting was not shared within or across corporate functions leading to information relating to a significant agreement affecting the Company's financial condition not being communicated effectively among members of management or to the Board of Directors.

    (ii)     In connection with the restatement of information contained in this Second Amendment, we have identified additional reasons why our disclosure controls and procedures were not effective as of December 31, 2007. These include (i) additional material weaknesses in internal control over financial reporting . . . and (ii) management's judgment that the Company did not have sufficiently detailed written policies and procedures to ensure that the preparation and review of reports filed with or submitted to the SEC included all material information and otherwise complied with applicable rules and regulations and the Company did not provide adequate training to ensure that relevant personnel fully understood their responsibilities associated with the preparation and review of such reports.

## VIII.  **ADDITIONAL SCIENTER ALLEGATIONS**

176.    As alleged herein, Defendants acted with scienter.  Defendants each and in concert knowingly and/or recklessly engaged in acts, practices and a scheme and course of business that artificially inflated NexCen's stock price beginning at least in March, 2007 and continuing during the Class Period.  Defendants also knew and/or recklessly disregarded that the public documents and statements they personally made or issued or disseminated in the name of the Company were materially false and misleading; knew and/or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and/or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their acts, practices and course of business, including receipt of information reflecting the true facts regarding NexCen, their control over, and/or receipt and/or modification of NexCen's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning NexCen, participated in the fraudulent scheme alleged herein, the principal purpose and effect of which was to create the false appearance of revenue and profitability intending to deceive investors and the market.

177.    In addition, Defendants knowingly and/or recklessly concealed the fact that NexCen's internal control systems were seriously deficient.  Moreover, Defendants knowingly and/or recklessly falsely certified the Company's internal controls and financial reporting in violation of Sarbanes-Oxley.  Defendants knew and/or recklessly disregarded that the Company's internal controls were not adequate because they personally were concealing information related to NexCen's cash flow and the Credit Facility.

178.    As described below, Defendants had the motive to commit the fraud as they enjoyed rich compensation packages, which depended in large part upon the Company's financial performance and its stock price.  Defendants were eligible for bonuses tied to the Company's financial performance.  They also received numerous options on NexCen's stock, and as the Company's stock price increased, so did the value of the options granted to the Defendants.  Certain of the Defendants also received significant contingent compensation pursuant to the NexCen-UCC Merger Agreement based upon NexCen's stock price and other performance measures.

### A.    Defendant D'Loren

179.    During the Class Period, Defendant D'Loren knowingly and/or recklessly approved and participated in acts and practices that created a false impression of sufficient cash flow, adequate internal controls, and non-material amendments to the Credit Facility during the Class Period.

180.    As Chairman and CEO of the Company, D'Loren personally signed NexCen's 2006 and 2007 Annual Reports on Form 10-K, which he knew and/or recklessly disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading.  He also certified the Company's financial results and sound internal controls in each of these Form 10-Ks and all Quarterly Reports filed on Form 10-Q during the Class Period.  D'Loren also deliberately and/or recklessly gave materially false and misleading reports regarding the Company's financial results and condition in conference calls with analysts and investors and in press releases.  D'Loren had a duty to speak truthfully on the calls and correct any false or misleading information provided to analysts, investors and the public, and he knowingly and/or recklessly breached this duty.

181.    As CEO and a member of NexCen's Board, D'Loren was responsible for ensuring that NexCen properly reported its financial statements and the true nature of the Company's internal controls.  As a Director, D'Loren had a duty of oversight that required him to implement reporting or information systems or controls and review information related NexCen's operations to be informed of risks and he knowingly and/or recklessly breached this duty.  During the Class Period, D'Loren failed to establish reporting and information systems, failed to review information he was required to review, and failed to monitor or oversee employee misconduct. In fact, D'Loren certified in writing in each of the Quarterly and Annual Reports issued during the Class Period that he was the certifying officer responsible for establishing and maintaining disclosure controls and procedures.

182.    D'Loren's motive to commit fraud included his ability to profit from sales of the Company stock at artificially-inflated prices.  D'Loren enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.  D'Loren's compensation included stock options to purchase 937,324 shares of NexCen common stock that vested in June 2007, as well as additional options to purchase 1,874,652 shares that were scheduled to vest in 2008 and 2009.  Additionally, D'Loren's employment contract included the potential of an annual bonus, 50% of which would be payable in shares of NexCen common stock.  D'Loren's bonus was to be no less than 50% of the entire bonus pool established by the Company each year.  As of April 20, 2007, before the vesting of any options under his compensation package, D'Loren beneficially owned 3,318,754 shares, or 6.25% of outstanding shares of NexCen stock.  As of April 21, 2008, D'Loren beneficially owned 7,330,175 shares, or 12.95% of NexCen stock.

