

Morningstar® Document Research℠

# FORM 8-K

## NexCen Brands, Inc. - NEXC

**Filed: January 29, 2008 (period: January 29, 2008)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

**Item 1.01**      Entry into Material Definitive Agreement

**Item 2.01**      Completion of Acquisition or Disposition of Assets

**Item 2.03**      Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant

**Item 3.02**      Unregistered Sales of Equity Securities

**Item 8.01**      Other Events

**Item 9.01**      Financial Statements and Exhibits

SIGNATURES
EX-2.1 (Plan of acquisition)

EX-4.1 (Instruments defining the rights of security holders)

EX-4.2 (Instruments defining the rights of security holders)

EX-4.3 (Instruments defining the rights of security holders)

EX-4.4 (Instruments defining the rights of security holders)

EX-9.1 (Voting trust agreement)

EX-10.1 (Material contracts)

EX-10.4 (Material contracts)

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): January 29, 2008

NEXCEN BRANDS, INC.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

| 000-27707 | 20-2783217 |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |
| 1330 Avenue of the Americas, 34th Floor, New York, NY | 10019-5400 |
| (Address of Principal Executive Offices) | (Zip Code) |

(212) 277-1100

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into Material Definitive Agreement**

*Asset Purchase Agreement*

On January 29, 2008, NexCen Brands, Inc., a Delaware corporation (the "Company"), through its wholly-owned subsidiary NexCen Asset Acquisition, LLC, a Delaware limited liability company (the "Buyer"), acquired substantially all of the assets of Great American Cookie Company Franchising, LLC, a Delaware limited liability company ("GACCF") and Great American Manufacturing, LLC, a Delaware limited liability company ("GAM," and together with GACCF, the "Sellers"), each a wholly-owned subsidiary of Mrs. Fields Famous Brands, LLC, a Delaware limited liability company ("MFFB"). The acquisition was completed pursuant to the terms of an Asset Purchase Agreement dated January 29, 2008, by and among the Company, the Buyer, the Sellers and MFFB (the "Purchase Agreement"). A copy of the Purchase Agreement is attached as Exhibit 2.1 to this Current Report on Form 8-K.

The purchase price paid at closing was approximately $93.65 million, consisting of $89 million in cash and 1,099,290 shares of the Company's common stock (the stock was valued at $4.23 per share which was the closing price of one share of the Company's common stock on the NASDAQ Global Market on January 28, 2008). Under the terms of the Purchase Agreement, 1,099,290 shares of the Company's common stock will be held in escrow for up to nine (9) months to satisfy indemnity or purchase price adjustment claims. The purchase price was calculated based upon the financial results of the Sellers for the twelve (12) month period ended November 24, 2007, and is subject to a customary post-closing review and adjustment to the extent actual financial results are determined to differ from the estimated financial results used to calculate the purchase price paid at closing.

The Purchase Agreement contains customary representations, warranties and covenants. Subject to limited exceptions, the representations and warranties of the Sellers and MFFB survive for nine (9) months following the closing. Environmental representations survive for a period of five (5) years following the closing and tax representations survive until thirty (30) days following the expiration of the applicable statute of limitations. Specified fundamental representations, such as sufficiency of assets and title to assets, survive indefinitely. Indemnification claims made by the Buyer for breaches of representations and warranties are generally capped at the purchase price and are subject to a $200,000 threshold, however, breaches of environmental representations are capped at $5 million.

On January 29, 2008, simultaneously with the execution of the Purchase Agreement and the closing of the acquisition, the Company entered into the following additional agreements:

- Registration Rights Agreement by and among the Company and the Sellers (the "Registration Rights Agreement"). The Registration Rights Agreement provides that the Company will file a registration statement within 180 days of the closing to register the 1,099,290 shares issued to the Sellers. Notwithstanding the registration of the shares, under the terms of the Purchase Agreement, the Sellers are not permitted to sell the shares issued to them for six (6) months following the closing and thereafter certain of the shares will be subject to resale limitations through the 15-month anniversary of the closing. Notwithstanding the transfer limitations, the Sellers are permitted to pledge their rights to the shares under the terms of an Indenture, dated March 16, 2004, by and among MFFB, Mrs. Fields Financing Company, Inc. and the Bank of New York (the "Indenture").

2

- Voting Agreement by and among the Company and the Sellers (the "Voting Agreement"). The Voting Agreement grants a power of attorney to a proxy holder designated by the Company's board of directors to vote or act by written consent with respect to the 1,099,290 shares issued to the Sellers.

The foregoing description of the Purchase Agreement, the Registration Rights Agreement, the Voting Agreement and the transactions completed thereby do not purport to be complete and are qualified in their entirety by the terms and conditions of such agreements, which are filed as Exhibits 2.1, 4.1, and 9.1, respectively, to this Current Report on Form 8-K.

*The Purchase Agreement has been included as an exhibit to this Current Report on Form 8-K to provide you with information regarding its terms. The Purchase Agreement contains representations and warranties that the parties thereto made and to the other parties thereto as of specific dates. The assertions embodied in the representations and warranties in the Purchase Agreement were made solely for purposes of the contracts among the respective parties, and each may be subject to important qualifications and limitations agreed to by the parties in connection with negotiating the terms thereof. Moreover, some of those representations and warranties may not be accurate or complete as of any specified date, may be subject to a contractual standard of materiality different from those generally applicable to stockholders or may have been used for the purpose of allocating risk among the parties rather than establishing matters as facts.*

*Settlement and Release Agreement*

On January 29, 2008, the Company, GACCF, MFFB, Mrs. Fields Original Cookies, Inc. ("MFOC") and each of the franchisees and franchisee principals listed therein (collectively, the "Franchisees"), entered into a Settlement and Release Agreement (the "New Settlement Agreement") to resolve issues under and related to certain Settlement Agreement and Releases dated June 1998 by and among MFOC, Capricorn Investors II, L.P., Great American Cookie Company, Inc., Cookies USA, Inc., The Jordan Company and certain former franchisees of Great American Cookie Company, Inc. (collectively, the "Original Settlement Agreements").

Pursuant to the New Settlement Agreement, the Franchisees agreed to release any and all rights under the Original Settlement Agreements. In return, (i) MFFB agreed to pay each Franchisee their pro rata share of $6.7 million in cash, (ii) the Company agreed to issue warrants to each Franchisee representing their pro rata share of 300,000 shares of the Company's common stock (the "Warrants"), and (iii) following the closing of the Purchase Agreement, the Company will credit each Franchisee with their pro rata share of $1 million in future franchise fee credits which are available for use for two (2) years for any Company franchise brand. The Warrants have an exercise price of $4.23 per share, which was the closing price of one share of the Company's common stock on the NASDAQ Global Market on January 28, 2008. A form of Warrant issued to the Franchisees is attached as Exhibit 4.2 to this Current Report on Form 8-K and is incorporated herein by reference.

3

Each Franchisee's pro rata share of $6.7 million in cash included their pro rata share of an aggregate royalty advance of $1.7 million. In connection with receiving the royalty advance, each Franchisee agreed each month following closing until the sixtieth (60th) month following closing, to pay the Company an increased royalty payment. If a Franchisee ceases to be a party to a Great American Cookie franchise agreement, the Franchisee is required to refund to the Company an amount equal to the royalty advance, less any increased royalty payments previously paid to the Company.

The Company also agreed to a number of undertakings, including maintaining product and development support, providing notice and the opportunity for the Franchisees to consult on material changes to the Great American Cookie franchise agreement, maintaining the primary Great American Cookie products, marks and designs and guaranteeing a specified profit margin on cookie dough provided to the Franchisees for two (2) years following closing of the Purchase Agreement.

The foregoing description of the New Settlement Agreement and the transactions completed thereby do not purport to be complete and are qualified in their entirety by the terms and conditions of such agreement, which is filed as Exhibit 10.1 to this Current Report on Form 8-K.

*Credit Facility*

On January 29, 2008, the Company amended its existing bank credit facility, originally entered into on March 12, 2007 pursuant to a security agreement and a note funding agreement (collectively, the "Original Loan Documentation") with BTMU Capital Corporation, as agent ("BTMU"). The amendment (the "Amendment") to the Original Loan Documentation and related documents increases the maximum amount of borrowing that may be outstanding thereunder at any one time from $150 million to $181 million and modifies as a consequence of the Company's acquisition of real estate assets, certain defined terms used in the Original Loan Documentation and related documents. With the exception of these changes, the Amendment contains substantially the same terms as the Original Loan Documentation. The descriptions of the credit facility, the terms of the Original Loan Documentation and the borrowings made thereunder contained in Notes 16 and 19 to the Unaudited Condensed Consolidated Financial Statements of the Company included in our Quarterly Report on Form 10-Q filed with the SEC on November 9, 2007 are incorporated by reference into this Item 1.01 of this Current Report on Form 8-K.

Also, on January 29, 2008, as partial consideration for the amendments to the bank credit facility, the Company issued to BTMU a warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $0.01 per share. BTMU may exercise the warrant in full or in part at any time from the date of issuance through January 29, 2018. If the shares underlying the warrant are not registered for resale on or before May 1, 2008, the Company may be obligated to pay BTMU an amount equal to $4.23 (the closing price of one share of the Company's common stock on January 28, 2008) multiplied by 200,000, less the aggregate exercise price of the warrant. Simultaneously with the execution of the Amendment and the issuance of the warrant to BTMU, the Company also entered into a Registration Rights Agreement by and between the Company and BTMU ("BTMU Registration Rights Agreement"). The BTMU Registration Rights Agreement provides that the Company will file a registration statement within 60 days of the closing to register the 200,000 shares underlying the warrant.