## B.    Defendant Meister

183.    During the Class Period, Defendant Meister knowingly and/or recklessly approved and participated in acts and practices that created a false impression of sufficient cash flow, adequate internal controls, and non-material amendments to the Credit Facility during the Class Period.

184.    As CFO of the Company, Meister personally signed all of NexCen's financial reports issued during the Class Period, which he knew and/or recklessly disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading.  He also certified the Company's financial results and sound internal controls in each of these financial statements.  Throughout the Class Period, Meister also signed the Company's Form 8-Ks, that released false and misleading quarterly and year-end revenue and earnings, which Meister knew and/or recklessly disregarded were false when he signed the Form 8-Ks and caused them to be publicly issued.  Meister also knowingly and/or recklessly personally gave materially false and misleading reports regarding the Company's financial results and condition for each period in the Class Period in conference calls with analysts and investors and in press releases.  Meister had a duty to speak truthfully on the call and correct any false or misleading information provided to analysts, investors and the public, and he knowingly and/or recklessly breached this duty.

185.    As CFO for NexCen, Meister was responsible for ensuring that NexCen properly reported its financial statements and the true nature of the Company's internal controls.  In fact, Meister certified in writing in each of the financial reports issued during the Class Period that he was the certifying officer responsible for establishing and maintaining disclosure controls and procedures.  Meister also certified in writing in each of these financial reports filed with the SEC that he had reviewed the financial statements and that they fairly presented in all material

respects the financial condition, results of operations, and cash flows of NexCen and that they were free of material misstatements and omissions.

186.    As alleged herein, Meister participated in NexCen's fraudulent acts, practices, and scheme and course of business.  Therefore, he knew and/or recklessly disregarded that the Company's cash flow was insufficient to service its constantly increasing debt load while continuing to acquire the represented number of brands each year.  Meister also signed the January 2008 amendment to the Credit Facility and therefore knew the terms of the amendment. Meister breached his duty (both as CFO and as NexCen's certifying officer) to make sure that NexCen's financial statements presented a true picture of the Company's operations and financial condition, which they did not because of the undisclosed shortage in cash flow, undisclosed terms of the amendment to the Credit Facility, and undisclosed material weaknesses in internal controls.

187.    Meister's motive to commit fraud included his ability to profit from sales of the Company stock at artificially-inflated prices.  Meister enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.  As NexCen's stock increased in price, so did the value of options granted to him and other insiders.  Meister's compensation included stock options to purchase 66,667 shares of NexCen common stock that vested in September 2007, as well as additional options to purchase 133,333 shares that were scheduled to vest in 2008 and 2009.

### C.    Defendant Oros

188.    During the Class Period, Defendant Oros knowingly and/or recklessly approved and participated in acts and practices that created a false impression of sufficient cash flow, adequate internal controls, and non-material amendments to the Credit Facility during the Class Period.

189.    Defendant Oros personally signed NexCen's 2006 and 2007 Annual Reports on Form 10-K, which he knew and/or recklessly disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading.  Additionally, as a Director, Oros had a duty of oversight that required him to implement reporting or information systems or controls and review information related NexCen's operations to be informed of risks and he knowingly and/or recklessly breached this duty.  During the Class Period, Oros failed to establish reporting and information systems, failed to review information he was required to review, and failed to monitor or oversee employee misconduct.

190.    Oros's motive to commit fraud included his ability to profit from sales of the Company stock at artificially-inflated prices.  Oros engaged in lucrative insider trading during the Class Period, taking advantage of NexCen's stock price, which was artificially inflated by his own, Defendant D'Loren's, Defendant Meister's, and the Company's fraud.  Oros enjoyed a compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.  Oros's compensation included an option grant of 100,000 shares in September 2007.  As of March 1, 2007, before the vesting of any options under this compensation package, Defendant Oros beneficially owned 3,247,868 shares, or 6.3% of the outstanding shares of NexCen stock.  As of April 21, 2008, Defendant Oros beneficially owned 2,315,879 shares, or 4.09% of NexCen stock.