4

Source: NexCen Brands, Inc., 8-K, January 29, 2008

The foregoing description of the Amendment, the warrant issued to BTMU, and the BTMU Registration Rights Agreement and the transactions completed thereby do not purport to be complete and are qualified in their entirety by the terms and conditions of such agreements, which are filed as Exhibits 10.4, 4.3 and 4.4 to this Current Report on Form 8-K.

**Item 2.01 Completion of Acquisition or Disposition of Assets**

On January 29, 2008, the Company, through the Buyer, completed the purchase of substantially all of the assets of GACCF and GAM, as described above in Item 1.01.

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The Company, through NexCen Acquisition Corp., its wholly owned subsidiary, entered into a $150 million bank credit facility on March 12, 2007 pursuant to a security agreement and note funding agreement with BTMU, as agent. On January 29, 2008, the Company amended this existing facility to increase the maximum amount of borrowing that may be outstanding thereunder at any one time to $181 million and modified, as a consequence of the Company's acquisition of real estate assets, certain defined terms used in the Original Loan Documentation and related documents. With the exception of these changes, the Amendment contains substantially the same terms as the Original Loan Documentation. A copy of the Amendment is attached as Exhibit 10.4 to this Current Report on Form 8-K.

The descriptions of the credit facility, the terms of the Original Loan Documentation and the borrowings made thereunder contained in Notes 16 and 19 to the Unaudited Condensed Consolidated Financial Statements of the Company included in our Quarterly Report on Form 10-Q filed with the SEC on November 9, 2007 are incorporated by reference into this Item 2.03 of this Current Report on Form 8-K.

**Item 3.02  Unregistered Sales of Equity Securities**

On January 29, 2008, as partial consideration for the acquisition described in Items 1.01 and 2.01 above, the Company issued 502,364 shares of its common stock to GACCF and 596,926 shares of its common stock to GAM. In issuing these shares, the Company relied on an exemption from registration under Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act").

Also, on January 29, 2008, pursuant to the New Settlement Agreement described in Item 1.01 above, the Company agreed to issue Warrants to the Franchisees to purchase an aggregate of 300,000 shares of the Company's common stock. In issuing these Warrants, the Company relied on an exemption from registration under Section 4(2) of the Securities Act.

Further, on January 29, 2008, as partial consideration for the amendments to the bank credit facility described in Items 1.01 and 2.03 above, the Company agreed to issue a warrant to BTMU to purchase 200,000 shares of the Company's common stock. In issuing the warrant, the Company relied on an exemption from registration under Section 4(2) of the Securities Act.

Source: NexCen Brands, Inc., 8-K, January 29, 2008

**Item 8.01 Other Events**

On January 29, 2008, the Company issued a press release announcing the signing and closing of the acquisition and the extension of its existing credit facility as described in Items 1.01, 2.01, and 2.03 above. A copy of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

(a) Financial Statements of Businesses Acquired

The Company intends to provide the financial statements for the periods specified in Rule 3-05(b) of Regulation S-X under cover of a Current Report on Form 8-K/A within the time allowed for such filing by Item 9.01(a)(4) of this Current Report on Form 8-K.

(b) Pro Forma Financial Information

The Company intends to provide the pro forma financial information required by Article 11 of Regulation S-X under cover of a Current Report on Form 8-K/A within the time allowed for such filings by Item 9.01(b)(2) of this Current Report on Form 8-K.

(d) Exhibits

2.1 Asset Purchase Agreement dated January 29, 2008 by and among the Company, the Buyer, the Sellers and MFFB.

4.1 Registration Rights Agreement dated January 29, 2008 by and among the Company and the Sellers.

4.2 Form of Common Stock Warrant issued by the Company to the Franchisees on January 29, 2008.

4.3 Common Stock Warrant dated January 29, 2008 issued by the Company to BTMU.

4.4 BTMU Registration Rights Agreement dated January 29, 2008 by and between the Company and BTMU.

9.1 Voting Agreement dated January 29, 2008 by and among the Company and the Sellers.

10.1 Settlement and Release Agreement dated January 29, 2008 by and among the Company, GACCF, MFFB, MFOC and the Franchisees.

*10.2 Security Agreement dated March 12, 2007 by and among NexCen Acquisition Corp., the subsidiary borrowers parties thereto and BTMU (Designated as Exhibit 10.19 to the Annual Report on Form 10-K filed on March 16, 2007).

*10.3 Note Funding Agreement dated March 12, 2007 by and among NexCen Acquisition Corp., the subsidiary borrowers parties thereto, Victory Receivables Corporation and BTMU (Designated as Exhibit 10.20 to the Annual Report on Form 10-K filed on March 16, 2007).

6

10.4 Omnibus Amendment dated January 29, 2008 by and among NexCen Holding Corporation (f/k/a NexCen Acquisition Corp.), BTMU, Victory Receivables Corporation, the Co-Issuers, as defined therein, NexCen Franchise Management, Inc. and NexCen Brand Management, Inc.

99.1 Press Release of the Company dated January 29, 2008.

---

* Incorporated by reference.

7

SIGNATURES

According to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on January 29, 2008.

**NEXCEN BRANDS, INC.**

|  | /s/ David B. Meister |
|---|---|
| By: | David B. Meister |
| Its: | Senior Vice President and Chief Financial Officer |

8

Source: NexCen Brands, Inc., 8-K, January 29, 2008

ASSET PURCHASE AGREEMENT

BY AND AMONG

NEXCEN ASSET ACQUISITION, LLC,

GREAT AMERICAN COOKIE COMPANY FRANCHISING, LLC,

GREAT AMERICAN MANUFACTURING, LLC,

NEXCEN BRANDS, INC.

AND

MRS. FIELDS FAMOUS BRANDS, LLC

DATED AS OF JANUARY 29, 2008

Source: NexCen Brands, Inc., 8-K, January 29, 2008

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| *ARTICLE I Definitions and Usage* | | *1* |
| 1.1 | Definitions | 1 |
| 1.2 | Usage | 14 |
| *ARTICLE II Purchase and Sale of Businesses and Assets* | | *14* |
| 2.1 | Purchase and Sale of Assets | 14 |
| 2.2 | Excluded Assets | 15 |
| 2.3 | Assumed Liabilities | 15 |
| 2.4 | Excluded Liabilities | 16 |
| *ARTICLE III Purchase Price; Payment; Assumption of Obligations* | | *17* |
| 3.1 | The Closing | 17 |
| 3.2 | Purchase Price | 18 |
| 3.3 | Payment | 19 |
| 3.4 | Allocation | 19 |
| 3.5 | Nonassignable Contracts | 20 |
| 3.6 | Escrow | 20 |
| 3.7 | Accounts Receivable. | 21 |
| *ARTICLE IV Representations and Warranties of the Sellers and MFFB* | | *22* |
| 4.1 | Organization and Good Standing | 23 |
| 4.2 | Enforceability; Authority | 23 |
| 4.3 | Consents; Approvals | 24 |
| 4.4 | Financial Statements | 24 |
| 4.5 | Real Property | 25 |
| 4.6 | Title to Assets | 27 |
| 4.7 | Sufficiency of Assets | 28 |
| 4.8 | Accounts Receivable | 28 |
| 4.9 | Insolvency Proceedings | 28 |
| 4.10 | Taxes | 28 |
| 4.11 | Labor Relations; Compliance | 29 |
| 4.12 | Employee Benefits | 29 |
| 4.13 | Litigation; Orders | 31 |
| 4.14 | Compliance With Laws; Permits | 32 |
| 4.15 | Operations of the Sellers | 32 |
| 4.16 | Material Contracts | 33 |
| 4.17 | Insurance | 34 |
| 4.18 | Environmental and Safety Matters | 35 |
| 4.19 | Intellectual Property | 36 |
| 4.20 | Affiliate Transactions | 38 |
| 4.21 | Brokers' or Finders' Fees | 38 |
| 4.22 | Suppliers | 38 |
| 4.23 | Franchise Matters | 39 |
| 4.24 | Powers of Attorney | 44 |
| 4.25 | Investment | 44 |
| 4.26 | Deferred Revenue Liability | 45 |
| 4.27 | Indenture Payment | 45 |
| 4.28 | Settlement Agreement | 45 |
| 4.29 | Other Contracts | 45 |

Source: NexCen Brands, Inc., 8-K, January 29, 2008

*ARTICLE V Representations and Warranties of Buyer and Parent*                45
  5.1    Existence and Good Standing; Authorization                45
  5.2    Consents and Approvals; No Violations                46
  5.3    SEC Documents and Other Reports                46
  5.4    Litigation                47
  5.5    Brokers' or Finders' Fees                47
  5.6    Parent Shares                47