191.    During the Class Period, Defendant Oros sold a total of 1,209,699 shares, for gross proceeds of nearly $15 million.  This constitutes 100% of the stock owned by NexGen Technologies, LLC, of which Oros is the managing member.  These are the only sales of NexCen stock completed by NexGen in 2007, and they occurred when NexCen's stock prices

were at their peak, with the June sales occurring on the final three days that NexCen's stock topped $13.00 per share.

### D. Collective Insider Trading

192. Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold a total of 1,454,699 shares of the Company's stock for gross proceeds of $17,567,556. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| March 23, 2007 | Truman Semans | 100,000 | $10.30 | $1,030,000 |
| March 23, 2007 | George Stamas | 45,000 | $10.30 | $463,500 |
| April 4, 2007 | David Oros | 175,000 | $10.60-$10.99 | $1,882,332 |
| April 5, 2007 | David Oros | 120,000 | $11.00-$11.65 | $1,359,753 |
| April 9, 2007 | David Oros | 22,500 | $11.65-$11.67 | $262,245 |
| April 10, 2007 | David Oros | 30,000 | $11.75-$11.83 | $352,709 |
| April 11, 2007 | David Oros | 120,000 | $11.90-$12.82 | $1,479,498 |
| April 16, 2007 | David Oros | 100,000 | $12.50-$12.89 | $1,271,912 |
| April 17, 2007 | David Oros | 109,600 | $12.80-$13.00 | $1,413,483 |
| April 18, 2007 | David Oros | 19,186 | $12.80-$12.85 | $245,956 |
| April 19, 2007 | David Oros | 250,324 | $12.69-$13.03 | $3,228,215 |
| April 20, 2007 | David Oros | 46,100 | $12.95-$13.00 | $597,767 |
| April 23, 2007 | David Oros | 31,306 | $13.00-$13.10 | $407,762 |
| April 25, 2007 | David Oros | 20,900 | $12.98-13.02 | $271,516 |
| May 16, 2007 | Jack Dunn | 15,000 | $11.73 | $175,950 |
| May 17, 2007 | Jack Dunn | 85,000 | $11.57 | $983,450 |
| June 1, 2007 | David Oros | 116,894 | $13.00-$13.16 | $1,521,106.90 |
| June 4, 2007 | David Oros | 26,300 | $13.00-$13.05 | $342,200 |
| June 5, 2007 | David Oros | 21,589 | $12.81-$13.02 | $278,201 |

| | TOTAL: | 1,454,699 Shares | | $17,567,556 Gross Proceeds |
|---|---|---|---|---|

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE

### A.    Fraud on the Market

193.    At all relevant times, the market for NexCen securities was an efficient market for the following reasons, among others:

(a)    NexCen stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    During the Class Period, an average of 2,494,371 shares of NexCen stock were traded on a weekly basis. As of March 1, 2008, NexCen had 56,616,764 shares outstanding. Thus, approximately 4.4% of all the outstanding shares were traded on a weekly basis, demonstrating a strong presumption of an efficient market.

(c)    As a regulated issuer, NexCen filed periodic public reports with the SEC and the NASDAQ;

(d)    During the Class Period, NexCen was eligible to file, and did file, registration statements on Form S-3 with the SEC;

(e)    NexCen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)    NexCen was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

(g)    Numerous NASD member firms were active market-makers of NexCen stock at all times during the Class Period; and

(h)    Unexpected material news about NexCen was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

194.    Under these circumstances, all purchasers of NexCen securities during the Class Period suffered similar injury through their purchase of NexCen securities at artificially inflated prices and a presumption of reliance applies.

### B.    Affiliated Ute

195.    Plaintiff need not prove reliance either individually or as a class because under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary for the presumption of reliance to attach is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of the decision.

### X.    NO SAFE HARBOR

196.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NexCen who knew that such statement was false when made.

## XI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

197.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired NexCen securities between March 13, 2007 and May 19, 2008, inclusive and who were damaged thereby.  Excluded from the Class are Defendants, the other officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

198.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NexCen's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by NexCen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

199.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

201.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NexCen; and

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

202.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    FIRST CLAIM
## VIOLATION OF SECTION 10(b) OF
## THE EXCHANGE ACT AND RULE 10b-5
## PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

203.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

204.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase NexCen securities at artificially inflated prices during the Class Period.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

205.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NexCen securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

206.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of NexCen as specified herein.