*ARTICLE VI Pre-Closing Covenants*                47
  6.1    Efforts to Closing                47
  6.2    Conduct of the Businesses                47
  6.3    Access and Investigation                49
  6.4    Business Plan                49
  6.5    Exclusivity                49
  6.6    Change of Name                49
  6.7    Notice of Developments                50
  6.8    Continuation of Businesses                50
  6.9    Regulatory Filings                50
  6.10   Maintenance of Real Property                51
  6.11   Leases                51
  6.12   Title Insurance                51
  6.13   Financing                51
  6.14   Employees                51

*ARTICLE VII Post-Closing Covenants*                52
  7.1    Employees                52
  7.2    Taxes Related to Purchase of Assets; Tax Cooperation                52
  7.3    Nonsolicitation                54
  7.4    Further Assurances                54
  7.5    Audit                54
  7.6    Confidentiality                55
  7.7    Solvency                55
  7.8    Restrictions on Sale of Parent Shares                56
  7.9    Registration                56
  7.10   Agreement to Vote                56
  7.11   Access to Records                56
  7.12   Product Formulation Royalties                57
  7.13   Lease Obligations                57
  7.14   Intellectual Property                58
  7.15   Franchise Business.                59
  7.16   New Settlement Agreement                59
  7.17   Waste Water Filter                59

*ARTICLE VIII Conditions Precedent to Parent's and Buyer's Obligation to Close*                59
  8.1    Truth of Representations and Warranties                60
  8.2    Performance of Agreements                60
  8.3    Certificate                60
  8.4    No Injunction                60
  8.5    Governmental and Other Approvals                60
  8.6    Indenture Lien Release                60
  8.7    Transition Services                60
  8.8    Escrow Agreement                60
  8.9    Registration Rights Agreement                60
  8.10   Voting Agreement                60

Source: NexCen Brands, Inc., 8-K, January 29, 2008

Source: NexCen Brands, Inc., 8-K, January 29, 2008

| 8.11 | Deed | 60 |
|------|------|----|
| 8.12 | No Material Adverse Effect | 61 |
| 8.13 | Financing | 61 |
| 8.14 | Real Property | 61 |
| 8.15 | Title Insurance | 61 |
| 8.16 | Closing Deliverables | 61 |
| *ARTICLE IX Conditions Precedent to the Sellers' Obligation to Close* | | 62 |
| 9.1 | Truth of Representations and Warranties | 62 |
| 9.2 | Performance of Agreements | 62 |
| 9.3 | Certificate | 62 |
| 9.4 | No Injunction | 62 |
| 9.5 | Governmental and Other Approvals | 62 |
| 9.6 | Escrow Agreement | 62 |
| 9.7 | Registration Rights Agreement | 62 |
| 9.8 | Closing Deliverables | 63 |
| *ARTICLE X Termination* | | 63 |
| 10.1 | Right to Terminate | 63 |
| 10.2 | Effect of Termination | 64 |
| *ARTICLE XI Indemnification; Remedies* | | 64 |
| 11.1 | Survival | 64 |
| 11.2 | Indemnification by the Sellers and MFFB | 64 |
| 11.3 | Indemnification by Buyer | 65 |
| 11.4 | Limitation on Liability | 65 |
| 11.5 | Other Indemnification Provisions | 66 |
| 11.6 | Procedure for Indemnification | 66 |
| 11.7 | Non-Third Party Claims | 67 |
| 11.8 | Indemnification Payments | 68 |
| *ARTICLE XII Miscellaneous* | | 68 |
| 12.1 | Public Disclosure or Communications. | 68 |
| 12.2 | Notices | 68 |
| 12.3 | Entire Agreement; Nonassignability; Parties in Interest | 69 |
| 12.4 | Bulk Sales Law | 69 |
| 12.5 | Expenses | 70 |
| 12.6 | Waiver and Amendment | 70 |
| 12.7 | Severability | 70 |
| 12.8 | Remedies Cumulative | 70 |
| 12.9 | Counterparts | 70 |
| 12.10 | Governing Law; Jurisdiction | 70 |
| 12.11 | Specific Performance | 71 |

Source: NexCen Brands, Inc., 8-K, January 29, 2008

**Annexes, Exhibits and Schedules**

| _Annexes_ | | |
|---|---|---|
| | Financial Results of GAC Related Businesses as of November 24, 2007 | Annex A |
| | Purchase Price Allocation | Annex B |
| _Exhibits_ | | |
| | GACCF and GAM Logos | Exhibit A |
| | Form of Transition Services Agreement | Exhibit B |
| | Form of Escrow Agreement | Exhibit C |
| | Form of Registration Rights Agreement | Exhibit D |
| | Form of Voting Agreement | Exhibit E |
| | Form of Deed | Exhibit F |
| _Schedules_ | | |
| | Assumed Contracts | 1.1A |
| | Deferred Revenue Liability | 1.1B |
| | Vendor Agreements | 1.1D |
| | Excluded Contracts | 2.2(g) |
| | Assumed Liabilities | 2.3 |
| | Allocation Schedule | 3.4 |
| | Seller Accounts Receivable | 3.7 |
| | Consents and Approvals | 4.3 |
| | Sellers' Material Liabilities and Obligations | 4.4(b) |
| | Owned Real Property | 4.5(a) |
| | Leased Real Property | 4.5(b) |
| | Real Property Permits | 4.5(g)(1) |
| | Consents and Real Property Permits | 4.5(g)(2) |
| | Sufficiency of Assets | 4.7 |
| | Accounts Receivable and Encumbrances | 4.8 |
| | Sellers' Tax Returns Subject to Audit | 4.10 |
| | Labor Relations; Compliance | 4.11 |
| | Employee Benefit Plans | 4.12 |
| | Litigation Proceedings | 4.13(a) |
| | Orders | 4.13(b) |
| | Compliance With Laws; Permits | 4.14 |
| | Operation of Sellers; Material Adverse Effect | 4.15 |
| | Material Contracts | 4.16(a) |
| | Breach or Default of Material Contracts | 4.16(b) |
| | Affiliated Contracts | 4.16(c) |
| | Insurance | 4.17 |
| | Environmental and Safety Matters | 4.18 |
| | Intellectual Property | 4.19(a) |
| | IT Software and Other Licensed Intellectual Property | 4.19(b) |
| | Sellers' Intellectual Property Rights | 4.19(c) |
| | Sellers' Intellectual Property Infringements | 4.19(d) |
| | Validity of Intellectual Property Rights | 4.19(e) |
| | Third Party Intellectual Property Infringements | 4.19(f) |
| | Intellectual Property Development and Acquisition | 4.19(g) |
| | Intellectual Property Restrictions | 4.19(h) |
| | Affiliate Transactions | 4.20 |
| | Suppliers | 4.22 |
| | Franchise Matters | 4.23(a)-(z) |

Source: NexCen Brands, Inc., 8-K, January 29, 2008

Source: NexCen Brands, Inc., 8-K, January 29, 2008

| | |
|---|---|
| Powers of Attorney | 4.24 |
| Settlement Franchisees | 4.28 |
| Transferred Employees | 6.14 |
| Vendor Allocation Schedule | 7.12 |
| Lease Locations | 7.13(a) |
| Foreign Trademarks | 7.14 |
| Governmental and Other Approvals | 8.5 |

v

Source: NexCen Brands, Inc., 8-K, January 29, 2008

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of January 29, 2008, by and among NexCen Asset Acquisition, LLC, a Delaware limited liability company ("Buyer"), NexCen Brands, Inc., a Delaware corporation ("Parent"), Great American Cookie Company Franchising, LLC, a Delaware limited liability company ("GACCF"), Great American Manufacturing, LLC, a Delaware limited liability company ("GAM," and with GACCF, each individually, a "Seller," and collectively, the "Sellers"), and Mrs. Fields Famous Brands, LLC, a Delaware limited liability company ("MFFB").

## RECITALS

WHEREAS, the Sellers are directly engaged in the Businesses;

WHEREAS, the Sellers desire to sell to Buyer, and Buyer desires to purchase from the Sellers, certain of the assets of the Businesses, and to assume certain liabilities associated therewith, on the terms and subject to the conditions set forth in this Agreement so as to permit Buyer to operate the Businesses.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I
Definitions and Usage

1.1 Definitions. For purposes of this Agreement, the following terms and variations thereof have the meanings specified or referred to in this Section 1.1:

"Accountant Statement" is defined in Section 3.2(c).

"Accredited Investor" has the meaning set forth in Regulation D promulgated under the Securities Act.

"Actual Financials" is defined in Section 3.2(b).

"Acquisition Proposal" is defined in Section 6.5.

"Acquired Franchise Assets" means those Purchased Assets owned or used by MFFB or GACCF in the operation of the GAC Franchise Business.

"Acquired Manufacturing Assets" means those Purchased Assets owned or used by MFFB or GAM in the operation of the GAC Manufacturing Business.

"Adjusted Closing Date Reference Price" is defined in Section 3.6(b).

"Adjustment" is defined in Section 7.8.

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Affiliate" of any Person means any Person which, directly or indirectly controls or is controlled by that Person, or is under common control with that Person; *provided*, that, for purposes of Section 7.3(a) only, Affiliates shall be deemed to include only Persons controlled by MFC and not Persons controlling MFC. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

"Allocation Schedule" is defined in Section 3.4.