207.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NexCen value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NexCen and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of NexCen securities during the Class Period.

208.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) by virtue of their responsibilities and activities as a senior officers and/or director of the Company, Individual Defendants were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Individual Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

209.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NexCen's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

210. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NexCen securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of NexCen publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NexCen securities during the Class Period at artificially high prices and were damaged thereby.

211. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NexCen was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NexCen securities, or, if they

had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

212.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

213.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### XIII.   SECOND CLAIM
### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS

214.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

215.    During the Class Period, Oros, D'Loren, and Meister acted as controlling persons of NexCen within the meaning of § 20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of NexCen stock, Oros, D'Loren, and Meister had the power and authority to cause NexCen to engage in the wrongful conduct complained of herein. Defendants, therefore are liable pursuant to § 20(a) of the Exchange Act.

216.    D'Loren and Meister served as executive officers of NexCen prior to and during the Class Period and when the false and misleading statements described herein were made. D'Loren was also a director of NexCen.

217.    Defendants D'Loren and Meister at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of NexCen's business affairs. As officers of a publicly-owned company, they had a duty to disseminate accurate and truthful information with respect to NexCen's financial condition and results of operations.  Because of their positions of control and authority as senior officers of

NexCen, D'Loren and Meister were able to, and did, control the contents of SEC filings, press releases, and conference calls which contained materially false information. They participated in the preparation and dissemination of the SEC filings, press releases, and conference calls.

218.    As directors of a publicly-owned company, Oros and D'Loren had a duty to disseminate accurate and truthful information with respect to NexCen's financial condition and results of operations. They also had a duty to implement reporting or information systems or controls and monitor or oversee NexCen's operations to be informed of risks and employee misconduct. They each signed the 2006 Form 10-K and 2007 Form 10-K and thereby controlled their contents and dissemination. Each of these documents contained materially false financial information.

219.    As a direct and proximate result of the conduct of Oros, D'Loren, and Meister, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of NexCen stock.

220.    By reason of the aforementioned conduct, each of the Individual Defendants named in this Count is liable under Section 20(a), jointly and severally with, and to the same extent as, the Company and Oros, D'Loren, and Meister are liable under the Exchange Act, to Plaintiff and the other members of the Class who purchased or acquired NexCen securities during the Class Period.

### XIV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)  Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(c)  Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

Dated:  August 24, 2009                           Respectfully submitted,


                                                  **COHEN MILSTEIN SELLERS & TOLL
                                                  PLLC**

                                                  *Catherine Torell*

                                                  Catherine A. Torell (CT-0905)
                                                  150 East 52nd Street, Thirtieth Floor
                                                  New York, New York 10022
                                                  Telephone: (212) 838-7797
                                                  Facsimile: (212) 838-7745

                                                  - and -

                                                  Lisa M. Mezzetti (LM-5105)
                                                  Avi S. Garbow (*pro hac vice*)
                                                  Anna K. Ryon (*pro hac vice*)
                                                  1100 New York Avenue, N.W.
                                                  West Tower, Suite 500
                                                  Washington, DC  20005-3964
                                                  Telephone: (202) 408-4600
                                                  Facsimile: (202) 408-4699

                                                  *Counsel for Lead Plaintiff Vincent Granatelli*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of August, 2009, I caused to be served a true and correct copy of the foregoing Consolidated Amended Class Action Complaint upon counsel listed on the attached service list, via overnight delivery.

Catherine A. Torell

## SERVICE LIST

David Avi Rosenfeld
**Coughlin, Stoia, Geller, Rudman & Robbins, LLP**
58 South Service Road
Suite 200
Melville, NY 11747

Lori Ann Martin
**Wilmer, Cutler, Hale & Dorr, L.L.P.**
399 Park Avenue
New York, NY 10022

Evan J. Smith
**Brodsky & Smith, L.L.C.**
240 Mineola Blvd.
Mineola , NY 11501

Phillip C. Kim
**The Rosen Law Firm P.A.**
350 5th Avenue
Suite 5508
New York, NY 10118

Gregg M. Mashberg
**Proskauer Rose LLP**
1585 Broadway
New York, NY 10036

Robert Allen Horowitz
**Greenberg Traurig, LLP**
200 Park Avenue
New York , NY 10166

Daniel B. Harris
Attorney At Law
3450 Sacramento Street #108
San Francisco , CA 94118