"Assumed Contracts" means all Franchise Agreements (including, without limitation, the right to collect any and all amounts due and payable thereunder that are unpaid to either Seller as of the Closing Date, other than the Seller Accounts Receivable) and, subject to Section 3.5, all other Contracts to which either Seller is a party that relate to the operation of the Businesses and all security deposits relating thereto, all of which are listed on Schedule 1.1A.

"Assumed Liabilities" is defined in Section 2.3.

"Balance Sheet" is defined in Section 4.4(a).

"Books and Records" means all books and records of the Sellers or their Affiliates relating exclusively to and necessary for the operation of the Businesses as they are currently operated, including files, documents, correspondence, cost and pricing information, accounting records, supplier lists and records, operating manuals, operating procedures, marketing research, training materials, training records, maintenance and inspection reports, equipment lists, repair notes and archives, sales and marketing materials, and personnel files and records for the Transferred Employees; *provided*, that "Books and Records" will not include any corporate records of the Sellers or their Affiliates.

"Brands" means the "Great American Cookies" and "Great American Chocolate Chip Cookie Company," and all other brands owned or in use by GACCF, together with the logos shown on Exhibit A, each of which are the subject of certain trademark and service mark registrations with the United States Patent and Trademark Office, or any other similar Government Authority responsible for trademark or service mark registration.

"Business Day" means any day other than (a) Saturday or Sunday or (b) any other day on which banks in New York, New York are permitted or required to be closed.

"Businesses" means the businesses that relate to the operation of the GAC Franchise Business and the GAC Manufacturing Business, including the use of any of the Purchased Assets in connection with the operation thereof.

"Business Plan" is defined in Section 6.4.

"Buyer Accounts Receivable" is defined in Section 3.7(a).

"Buyer's Closing Documents" is defined in Section 9.8.

2

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Buyer Indemnified Parties" is defined in Section 11.2.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601, et seq.).

"Claim Notice" is defined in Section 11.7.

"Closing" is defined in Section 3.1.

"Closing Date" means the date on which the Closing actually takes place.

"Closing Date Reference Price" means $4.23.

"Closing Statement" is defined in Section 3.2(b).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar applicable Legal Requirement.

"Code" means the Internal Revenue Code of 1986.

"Contingent Initial Franchise Fees" means, in the aggregate, the Initial Franchise Fees that have been paid pursuant to Section 6.1 of those Franchise Agreements executed by GACCF prior to or on the Closing Date for stores not opened for business on or prior to the Closing Date.

"Contingent Initial Franchise Fee Refunds" means, in the aggregate any portion of the Contingent Initial Franchise Fees that become due and payable to any Franchisee upon the termination of any Franchise Agreement pursuant to the terms of such Franchise Agreement.

"Contract" means any contract, license, sublicense, franchise, permit, mortgage, purchase orders, indenture, loan agreement, note, lease, sublease, agreement, obligation, commitment, understanding, instrument or other arrangement or any commitment to enter into any of the foregoing (in each case, whether written or oral).

"Core Representations" is defined in Section 11.1.

"Damages" means any loss, liability, claim, damage, expense (including reasonable attorneys' fees and costs), whether or not involving a third party claim, *provided*, *however*, that other than with respect to Damages payable to a Third Party pursuant to a third party claim, Damages shall not include any special, consequential, punitive or treble damages.

"Deed" means the Limited Warranty Deed transferring fee title to the Owned Real Property to GAC Manufacturing, LLC, to be dated as of the Closing Date and substantially in the form attached hereto as Exhibit F.

"Deferred Revenue Cash" means cash in an amount equal to the Deferred Revenue Liability.

3

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Deferred Revenue Liability" means, in the aggregate, the amount of deferred revenue allocated to Franchise Agreements on an itemized basis, that would be required under GAAP to be shown on a balance sheet of each Seller as of the Closing Date, as set forth on Schedule 1.1B.

"Disclosure Schedule" is defined in the first paragraph of Article IV.

"Domestic UFOC" means the Uniform Franchise Offering Circular of GACCF, as applicable, prepared in accordance with the UFOC Guidelines.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA and any other compensation or benefit plan, program, agreement or arrangement of any kind (whether written or oral) including any employment, severance, change of control or other similar agreement or arrangement.

"Encumbrance Documents" is defined in Section 4.5(i).

"Encumbrances" means any liens, pledges, claims, encumbrances, mortgages, charges, options, preemptive rights, rights of first refusal or similar rights, title retention agreements, easements, encroachments, leases, subleases, covenants, security interests and restrictions and encumbrances of any kind or nature whatsoever.

"Environmental and Safety Requirements" means, whenever in effect, all federal, state, local and foreign statutes, regulations, ordinances, codes and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law concerning public health and safety, worker health and safety, or pollution or protection of the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of, or exposure to, any Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means, with respect to any Person, any other Person that at any relevant time is or was treated as a single employer with such Person under Sections 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" means Wilmington Trust Company, in its capacity as the escrow agent under the Escrow Agreement.

"Escrow Agreement" means the Escrow Agreement, to be dated as of the Closing Date and substantially in the form attached hereto as Exhibit C.

"Executive Knowledge" means, with respect to the Sellers and/or MFFB, as the case may be, the actual knowledge, after reasonable due inquiry, of Stephen Russo and Michael Ward.

4

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

"Excluded Assets" is defined in Section 2.2.

"Excluded Liabilities" is defined in Section 2.4.

"Filter Contract" means the contract to be entered into by GAM to replace the waste water filter at its manufacturing facility.

"Final Purchase Price" means the Initial Purchase Price minus the Purchase Price Deficit Amount, if any.

"Financial Statements" is defined in Section 4.4(a).

"Franchise Agreements" means any Contract (and any written or oral amendment or modification thereto) between GACCF or any of its predecessors and a Franchisee pertaining to and evidencing the grant of a Franchise.

"Franchisee" means a Person who has entered into and as of the Closing Date is a party to a Franchise Agreement with GACCF or any of its predecessors.

"Franchise" means the grant by GACCF to a Franchisee of the rights to establish and operate a location using the Brands or outlet thereof including subfranchise agreements, master development agreements, area representative agreements, area development agreements, master franchise agreements, development agreements, license agreements, and any other similar agreements, together with all ancillary agreements related thereto.

"Franchise Purchase Price" means $45,000,000, which is the initial purchase price for the Acquired Franchise Assets.

"Franchise Revenue Difference" means the difference between the total revenues in the Actual Financials minus the "Total Revenues" as set forth under the column entitled "GAC Franchise Business" on Annex A, each calculated in accordance with GAAP.

"GAAP" means generally accepted accounting principles for financial reporting in the United States.

"GAC" means Great American Cookie.

"GAC Franchise Business" means the licensing of the right to conduct the business of a retail snack, dessert and beverage outlet selling any GACCF Products and other products for off-premises consumption and services specified by GACCF at or from the premises of such outlet (including carts and kiosks).

"GAC Manufacturing Business" means the GAC dough manufacturing and supply businesses, and any ancillary product supply business.

5

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"GACCF Accounts Receivable" means (a) all trade accounts receivable, franchise royalty accounts receivable and other rights to payment from franchisees and customers of GACCF, (b) all advertising accounts receivable of GACCF related to advertising or marketing funds, (c) all other accounts or notes receivable of GACCF and the full benefit of all security for such accounts or notes, and (d) any claim, remedy or other right related to any of the foregoing.

"GACCF Products" means products approved or required by GACCF from time to time for sale in the GAC Franchise Business, including, without limitation, specialty snacks and other bakery items, desserts and beverages (such as cookies, brownies, coffee cakes and coffee) and other products approved by GACCF from time to time.

"GACCI" means Great American Cookie Company, Inc., a Delaware Corporation.

"GAM Accounts Receivable" means (a) all trade accounts receivable, franchise royalty accounts receivable and other rights to payment from franchisees and customers of GAM, (b) all advertising accounts receivable of GAM related to advertising or marketing funds, (c) all other accounts or notes receivable of GAM and the full benefit of all security for such accounts or notes, and (d) any claim, remedy or other right related to any of the foregoing.

"Government Authority" means any domestic or foreign national, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, including any quasi-governmental or private body exercising any regulatory or taxing authority thereunder or any judicial authority (or any department, bureau or division thereof).

"Government Authorization" means any approval, consent, license, permit, waiver, or other authorization issued, granted, given or otherwise made available by or under the authority of any Government Authority or pursuant to any Legal Requirement.

"Hazardous Substance" means any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, odor or radiation, or any other material, substance or waste as to which liability or standards of conduct may be imposed pursuant to Environmental and Safety Requirements.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Improvements" is defined in Section 4.5(d).

"Indemnification Objection" is defined in Section 11.7.

"Indemnified Party" is defined in Section 11.3.

"Indemnifying Party" is defined in Section 11.6(a).

"Indemnity Escrow Amount" means, for each Seller, the number of Parent Shares set forth next to each Seller's name in Column II of Annex B.

6

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Indemnity Escrow Release Date" is defined in Section 3.6(a).

"Indebtedness" means (a) indebtedness of either Seller for borrowed money or with respect to deposits or advances of any kind (other than advances due from customers incurred in the ordinary course of business and consistent with past practice), (b) all obligations of either Seller evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of either Seller upon which interest charges are paid, (d) all obligations of either Seller in respect of capitalized leases that, individually, involve an aggregate future liability in excess of $5,000 and obligations of either Seller for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business and consistent with past practice), (e) all obligations in respect of banker's acceptances or letters of credit issued or created for the account of either Seller, (f) all indebtedness or obligations of the types referred to in the preceding clauses (a) through (e) of any other Person secured by any Encumbrance on any assets of either Seller, even though such Seller has not assumed or otherwise become liable for the payment thereof, (g) all guarantees by either Seller of obligations of the type described in clauses (a) through (f) above of any other Person, and (h) payment obligations in respect of interest under any interest rate swap or other hedge agreement or arrangement entered into by either Seller with respect to any Indebtedness described in clauses (a) through (g) above.

"Indenture" means that certain Indenture, dated as of March 16, 2004, among *inter alia*, MFFB, Mrs. Fields Financing Company, Inc. and The Bank of New York.

"Initial Franchise Fees" means, in the aggregate, the nonrecurring initial franchise fees payable pursuant to Section 6.1 of the Franchise Agreements.

"Initial Period" is defined in Section 7.8.

"Initial Purchase Price" means the sum of (i) the Franchise Purchase Price *plus* (ii) the Manufacturing Purchase Price.

"Insurance Policies" is defined in Section 4.17.

"Intellectual Property Rights" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, recipes and proprietary food processes (including, without limitation, the Seller Recipes and Processes), trade dress, trade names, product configuration, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, Internet websites, and URLs; (iii) copyrights and copyrightable works; (iv) registrations and applications for any of the foregoing; (v) trade secrets and confidential information (including inventions, ideas, formulae, compositions, know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial, business and marketing plans, and customer and supplier lists and related information); (vi) all other intellectual property; and (vii) any goodwill associated with each of the foregoing.

"Interim Reports" is defined in Section 4.4(a).

7

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Inventory" means the inventory of GAM, wherever located, including, without limitation, all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or intended for use by the GAC Manufacturing Business.

"IRS" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of the Treasury.

"IT Software" is defined in Section 4.19(b).

"Knowledge" means, with respect to the Sellers and/or MFFB, as the case may be, the actual knowledge, after reasonable due inquiry, of Stephen Russo, Michael Ward, Dale Thompson, Michael Curtis, Steve Passey and Justin Nalder. The terms "know" and "knows" and like terms will have correlative meanings.

"Leases" is defined in Section 4.5(b).

"Lease Locations" is defined in Section 7.13(a).

"Lease Obligation Date" is defined in Section 7.13(d).

"Leased Real Property" is defined in Section 4.5(b).

"Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational or other administrative order, constitution, law, ordinance, principle of common law, regulation, rule, statute or treaty.

"Manufacturing Contribution" means manufacturing revenues less direct manufacturing expenses, each as calculated in accordance with GAAP.

"Manufacturing Contribution Difference" means the Manufacturing Contribution in the Actual Financials minus the "Manufacturing Contribution" as set forth under the column entitled "GAC Manufacturing Business" on Annex A, each as calculated in accordance with GAAP.

"Manufacturing Purchase Price" means $48,650,000, which is the initial purchase price for the Acquired Manufacturing Assets.

"Marketing Fees" means, in the aggregate, the amount of marketing fees collected by GACCF under the Franchise Agreements.

"Marketing Fees Balance" is defined in Section 4.23(w).

"Marketing Fees Cash" means cash in an amount equal to the Marketing Fees Balance.

"Marketing Fees Reconciliation" is defined in Section 4.23(w).

8

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Material Adverse Effect" means any change, effect, event, occurrence, state of facts or development that is, or would reasonably be expected to be, materially adverse to the assets, business, liabilities, prospects, results of operations or condition (financial or otherwise) of the Sellers taken as a whole or that prevents or materially impedes, or would reasonably be expected to prevent or materially impede, the consummation by the Sellers of the transactions contemplated by this Agreement.

"Material Contracts" is defined in Section 4.16(a).

"MFC" means Mrs. Fields' Companies, Inc.

"MFFB Other Franchise Brands" means any of the following brands owned by MFFB or any of its Affiliates as of the date of this Agreement: "Mrs. Fields Cookies," "Yovana" and "TCBY," or any other brand (other than the Brands) under which MFFB or any of its Affiliates conducts a franchise business.

"Minimum Loss" is defined in Section 11.4(a).

"Multiemployer Plan" has the meaning set forth in Section 3(37) of ERISA.

"NASAA" means the North American Securities Administrators Association.

"New Settlement Agreement" means that certain Settlement and Release Agreement dated as of January 29, 2008, by and among Parent, GACCF, MFFB, Mrs. Fields' Original Cookies, Inc. and certain franchisees of GACCI that are signatories thereto.

"Notice of Default" means a formal, written notice of default under a Franchise Agreement issued with the approval of the senior management of either Seller. A "Notice of Default" does not include a notice of operating deficiencies issued by the staff personnel of either Seller contained in a field inspection report or other similar writing.

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made or rendered by any court, administrative agency or other Government Authority or by any arbitrator.

"Organizational Documents" means with respect to any entity, the certificate of incorporation, bylaws, certificate of formation, operating agreement or other governing documents of such entity.

"Original Settlement Agreement" means collectively those certain Settlement Agreement and Releases dated June 1998, by and among Mrs. Fields' Original Cookies, Inc., Capricorn Investors II, L.P., GACCI, Cookies USA, Inc., The Jordan Company and certain franchisees of GACCI.

"Other Interim Report" is defined in Section 6.3.

"Owned Real Property" is defined in Section 4.5(a).

"Parent SEC Documents" is defined in Section 5.3.

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Parent Shares" means the shares of common stock, par value $0.01 per share, of Parent.

"Permitted Encumbrances" means (i) any liens for current Taxes, assessments or governmental charges which are not yet due and payable or (ii) with respect to each Owned Real Property and Improvements on the Leased Real Property (as the case may be): (a) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to such Real Property which are not due and payable as of Closing, (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to such Real Property incurred in the ordinary course of business for amounts which are not due and payable and which shall be paid in full and released at Closing, (c) zoning, building codes and other land use laws regulating the use or occupancy of such Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property which are not violated by the current use or occupancy of such Real Property or the operation of the Businesses thereon, and (d) easements, covenants, conditions, restrictions and other similar matters of record affecting title to such Real Property which do not or would not materially impair the use or occupancy of such Real Property in the operation of the Businesses conducted thereon.

"Person" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Government Authority.

"Personal Property" means the equipment, furniture, machinery, computer hardware, motor vehicles and other tangible personal property owned by either Seller and used or intended for use in the Businesses as currently operated.

"Prepaid Expenses" as of any date means payments made by either Seller or any of their Affiliates with respect to the Businesses or the Purchased Assets, which constitute prepaid expenses in accordance with GAAP.

"Proceeding" means any action, charge, complaint, material grievance, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before (or that could come before), or otherwise involving, any Government Authority or arbitrator.

"Product Formulation Royalties" means in the aggregate, all of the payments to be paid by the counterparty to any Assumed Contract to either Seller or to MFFB or one of its Affiliates and allocated to either Seller by MFFB or such Affiliate pursuant to any Vendor Agreement.

"Purchase Price Deficit Amount" is defined in Section 3.2(f).

"Purchase Price Deficit Statement" is defined in Section 3.2(f).

10

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Purchased Assets" means all right, title, and interest in and to all of the assets that are used exclusively or primarily in the Businesses, whether tangible or intangible, real or personal and wherever located and by whomever possessed (other than the Excluded Assets), including, without limitation, (i) Personal Property, (ii) Real Property, (iii) Assumed Contracts, (iv) the Marketing Fees Balance (if a positive amount), (v) Government Authorizations, (vi) Intellectual Property Rights, (vii) Inventory, maintenance and operating supplies, (viii) Prepaid Expenses, (ix) Books and Records, (x) the assets of any advertising fund, gift card program, and any brand building fund associated with the Businesses, (xi) all claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind against the Franchisees, (xii) all proceeds actually recovered under insurance policies and, to the extent transferable, all rights of recovery under such insurance policies, (xiii) the Deferred Revenue Cash, (xiv) all of the files of Sellers' counsel (in-house and outside counsel) relating to the Franchise Agreements, the Seller UFOCs, the registration, exemption and notice filings made by each Seller and the Intellectual Property Rights of each Seller, (xv) all other properties, assets and rights owned by either Seller as of the Closing Date, or in which either Seller has an interest, and which are not otherwise Excluded Assets, (xvi) an assignment of the license rights of each Seller with respect to the property owned by third parties and used by either Seller under license, (xvii) the rights to obtain and have installed the waste water filter under the Filter Contract, but not the payment obligations thereunder, and (xviii) the Seller Recipes and Processes.

"Qualified Plan" is defined in Section 4.12(b).

"Real Estate Impositions" is defined in Section 4.5(k).

"Real Property" is defined in Section 4.5(c).

"Real Property Laws" is defined in Section 4.5(f).

"Real Property Lease" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which a Person holds a leasehold or subleasehold estate in, or is granted the right to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property.

"Real Property Permits" is defined in Section 4.5(g).

"Registration Laws" is defined in Section 4.23(i).

"Registration Rights Agreement" is defined in Section 7.9.

"Registration Statement" is defined in Section 7.9.

"Release Consideration" has the meaning set forth in the New Settlement Agreement.

"Representative" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

"Reviewing Accountant" is defined in Section 3.2(c).

"SEC Financial Statements" is defined in Section 7.5.

11

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Securities" is defined in Section 7.8.

"Securities Act" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"Seller Accounts Receivable" is defined in Section 3.7(c).

"Seller Benefit Plan" is defined in Section 4.12(a).

"Seller Indemnified Parties" is defined in Section 11.3.

"Seller Information" means any data and information relating to the Businesses, customers, financial statements, conditions or operations of the Businesses, in each case which is confidential in nature and not generally known to the public.

"Seller Recipes and Processes" is defined in Section 4.19(l).

"Sellers" is defined in the first paragraph of this Agreement.

"Seller UFOC" means the Domestic UFOC(s) and all other forms of disclosure documents used by GACCF to offer and sell Franchises in the United States and throughout the world.

"Settlement Franchisees" means those persons or entities who are franchisee parties to the Original Settlement Agreement.

"Statement of Objection" is defined in Section 3.2(b).

"Straddle Period" is defined in Section 7.2(b).

"Subsidiary" means, with respect to any Person, any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by such Person or one or more of its Subsidiaries.

"Survey" means that certain ALTA/ACSM Land Title Survey for the Owned Real Property, Job No. 20070272-001, prepared by Abb W. Preston of Preston Land Surveyors dated as of November 9, 2007.

"Survival Date" is defined in Section 11.1.

"Tax" means (i) any tax (including, without limitation, any income tax, franchise tax, margin tax, branch profits tax, capital gains tax, alternative or add-on minimum tax, estimated tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax, escheat or abandoned property liability), and any related fine, penalty, interest or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Government Authority or payable pursuant to any tax-sharing agreement relating to the sharing or payment of any such tax and (ii) any transferee, successor or other liability in respect of the taxes of another Person (whether by contract or otherwise).

12

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Tax Return" means any return (including any information return), report, statement, schedule, notice, form or other document or information filed with or submitted to, or required to be filed with or submitted to, any Government Authority in connection with the determination, assessment, collection or payment of any Tax.

"Termination Date" is defined in Section 10.1(b).

"Territorial Rights" means a protected territory, exclusive territory, covenant not to compete, right of first refusal, option or other similar arrangement granted by either Seller to any Franchisee.

"Third Party" means a Person that is not a party to this Agreement.

"Third Party Claim" is defined in Section 11.6(b).

"Title Commitment" means that certain ALTA Commitment, File No. 10012007, for the Owned Real Property issued by the Title Company dated as of October 23, 2007 or such later date as in effect from time to time.

"Title Company" means Stewart Title Guaranty Company.

"Title Policy" is defined in Section 8.15.

"Transfer" is defined in Section 7.8.

"Transfer Taxes" is defined in Section 7.2(a).

"Transferred Employees" is defined in Section 6.14.

"Transition Services Agreement" means the Transition Services Agreement, to be dated as of the Closing Date and substantially in the form attached hereto as Exhibit B.

"TTM Period" means the period consisting of the trailing twelve (12) months ended November 24, 2007.

"UFOC Guidelines" means the Uniform Franchise Offering Circular Guidelines published by NASAA as in effect from time to time.

"UFOCs" means all of the uniform franchise offering circulars used by GACCF since March 16, 2004, in its efforts to comply with the laws pertaining to the offer and sale of the Franchises.

"Undertakings" has the meaning set forth in the New Settlement Agreement.

13

Source: NexCen Brands, Inc., 8-K, January 29, 2008

"Vendor Agreements" means those agreements listed on Schedule 1.1D pursuant to which MFFB or one of its Affiliates (other than Sellers) collects royalties.

"Vendor Allocation Schedule" is defined in Section 7.12.

"Voting Agreement" is defined in Section 7.10.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, and any similar foreign, state or local law, regulation or ordinance.

1.2 Usage

(a) Interpretation. In this Agreement, unless a clear contrary intention appears: (i) the singular number includes the plural number and vice versa; (ii) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually; (iii) reference to any gender includes each other gender; (iv) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (v) reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (vi) "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof; (vii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (viii) "or" is used in the inclusive sense of "and/or"; (ix) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and (x) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b) Legal Representation of the Parties. This Agreement was negotiated by the parties with the benefit of legal representation, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

ARTICLE II
Purchase and Sale of Businesses and Assets

2.1 Purchase and Sale of Assets. Subject to the terms and conditions of this Agreement, each Seller agrees to sell, assign, convey, transfer and deliver to Buyer (as directed by Buyer) as of the Closing Date, and Buyer agrees to purchase and to take (or to cause its designated Affiliate to take) assignment and delivery from the Sellers as of the Closing Date, all of such Seller's right, title and interest in and to the Purchased Assets (other than the Marketing Fees Balance, which shall be delivered by the Sellers to the Buyer within five (5) Business Days after the Closing Date), free and clear of all Encumbrances other than the Permitted Encumbrances.

14

Source: NexCen Brands, Inc., 8-K, January 29, 2008

2.2 <u>Excluded Assets</u>. Pursuant to this Agreement, Buyer is not acquiring, and the Sellers shall retain, the following assets, rights and properties (collectively, the "<u>Excluded Assets</u>") and, as such, they are not included in the Purchased Assets:

(a) All cash and cash equivalents of the Sellers on hand in the Sellers' accounts immediately prior to Closing, other than security deposits related to the Assumed Contracts, and Deferred Revenue Cash.

(b) All Seller Accounts Receivable.

(c) All Contracts that have terminated or expired prior to the Closing Date in the ordinary course of business consistent with the past practices of the Sellers, except any Franchise Agreements for active franchised locations that are operating under formal or informal, written or verbal, short term extensions pending completion of the renewal process and execution of renewal Franchise Agreements.

(d) All books and records as pertain to the organization, existence or capitalization of the Sellers and any other records or materials relating to the Sellers generally and not involving or relating to the Purchased Assets, other than the Books and Records.

(e) All assets and rights associated with any Seller Benefit Plan, collective bargaining agreements or arrangements, or any Employee Benefit Plan maintained, sponsored, contributed to or required to be contributed to by any Seller or any ERISA Affiliate of any Seller or with respect to which any Seller or any ERISA Affiliate of any Seller has any actual or potential liability.

(f) All rights of the Sellers under this Agreement, any agreement, certificate, instrument or other document executed and delivered by either Seller or Buyer in connection with the transactions contemplated hereby, or any side agreement between either Seller and Buyer entered into on or after the date of this Agreement.

(g) Those Contracts set forth on <u>Schedule 2.2(g)</u>.

2.3 <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall assume and agree to pay, discharge and perform when due, the Sellers' liabilities and obligations (a) arising under the Assumed Contracts, including the Franchise Agreements, to the extent such liabilities or obligations are incurred after the Closing Date (but specifically excluding any liability or obligation relating to or arising out of such Assumed Contract that exists as a result of (i) any breach of such Assumed Contract occurring on or prior to the Closing Date, (ii) any obligation of the Sellers or MFFB to pay any Taxes allocated to the Sellers or MFFB pursuant to <u>Section 7.2(b)</u>, (iii) any violation of law, breach of warranty, tort or infringement occurring on or prior to the Closing Date or (iv) any charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand arising on or prior to the Closing Date), (b) arising out of the operation of the Businesses to the extent that such liabilities or obligations accrue on or after the Closing Date and are based on conditions resulting from the operation of the Businesses by Buyer following the Closing, (c) with respect to any Contingent Initial Franchise Fee Refunds that become due and payable after the Closing Date, (d) arising from the Deferred Revenue Liability, and (e) other liabilities of a type and amount expressly identified on <u>Schedule 2.3</u> (collectively, the "<u>Assumed Liabilities</u>").

15

Source: NexCen Brands, Inc., 8-K, January 29, 2008

2.4 <u>Excluded Liabilities</u>. Except as and to the extent expressly provided in <u>Section 2.3</u>, Buyer is not agreeing to, and shall not, assume any other liability, obligation, undertaking, expense or agreement of either Seller (or relating to either Seller, either Business or any of the Purchased Assets) of any kind, character or description, whether absolute, known, unknown, accrued, liquidated, unliquidated, contingent, executory or otherwise, and whether arising prior to or following the Closing, and the execution and performance of this Agreement shall not render Buyer liable for any such liability, obligation, undertaking, expense or agreement (all of such liabilities and obligations shall be referred to herein as the "<u>Excluded Liabilities</u>"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, and Buyer will not assume or be liable for:

(a) Any liability or obligation with respect to any Excluded Asset, whether arising prior to or after the Closing.

(b) Except as expressly assumed pursuant to <u>Section 2.3(c)</u>, any liability, claim or obligation, contingent or otherwise, arising out of the operation of the Businesses or any Purchased Asset prior to the Closing Date, including, without limitation, any Contingent Initial Franchise Fee Refunds that became due and payable on or before the Closing Date and the Marketing Fee Balance (if a negative amount).

(c) Any liability or obligation arising out of or related to any Contract that is not an Assumed Contract.

(d) Except as provided in <u>Section 7.13</u>, any liability or obligation arising out of, or related to, any Lease Location, whether arising prior to or after the Closing.

(e) Any liabilities or obligations of the Sellers for expenses or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys' and accountants' fees, and brokerage fees).

(f) Any liability or obligation for any Taxes other than (i) Taxes on the Purchased Assets payable with respect to taxable periods beginning on or after the Closing Date, (ii) Transfer Taxes for which Buyer is liable pursuant to <u>Section 7.2(a)</u> of this Agreement, and (iii) the portion of the Taxes on the Purchased Assets payable for a Straddle Period for which Buyer is liable pursuant to <u>Sections 7.2(b) and (c)</u> of this Agreement.

(g) Any liability or obligation to any current or former employee, officer, director or contractor of either Seller, or any Affiliate of any Seller who provides or provided services to either Seller or any Affiliate thereof (other than any liability or obligation arising after the Closing to any employee hired by Buyer and related solely to the Buyer's employment of such employee), including any liability or obligation arising out of, relating to or incurred in connection with the employment or service by, or termination from employment or service with, either Seller or any Affiliate of any Seller, including any liabilities or obligations pertaining to any salary or wages, vacation pay, bonuses or any other type of compensation or benefits.

16

Source: NexCen Brands, Inc., 8-K, January 29, 2008

(h) Any duty, obligation or liability arising at any time under or relating to any Seller Benefit Plan or any other Employee Benefit Plan at any time maintained, sponsored or contributed or required to be contributed to by either Seller or any Affiliate or ERISA Affiliate of either Seller or with respect to which either Seller or any Affiliate or ERISA Affiliate of either Seller has any current or potential liability or obligation.

(i) Any liability or obligation (contingent or otherwise) arising out of or relating to any Environmental and Safety Requirements, except to the extent based on conditions resulting from Buyer's operation of the Businesses following the Closing.

(j) Any liability or obligation arising out of any violation by GACCF of any Legal Requirement applicable to the offer and sale of the Franchises.

(k) Any liability or obligation arising out of any violation by GACCF of any Legal Requirement applicable to the relationship between GACCF and the Franchisees under the Franchise Agreements.

(l) Any liability or obligation arising out of any violation by either Seller or its affiliates of any Legal Requirement applicable to the relationship between such Seller and any vendors who provide goods or services to the Franchisees.

(m) Any liability or obligation arising out of any infringement or other unlawful use by either Seller or any Person acting under a Seller's direction or control of any Intellectual Property Rights owned or held by any Person.

(n) Any liability or obligation of either Seller arising out of any litigation, proceeding, or claim by any Person relating to the Businesses as conducted prior to the Closing Date, whether or not such litigation, proceeding, or claim is pending, threatened, or asserted before, on, or after the Closing Date or has been disclosed by either Seller to Buyer.

(o) All obligations to make payments to the vendor under the Filter Contract.

ARTICLE III

Purchase Price; Payment; Assumption of Obligations

3.1 The Closing. The closing of the transactions contemplated hereby (the "Closing") will take place at a location, date and time mutually agreed upon by the parties. The effective time of the Closing shall be deemed to be 12:01AM on the Closing Date.

17

Source: NexCen Brands, Inc., 8-K, January 29, 2008

3.2 Purchase Price.

(a) Subject to the terms and conditions of this Agreement, in reliance on the representations, warranties, covenants and agreements of the Sellers contained herein, and in payment and consideration for the sale, conveyance, assignment, transfer and delivery of the Purchased Assets by the Sellers to Buyer, Buyer or Parent shall pay the Initial Purchase Price as hereinafter provided. Annex A has been prepared in good faith by MFFB management; *provided, however*, that Buyer's belief that Annex A is reasonable when given (and Buyer's payment of the Initial Purchase Price) shall not foreclose, prevent, limit or preclude any rights or remedy of Buyer set forth herein.

(b) On or before sixty (60) days following the Closing Date, the Sellers shall prepare and deliver to Buyer a statement (the "Closing Statement") setting forth the audited revenues and expenses related to the GAC Franchise Business and audited revenues and expenses related to the GAC Manufacturing Business for the TTM Period, in each case reflected in the Sellers' audited financial statements (the "Actual Financials"), together with a letter from the chief accounting officer of MFFB certifying that the amounts set forth in the Closing Statement are accurate. The Actual Financials, as calculated by the Sellers, shall be final and binding on the parties hereto unless Buyer delivers to the Sellers a reasonably detailed statement describing its objections to the calculation of the Actual Financials (a "Statement of Objection") within thirty (30) days of its receipt of the Closing Statement.

(c) If Buyer delivers to the Sellers a timely Statement of Objection, Buyer and the Sellers and their respective independent accountants shall negotiate in good faith and use reasonable best efforts to resolve any dispute. If a final resolution is not reached within thirty (30) days after Buyer has submitted a timely Statement of Objection, any remaining disputes shall be resolved by an independent accounting firm selected jointly by the parties (the "Reviewing Accountant"). The Reviewing Accountant shall be instructed to limit its review to matters specifically set forth in the Statement of Objection and to resolve any matters in dispute as promptly as practicable, but in no event more than thirty (30) days after such matters have been submitted to them, and to set forth their resolution in a statement (the "Accountant Statement") setting forth the Actual Financials. With respect to any disputed matter, the Reviewing Accountant may select Buyer's figure, the Sellers' figure or any figure between the two. The Reviewing Accountant shall act as an arbitrator to determine only those issues in dispute, based solely on the terms of this Agreement and the presentations by the parties and not by independent review of legal, accounting or factual matters. The Reviewing Accountant shall only consider issues, amounts or matters disputed in a Statement of Objection delivered within the applicable thirty (30) day period. The determination of the Reviewing Accountant shall be final and binding on the parties hereto.

(d) The fees and expenses of the Reviewing Accountant shall be borne by Buyer and the Sellers in inverse proportion as they may prevail on matters resolved by the Reviewing Accountant, and such proportionate allocation shall also be determined by the Reviewing Accountant when their determination is rendered on the merits of the matter submitted. For illustration purposes only: (i) if the total amount of disputed items by the Sellers is $100,000 and the Reviewing Accountant awards the Sellers $50,000, then the Sellers and Buyer shall bear the Reviewing Accountant's fees and expenses equally; or (ii) if the total amount of the Sellers' disputed items is $100,000 and the Reviewing Accountant awards the Sellers $75,000, then the Sellers shall bear 25% and Buyer shall bear 75% of the Reviewing Accountant's fees and expenses.

18

Source: NexCen Brands, Inc., 8-K, January 29, 2008

(e) The Sellers and Buyer shall cooperate with each other and the Reviewing Accountant in connection with the matters contemplated by this Section 3.2, including the Sellers' preparation of and Buyer's review of the Closing Statement, in each case including by furnishing such information and access to books, records (including accountants' work papers), personnel and properties as may be reasonably requested.

(f) Within three (3) Business Days after the final determination of the Actual Financials in accordance with this Section 3.2, if the Actual Financials differ from the financials on Annex A, then Buyer shall calculate (i) the Franchise Revenue Difference and (ii) the Manufacturing Contribution Difference. If the sum of the Franchise Revenue Difference and the Manufacturing Contribution Difference (the "Cumulative Difference") is a negative amount of $100,000 or greater, then Buyer shall deliver a statement to the Sellers (the "Purchase Price Deficit Statement") setting forth the Cumulative Difference. If the Cumulative Difference is a negative amount of $100,000 or greater, then upon receipt of the Purchase Price Deficit Statement, the Sellers shall owe to Buyer an amount equal to the Cumulative Difference, multiplied by 8.4 (the "Purchase Price Deficit Amount"). Notwithstanding the forgoing, if the Cumulative Difference is a positive amount (e.g. the Actual Financials are cumulatively greater than the financials on Annex A), then Buyer shall not owe any additional amounts to the Sellers under this Agreement.

(g) Any Purchase Price Deficit Amount owed by the Sellers to Buyer, shall be paid, within three (3) Business Days after the Sellers' receipt of the Purchase Price Deficit Statement, by wire transfer of immediately available funds by the Sellers to an account designated in writing by Buyer; provided, that, if the Sellers do not make such payment to Buyer within three (3) Business Days after the Sellers' receipt of the Purchase Price Deficit Statement, Buyer may draw from the Indemnity Escrow Amount the number of Parent Shares equal to (x) the Purchase Price Deficit Amount divided by (y) the Closing Date Reference Price to satisfy the Sellers' payment obligations under this Section 3.2(g).

3.3 Payment. At Closing:

(a) Buyer shall (i) pay to each Seller the amount in cash set forth opposite such Seller's name in Column I on Annex B, by wire transfer of immediately available funds and (ii) cause to be delivered to the Escrow Agent the number of Parent Shares equal to the Indemnity Escrow Amount, pursuant to the Escrow Agreement.

(b) GACCF shall deliver to Buyer a Marketing Fees Reconciliation calculated as of the Closing Date and GACCF shall pay to Buyer the amount of the Marketing Fees Cash (if a positive amount) shown in such Marketing Fees Reconciliation.

3.4 Allocation. The Sellers and Buyer agree to allocate the Final Purchase Price among the Purchased Assets in accordance with the pro forma allocation schedule attached hereto as Schedule 3.4 and the principles of Code Section 1060 and the regulations thereunder which final allocation schedule will be determined after the date hereof, but by a date no later than ninety (90) days after the Closing Date (the "Allocation Schedule"). The Sellers and Buyer agree that the Sellers' amount realized for income tax purposes shall not include any Royalty Advances as defined in and paid under the New Settlement Agreement. If the parties are unable to agree on the final Allocation Schedule within ninety (90) days after the Closing Date, a third-party appraiser selected by Buyer, and reasonably acceptable to the Sellers, the fees of which shall be borne equally by Buyer and the Sellers, shall resolve the allocation of the consideration to any items with respect to which there is a dispute between the parties. In the absence of manifest error, the determination of the Allocation Schedule by the third-party appraiser shall be final and binding on all parties and shall not be subject to contest. Each of the parties hereto agree that: (i) none of the parties shall take a position on any Tax Return (including IRS Form 8594) that is in any way inconsistent with the Allocation Schedule without the written consent of the other parties or unless specifically required by an applicable Government Authority; and (ii) they shall promptly advise each other regarding the existence of any Tax audit, controversy or litigation related to the Allocation Schedule. Notwithstanding the foregoing, nothing contained herein shall prevent Buyer or the Sellers from settling any proposed deficiency or adjustment assessed against it by any Government Authority based upon or arising out of the Allocation Schedule, and neither Buyer nor the Sellers shall be required to litigate before any court any such proposed deficiency or adjustment by any Government Authority challenging the Allocation Schedule.

19

Source: NexCen Brands, Inc., 8-K, January 29, 2008

3.5 <u>Nonassignable Contracts</u>. Notwithstanding anything to the contrary herein, to the extent that the assignment hereunder by either Seller to Buyer of any Assumed Contract is not permitted or is not permitted without the consent of any other party to such Assumed Contract, this Agreement shall not be deemed to constitute an assignment of any such Assumed Contract if such consent is not given or if such assignment otherwise would constitute a breach of, or cause a loss of contractual benefits under, any such Assumed Contract, and Buyer shall assume no obligations or liabilities under any such Assumed Contract. The Sellers shall advise Buyer in writing on the date hereof with respect to any Assumed Contract which either Seller knows or has substantial reason to believe will or may not be subject to assignment to Buyer hereunder at the Closing. Without in any way limiting the Sellers' obligation to obtain all consents and waivers necessary for the sale, transfer, assignment and delivery of the Assumed Contracts and the Purchased Assets to Buyer hereunder, if any such consent is not obtained or if such assignment is not permitted irrespective of consent and if the Closing shall occur, the Sellers shall cooperate with Buyer following the Closing Date in any reasonable arrangement designed to provide Buyer with the rights and benefits (subject to the obligations) under any such Assumed Contract, including enforcement for the benefit of Buyer (at the Buyer's cost) of any and all rights of the Sellers against any other party arising out of any breach or cancellation of any such Assumed Contract by such other party and, if requested by Buyer, acting as an agent on behalf of Buyer or as Buyer shall otherwise reasonably require.

3.6 <u>Escrow</u>.

(a) <u>Indemnity Escrow Amount</u>. The Indemnity Escrow Amount shall be used to satisfy Damages, if any, for which Buyer Indemnified Parties are entitled to indemnification or reimbursement in accordance with <u>Article XI</u> hereof. For purposes of satisfying any claim under this Agreement, the value of each Parent Share included in the Indemnity Escrow Amount shall be equal to the Closing Date Reference Price. The Escrow Agent shall release the balance of the Indemnity Escrow Amount to the Sellers, as applicable, on the first Business Day which is nine (9) months after the Closing Date (the "<u>Indemnity Escrow Release Date</u>"), *provided* that if on the Indemnity Escrow Release Date any claim by a Buyer Indemnified Party has been made that could result in Damages and Buyer has notified the Escrow Agent and the Sellers of such in writing, then either (i) there shall be withheld from the distribution to the Sellers such portion of the Indemnity Escrow Amount as is necessary to cover all Damages potentially resulting from all such pending claims in accordance with the terms of the Escrow Agreement (and the escrow account shall continue with respect to such withheld amount) and such withheld amount (or the applicable portion thereof) shall either be (A) paid to Buyer or (B) paid to the Sellers, as determined upon final resolution of each such claim in accordance with the terms of the Escrow Agreement and <u>Article XI</u> hereof or (ii) the Sellers shall post a bond in an amount reasonably acceptable to Buyer for such amount necessary to cover all Damages potentially resulting from all such pending claims in accordance with the terms of the Escrow Agreement, and upon posting of such bond all of the remaining balance of the Indemnity Escrow Amount shall be released to the Sellers in accordance with the terms of the Escrow Agreement and <u>Article XI</u> hereof. Notwithstanding the forgoing, the Indemnity Escrow Amount shall be available to satisfy any claims made by Buyer pursuant to <u>Section 3.2(g)</u>.

Source: NexCen Brands, Inc., 8-K, January 29, 2008

(b) <u>Conversion of Parent Shares Held In Escrow</u>. If the Parent Shares held as any part of the Indemnity Escrow Amount are converted by the Parent through a stock split or a reverse stock split, then the Closing Date Reference Price shall be adjusted in direct but inverse relation to the stock split (the "<u>Adjusted Closing Date Reference Price</u>"). For example, for illustration purposes only: (A) if the Parent Shares are split 2 to 1, then the Adjusted Closing Date Reference Price shall be the Closing Date Reference Price divided by 2; or (B) if the Parent Shares undergo a reverse split of 1 to 2, then the Adjusted Closing Date Reference Price shall be the Closing Date Reference Price multiplied by 2.

3.7 <u>Accounts Receivable</u>.

(a) Each Seller shall hold in trust for, and, within five (5) Business Days of such Seller's receipt, pay to, Buyer any and all proceeds from:

(i) GACCF Accounts Receivable relating to the GAC Franchise Business that are received by GACCF following the Closing Date to the extent such proceeds relate to a period ending on or after the Closing Date;

(ii) GAM Accounts Receivable relating to the GAC Manufacturing Business that are received by GAM following the Closing Date to the extent such proceeds relate to a period ending on or after the Closing Date (<u>Sections 3.7(a)(i) and (ii)</u> collectively, the "<u>Buyer Accounts Receivable</u>");

(b) The parties agree that each Seller, as applicable, will continue to collect the Buyer Accounts Receivable through the applicable Seller's current EFT system pursuant to and until such time as stipulated in the Transition Services Agreement and forward such amounts to Buyer.

(c) Buyer acknowledges that all GACCF Accounts Receivable and GAM Accounts Receivable in respect of amounts due from Franchisees or any Persons prior to the Closing Date shall remain the property of each Seller, as applicable, (the "<u>Seller Accounts Receivable</u>") and that Buyer shall not acquire any beneficial right or interest therein. An estimate of the Seller Accounts Receivable calculated as of September 29, 2007 is set forth on <u>Schedule 3.7</u>. A revised estimate of the Seller Accounts Receivable as of the Closing Date shall be calculated within ten (10) days of the Closing Date, with the Seller Accounts Receivable to be finalized and updated in connection with the preparation of the Closing Statement.

21

Source: NexCen Brands, Inc., 8-K, January 29, 2008

(d) Notwithstanding anything to the contrary set forth in Section 3.7(b), the Sellers shall be entitled to retain from the amounts collected pursuant to Section 3.7(b) any Seller Accounts Receivable actually received by the Sellers from a Franchisee.

(e) Within 10 days following the end of each calendar month following the Closing Date, Buyer shall forward to the Sellers any amounts actually received by Buyer following the Closing Date that are designated by a Franchisee as Seller Accounts Receivable. For purposes of determining the amount of Seller Accounts Receivable payable to the Sellers for purposes of this Section 3.7, (x) in the case of Seller Accounts Receivable received in respect of a period (such as a fiscal quarter or other similar period for which such amounts are paid) that was completed prior to the Closing Date, the entire amount of such Seller Accounts Receivable shall be paid to the Sellers and (y) in the case of any Seller Accounts Receivable that are paid on a periodic basis and are payable for a period (such as a fiscal quarter) that includes, but does not end prior to, the Closing Date, the Sellers shall be paid a portion of such Seller Accounts Receivable equal to the Seller Accounts Receivable for the entire applicable period multiplied by a fraction the numerator of which is the number of days in such period ending on the Closing Date and the denominator of which is the number of days in the entire period for which such Seller Accounts Receivable are paid.

(f) Notwithstanding anything to the contrary in this Section 3.7, neither Seller, MFFB nor any of their Affiliates shall be entitled to contact any Franchisee regarding any past due Seller Accounts Receivable without Buyer's prior approval, which approval shall not be unreasonably withheld.

(g) Buyer and the Sellers shall provide to each other reasonable access to files, records and books of account for the purpose of verifying any funds that have been remitted to each to verify collection of the accounts receivable.

ARTICLE IV
Representations and Warranties of the Sellers and MFFB

Each Seller, and MFFB, as applicable, hereby represents and warrants to Buyer with respect to itself that the statements contained in this Article IV are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article IV except to the extent any representation or warranty expressly speaks only as of a different date), except as set forth in the disclosure schedules attached hereto (the "Disclosure Schedules"), which Disclosure Schedules set forth individually each Seller's, or MFFB's if applicable, disclosures identified by each Seller or MFFB, as applicable.

22