Morningstar® Document Research℠

# FORM 8-K

## NexCen Brands, Inc. - NEXC

**Filed: August 19, 2008 (period: August 14, 2008)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

Item 5.02     Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers

Item 8.01     Other Events

Item 9.01     Financial Statements and Exhibits

SIGNATURES

EX-10.1 (Material contracts)

EX-10.2 (Material contracts)

EX-10.3 (Material contracts)

EX-10.4 (Material contracts)

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

# FORM 8-K

CURRENT REPORT PURSUANT
TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported): August 14, 2008

NEXCEN BRANDS, INC.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

| 000-27707 | 20-2783217 |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |
| 1330 Avenue of the Americas, 34 th Floor, New York, NY | 10019-5400 |
| (Address of Principal Executive Offices) | (Zip Code) |

(212) 277-1100

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: NexCen Brands, Inc., 8-K, August 19, 2008

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

**Resignation of Principal Executive Officer**

On August 15, 2008, Robert W. D'Loren, who was President and Chief Executive Officer of NexCen Brands, Inc. (the "Company"), resigned from his positions as a director, officer and employee of the Company and its subsidiaries, effective that day. The resignation was announced publicly through a press release issued on August 15, 2008. On the same day, the Company and Mr. D'Loren entered into a Separation Agreement, dated August 15, 2008 (the "Separation Agreement"). The description of the Separation Agreement set forth herein is qualified in its entirety by reference to the full text of the Separation Agreement, which is attached hereto as Exhibit 10.1 and which is incorporated herein by reference.

Pursuant to the terms of the Separation Agreement, Mr. D'Loren will receive a lump sum payment of approximately $13,416, reflecting payment of base salary that Mr. D'Loren had agreed to defer since May 2008 (less applicable withholding and payroll taxes) plus payment of certain benefits to which he was entitled under the terms of his employment agreement but that had not been paid to him prior to his departure, plus reimbursement for previously unreimbursed business expenses, less amounts Mr. D'Loren agreed to pay the Company, primarily related to repayment of previously incurred expenses that had been paid or reimbursed by the Company, as well as other amounts that the parties agreed would be paid to the Company in connection with Mr. D'Loren's departure. As part of Mr. D'Loren's resignation, the Company agreed to provide Mr. D'Loren with continuation of medical coverage under the Company's group medical plans for a one-year period (provided that such coverage will cease if Mr. D'Loren becomes eligible for health insurance coverage by another employer). The Company also agreed to reduce the duration of the non-compete and non-solicitation provisions in his employment agreement to six months from 24 months.

**Appointment of Principal Executive Officer**

On August 15, 2008, the Company's board of directors appointed Kenneth J. Hall, age 50, to the position of Chief Executive Officer. Since March 25, 2008, Mr. Hall has served as the Company's Executive Vice President, Chief Financial Officer and Treasurer. For an interim period, Mr. Hall will also retain his duties as the Company's Chief Financial Officer and Treasurer. The Company's board of directors is commencing a formal search process to identify and retain a new Chief Financial Officer.

In connection with Mr. Hall's appointment, the Company and Mr. Hall entered into Amendment No. 1 to that certain Employment Agreement by and between the Company and Mr. Hall dated March 19, 2008 ("Amendment No. 1"). The Company's board of directors (and the compensation committee of the board) determined that certain amendments were appropriate in light of Mr. Hall's new position as the Company's Chief Executive Officer. The description of Amendment No. 1 set forth herein is qualified in its entirety by reference to the full text of Amendment No. 1, which is attached hereto as Exhibit 10.3 and which is incorporated herein by reference.

Other than changing Mr. Hall's position and duties to reflect his appointment as the Company's Chief Executive Officer, Amendment No. 1 does not materially amend the terms of his current employment agreement, except as noted below:

- Mr. Hall's annual base salary was increased from $400,000 to $500,000, retroactive to June 1, 2008.

- For each calendar year during the term of the employment agreement, Mr. Hall will be entitled to receive a performance-based bonus, payable in cash, as determined by the Company's board of directors or its compensation committee pursuant to the Company's management bonus plan or other applicable laws; provided, that for each calendar quarter during the employment period, retroactive to the calendar quarter that ended June 30, 2008, Mr. Hall will receive a minimum bonus equal to 25% his annual base salary. As a result, Mr. Hall will be entitled to an annual minimum bonus equal to 100% of his base salary ("Annual Minimum Bonus"). Prior to Amendment No. 1, Mr. Hall was not entitled to any guaranteed minimum bonus.

- Mr. Hall will be granted additional options to purchase a total of 250,000 shares of the Company's common stock, under the terms of the Company's 2006 Long Term Equity Incentive Plan and a customary grant agreement. The options will have a 10-year term and an exercise price equal to the fair market value of the Company's common stock on the grant date, which is expected to be August 20, 2008 (the third trading day after the announcement of Mr. Hall's appointment as Chief Executive Officer) or as soon thereafter as is legally permissible. Half of the options will be vested and exercisable on the date of grant, and the balance will vest and become exercisable on February 1, 2009 contingent upon Mr. Hall's continued employment with the Company as of such date.

- If (i) the Company terminates Mr. Hall's employment without "Cause" (as defined in his employment agreement) or does not renew the employment agreement at the end of any term or (ii) Mr. Hall terminates his employment for "Good Reason" (as defined in his employment agreement), he will be entitled to receive a severance package consisting of (1) any earned but unpaid base salary through the date of termination and any declared but unpaid annual bonus (including the prorated portion of the quarterly bonus applicable to such calendar quarter during which such termination occurs) or other entitlement's then due and owing to Mr. Hall and (2) an amount equal to the greater of (a) his base salary (at the rate then in effect on the date of termination) for the remainder of the initial three-year term or (b) two times the sum of (x) Mr. Hall's base salary (at the rate then in effect on the date of termination) and (y) Mr. Hall's Annual Minimum Bonus; provided, that such amount is capped at $1.4 million if Mr. Hall's employment is terminated prior to January 31, 2009. Prior to Amendment No. 1, Mr. Hall's severance payment was calculated based on an amount equal to his base salary for the greater of the remainder of the initial three-year term or eighteen months. Additionally, the severance payment did not include any multiple of a guaranteed annual minimum bonus.

- If Mr. Hall's employment is terminated without "Cause" or if he resigns for "Good Reason" within a year of a "Change of Control" (as defined in the employment agreement), he will be entitled to receive the same severance as described in the preceding paragraph, however, the amount of severance will be equal to $100 less than two times the sum of (i) Mr. Hall's base salary (at the rate in effect on the date of termination) and (ii) Mr. Hall's Annual Minimum Bonus. Prior to Amendment No. 1, the bonus component of Mr. Hall's severance payment was calculated based on the annual bonus paid to Mr. Hall in the year prior to such Change of Control, if any.

The terms and conditions of Mr. Hall's original employment agreement were disclosed in a Current Report on Form 8-K filed on March 27, 2008. The Company intended to file Mr. Hall's original employment agreement as an exhibit to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008. Because the Company did not file such report (as publicly announced previously), the Company has attached Mr. Hall's original employment agreement hereto as Exhibit 10.2. Except as modified by Amendment No. 1, the original employment agreement remains in full force and effect.

Prior to joining the Company, Mr. Hall served as the Chief Financial Officer and Treasurer of Seevast Corp, a leading online-media holding company comprised of content and online advertising businesses, including Pulse 360, Kanoodle and Moniker, from April 2005 to February 2008. From December 2003 to March 2005, Mr. Hall worked as an independent consultant advising companies on strategic and financial matters. From July 2001 to November 2003, he served as Executive Vice President, Chief Financial Officer and Treasurer of Mercator Software, Inc. Mr. Hall holds a B.S. in Finance from Lehigh University and a M.B.A. from Golden Gate University.

**Resignation of Named Executive Officer**

On August 14, 2008, James Haran, Executive Vice President, M&A and Operations of the Company, submitted to the Company written notice of his resignation as an officer and employee of the Company and its subsidiaries, effective August 14, 2008. In connection with Mr. Haran's resignation, the Company and Mr. Haran entered into a Separation and General Release Agreement, dated August 14, 2008 (the "Haran Separation Agreement"). The description of the Haran Separation Agreement set forth herein is qualified in its entirety by reference to the full text of the Haran Separation Agreement, which is attached hereto as Exhibit 10.4 and which is incorporated herein by reference.

Pursuant to the terms of the Haran Separation Agreement, Mr. Haran will receive a lump sum payment of approximately $72,676, reflecting payment of base salary that Mr. Haran had agreed to defer since May 2008 (less applicable withholding and payroll taxes) and reimbursement for previously unreimbursed business expenses. Additionally, Mr. Haran will receive a cash severance payment of approximately $281,250, prior to deductions for taxes and other withholdings, which will be paid in substantially equal semi-monthly installments over a period of nine months. As part of Mr. Haran's resignation, Mr. Haran provided a general release to the Company, and the Company agreed to provide Mr. Haran with continuation of medical coverage under the Company's group medical plans until the earlier of August 31, 2009 or the date Mr. Haran is provided with health insurance coverage by a successor employer. The Company also agreed to reduce the duration of the non-compete and non-solicitation provisions in Mr. Haran's employment agreement to six months from 24 months.

**Resignation of Board Member and Reduction of Board Size**

As discussed above, on August 15, 2008, Mr. D'Loren resigned his position as a director of the Company, effective that day. In connection with Mr. D'Loren's resignation, the board of directors by resolution reduced the size of the board from nine members to eight.

**Item 8.01 Other Events**

**Special Investigation**

As previously announced, independent counsel was retained by the audit committee of the Company's board of directors to review the events and circumstances surrounding the Company's public disclosures concerning the January 2008 amendment to the Company's bank credit facility with BTMU Capital Corporation in connection with the acquisition of the Great American Cookies business. That review has been completed, and independent counsel reported its findings to the Company's audit committee and then to the other non-management directors in late July.

Key conclusions of the independent counsel were as follows:

- Certain members of the Company's senior management (i) failed to advise the board of directors of material changes in the terms of the financing of the Great American Cookies acquisition after the board had approved terms previously presented to it and (ii) made serious errors with respect to public disclosures regarding the terms of the financing and their impact on the Company's financial condition that were contained in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on January 29, 2008 and in the Company's Annual Report on Form 10-K for the year ended December 31, 2007, as originally filed with the Securities and Exchange Commission on March 21, 2008.

- Independent counsel did not find evidence that led it to conclude that there was an intentional effort to keep information concerning the terms of the financing from the board, the auditors or the public.

The Company's board of directors has discussed these findings and conclusions at length and has addressed them with both current and former senior officers of the Company. The board of directors has concluded that the changes that have occurred in the composition of the Company's senior management, as well as changes that have been made to certain responsibilities within the Company's financial staff, at least as an initial matter, address the matters identified by the independent counsel and are consistent with the findings and conclusions of the independent investigation. The audit committee also has directed the Company's senior management to carry out a complete review and assessment of the Company's disclosure controls and procedures and its internal control over financial reporting and to report to the audit committee on specific changes that should be made to remediate deficiencies, in light of the conclusions of the independent investigation and the material weaknesses previously identified in its Annual Report on Form 10-K for the year ended December 31, 2007.

The Company voluntarily notified the Securities and Exchange Commission ("SEC") Division of Enforcement on May 19, 2008 that it would be filing a Current Report on Form 8-K correcting past disclosures related to the Great American Cookie financing completed in January 2008. The Company filed the Current Report on May 19, 2008. Subsequent to that notice, the SEC commenced an informal investigation. The Company continues to fully cooperate with the SEC's Division of Enforcement.

**Business Expense Review**

The Company is in the process of completing a review of business expense reimbursements since 2006. As part of this review, the Company will evaluate whether any changes will be required to past disclosures regarding executive compensation. If any changes are required, they will be reflected in the anticipated amendment to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007.

**Press Release**

A copy of the press release announcing Mr. D'Loren's resignation and Mr. Hall's appointment is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits

10.1 Separation Agreement by and between the Company and Robert W. D'Loren, dated August 15, 2008.

10.2 Employment Agreement, by and between the Company and Kenneth J. Hall, dated March 19, 2008.

10.3 Amendment No. 1 to Employment Agreement, by and between the Company and Kenneth J. Hall, dated August 15, 2008.

10.4 Separation and General Release Agreement, by and between the Company and James Haran, dated August 14, 2008.

99.1 Press release, dated August 15, 2008.

## SIGNATURES

According to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 18, 2008.

NEXCEN BRANDS, INC.

By: /s/ Sue J. Nam
Sue J. Nam

Its: General Counsel

Source: NexCen Brands, Inc., 8-K, August 19, 2008

<u>Separation Agreement</u>

This Separation Agreement (this "<u>Agreement</u>") is made as of this 15th day of August, 2008 by and between NexCen Brands, Inc. (the "<u>Company</u>") and Robert W. D'Loren ("<u>Executive</u>," and together with the Company, the "<u>Parties</u>").

WHEREAS, Executive has been employed by the Company under terms set forth in that certain Employment Agreement dated June 6, 2006, by and between the Company and Executive (the "<u>Employment Agreement</u>");

WHEREAS, Executive desires to voluntarily resign as a director, an officer and employee of the Company (the "<u>Separation</u>") effective as of August 15, 2008 (the "<u>Separation Date</u>");

WHEREAS, the Parties' rights and obligations with respect to certain incentive equity interests in the Company held by Executive are set forth in the Employment Agreement, the Company's 1999 Equity Incentive Plan (the "<u>Plan</u>"), that certain Stock Option Agreement dated June 6, 2006, by and between the Company and Executive (the "<u>Option Agreement</u>"), and that certain Stock Purchase Warrant dated June 6, 2006, by and between the Company and Executive (the "<u>Warrant Agreement</u>," and with the Option Agreement, collectively, the "<u>Incentive Equity Agreements</u>"); and

WHEREAS, the Parties desire to enter into this Agreement in order to set forth the definitive rights and obligations of the Parties in connection with the Separation.

NOW, THEREFORE, in consideration of the mutual covenants, commitments and agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties intending to be legally bound hereby agree as follows:

1. <u>Acknowledgment of Separation</u>. The Company hereby accepts Executive's voluntary resignation as a director, an officer and employee of the Company as of the Separation Date, and from any and all other offices which he holds at the Company or any of the Company's subsidiaries as of the Separation Date and as a fiduciary of any benefit plan of the Company as of the Separation Date. The Company expressly waives its right to 90 days written notice of such voluntary resignation by the Executive pursuant to Section 1.4(a) of the Employment Agreement.

2. <u>Resignation of Office</u>. Effective as of the Separation Date, Executive hereby voluntarily resigns his position as a director, an officer, and employee of the Company, and from any and all other offices which he holds at the Company or any of the Company's subsidiaries or affiliates and as a fiduciary of any benefit plan of the Company or its subsidiaries. Executive hereby waives any grounds that would constitute resignation for "Good Reason" (as defined in Section 2.1 of the Employment Agreement). Executive hereby relinquishes his proxy to act as the designated proxy holder pursuant to any voting agreement under which Executive is currently named as the designated proxy holder (excluding any shares owned directly by him or for which he is the beneficial owner) and designates any authorized officer as the board of directors of the Company may appoint in his stead without further action. Executive acknowledges that he will have no authority or right to vote or act by written consent any shares covered by such voting agreements.

**3. Press Release.** The Company and Executive agree that the Company shall issue a press release substantially in the form attached hereto as Exhibit A promptly following the execution of this Agreement.

**4. Payments Upon and After the Separation; Other Benefits.**

(a) Final Payment. On the next regular payroll date following the Separation Date, Executive shall receive a lump sum payment of $13,415.69, which is equal to (i) final wages (including any salary amounts temporarily deferred by Executive, any accrued unused vacation pay, and any other employment compensation (totaling $173,557.03) owned for services performed for the Company (the "Wage Payment") plus (ii) expense reimbursement and other credits due and owing to Executive (totaling $86,759.53), less (iii) $172,058.36 (the "Net Executive Reimbursement"), which shall be final adjustment and settlement of credits and debits between the Executive and the Company without necessarily the Executive's agreement on the substance thereof; provided, however, that the Executive acknowledges that the Wage Payment has been adjusted for applicable federal, state and local tax withholdings before being reduced by the Net Executive Reimbursements. Executive represents and warrants that he has cancelled all accounts used by Executive or any Company employees for the conduct of Company business. The Company represents and warrants that it has instructed Company employees to cease using Executive's accounts and credit cards for Company business, and has taken commercially reasonable steps to end all charges previously being applied to Executive's accounts. Executive acknowledges that he is not entitled to any wages or reimbursement other than as set forth above.

(b) No Severance Benefits. Executive hereby acknowledges that as a result of his voluntary resignation, he is not entitled to (i) Severance Payments, pursuant to Section 1.4(b) of the Employment Agreement, (ii) severance under any other severance plan program or arrangement of the Company or (iii) any Benefits (as defined in Section 1.3(g) of the Employment Agreement) after the Termination Date, except as set forth in Section 1.4 (g) of the Employment Agreement or as provided herein.

(c) Stock Options and Warrants. The Parties agree that as of the Separation Date Executive has 1,724,649 vested options and warrants. Pursuant to the terms of the Incentive Equity Agreements, vested options and warrants will remain exercisable for 90 days following the Separation Date. Except for the foregoing, all unvested options and warrants granted previously to Executive prior to the Separation Date shall be forfeited immediately.

(d) Medical Continuation; COBRA and COBRA Premium Payments. Executive shall be entitled to continue to participate in the Company's group medical plan(s) on the same basis as he previously participated for a one-year period following the Separation Date; provided that if Executive becomes eligible for health insurance coverage from another employer, any such coverage by the Company shall cease (the "Medical Continuation Period"). Executive shall be required promptly to notify the Company of his eligibility for health insurance coverage from another employer. Upon termination of the Medical Continuation Period, as required by the continuation coverage provisions of Section 4980B of the U. S. Internal Revenue Code of 1986, as amended ("the Code"), Executive shall be offered the opportunity to elect continuation coverage, at his sole expense, under the group medical plan(s) of the Company ("COBRA coverage"). The Company shall provide Executive with the appropriate COBRA coverage notice and election form for this purpose. The existence and duration of Executive's rights and/or the COBRA rights of any of Executive's eligible dependents shall be determined in accordance with Section 4980B of the Code.

2

(e) Key Man Insurance. The Company hereby agrees to cancel any "key man" or similar life insurance policy with respect to Executive of which the Company or any of its subsidiaries is the beneficiary, effective as of the Separation Date.

5. **Confidential Information; Inventions and Patents; Return of Corporate Property; Non-Competition and Non-Solicitation; Enforcement.** Executive expressly acknowledges and reaffirms his understanding of and obligations under Sections 1.6, 1.7, 1.8, 1.9 and 1.10 of the Employment Agreement and that such provisions will survive and continue in full force in accordance with their terms notwithstanding Executive's resignation. Notwithstanding the foregoing, the Parties agree that the Noncompete Period and Nonsolicitation Period (each as defined in Section 2.1 of the Employment Agreement, respectively) shall each be reduced to six (6) months. The Company acknowledges and affirms that, except as expressly set forth herein, there are no other contractual or similar restrictions on Executive's post-employment activities. In the event of Executive's material breach of his obligations under this provision, the length of the Noncompete Period and/or Nonsolicitation Period shall be increased by the amount of time during which Executive was in breach.

6. **Property.** The Company expressly acknowledges that the personal effects located and identified as such on Exhibit B is the property of Executive and the Parties agree that such property and Executive's other personal possessions and personal papers shall be removed by, or at the direction of, Executive within seven (7) days following the Separation Date. The Parties acknowledge that the automobile set forth on Exhibit C is owned by Executive. Following the Separation Date, Executive expressly agrees to pay, discharge and perform when due all of the obligations related to such automobile and to indemnify and hold the Company harmless from any obligations or liabilities in respect of such automobile thereafter. The Parties acknowledge that certain computer equipment and ancillary devices owned by the Company and set forth on Exhibit B will be purchased from the Company by Executive and that such costs is included in the Net Executive Reimbursement amount owed by Executive pursuant to Section 4(a) of this Agreement.

7. **No Disparaging Remarks.** Executive hereby covenants to the Company and agrees that he will not, directly or indirectly, make or solicit or encourage others to make or solicit (publicly or that reasonably could be expected to become publicly known) any disparaging remarks concerning the Company, its subsidiaries, any current or former officers, directors, employees, or any of its products, services, businesses or activities. None of the Company, its subsidiaries or their respective executive officers or directors (but only for so long as they are employed by or otherwise serving the Company or its subsidiaries) will, directly or indirectly, make or solicit or encourage others to make or solicit (publicly or that reasonably could be expected to become publicly known) any disparaging remarks concerning Executive. Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall prohibit or restrict any person from providing statements or information that such person believes in good faith to be necessary or advisable in connection with (i) any legal proceeding or any investigation conducted by or at the behest of the Company, any governmental or quasi-governmental authority or any third parties (ii) compliance with any legal or regulatory obligations or (iii) statements believed in good faith to be truthful that are made or provided in order to rebut or clarify statements made about such party.

3

Source: NexCen Brands, Inc., 8-K, August 19, 2008

**8. Assistance, Cooperation, Future Litigation.** Executive agrees that for a period of six (6) months following the Separation Date, upon request by the Company, Executive shall reasonably cooperate with the Company in connection with any matters Executive worked on during his employment with the Company and any related transitional matters. In addition, from the Separation Date and thereafter, Executive agrees to reasonably cooperate with the Company in the investigation or defense of any claims, actions, litigations, arbitrations, investigations, audits or proceedings, whether initiated by any governmental authority, private party or the Company, that may be made by or against the Company that affect Executive's prior areas of responsibility or involve matters about which Executive has knowledge, except if Executive's reasonable interests are adverse to the Company in such matter, and provided that such level of cooperation shall be reasonable and shall take due account of Executive's work and personal commitments. The Company agrees to promptly reimburse Executive for all of Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with Executive's obligations under this Section 8.

**9. Indemnification.** Company expressly acknowledges and affirms its obligations as to indemnification, advancement of legal fees and directors and officer liability insurance to Executive, as and to the extent set forth in (i) Section 1.3(i) of the Employment Agreement, (ii) the Company's Certificate of Incorporation, as amended ("Articles"), (iii) the Company's Amended and Restated By-laws ("By-laws") and (iii) any voting or registration agreements to which the Company entered into in connection with acquisitions, or (iv) at law. Such obligations will survive and continue in full force and effect in accordance with their terms notwithstanding Executive's resignation. Advancement of expenses pursuant to such letters will be made pursuant to the Company's Articles and By-laws, subject to Executive's obligations to repay the Company under certain circumstances.

**10. Governmental Filings.** The Company and Executive each acknowledge and agree that the Company expects it will be required to disclose in a Current Report on Form 8-K and other filings with the Securities Exchange Commission the material terms of this Agreement and attaching as an exhibit to such filings a copy of this Agreement (including the press release), and they each hereby consent to such filings and disclosures.

**11. Complete Agreement; Inconsistencies.** This Agreement, the Plan, the Incentive Equity Agreements (to the extent awards are vested as of the date hereof) and the Employment Agreement (solely to the extent provisions thereof are incorporated herein), constitute the complete and entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersedes in its entirety any and all prior understandings, commitments, obligations and/or agreements, whether written or oral, with respect thereto; it being understood and agreed that this Agreement and including the mutual covenants, agreements, acknowledgments and affirmations contained herein, is intended to constitute a complete settlement and resolution of all matters set forth in this Agreement. For clarity and not by way of limitation, nothing herein shall impact in any manner the Executive's equity interests in the Company (other than the incentive equity interests as specifically provided herein) or the Registration Rights Agreement dated June 6, 2006; provided that Executive for himself and his affiliates, heirs, successors, and assigns agree that the Blackout Period (as defined in such agreement) shall be extended until such time that all filings required to be made by the Company are current. The Parties acknowledge that the Employment Period (as defined in Section 1.1 of the Employment Agreement) is hereby terminated as of the Separation Date. In the event of any conflict or inconsistencies between the terms of this Agreement and the Plan, the Incentive Equity Agreements and the Employment Agreement, the terms of this Agreement shall govern.

4

Source: NexCen Brands, Inc., 8-K, August 19, 2008

12. **No Strict Construction**. The language used in this Agreement shall be deemed to be the language mutually chosen by the Parties to reflect their mutual intent, and no doctrine of strict construction shall be applied against any Party.

13. **No Third Party Beneficiaries**. This Agreement is not intended for the benefit of any person other than the Parties, and no such other person shall be deemed to be a third party beneficiary hereof. Without limiting the generality of the foregoing, it is not the intention of the Company to establish any policy, procedure, course of dealing or plan of general application for the benefit of or otherwise in respect of any other employee, officer, director or stockholder, irrespective of any similarity between any contract, agreement, commitment or understanding between the Company and such other employee, officer, director or stockholder, on the one hand, and any contract, agreement, commitment or understanding between the Company and Executive, on the other hand, and irrespective of any similarity in facts or circumstances involving such other employee, officer, director or stockholder, on the one hand, and Executive, on the other hand.

14. **Tax Withholdings**. Notwithstanding any other provision herein, the Company shall be entitled to withhold from any amounts otherwise payable hereunder to Executive any amounts required to be withheld in respect of federal, state or local taxes.

15. **Notices**. All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) three (3) days following mailing by certified or registered mail, postage prepaid and return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the Party (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

5

Source: NexCen Brands, Inc., 8-K, August 19, 2008

If to the Company:

NexCen Brands, Inc.
1330 Avenue of the Americas
34th Floor
New York, NY 10019
Attn: Sue Nam, General Counsel
Ph:   (212) 277-1154
Fax:  (212) 247-7132

With a mandatory copy to:

Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Attn: Mark Director, Esq.
Ph:   (202) 879-5000
Fax:  (202) 879-5200

If to Executive:

Robert W. D'Loren
c/o Proskauer Rose, LLP
1585 Broadway
NYC, NY 10036
Attn: Michael S. Sirkin

   16. <u>Governing Law.</u> All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application hereto of the laws of any jurisdiction other than the State of New York. In furtherance of the foregoing, the internal law of the State of New York shall control the interpretation and construction of this Agreement, even though under any other jurisdiction's choice of law or conflict of law analysis the substantive law of some other jurisdiction may ordinarily apply.

   17. <u>Severability.</u> The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall otherwise remain in full force and effect.

   18. <u>Counterparts.</u> This Agreement may be executed in separate counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

   19. <u>Successors and Assigns.</u> The Parties' obligations hereunder shall be binding upon their successors and assigns. The Parties' rights shall inure to the benefit of, and be enforceable by, any of the Parties' respective successors and assigns. The Company may and shall assign all rights and obligations of this Agreement to any successor in interest to the assets of the Company, and such successor in interest shall promptly deliver to Executive a written assumption of the obligations hereunder. In the event that the Company is dissolved, all obligations of the Company under this Agreement shall be provided for in accordance with applicable law.

6

Source: NexCen Brands, Inc., 8-K, August 19, 2008

**20. Amendments and Waivers.** Except with respect to any non-competition or similar post-employment restrictions, which shall be subject to modification by a court of competent jurisdiction pursuant to their express terms (as may be modified herein), no amendment to or waiver of this Agreement or any of its terms shall be binding upon any Party unless consented to in writing by such Party.

**21. Headings.** The headings of the Sections and subsections hereof are for purposes of convenience only, and shall not be deemed to amend, modify, expand, limit or in any way affect the meaning of any of the provisions hereof.

**22. Disputes.** Except as set forth in this paragraph or with regard to any rights of indemnification, advancement of legal fees or directors and officers liability insurance; any dispute, claim or difference arising out of this Agreement will be settled exclusively by binding arbitration in accordance with the rules of JAMS. The arbitration will be held New York City unless Executive and the Company mutually agree otherwise. Nothing contained in this Section 22 will be construed to limit or preclude a Party from bringing any action in any court of competent jurisdiction for injunctive or other provisional relief to compel another party to comply with its obligations under this Agreement or any other agreement between or among the Parties during the pendency of the arbitration proceedings. Each Party shall bear its own costs and fees of the arbitration, and the fees and expenses of the arbitrator will be borne equally by the Parties unless the arbitrator determines that any Party has acted in bad faith, in which event the arbitrator shall have the discretion to require any one or more of the Parties to bear all or any portion of fees and expenses of the Parties and/or the fees and expenses of the arbitrator; provided, however, that with respect to claims that, but for this mandatory arbitration clause, could be brought against the Company under any applicable federal or state labor or employment law ("Employment Law"), the arbitrator shall be granted and shall be required to exercise all discretion belonging to a court of competent jurisdiction under such Employment Law to decide the dispute, whether such discretion relates to the provision of discovery, the award of any remedies or penalties, or otherwise. As to claims not relating to Employment Laws, the arbitrator shall have the authority to award any remedy or relief that a Court of the State of New York could order or grant. The decision and award of the arbitrator shall be in writing and copies thereof shall be delivered to each Party. The decision and award of the arbitrator shall be binding on all Parties. In rendering such decision and award, the arbitrator shall not add to, subtract from or otherwise modify the provisions of this Agreement. Either Party to the arbitration may seek to have the ruling of the arbitrator entered in any court having jurisdiction thereof. Each Party agrees that it will not file suit, motion, petition or otherwise commence any legal action or proceeding for any matter which is required to be submitted to arbitration as contemplated herein except in connection with the enforcement of an award rendered by an arbitrator and except to seek the issuance of an injunction or temporary restraining order pending a final determination by the arbitrator or as otherwise excepted above. Upon the entry of any order dismissing or staying any action or proceeding filed contrary to the preceding sentence, the Party which filed such action or proceeding shall promptly pay to the other Party the reasonable attorney's fees, costs and expenses incurred by such other Party prior to the entry of such order. All aspects of the arbitration shall be considered confidential and shall not be disseminated by any Party with the exception of the ability and opportunity to prosecute its claim or assert its defense to any such claim. The arbitrator shall, upon request, issue all prescriptive orders as may be required to enforce and maintain this covenant of confidentiality during the course of the arbitration and after the conclusion of same so that the result and underlying data, information, materials and other evidence are forever withheld from public dissemination with the exception of its subpoena by a court of competent jurisdiction in an unrelated proceeding brought by a third party. Section 3.12 of the Employment Agreement shall be of no further force or effect.

7

23. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

\* \* \* \* \*

8

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date of the first signature affixed below or as otherwise provided in this Agreement.

DATED: August 15, 2008

By: ___/s/ Robert W. D'Loren___

Robert W. D'Loren

DATED: August 15, 2008

NexCen Brands, Inc.

By: ___/s/ Kenneth J. Hall___

Name: Kenneth J. Hall

Title: Chief Financial Officer

Source: NexCen Brands, Inc., 8-K, August 19, 2008

# NexCen Brands Announces
# Resignation of CEO Robert W. D'Loren

## Kenneth J. Hall Appointed CEO

**NEW YORK – August [_], 2008 –** NexCen Brands, Inc. (NASDAQ: NEXC), today announced that Robert W. D'Loren has resigned as Chief Executive Officer and President and as a member of the Company's Board of Directors, effective August 15, 2008. Kenneth J. Hall, currently Executive Vice President, Chief Financial Officer and Treasurer, has been appointed Chief Executive Officer.

"We are pleased to have Ken take on the role of CEO," stated David S. Oros, Chairman of NexCen Brands. "We are confident in his ability to lead NexCen as the Company works to complete a restructuring of its financing arrangements and continues to execute the business restructuring plan initiated in May, which focuses on our franchising business."

Mr. Hall is a seasoned executive with more than 25 years of cross-functional operating, strategic and financial leadership experience for public and private companies across a variety of industries. As an executive of middle-market global companies with revenues up to $1 billion, his experience has spanned all core operations and market sectors. He has held executive leadership positions with NYSE and NASDAQ-listed companies as well as private companies, including Global DirectMail, Icon CMT Corp., the National Football League, and Mercator Software, where he helped lead its financial turnaround following a financial restatement and SEC investigation. Prior to joining NexCen, Mr. Hall most recently served as Chief Financial Officer and Treasurer of Seevast Corp, a leading online-media holding company comprised of ad networks, Pulse 360 and Kanoodle, as well as a domain asset management company, Moniker, for which Mr. Hall led a successful sale process.

Mr. Hall holds a B.S. in Finance from Lehigh University and a M.B.A. from Golden Gate University. He is a member of the National Association of Corporate Directors.

The Company plans to commence a search for a new Chief Financial Officer.

## Exhibit B

**Personal Effects:**

Dog Theme Lamp

Polo Lamp

All art and photos in office

Bill Blass and Peter Max Photo

Couch and pillows

5 chairs

Desk and desk chair

Computer table

Coffee table

(1) lamp end table

(2) garbage cans (ledger books)

Trolley (shelf unit)

Umbrella stand

Stark carpet

Super Bowl art

**Computer Equipment and Ancillary Devices:**

(2) Laptop Computers

(1) Blackberry

---

**Exhibit C - Automobile**

2008 Black Chevrolet Van
VIN Number: 1GBGG25K281143770

THIS EMPLOYMENT AGREEMENT (this "*Agreement*") is made as of March 19, 2008, by and between NexCen Brands, Inc., a Delaware corporation (the "*Company*"), and Kenneth J. Hall (the "*Executive*"), each a "*Party*" and collectively the "*Parties.*" Unless otherwise indicated, capitalized terms used herein are defined in Section 2.1.

WHEREAS, the Company has determined that it is in the best interests of the Company and its shareholders to enter into an employment agreement with the Executive, and the Executive is willing to serve as an employee of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, including the Option Grant, as defined below, it is agreed by and between the Executive and the Company as follows:

## ARTICLE I
## EMPLOYMENT TERMS

1.1 <u>Employment</u>. The Company will employ the Executive, and the Executive accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on March 25, 2008 (the "*Effective Date*") and ending as provided in Section 1.4(a) hereof (the "*Employment Period*").

1.2 <u>Position and Duties</u>.

(a) <u>Generally</u>. The Executive shall serve as the Executive Vice President, Chief Financial Officer and Treasurer of the Company and, in such capacity shall perform such duties as are set forth in the By-Laws of the Company and as are customarily performed by an officer with similar title and responsibilities of a public company of a similar size and shall have such power and authority as shall reasonably be required to enable him to perform his duties hereunder; provided, however, that in exercising such power and authority and performing such duties, he shall at all times be subject to the authority, control and direction of the Chief Executive Officer and ultimately the Board of Directors of the Company (the "Board").

(b) <u>Duties and Responsibilities</u>. The Executive shall report to the Chief Executive Officer of the Company and shall devote his full business time and attention to the business and affairs of the Company and its Subsidiaries. The Executive shall perform his duties and responsibilities in a diligent, trustworthy, businesslike and efficient manner. The Executive shall not engage in any other business activities that could reasonably be expected to conflict with the Executive's duties, responsibilities and obligations hereunder. During the Employment Period, the Executive shall promptly bring to the Company or its Subsidiaries, as applicable, all investment or business opportunities relating to the Business of which the Executive becomes aware.

(c) <u>Principal Office</u>. The principal place of performance by the Executive of his duties hereunder shall be the Company's principal executive offices in New York, New York, although the Executive may be required to travel outside of the area where the Company's principal executive offices are located in connection with the business of the Company.

1.3 Compensation.

(a) Base Salary. The Executive's base salary shall be $400,000.00 per annum (the "*Base Salary*"). The Base Salary payable for Fiscal Year 2008 shall be prorated based on the number of days from and including the Effective Date through and including December 31, 2008. The Base Salary will be payable to the Executive by the Company in regular installments in accordance with the Company's general payroll practices. The Executive shall receive such increases (but not decreases) in his Base Salary as the Board, or the Compensation Committee of the Board ("Compensation Committee"), may approve in its sole discretion from time to time; provided that the Executive's Base Salary will be reviewed for potential upward adjustment not less often than annually.

(b) Annual Bonus. Executive will be eligible to receive a performance-based bonus, payable in cash, as determined by the Chief Executive Officer, calculated as a percentage of the Bonus Pool, based on the Executive and the Company achieving annual performance goals, all of which shall be subject to review and confirmation by Compensation Committee or the Board to the extent required under the Company's management bonus plan or under applicable securities laws and the Nasdaq listed company requirements.

(c) Withholding. All payments made under this Agreement (including Base Salary, bonus payments, and other amounts) shall be subject to withholding for income taxes, payroll taxes and other legally required deductions.

(d) Expenses. The Company will reimburse the Executive for all reasonable expenses incurred by him in the course of performing his duties under this Agreement that are consistent with the Company's policies in effect at that time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(e) Vacation; Holiday Pay and Sick Leave. The Executive shall be entitled to four (4) weeks' paid vacation in each calendar year, which if not taken during any year may be carried forward to any subsequent year. Executive shall receive holiday pay and paid sick leave as provided to other senior executive employees of the Company.

(f) Additional Benefits. During the Employment Period, the Executive shall be entitled to participate (for himself and, as applicable, his dependents) in the group medical, life, 401(k) and other insurance programs, employee benefit plans and perquisites which may be adopted by the Company, the Board or the Compensation Committee, from time to time, for participation by the Company's senior management or executives, as well as dental, life and disability insurance coverage, with payment of, or reimbursement for, such insurance premiums by the Company, subject to, in all cases, the terms and conditions established by the Company, Board or the Compensation Committee with respect to such plans (collectively, the "*Benefits*"); provided, however, that the Company, Board or the Compensation Committee, in its reasonable discretion, may revise the terms of any Benefits so long as such revision does not have a disproportionately negative impact on the Executive vis-à-vis other Company employees, to the extent applicable. In addition, during the Employment Period, the Executive will be provided with a monthly automobile allowance in an amount comparable to other senior executive employees of the Company, but in no event less than $1,250 per month.

2

(g) Indemnification. The Executive shall be entitled to indemnification by the Company in the same circumstances and to the same extent as the other executive officers and directors of the Company, which indemnification shall in no event be less favorable to the Executive than the fullest scope of indemnification permitted by applicable Delaware law (or any such greater scope of indemnification provided by agreement or by the terms of the Company's Certificate of Incorporation or By-Laws to any executive officer or director of the Company).

(h) Stock Options. The Executive shall be granted options to purchase a total of 250,000 shares of the Company's common stock (the "Option Grant"), subject to the approval of the Compensation Committee. These Stock Options shall have a 10-year term and an exercise price equal to the fair market value of the Company's common stock on the grant date, which is typically the closing price per share on the third trading day after the Company publicly announces its next annual or quarterly financial results, immediately following the start of employment. The Stock Options shall be granted pursuant to and be subject to the terms of the 2006 Long Term Equity Incentive Plan (the "Plan") and customary grant agreements. The Stock Options shall vest and become exercisable in equal tranches on the first, second and third anniversaries of the grant date, subject to the Executive's continued employment with the Company on each vesting date, and further subject to accelerated vesting under the Plan, the grant agreement and the terms of this Agreement; provided that in the event of the Executive's termination by the Company without Cause, the Executive's resignation with Good Reason or upon a Change of Control (as defined below), the Executive shall immediately be fully vested in all of the Stock Options and all of such Stock Options shall remain exercisable for a period of twelve (12) months following such termination. Except as provided in the preceding sentence, any unvested options shall be forfeited upon termination of this Agreement, and any options that are vested but unexercised upon termination shall be subject to the terms and conditions of the Plan or, if applicable, the last sentence of Section 1.4(c) hereof. In the event that the Company elects from time to time during the Employment Period to award to its senior management or executives, generally, options to purchase shares of the Company's stock pursuant to any stock option plan or similar program, the Executive shall be entitled to participate in any such stock option plan or similar program on a basis consistent with the participation of other senior management or executives of the Company.

1.4 Term and Termination.

(a) Duration. The Employment Period shall commence on the Effective Date and the initial term shall terminate three (3) years from the Effective Date (the "Term"), unless earlier terminated by the Company or the Executive as set forth in this Section 1.4. The Term shall renew automatically for one-year periods, unless either party gives the other party written notice of its intention not to renew the Agreement no later than 90 days prior to the expiration of the then current Term. The Employment Period shall be terminated prior to the then-applicable expiration of the Term upon the first to occur of (i) termination of the Executive's employment by the Company for Cause, (ii) termination of the Executive's employment by the Company without Cause, (iii) the Executive's resignation with Good Reason, (iv) the Executive's resignation other than for Good Reason, or (v) the Executive's death or Disability. The Executive shall not terminate the Employment Period, without Good Reason, unless he gives the Company written notice that he intends to terminate the Employment Period at least 90 days prior to the Executive's proposed Termination Date. As a condition to Executive receiving any payments or benefits under Section 1.4(b) or Section 1.4(c), the Executive shall execute and deliver to the Company the General Release in the form attached hereto as Exhibit A.

3

(b) <u>Severance Upon Termination Without Cause, Upon Resignation by the Executive For Good Reason or Failure to Renew Term</u>. If the Employment Period is terminated by the Company without Cause or if the Executive resigns for Good Reason, or if the Company fails to renew the Term (in which case termination of the Executive's employment shall be effective at the expiration of the then-current Term), then the Executive will be entitled to receive (1) any unpaid Base Salary through and including the date of termination or resignation and any other amounts, including any declared but unpaid Annual Bonus, or other entitlements then due and owing to the Executive as of the Termination Date; (2) an amount equal to the Executive's Base Salary (at the rate in effect on the date the Executive's employment is terminated) for the greater of the remainder of the initial three (3) year Term or eighteen (18) months, payable in (A) substantially equal installments over the lesser of (i) a six-month period immediately following such termination, or (ii) such shorter period that is the longest period permissible in order for the payments not to be considered *"nonqualified deferred compensation"* under Section 409A of the Code or any regulations, rulings or other regulatory guidance issued thereunder, or (B) if such payment terms would not satisfy the requirements of Section 409A of the Code and the regulations, rulings and other regulatory guidance issued thereunder, a lump sum on the date that is six months following the Executive's *"separation from service"* (within the meaning of Section 409A of the Code) occurring in connection with such termination and (3) continue to participate in the Company's group medical plan on the same basis as he previously participated <u>or</u> receive payment of, or reimbursement for, COBRA premiums (or, if COBRA coverage is not available, reimbursement of premiums paid for other medical insurance in an amount not to exceed the COBRA premium) for an eighteen (18) month period following the Executive's termination of employment; *provided* that if the Executive is provided with health insurance coverage by a successor employer, any such coverage by the Company shall cease (each of (1), (2) and (3) referred to as the "*Severance Payment*"). The Executive also shall be entitled to receive payment for all reimbursable expenses or other entitlements then due and owing to the Executive as of the Termination Date. If the Executive breaches his obligations under Section 1.6, 1.7, 1.8 or 1.9 of this Agreement, the Company's obligation to make any Severance Payments and provide any Benefits shall cease as of the date of such breach; provided, that if the Executive cures such breach within 10 days of receiving written notice from the Company of such breach (which notice the Company shall provide promptly to the Executive after learning of such breach), the Company shall promptly pay all Severance Payments not made during such period of dispute and resume making Severance Payments and providing Benefits promptly following such cure.

4

Source: NexCen Brands, Inc., 8-K, August 19, 2008

(c) <u>Severance upon a Change of Control</u>. Anything contained herein to the contrary notwithstanding, in the event the Executive's employment hereunder is terminated within twelve (12) months following a Change of Control (as defined in the Plan) by the Company without Cause or by the Executive with Good Reason, the Executive shall be entitled to receive the Severance Payment as described in sub-section (b) above; provided, however, that in lieu of the calculation contained in Section 1.4(b)(2), Executive shall be entitled to receive an amount equal to $100 less than two times the sum of (i) the Executive's Base Salary (at the rate in effect on the date of termination) and (ii) the annual bonus paid to Executive in the year prior to such Change of Control, if any; provided, however, that if such lump sum severance payment, either alone or together with other payments or benefits, either cash or non-cash, that the Executive has the right to receive from the Company, including, but not limited to, accelerated vesting or payment of any deferred compensation, options, stock appreciation rights or any benefits payable to the Executive under any plan for the benefit of employees, would constitute an *"excess parachute payment"* (as defined in Section 280G of the Internal Revenue Code of 1986), then such lump sum severance payment or other benefit shall be reduced to the largest amount that will not result in receipt by the Executive of an *"excess parachute payment."* The determination of the amount of the payment described in this subsection shall be made by the Company's independent auditors at the sole expense of the Company. For purposes of clarification the value of any options described above will be determined by the Company's independent auditors using a Black-Scholes valuation methodology. Upon any Change in Control of the Company, then notwithstanding the vesting and exercisability schedule in any stock option or other grant agreement between the Company and the Executive, all unvested stock options, shares of restricted stock and other equity awards granted by the Company to the Executive pursuant to any such agreement shall immediately vest, and all such stock options shall become exercisable and, if within twelve (12) months after the occurrence of a Change of Control, the Company shall terminate the Executive's employment without Cause or the Executive terminates his employment with Good Reason, all such stock options shall remain exercisable for the lesser of twelve (12) months after the effective date of termination of the Executive's employment or the remaining term of the applicable option.

(d) <u>Death and Disability</u>. In the event the Company terminates this Agreement due to the death of the Executive, the Company shall pay the Executive his Base Salary through the date of termination, at the rate then in effect, and all expenses or accrued Benefits arising prior to such termination which are payable to the Executive pursuant to this Agreement through the date of termination. Any other rights and benefits the Executive may have under employee benefit plans and programs of the Company generally in the event of the Executive's Disability shall be determined in accordance with the terms of such plans and programs. In the event of Executive's death, any rights and benefits that the Executive's estate or any other person may have under employee benefit plans and programs of the Company generally in the event of the Executive's death shall be determined in accordance with the terms of such plans and programs.

(e) <u>Salary and Other Payments Through Termination</u>. If the Executive's employment with the Company is terminated during the Term (i) by the Company for Cause or (ii) by the Executive other than for Good Reason, the Executive will be entitled to receive his Base Salary through the Termination Date, but will not be entitled to receive any Severance Payments or Benefits after the Termination Date. The Executive shall be entitled to receive payment for all reimbursable expenses or other entitlements then due and owing to the Executive as of the Termination Date.

5

Source: NexCen Brands, Inc., 8-K, August 19, 2008

(f) Other Rights. Except as set forth in this Section 1.4, all of the Executive's rights to receive Base Salary, Benefits and annual bonuses hereunder (if any) which accrue or become payable after the termination of the Employment Period shall cease upon such termination.

(g) Continuing Benefits. Notwithstanding Section 1.4(f), termination pursuant to this Section 1.4 shall not modify or affect in any way whatsoever any vested right of the Executive to benefits payable under any retirement or pension plan or under any other employee benefit plan of the Company, and all such benefits shall continue, in accordance with, and subject to, the terms and conditions of such plans, to be payable in full to, or on account of, the Executive after such termination.

(h) No Duty of Mitigation. The Executive shall not be required to mitigate the amount of any payment provided for in this Article I by seeking other employment or otherwise.

1.5 Confidential Information.

(a) The Executive shall not disclose or, directly or indirectly, use at any time, during the Employment Period or thereafter, any Confidential Information (as defined below) of which the Executive is or becomes aware, whether or not such information is developed by him, alone or with others, except to the extent that (i) such disclosure or use is required by the Executive's performance of the duties assigned to the Executive by the Board, (ii) the Executive is required by subpoena or similar process to disclose or discuss any Confidential Information, provided, that in such case, the Executive shall promptly inform the Company in writing of such event, shall cooperate with the Company in attempting to obtain a protective order or to otherwise limit or restrict such disclosure to the greatest extent possible, and shall disclose only that portion of the Confidential Information as is strictly required, or (iii) such Confidential Information is or becomes generally known to and available for use by the public, other than as a result of any action or inaction directly or indirectly by the Executive. At the Company's expense, the Executive shall take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. The Executive acknowledges that the Confidential Information obtained by him during the course of his employment with the Company is the sole and exclusive property of the Company and its Subsidiaries, as applicable.

(b) The Executive understands that the Company and its Subsidiaries will receive from third parties confidential or proprietary information ("*Third Party Information*") subject to a duty on the part of the Company and its Subsidiaries to maintain the confidentiality of such information and to use it only for certain limited purposes. During the Employment Period and in the period specified in such confidentiality agreements, and without in any way limiting the provisions of Section 1.5(a) above, the Executive will hold Third Party Information in confidence, consistent with the obligations applicable to Confidential Information of the Company generally, and will not disclose to anyone (other than personnel and agents of the Company or its Subsidiaries who need to know such information in connection with their work for the Company or its Subsidiaries) or use, except in connection with his work for the Company or its Subsidiaries, Third Party Information unless expressly authorized by the Board in writing.

6

Source: NexCen Brands, Inc., 8-K, August 19, 2008

(c) As used in this Agreement, the term "*Confidential Information*" means information that is not generally known to the public and that is related in any way to the actual or anticipated business of the Company, its Subsidiaries, its Affiliates or any of their respective predecessors in interest, including but not limited to (i) business development, growth and other strategic business plans, (ii) properties available for acquisition, financing development or sale, (iii) accounting and business methods, (iv) services or products and the marketing of such services and products, (v) fees, costs and pricing structures, (vi) designs, (vii) analysis, (viii) drawings, photographs and reports, (ix) computer software, including operating systems, applications and program listings, (x) flow charts, manuals and documentation, (xi) data bases, (xii) inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice, (xiii) copyrightable works, (xiv) all technology and trade secrets, (xv) confidential terms of material agreements and customer relationships, and (xvi) all similar and related information in whatever form or medium. Confidential Information shall not include any information that has become generally available to the public prior to the date the Executive proposes to disclose or use such information or general know-how of the Executive.

1.6 <u>Inventions and Patents</u>. Executive acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, products, methods, processes, techniques, programs, designs, analyses, drawings, reports, patents, copyrightable works and mask works (whether or not including any Confidential Information) and all issuances, registrations or applications related thereto, all other proprietary information or intellectual property and all similar or related information (whether or not patentable) conceived, developed, contributed to, made, or reduced to practice by Executive (either alone or with others) while employed by Company or any of its Subsidiaries or Affiliates or any of their respective predecessors in interest (including prior to the date of this Agreement) or using the materials, facilities or resources of the Company or any of its Subsidiaries or Affiliates or any of their respective predecessors in interest (collectively, "*Company Works*") is the sole and exclusive property of the Company and its Subsidiaries. Executive hereby assigns all right, title and interest in and to all Company Works to the Company and its Subsidiaries and waives any moral rights he may have therein, without further obligation or consideration. Any copyrightable work prepared in whole or in part by the Executive will be deemed "*a work made for hire*" under Section 201(b) of the 1976 Copyright Act, and the Company and its Subsidiaries shall own all of the rights comprised in the copyright therein. The Executive shall promptly and fully disclose in writing all Company Works to the Company and shall cooperate with the Company and its Subsidiaries to protect, maintain and enforce the Company's and its Subsidiaries' interests in and rights to such Company Works (including, without limitation, providing reasonable assistance in securing patent protection and copyright registrations and executing all affidavits, assignments, powers-of-attorney and other documents as reasonably requested by the Company, whether such requests occur prior to or after termination of the Executive's employment with the Company).

7

Source: NexCen Brands, Inc., 8-K, August 19, 2008

1.7 <u>Delivery of Materials Upon Termination of Employment</u>. As requested by the Company from time to time and in any event upon the termination of the Executive's employment with the Company , the Executive shall promptly deliver to the Company, or at the Company's election destroy, all copies and embodiments, in whatever form or medium, of all Confidential Information, Company Works and other property and assets of the Company and its Subsidiaries in the Executive's possession or within his control (including, but not limited to, office keys, access cards, written records, notes, photographs, manuals, notebooks, documentation, program listings, flow charts, magnetic media, disks, diskettes, tapes computers and handheld devices (including all software, files and documents thereon) and any other materials containing any Confidential Information or Company Works) irrespective of the location or form of such material and, if requested by the Company, shall provide the Company with written confirmation that all such materials have been delivered to the Company or destroyed, as applicable.

1.8 <u>Non-Compete and Non-Solicitation Covenants</u>.

(a) The Executive acknowledges and agrees that the Executive's services to the Company and its Subsidiaries are unique in nature and that the Company and its Subsidiaries would be irreparably damaged if the Executive were to provide similar services to any Person competing with the Company and its Subsidiaries or engaged in the Business. The Executive further acknowledges that, in the course of his employment with the Company, he will become familiar with the Company's and its Subsidiaries' trade secrets and with other Confidential Information. During the Noncompete Period, he shall not, directly or indirectly, whether for himself or for any other Person, permit his name to be used by or participate in any business or enterprise (including, without limitation, any division, group or franchise of a larger organization) that engages or proposes to engage in the Business in the Restricted Territories, other than the Company and its Subsidiaries or except as otherwise directed or authorized by the Board. For purposes of this Agreement, the term *"participate in"* shall include, without limitation, having any direct or indirect interest in any Person, whether as a sole proprietor, owner, stockholder, partner, member, joint venturer, creditor or otherwise, or rendering any direct or indirect service or assistance to any Person (whether as a director, officer, supervisor, employee, agent, consultant or otherwise). Nothing herein will prohibit the Executive from mere passive ownership of not more than five percent (5%) of the outstanding stock of any class of a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market. As used herein, the phrase *"mere passive ownership"* shall include voting or otherwise granting any consents or approvals required to be obtained from such Person as an owner of stock or other ownership interests in any entity pursuant to the charter or other organizational documents of such entity, but shall not include, without limitation, any involvement in the day-to-day operations of such entity.

(b) During the Nonsolicitation Period, the Executive will not directly, or indirectly through another Person, solicit, induce or attempt to induce any customer, supplier, licensee, or other business relation of the Company or any of its Subsidiaries to cease doing business with the Company or any of its Subsidiaries, or solicit, induce or attempt to induce any person who is, or was during the then-most recent 12-month period, a corporate officer, general manager or other employee of the Company or any of its Subsidiaries to terminate such employee's employment with the Company or any of its Subsidiaries, or hire any such person unless such person's employment was terminated by the Company or any of its Subsidiaries, or in any way interfere with the relationship between any such customer, supplier, licensee, employee or business relation and the Company or any of its Subsidiaries. The Executive acknowledges and agrees that the Company and its Subsidiaries would be irreparably damaged if the Executive were to breach any of the provisions contained in this Section 1.8(b).

8

Source: NexCen Brands, Inc., 8-K, August 19, 2008

(c) Executive acknowledges that this Agreement, and specifically, this Section 1.8, does not preclude Executive from earning a livelihood, nor does it unreasonably impose limitations on Executive's ability to earn a living. In addition, Executive agrees and acknowledges that the potential harm to the Company of its non-enforcement outweighs any harm to Executive of its enforcement by injunction or otherwise.

1.9 Enforcement. If, at the time of enforcement of Section 1.5, 1.6, 1.7, 1.8 or 1.10, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties agree that, to the extent permitted by applicable law, the maximum period, scope or geographical area reasonable under such circumstances will be substituted for the Noncompete Period, scope or area. Because the Executive's services are unique and because the Executive has access to Confidential Information and Company Works, the Parties agree that money damages would be an inadequate remedy for any breach of Section 1.5, 1.6, 1.7, 1.8 or 1.10. Therefore, in the event of a breach or threatened breach of Section 1.5, 1.6, 1.7, 1.8 or 1.10, the Company or any of its Subsidiaries or any of their respective successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security). The Parties hereby acknowledge and agree that (a) performance of the services of the Executive hereunder may occur in jurisdictions other than the jurisdiction whose law the Parties have agreed shall govern the construction, validity and interpretation of this Agreement, (b) the law of the State of New York shall govern construction, validity and interpretation of this Agreement to the fullest extent possible, and (c) Section 1.5, 1.6, 1.7, 1.8 or 1.10 shall restrict the Executive only to the extent permitted by applicable law.

1.10 Survival. Sections 1.5, 1.6, 1.7 and 1.8 and 1.10 will survive and continue in full force in accordance with their terms notwithstanding any termination of the Employment Period.

1.11 Consideration. The Executive hereby agrees and acknowledges that the Option Grant constitutes good and valuable consideration for the covenant and obligations incurred by Executive pursuant to Section 1.8.

ARTICLE III
DEFINED TERMS

2.1 Definitions. For purposes of this Agreement, the following terms will have the following meanings:

"*Bonus Pool*" means, with respect to any Fiscal Year, an amount equal to 5.0% of the annual net income of Company for such Fiscal year, as reported by Company in its audited annual financial statements or any other amount authorized as the "Bonus Pool" by the Board or Compensation Committee under the 2006 Management Bonus Plan or any other management bonus plan adopted by the Company.

9

Source: NexCen Brands, Inc., 8-K, August 19, 2008

"*Business*" means the business of (i) acquiring or licensing, for sale, licensing or sublicensing (or other commercial exploitation) intellectual property including trademarks and service marks, (ii) retail or quick service restaurant franchising and (iii) activities related or ancillary to, or that support, any of the foregoing; provided, however that the term "*Business*" shall not include the business of acquiring or licensing, for sale, licensing or sublicing (or other commercial exploitation) of technology, media or professional sports organizations.

"*Cause*" means with respect to the Executive, the occurrence of one or more of the following: (i) indictment of a felony involving moral turpitude, misappropriation of Company property, embezzlement of Company funds, violation of the securities laws or dishonesty, (ii) persistent and repeated refusal to comply with no less than three written directives of the Board with respect to an item that the Board deems material to the business, prospects and/or operations of the Company or requiring the Executive, in his reasonable judgment, after consultation with counsel, to act in a manner not inconsistent with his fiduciary obligations; (iii) reporting to work under the influence of alcohol or illegal drugs, or the use of illegal drugs (whether or not at the workplace), or (iv) any breach of this Agreement. Notwithstanding the foregoing, termination by the Company for Cause (other than pursuant to clause (i) above) shall not be effective until and unless (i) Executive fails to cure such alleged act or circumstance within 30 days of receipt of notice thereof, to the satisfaction of the Board in the exercise of its reasonable judgment (or, if within such 30-day period the Executive commences and proceeds to take all reasonable actions to effect such cure, within such reasonable additional time period (no longer than 60 days) as may be necessary).

"*Code*" means the Internal Revenue Code of 1986 and the Treasury regulations thereunder, each as amended from time to time.

"*Disability*" shall have the meaning set forth in a policy or policies of long-term disability insurance, if any, the Company obtains for the benefit of itself and/or its employees. If there is no definition of "*disability*" applicable under any such policy or policies, if any, then the Executive shall be considered disabled due to mental or physical impairment or disability, despite reasonable accommodations by the Company and its Subsidiaries, to perform his customary or other comparable duties with the Company or its Subsidiaries immediately prior to such disability for a period of at least 120 consecutive days or for at least 180 non-consecutive days in any 12-month period.

"*Fiscal Year*" means the fiscal year of the Company and its Subsidiaries.

"*Good Reason*" means the occurrence, without the Executive's written consent, of one or more of the following events: (i) the Company reduces the amount of Executive's Base Salary, (ii) the Company requires that the Executive relocate his principal place of employment to a site that is more than 50 miles from the Company's offices in New York City or if the Company changes the location of its headquarters with the consent of Executive to a location that is more than 50 miles from such location, (iii) the Company materially reduces the Executive's responsibilities or removes the Executive from the position of Executive Vice President, Chief Financial Officer or Treasurer other than pursuant to a termination of his employment for Cause, or upon the Executive's death or Disability, (iv) the failure or unreasonable delay of the Company to provide to the Executive any of the payments or benefits contemplated hereby or (v) the Company otherwise materially breaches the terms of this Agreement; provided that no such event shall constitute Good Reason hereunder unless (a) the Executive shall have given written notice to the Company of the Executive's intent to resign for Good Reason within 30 days after the Executive becomes aware of the occurrence of any such event, which notice shall describe in reasonable detail the event or events constitution the basis for the Executive's intention to resign for Good Reason and (b) such event or occurrence, if a breach susceptible to cure, shall not have been cured or otherwise shall not have been resolved to the Executive's reasonable satisfaction, in each case within 30 days of the Company's receipt of such notice. In such case the Executive's resignation shall become effective on the 31st day after the Company's receipt of the aforementioned notice.

10

Source: NexCen Brands, Inc., 8-K, August 19, 2008

"*Noncompete Period*" means the Employment Period and 24 months thereafter; provided that, in the event, but only in the event, the Executive's employment hereunder is terminated by the Company without Cause or by the Executive with Good Reason, "*Noncompete Period*" shall mean the Employment Period and 12 months thereafter.

"*Nonsolicitation Period*" means the Employment Period and 24 months thereafter.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or the United States of America any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"*Restricted Territories*" means the United States and its territories and possessions in which the Company engages in the Business as of the Termination Date.

"*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, association, or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association, or other business entity. For purposes hereof, references to a "*Subsidiary*" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "*Subsidiary*" refers to a Subsidiary of the Company.

11

Source: NexCen Brands, Inc., 8-K, August 19, 2008

"*Termination Date*" means the effective date of the Executive's termination of employment with the Company.

2.2 Other Definitional Provisions.

(a) Section references contained in this Agreement are references to sections in this Agreement, unless otherwise specified. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. Each gender-specific term used in this Agreement has a comparable meaning whether used in a masculine, feminine or gender-neutral form.

(b) Whenever the term "*including*" (whether or not that term is followed by the phrase "*but not limited to*" or "*without limitation*" or words of similar effect) is used in this Agreement in connection with a listing of items within a particular classification, that listing will be interpreted to be illustrative only and will not be interpreted as a limitation on, or an exclusive listing of, the items within that classification.

## ARTICLE III
## MISCELLANEOUS TERMS

3.1 Defense of Claims. The Executive agrees that, during the Employment Period, and for a period of six months after termination of the Executive's employment, upon request by the Company, the Executive shall reasonably cooperate with the Company in connection with any matters the Executive worked on during his employment with the Company and any related transitional matters. In addition, during the Employment Period and thereafter, the Executive agrees to reasonably cooperate with the Company in the defense of any claims or actions that may be made by or against the Company that affect the Executive's prior areas of responsibility or involve matters about which the Executive has knowledge, except if the Executive's reasonable interests are adverse to the Company in such claim or action and provided that after the Employment Period such level of cooperation shall be reasonable and shall take due account of the Executive's work and personal commitments. The Company agrees to promptly reimburse the Executive for all of the Executive's reasonable travel and other direct expenses incurred, or to be reasonably incurred, to comply with the Executive's obligations under this Section 3.1.

3.2 Nondisparagement. The Executive agrees to refrain from (i) making, directly or indirectly, any derogatory comments concerning the Company or its Subsidiaries or any current or former officers, directors, employees or shareholders thereof or (ii) taking any other action with respect to the Company or its Subsidiaries which is reasonably expected to result, or does result in, damage to the business or reputation of the Company, its Subsidiaries or any of its current or former officers, directors, employees or shareholders. The Company agrees to refrain from (i) making, directly or indirectly, any derogatory comments concerning the Executive or (ii) taking any other action with respect to the Executive which is reasonably expected to result, or does result in, damage to the reputation of the Executive. Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall prohibit or restrict either party from, truthfully and in good faith: (i) making any disclosure of information required by law; (ii) providing information to, or testifying or otherwise assisting in any investigation or proceeding brought by, any federal regulatory or law enforcement agency or legislative body, any self-regulatory organization, or the Company's or the Executive's designated legal, compliance or human resources officers; or (iii) filing, testifying, participating in or otherwise assisting in a proceeding relating to an alleged violation of any federal, state or municipal law relating to fraud, or any rule or regulation of the Securities and Exchange Commission or any self-regulatory organization.

12

Source: NexCen Brands, Inc., 8-K, August 19, 2008

3.3 Source of Payments. All payments provided under this Agreement, other than payments made pursuant to a plan which provides otherwise and except as otherwise provided herein, shall be paid in cash from the general funds of the Company, and no special or separate fund shall be established, and no other segregation of assets shall be made, to assure payment. The Executive shall have no right, title or interest whatsoever in or to any investments which the Company or its Subsidiaries may make to aid the Company in meeting its obligations hereunder. To the extent that any person acquires a right to receive payments from the Company hereunder, such right shall be no greater than the right of an unsecured creditor of the Company.

3.4 Notices. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier service (charges prepaid) or sent by facsimile (with receipt confirmed) to the recipient at the address or facsimile number indicated below:

> To the Company:
> NexCen Brands, Inc.
> 1330 Avenue of the Americas, 34 th Floor
> New York, NY 10019
> Telephone: (212) 277-1101
> Telecopy: (212) 573-1160
> Attention: General Counsel
>
> To the Executive:
> Kenneth J. Hall
> 22 Normandy Lane
> Riverside, CT 06878
> Telephone: (203) 698-0104
> Telecopy: (203) 637-4640

or such other address or to the attention of such other Person as the recipient Party will have specified by prior written notice to the sending Party. Any notice under this Agreement will be deemed to have been given when so delivered or sent or, if mailed, five days after deposit in the U.S. mail.

3.5 Severability. Subject to the express provisions of Section 1.9 relating to certain specified changes, whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

13

3.6 <u>Complete Agreement</u>. This Agreement embodies the complete agreement and understanding among the Parties with regard to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the Parties, written or oral, which may have related to the subject matter hereof in any way. To the extent that this Agreement provides greater benefits to the Executive than available under the Company's employee handbook or other corporate policies, then this Agreement shall prevail.

3.7 <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

3.8 <u>Assignment</u>. Without the Executive's consent, the Company may not assign its rights and obligations under this Agreement except (i) to a *"Successor"* (as defined below) or (ii) to an entity that is formed and controlled by the Company or any of its Subsidiaries; provided, however, that no such assignment shall relieve the Company of any of its obligations under this Agreement. This Agreement is personal to the Executive, and the Executive shall not have the right to assign the Executive's interest in this Agreement, any rights under this Agreement or any duties imposed under this Agreement, nor shall the Executive have the right to pledge, hypothecate, transfer, assign or otherwise encumber the Executive's right to receive any form of compensation hereunder without the prior written consent of the Board. As used in this Section 3.8, "Successor" shall include any Person that at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets of, or ownership interests in, the Company and its Subsidiaries.

3.9 <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by the Company, the Executive, and their respective heirs, successors and permitted assigns.

3.10 <u>Choice of Law</u>. This Agreement and the performance of the parties hereunder shall be governed by the internal laws (and not the law of conflicts) of the State of New York. Any claim or controversy arising out of or in connection with this Agreement, or the breach thereof, shall be adjudicated exclusively by the Supreme Court, New York County, State of New York, or by a federal court sitting in Manhattan in New York City, State of New York. The parties hereto agree to the personal jurisdiction of such courts and agree to accept process by regular mail in connection with any such dispute.

3.11 <u>Waiver of Jury Trial</u>. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

14

Source: NexCen Brands, Inc., 8-K, August 19, 2008

3.12 Legal Fees and Court Costs. In the event that any action, suit or other proceeding in law or in equity is brought to enforce the provisions of this Agreement, and such action results in the award of a judgment for money damages or in the granting of any injunction in favor of the Company, all expenses (including reasonable attorneys' fees) of the Company in such action, suit or other proceeding shall be paid by the Executive. In the event that any action, suit or other proceeding in law or in equity is brought to enforce the provisions of this Agreement, and such action results in the award of a judgment for money damages or in the granting of any injunction in favor of the Executive, all expenses (including reasonable attorneys' fees and travel expenses) of the Executive in such action, suit or other proceeding shall be paid by the Company.

3.13 Remedies. Subject to the provisions of Section 3.1, each Party will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. Nothing herein shall prohibit any arbitrator or judicial authority from awarding attorneys' fees or costs to a prevailing Party in any arbitration or other proceeding to the extent that such arbitrator or authority may lawfully do so.

3.14 Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and the Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement will affect the validity, binding effect or enforceability of this Agreement.

3.15 Third Party Beneficiaries. This Agreement will not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns and other than, in the event of the Executive's death, his estate, to which all of Executive's rights and remedies set forth herein shall accrue

3.16 The Executive's Representations. The Executive hereby represents and warrants to the Company that (a) the execution, delivery and performance of this Agreement by the Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which he is bound, (b) the Executive is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other Person (or other agreement with any other person containing a restriction on the Executive's right to do business or obligating him to do business with any other Person on a priority or preferential basis), other than such agreements to which the Executive is a party with former employers, but none of which agreements are violated by the Executive's employment by the Company hereunder, (c) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of the Executive, enforceable in accordance with its terms and (d) upon the execution and delivery of this Agreement by the Company, Executive shall not be in violation of clause (i) set forth in the definition of Cause and shall not be disabled.

15

Source: NexCen Brands, Inc., 8-K, August 19, 2008

3.17 <u>Amendment to Comply with Section 409A of the Code</u>. To the extent that this Agreement or any part thereof is deemed to be a nonqualified deferred compensation plan subject to Section 409A of the Code and the Treasury Regulations (including proposed regulations) and guidance promulgated thereunder, (a) the provisions of this Agreement shall be interpreted in a manner to the maximum extent possible to comply in good faith with Code Section 409A and (b) the parties hereto agree to amend this Agreement for purposes of complying with Code Section 409A promptly upon issuance of any Treasury regulations or guidance thereunder, *provided*, that any such amendment shall not materially change the present value of the benefits payable to the Executive hereunder or otherwise materially adversely affect the Executive, the Company, or any affiliate of the Company, without the consent of such party.

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

16

Source: NexCen Brands, Inc., 8-K, August 19, 2008

IN WITNESS WHEREOF, the Parties have executed this Employment Agreement as of the date first written above.

**NEXCEN BRANDS, INC.**

By:          /s/ Robert W. D'Loren
                Name:  Robert W. D'Loren
                Title:    Chief Executive Officer

/s/ Kenneth J. Hall

**KENNETH J. HALL**

17

## FORM OF RELEASE

I, Kenneth J. Hall, on behalf of myself and my heirs, successors and assigns, in consideration of the performance by NexCen Brands, Inc., a Delaware corporation (together with its Subsidiaries, the "*Company*"), of its material obligations under the Employment Agreement, dated as of March 19, 2008 (the "*Agreement*"), do hereby release and forever discharge as of the date hereof the Company, its Affiliates, each such Person's respective successors and assigns and each of the foregoing Persons' respective present and former directors, officers, partners, stockholders, members, managers, agents, representatives, employees (and each such Person's respective successors and assigns) (collectively, the "*Released Parties*") to the extent provided below.

1. I understand that any payments or benefits paid or granted to me under Section 1.4(b) of the Agreement represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive the payments and benefits specified in Section 1.4(b) of the Agreement unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter or breach this General Release.

2. I knowingly and voluntarily release and forever discharge the Company and the other Released Parties from any and all claims, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date of this General Release), whether under the laws of the United States or another jurisdiction and whether known or unknown, suspected or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, have or may have, which arise out of or are connected with my employment with, or my separation from, the Company (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866, as amended; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, or defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (all of the foregoing collectively referred to herein as the "Claims"); provided, however, that nothing contained in this General Release shall apply to, or release the Company from, (i) any obligation of the Company contained in the Agreement to be performed after the date hereof or (ii) any vested or accrued benefits pursuant to any employee benefit plan, program or policy of the Company.

18

3. I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 2 above.

4. I agree that this General Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 which arise after the date I execute this General Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Agreement shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

5. In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver the Company would not have agreed to the terms of the Agreement. I covenant that I shall not directly or indirectly, commence, maintain or prosecute or sue any of the Released Persons either affirmatively or by way of cross-complaint, indemnity claim, defense or counterclaim or in any other manner or at all on any Claim covered by this General Release. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, this General Release shall serve as a complete defense to such Claims. I further agree that I am not aware of any pending charge or complaint of the type described in paragraph 2 as of the execution of this General Release.

6. I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

7. I agree that this General Release is confidential and agree not to disclose any information regarding the terms of this General Release, except to my immediate family and any tax, legal or other counsel I have consulted regarding the meaning or effect hereof or as required by law, and I will instruct each of the foregoing not to disclose the same to anyone.

8. Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. or any other self-regulatory organization or governmental entity.

. 19

---

Source: NexCen Brands, Inc., 8-K, August 19, 2008

9. Without limitation of any provision of the Agreement, I hereby expressly re-affirm my obligations under Sections 1.5, 1.6, 1.8, 1.8, 1.10 and 3.1.

10. Whenever possible, each provision of this General Release shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

"Affiliate" means, with respect to any Person, any Person that controls, is controlled by or is under common control with such Person or an Affiliate of such Person.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, investment fund, any other business entity and a governmental entity or any department, agency or political subdivision thereof.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association, or other business entity.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

(a) I HAVE READ IT CAREFULLY;

(b) I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963, THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

(c) I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

Source: NexCen Brands, Inc., 8-K, August 19, 2008

(d) I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY (VIA THE AGREEMENT AND THIS RELEASE) BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(e) I HAVE HAD AT LEAST 21 DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE SUBSTANTIALLY IN ITS FINAL FORM ON ___, ___ TO CONSIDER IT AND THE CHANGES MADE SINCE THE ___, ___ VERSION OF THIS RELEASE ARE NOT MATERIAL AND WILL NOT RESTART THE REQUIRED 21-DAY PERIOD;

(f) THE CHANGES TO THE AGREEMENT SINCE ___, ___ EITHER ARE NOT MATERIAL OR WERE MADE AT MY REQUEST.

(g) I UNDERSTAND THAT I HAVE SEVEN DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE EIGHTH DAY FOLLOWING EXECUTION OF THE AGREEMENT;

(h) I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(i) I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

Kenneth J. Hall

DATE: _____ ___, _____

Source: NexCen Brands, Inc., 8-K, August 19, 2008

This AMENDMENT NO. 1 (this "Amendment") to that certain Employment Agreement, dated as of March 19, 2008 (the "Agreement"), by and between NexCen Brands, Inc. (the "Company") and Kenneth J. Hall (the "Executive"), is made on August 15, 2008 (the "Amendment Effective Date").

WHEREAS, the Company and the Executive desire to amend the Agreement in certain respects, to, among other things, reflect the Executive's new position as the Company's Chief Executive Officer; and

WHEREAS, the Company's Board of Directors has reviewed and approved this Amendment and the changes to the Agreement that it will effect.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned agree as follows:

Section 1.     Amendments. The Agreement shall be amended as follows:

A. Section 1.2 (a) ("Generally") shall be deleted in its entirety and replaced with the following new Section 1.2(a):

(a) Generally. The Executive shall serve as the Chief Executive Officer of the Company and, in such capacity shall perform such duties as are set forth in the By-Laws of the Company and as are customarily performed by an officer with similar title and responsibilities of a public company of a similar size and shall have such power and authority as shall reasonably be required to enable him to perform his duties hereunder; provided, however, that in exercising such power and authority and performing such duties, he shall at all times be subject to the authority, control and direction of the Board of Directors of the Company (the "Board").

B. Section 1.2(b) ("Duties and Responsibilities") shall be amended by deleting the phrase "Chief Executive Officer" in the first sentence thereof and replacing it with the word "Board".

C. Section 1.2(c) ("Principal Office") shall be amended by adding the following sentence at the end of that section:

The parties acknowledge that such travel shall include periodic visits to the Company's offices in Norcross, Georgia at a frequency and for durations that are consistent with the Executive's previous travel to such offices while the Executive was servicing as the Company's Executive Vice President, Chief Financial Officer and Treasurer, but in any event not less than one (1) to two (2)

Source: NexCen Brands, Inc., 8-K, August 19, 2008

times per month, so long as such travel does not interfere with the Executive's performance of his obligations and responsibilities as the Company's Chief Executive Officer.

D. Section 1.3(a) ("Base Salary") shall be amended by deleting the first sentence thereof in its entirety and replacing it with the following new sentence:

The Executive's base salary (the "Base Salary") shall initially be $400,000 per annum through and including May 31, 2008 and, effective June 1, 2008, shall be increased to $500,000 per annum

E. Section 1.3 (b) ("Annual Bonus") shall be deleted in its entirety and replaced with the following new Section 1.3(b):

(b) Annual Bonus. Executive will be eligible to receive a performance-based bonus, payable in cash, all of which shall be subject to the determination by the Compensation Committee or the Board to the extent required under the Company's management bonus plan or under applicable securities laws and the Nasdaq listed company requirements; provided that for each of calendar quarter during the Employment Period, commencing with the calendar quarter ending June 30, 2008, the Executive shall be entitled to a minimum bonus equal to 25% of the Executive's Base Salary in effect on the last day of the calendar quarter to which such minimum bonus relates (or, if applicable, on the date of any termination of the Executive's employment during such quarter) (each such payment, a "Quarterly Bonus"). Each Quarterly Bonus earned by Executive shall be paid in the final payroll period ending in the calendar quarter to which it relates (or, in the event of any termination of the Executive's employment during such quarter, then during the payroll period in which such termination occurs) and shall be prorated based upon the number of days that the Executive is employed during such quarter (in the event of any termination of the Executive's employment during such quarter); provided that any such Quarterly Bonus that is payable to the Executive prior to the execution and delivery of amendments to the Company's credit facility (and related notes, security agreements, note funding agreements and other related documents) with BTMU Capital Corporation as generally contemplated by the term sheet delivered by BTMU Capital Corporation to the Company on June 27, 2008 (the "Credit Transaction"), such Quarterly Bonus shall not be paid until the earlier of (i) March 1 of the calendar year following the year in which the Executive earned such Quarterly Bonus (e.g., March 1, 2009 for the Quarterly Bonus earned with respect to the calendar quarter ending on June 30, 2008) or (ii) the date of completion of such Credit Transaction. For purposes of this Agreement, the term "Annual Minimum Bonus" shall mean an amount equal to 100% of Executive's Base Salary at the rate in effect on the date in question.

F. Section 1.3(h) ("Stock Options") shall be amended by (i) deleting the phrase "(the "Option Grant")" in the first sentence thereof and replacing it with the phrase "(the

2

Source: NexCen Brands, Inc., 8-K, August 19, 2008

"*Initial Option Grant*")", and (ii) adding the following sentence at the end of such section:

> In addition to the Initial Option Grant, the Executive shall be granted options to purchase an additional 250,000 shares of the Company's common stock (the "*Second Option Grant*" and, collectively with the Initial Option Grant, the "*Option Grant*"), 50% of which shall vest and become exercisable upon the date of grant and the remaining 50% of which shall vest and become exercisable on February 1, 2009, contingent upon the Executive's continued employment by the Company as of that date. The Second Option Grant shall be granted to the Executive on the third trading day after the Company announces the appointment of the Executive as its Chief Executive Officer, or as soon thereafter as is legally permissible. Other than the terms of the Second Option Grant set forth above, the Second Option Grant shall have the same terms and conditions as the Initial Option Grant.

G. Section 1.4(b) ("Severance Upon Termination Without Cause, Upon Resignation by the Executive For Good Reason or Failure to Renew Term") shall be amended by deleting, in the beginning of clause (2) in the first sentence thereof, the phrase "an amount equal to the Executive's Base Salary (at the rate in effect on the date the Executive's employment is terminated) for the greater of the remainder of the initial three (3) year Term or eighteen (18) months" and replacing it with the following phrase:

> an amount equal to the greater of (X) the Executive's Base Salary (at the rate in effect on the date the Executive's employment is terminated) for the remainder of the initial three (3) year Term or (Y) two times the sum of (I) the Executive's Base Salary (at the rate in effect on the date the Executive's employment is terminated) and (II) the Executive's Annual Minimum Bonus" (provided, however, that the amount of the Severance Payment (as defined below) payable to the Executive solely pursuant to this clause (2) shall not exceed $1,400,000 in the event that the Executive's employment is terminated pursuant to this Section 1.4(b) on or before January 31, 2009).

H. Section 1.4(c) ("Severance upon a Change of Control") shall be amended by deleting, in the first sentence thereof, the phrase "(ii) the annual bonus paid to Executive in the year prior to such Change in Control, if any" and replacing it with the phrase "(ii) the Executive's Annual Minimum Bonus".

I. Section 1.4(e) ("Salary and Other Payments Through Termination") shall be amended by inserting, in the first sentence thereof, immediately following the phrase "his Base Salary through the Termination Date", the phrase "plus the portion of the Quarterly Bonus applicable to the calendar quarter during which such termination occurs (prorated through the Termination Date)".

3

EAST_60073028_1 DOC

J. Section 2.1 ("Definitions") shall be amended by amending the definition of the term "Good Reason" contained therein, by deleting, in clause (iii) thereof, the phrase "Executive Vice President, Chief Financial Officer or Treasurer" and replacing it with the phrase "Chief Executive Officer".

**Section 2.** <u>Effect of Amendment</u>. Except as set forth in Section 1 of this Amendment, the provisions of the Agreement shall not be amended or altered by this Amendment and shall continue in full force and effect.

**Section 3.** <u>Miscellaneous</u>. This Amendment shall be governed by the internal laws of the State of New York. This Amendment may be executed in one or more counterparts, each of which when executed and delivered shall be deemed to be an original and all counterparts taken together shall constitute one and the same instrument. This Amendment and the Agreement (as amended hereby) constitute the entire understanding of the parties hereto with respect to the subject matter hereof, and any and all prior agreements and understandings between the parties regarding the subject matter hereof, whether written or oral, except for the Agreement (as amended hereby), are superceded by this Amendment. Any provision of this Amendment which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rending unenforceable the remaining provisions hereof, and any invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by the undersigned parties on the Amendment Effective Date.

COMPANY:

NEXCEN BRANDS, INC.

By: _____
Name: David Oros
Title: Chairman

EXECUTIVE:

_____
Kenneth J. Hall

4

Source: NexCen Brands, Inc., 8-K, August 19, 2008

## Separation and General Release Agreement

This Separation and General Release Agreement (this "Agreement") is made as of this 14th day of August, 2008 by and between NexCen Brands, Inc. (the "Company") and James Haran ("Executive," and together with the Company, the "Parties").

WHEREAS, Executive has been employed by the Company under terms set forth in that certain Employment Agreement dated June 6, 2006, by and between the Company and Executive (the "Employment Agreement");

WHEREAS, Executive and the Company entered into a letter agreement dated May 29th, 2008 deferring salary effective May 16th, 2008 ("Deferred Salary Letter");

WHEREAS, Executive desires to voluntarily resign as an officer and employee of the Company for reasons other than "Good Reason" (as defined in Section 2.1 of the Employment Agreement) (the "Separation") effective as of August 14, 2008 (the "Separation Date");

WHEREAS, the Parties' rights and obligations with respect to Executive's equity interests in the Company are set forth in the Employment Agreement, the Company's 1999 Equity Incentive Plan (the "Plan"), that certain Stock Option Agreement dated June 6, 2006, by and between the Company and Executive (the "Option Agreement"); and

WHEREAS, the Parties desire to enter into this Agreement in order to set forth the definitive rights and obligations of the Parties in connection with the Separation.

NOW, THEREFORE, in consideration of the mutual covenants, commitments and agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties intending to be legally bound hereby agree as follows:

1. **Acknowledgment of Separation.** The Company hereby accepts Executive's voluntary resignation as an officer and employee of the Company as of the Separation Date, and from any and all other offices which he holds at the Company or any of the Company's subsidiaries as of the Separation Date. The Parties acknowledge and agree that the Separation is effective as of August 14, 2008. The Company expressly waives its right to 90 days notice of such voluntary resignation by the Executive pursuant to Section 1.4(a) of the Employment Agreement.

2. **Resignation of Office.** Effective as of the Separation Date, Executive voluntarily resigns his position as an officer, and employee of the Company, and from any and all other offices which he holds at the Company or any of the Company's subsidiaries or affiliates. The parties hereby confirm, acknowledge and agree that Executive does not have any grounds that would constitute resignation for "Good Reason" (as defined in Section 2.1 of the Employment Agreement) and that the Company does not have any grounds for termination for "Cause" (as defined in Section 2.1 of the Employment Agreement).

3. <u>Executive's Acknowledgment of Consideration</u>. Executive specifically acknowledges and agrees that certain of the obligations created and payments made to him by the Company under this Agreement are promises and payments to which he is not otherwise entitled under any law or contract.

4. <u>Payments Upon and After the Separation</u>.

(a) <u>Final Payment</u>. On the next regular payroll date following the Separation Date, Executive shall receive a payment of (1) reimbursable expenses of $1,522.98 and (2) the salary amount of $1,730.77 (reflecting the accrued salary up to and including August 8, 2008 at the deferred salary rate agreed to in the Deferred Salary Letter), subject to applicable federal, state and local tax withholdings. As soon as practicable but no later than five business days after the Separation Date, Executive shall receive a lump sum payment of all amounts deferred in accordance with the Deferred Salary Letter through and including August 8, 2008, which amount equals $69,422.74. This sum, payable to Executive, shall be subject to applicable federal, state and local tax withholdings. Executive acknowledges that he is not entitled to any wages or reimbursements from the Company other than as set forth above.

(b) <u>Separation Payment</u>. The Company shall pay to Executive payments totaling **Two Hundred Eighty-One Thousand Two Hundred Fifty Dollars ($281,250.00)** (less standard statutory deductions for federal and state taxes and withholdings), which shall be paid in substantially equal semi-monthly installments over a period of nine months, in accordance with the Company's normal payroll practices.

(c) <u>Continued Participation in Company's Group Medical Plan</u>. The Company shall continue Executive's participation in the Company's group medical plan on the same basis as he previously participated, until the earlier of August 31, 2009 or the date Executive is provided with health insurance coverage by a successor employer. Executive shall promptly inform, General Counsel of the Company, if and when he is provided with health insurance coverage by a successor employer. After August 31, 2009, Executive may continue to participate in the Company's group health plans to the extent permitted under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). The Company shall provide Executive with the appropriate COBRA coverage notice and election form for this purpose. The existence and duration of Executive's rights and/or the COBRA rights of any of Executive's eligible dependents shall be determined in accordance with Section 4980B of the Code.

(d) <u>Severance Benefits</u>. In consideration of the Company's obligations and undertakings hereunder, Executive hereby waives and releases any claim for any Severance Payments or Benefits (each as defined in Sections 1.3(f) and 1.4(b) of the Employment Agreement, respectively).

(e) <u>Stock Options and Warrants</u>. The Parties agree that, as of the Separation Date, Executive has 387,859 vested options. Pursuant to the terms of the Option Agreement, vested options and warrants will remain exercisable for 90 days following the Separation Date. Except for the foregoing, all unvested options granted previously to Executive prior to the Separation Date shall be forfeited immediately.

Source: NexCen Brands, Inc., 8-K, August 19, 2008

**5. Confidential Information; Inventions and Patents; Return of Corporate Property; Non-Competition and Non-Solicitation; Enforcement.** Executive expressly acknowledges and reaffirms his understanding of and obligations under Sections 1.6, 1.7, 1.8, 1.9 and 1.10 of the Employment Agreement and that such provisions will survive and continue in full force in accordance with their terms notwithstanding Executive's resignation. Notwithstanding the foregoing, the Parties agree that the Noncompete Period and Nonsolicitation Period (each as defined in Section 2.1 of the Employment Agreement, respectively) shall each be reduced to 6-months. The Parties further agree that, during the 6-month Noncompete Period, the Board shall not unreasonably withhold its authorization or consent to the Executive pursuant to Section 1.8(a) to engage in a business enterprise that engages or proposes to engage in the Business in the Restricted Territory, so long as such business enterprise does not directly compete with the Company or its Subsidiaries (each capitalized term as defined in Section 2.1 of the Employment Agreement, respectively). In the event of Executive's breach of his obligations under this provision, the length of the Noncompete Period and/or Nonsolicitation Period shall be increased by the amount of time during which Executive was in breach.

**6. General Release and Waiver by Executive.**

(a) General Release. In consideration of the Company's performance of this Agreement, Executive, for and on behalf of himself and each of his heirs, executors, administrators, personal representatives, successors and assigns, to the maximum extent permitted by law, hereby acknowledges full and complete satisfaction of and ABSOLUTELY AND IRREVOCABLY AND UNCONDITIONALLY FULLY AND FOREVER RELEASES, ACQUITS AND DISCHARGES the Company together with their subsidiaries, parents and affiliates, and each of their past and present direct and indirect stockholders, directors, members, partners, officers, employees, attorneys, agents and representatives, and their heirs, executors, administrators, personal representatives, successors and assigns, from any and all claims, demands, suits, causes of action, liabilities, obligations, judgments, orders, debts, liens, contracts, agreements, covenants and causes of action of every kind and nature, whether known or unknown, suspected or unsuspected, concealed or hidden, vested or contingent, in law or equity, existing by statute, common law, contract or otherwise, which have existed, may exist or do exist, through and including the execution and delivery by Executive of this Agreement (but not including Executive's or the Company's performance under this Agreement), including, without limitation, any of the foregoing arising out of or in any way related to or based upon:

(i) Executive's application for and employment with the Company, his being a director, an officer, or employee of the Company, or the Separation;

(ii) any and all claims in tort or contract, and any and all claims alleging breach of an express or implied, or oral or written, contract, policy manual or employee handbook;

(iii) any alleged misrepresentation, defamation, interference with contract, intentional or negligent infliction of emotional distress, sexual harassment, negligence or wrongful discharge; or

(iv) any federal, state or local statute, ordinance or regulation, including but not limited to labor laws or discrimination laws such as Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1987, as amended by the Older Workers Benefit Protection Act and otherwise (the "ADEA"), the Family and Medical Leave Act, the Civil Rights Act set forth at 42 U.S.C. § 1981, the Civil Rights Act of 1986, and the Civil Rights Act of 1991.

3

(b) <u>Acknowledgment of Waiver; Disclaimer of Benefits</u>. Executive acknowledges and agrees that he is waiving all rights to sue or obtain equitable, remedial or punitive relief from the Company of any kind whatsoever, including, without limitation, reinstatement, back pay, front pay, attorneys' fees and any form of injunctive relief. Notwithstanding the above, Executive further acknowledges that he is not waiving and is not being required to waive any right that cannot be waived by law, including the right to file a charge or participate in an administrative investigation or proceeding; *provided, however*, that Executive disclaims and waives any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation.

(c) <u>Effect of Release and Waiver</u>. Executive understands and intends that this Section 6 constitutes a general release of all claims except as otherwise provided in Section 6(a) above, and that no reference therein to a specific form of claim, statute or type of relief is intended to limit the scope of such general release and waiver.

(d) <u>Waiver of Unknown Claims</u>. Executive expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Executive understands the significance of his release of unknown claims and his waiver of statutory protection against a release of unknown claims.

7. <u>Executive's Representations and Covenants Regarding Actions</u>. Executive represents, warrants and covenants to the Company that at no time prior to or contemporaneous with his execution of this Agreement has he filed or caused or knowingly permitted the filing or maintenance, in any state, federal or foreign court, or before any local, state, federal or foreign administrative agency or other tribunal, any charge, claim or action of any kind, nature and character whatsoever ("Claim"), known or unknown, suspected or unsuspected, which he may now have or has ever had against the Company. Executive hereby grants the Company his perpetual and irrevocable power of attorney with full right, power and authority to take all actions necessary to dismiss or discharge any such Claim. Executive further covenants and agrees that he will not encourage any person or entity, including but not limited to any current or former employee, officer, director or stockholder of the Company, to institute any Claim against the Company.

8. <u>No Disparaging Remarks</u>. Executive hereby covenants to the Company and agrees that he shall not, directly or indirectly, make or solicit or encourage others to make or solicit any disparaging remarks concerning the Company, or any of their products, services, businesses or activities. The Company acting by formal statement or through its officers or directors (while serving in such capacities), will not, directly or indirectly, make or solicit or encourage others to make or solicit any disparaging remarks concerning Executive. Notwithstanding the foregoing, nothing in this Agreement shall prohibit or restrict any person from providing statements or information that such person believes in good faith to be necessary or advisable in connection with (i) any legal proceeding or investigation conducted by or at the behest of the Company, any governmental authority or quasi-governmental authority or (ii) with the Company's compliance with any of its legal or regulatory obligations.

4

Source: NexCen Brands, Inc., 8-K, August 19, 2008

9. **Indemnification**. Company expressly acknowledges and affirms its indemnification obligations to Executive, as set forth in (i) Section 1.3(g) of the Employment Agreement, (ii) the Company's Certificate of Incorporation, as amended, and (iii) the Company's Amended and Restated By-laws. Such obligations will survive and continue in full force and effect in accordance with their terms notwithstanding Executive's resignation.

10. **No Conflict of Interest**. Executive hereby covenants and agrees that he shall not, directly or indirectly, incur any obligation or commitment, or enter into any contract, agreement or understanding, whether express or implied, and whether written or oral, which would be in conflict with his obligations, covenants or agreements hereunder or which could cause any of his representations or warranties made herein to be untrue or inaccurate.

11. **Assistance, Cooperation, Future Litigation.**

(a) <u>Executive's Business Assistance and Cooperation</u>. Executive shall make himself reasonably available to assist and cooperate with the Company in connection with any internal and/or independent review of the Company's financial policies, procedures and activities in respect of all periods during which Executive was employed by the Company.

(b) <u>Executive's Litigation Assistance and Cooperation</u>. Executive acknowledges and affirms his understanding that he may be a witness in litigation, arbitrations, government or other administrative proceedings involving the Company. Executive hereby covenants and agrees to testify truthfully in any and all such litigation, arbitrations, government or administrative proceedings. Executive further covenants and agrees, upon prior notice and for no further compensation, to make himself reasonably available to and otherwise reasonably assist and cooperate with the Company and with its respective attorneys and advisors in connection with any such litigation or administrative proceeding. The Company will make all reasonable efforts to insure that such assistance and cooperation will not materially interfere with Executive's employment and business responsibilities. The Company shall reimburse the Executive for out of pocket expenses incurred in his cooperation and assistance.

12. **Confidentiality**. Executive asserts that he has not discussed, and agrees that except as expressly authorized by the Company he will not discuss, this Agreement or the circumstances of his Separation with any employee of the Company, and that he will take affirmative steps to avoid or absent himself from any such discussion even if he is not an active participant therein.

13. **Remedies**. Executive hereby acknowledges and affirms that in the event of any breach by Executive of any of his covenants, agreements and obligations hereunder, monetary damages would be inadequate to compensate the Company. Accordingly, in addition to other remedies which may be available to the Company hereunder or otherwise at law or in equity, the Company shall be entitled to specifically enforce such covenants, obligations and restrictions through injunctive and/or equitable relief, in each case without the posting of any bond or other security with respect thereto. Should any provision hereof be adjudged to any extent invalid by any court or tribunal of competent jurisdiction, each provision shall be deemed modified to the minimum extent necessary to render it enforceable.

5

Source: NexCen Brands, Inc., 8-K, August 19, 2008

**14. Acknowledgment of Voluntary Agreement; ADEA Compliance** . Executive acknowledges that he has entered into this Agreement freely and without coercion, that he has been advised by the Company to consult with counsel of his choice, that he has had adequate opportunity to so consult, and that he has been given all time periods required by law to consider this Agreement, including but not limited to the 21-day period required by the ADEA (the "Consideration Period"). Executive understands that he may execute this Agreement less than 21 days from its receipt from the Company, but agrees that such execution will represent his knowing waiver of such Consideration Period. Executive further acknowledges that within the 7-day period following his execution of this Agreement (the "Revocation Period"), he shall have the unilateral right to revoke this Agreement, and that the Company's obligations hereunder shall become effective only upon the expiration of the Revocation Period without Executive's revocation hereof. In order to be effective, notice of Executive's revocation of this Agreement must be received by the Company in writing on or before the last day of the Revocation Period.

**15. Complete Agreement; Inconsistencies.** This Agreement, the Plan, the Equity Agreements (to the extent awards are vested as of the date hereof) and the Employment Agreement (solely to the extent provisions thereof are incorporated herein), constitute the complete and entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersedes in its entirety any and all prior understandings, commitments, obligations and/or agreements, whether written or oral, with respect thereto; it being understood and agreed that this Agreement and including the mutual covenants, agreements, acknowledgments and affirmations contained herein, is intended to constitute a complete settlement and resolution of all matters set forth in Section 6 hereof. In the event of any conflict or inconsistencies between the terms of this Agreement and the Plan, the Equity Agreements and the Employment Agreement, the terms of this Agreement shall govern.

**16. No Strict Construction.** The language used in this Agreement shall be deemed to be the language mutually chosen by the Parties to reflect their mutual intent, and no doctrine of strict construction shall be applied against any Party.

**17. Third Party Beneficiaries.** Executive's heirs or assigns also are intended third-party beneficiaries with respect to the payments set forth in Section 4 of this Agreement in the event of Executive's death, and this Agreement may be enforced by each of them in accordance with the terms of that Section 4 in respect of the rights granted to such heirs or assigns therein. Except and to the extent set forth in the preceding two sentences, this Agreement is not intended for the benefit of any person other than the Parties, and no such other person shall be deemed to be a third party beneficiary hereof. Without limiting the generality of the foregoing, it is not the intention of the Company to establish any policy, procedure, course of dealing or plan of general application for the benefit of or otherwise in respect of any other employee, officer, director or stockholder, irrespective of any similarity between any contract, agreement, commitment or understanding between the Company and such other employee, officer, director or stockholder, on the one hand, and any contract, agreement, commitment or understanding between the Company and Executive, on the other hand, and irrespective of any similarity in facts or circumstances involving such other employee, officer, director or stockholder, on the one hand, and Executive, on the other hand.

6

Source: NexCen Brands, Inc., 8-K, August 19, 2008

18. **Tax Withholdings**. Notwithstanding any other provision herein, the Company shall be entitled to withhold from any amounts otherwise payable hereunder to Executive any amounts required to be withheld in respect of federal, state or local taxes.

19. **Notices**. All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) three (3) days following mailing by certified or registered mail, postage prepaid and return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the Party (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

If to the Company:

NexCen Brands, Inc.
1330 Avenue of the Americas
34th Floor
New York, NY 10019
Attn:   Sue Nam, General Counsel
Ph:     (212) 277-1154
Fax:    (212) 247-7132

With a mandatory copy to:

Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Attn:   Mark Director, Esq.
Ph:     (202) 879-5000
Fax:    (202) 879-5200

If to Executive:

James Haran
21 Club Drive
Massapequa, NY 11758
Ph. (516) 795 0170
Fax (516) 795 0985

20. **Governing Law**. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application hereto of the laws of any jurisdiction other than the State of New York. In furtherance of the foregoing, the internal law of the State of New York shall control the interpretation and construction of this Agreement, even though under any other jurisdiction's choice of law or conflict of law analysis the substantive law of some other jurisdiction may ordinarily apply.

7

Source: NexCen Brands, Inc., 8-K, August 19, 2008

21. **Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall otherwise remain in full force and effect.

22. **Counterparts**. This Agreement may be executed in separate counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

23. **Successors and Assigns**. The Parties' obligations hereunder shall be binding upon their successors and assigns. The Parties' rights shall inure to the benefit of, and be enforceable by, any of the Parties' respective successors and assigns. The Company may assign all rights and obligations of this Agreement to any successor in interest to the assets of the Company. In the event that the Company is dissolved, all obligations of the Company under this Agreement shall be provided for in accordance with applicable law.

24. **Amendments and Waivers**. Except with respect to any non-competition or similar post-employment restrictions, which shall be subject to modification by a court of competent jurisdiction pursuant to their express terms (as may be modified herein), no amendment to or waiver of this Agreement or any of its terms shall be binding upon any Party unless consented to in writing by such Party.

25. **Headings**. The headings of the Sections and subsections hereof are for purposes of convenience only, and shall not be deemed to amend, modify, expand, limit or in any way affect the meaning of any of the provisions hereof.

26. **Disputes**. Except as set forth in this paragraph, any dispute, claim or difference arising out of this Agreement will be settled exclusively by binding arbitration in accordance with the rules of the Federal Mediation and Conciliation Service ("FMCS"). The arbitration will be held New York City unless Executive and the Company mutually agree otherwise. Nothing contained in this Section 26 will be construed to limit or preclude a Party from bringing any action in any court of competent jurisdiction for injunctive or other provisional relief to compel another party to comply with its obligations under this Agreement or any other agreement between or among the Parties during the pendency of the arbitration proceedings. Subject to the proviso in this sentence below, each Party shall bear its own costs and fees of the arbitration, and the fees and expenses of the arbitrator will be borne equally by the Parties unless the arbitrator determines that any Party has acted in bad faith, in which event the arbitrator shall have the discretion to require any one or more of the Parties to bear all or any portion of fees and expenses of the Parties and/or the fees and expenses of the arbitrator; provided, however, that with respect to claims that, but for this mandatory arbitration clause, could be brought against the Company under any applicable federal or state labor or employment law ("Employment Law"), the arbitrator shall be granted and shall be required to exercise all discretion belonging to a court of competent jurisdiction under such Employment Law to decide the dispute, whether such discretion relates to the provision of discovery, the award of any remedies or penalties, or otherwise. As to claims not relating to Employment Laws, the arbitrator shall have the authority to award any remedy or relief that a Court of the State of New York could order or grant. The decision and award of the arbitrator shall be in writing and copies thereof shall be delivered to each Party. The decision and award of the arbitrator shall be binding on all Parties. In rendering such decision and award, the arbitrator shall not add to, subtract from or otherwise modify the provisions of this Agreement. Either Party to the arbitration may seek to have the ruling of the arbitrator entered in any court having jurisdiction thereof. Each Party agrees that it will not file suit, motion, petition or otherwise commence any legal action or proceeding for any matter which is required to be submitted to arbitration as contemplated herein except in connection with the enforcement of an award rendered by an arbitrator and except to seek the issuance of an injunction or temporary restraining order pending a final determination by the arbitrator. Upon the entry of any order dismissing or staying any action or proceeding filed contrary to the preceding sentence, the Party which filed such action or proceeding shall promptly pay to the other Party the reasonable attorney's fees, costs and expenses incurred by such other Party prior to the entry of such order. All aspects of the arbitration shall be considered confidential and shall not be disseminated by any Party with the exception of the ability and opportunity to prosecute its claim or assert its defense to any such claim. The arbitrator shall, upon request, issue all prescriptive orders as may be required to enforce and maintain this covenant of confidentiality during the course of the arbitration and after the conclusion of same so that the result and underlying data, information, materials and other evidence are forever withheld from public dissemination with the exception of its subpoena by a court of competent jurisdiction in an unrelated proceeding brought by a third party.

8

Source: NexCen Brands, Inc., 8-K, August 19, 2008

27. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

* * * * *

9

Source: NexCen Brands, Inc., 8-K, August 19, 2008

IN WITNESS WHEREOF, the Parties have executed this Separation and General Release Agreement effective as of the date of the first signature affixed below or as otherwise provided in this Agreement.

<u>**READ CAREFULLY BEFORE SIGNING**</u>

I have read this Separation and General Release Agreement and have had the opportunity to consult legal counsel prior to my signing of this Agreement.

DATED: August 15, 2008

By:  /s/ James Haran
     James Haran

DATED: August 14, 2008

NexCen Brands, Inc.

By:  /s/ Kenneth J. Hall
Name: Kenneth J. Hall
Title:  Executive Vice President, Chief
Financial Officer and Treasurer

Source: NexCen Brands, Inc., 8-K, August 19, 2008



1330 Avenue of the Americas
New York, NY 10019
Contact:
Leigh Parrish/David Roady
FD
(212) 850-5600

## NexCen Brands Announces
## Resignation of CEO, Robert W. D'Loren

### Kenneth J. Hall to be Appointed CEO

**NEW YORK - August 15, 2008** - NexCen Brands, Inc. (NASDAQ: NEXC), today announced that Robert W. D'Loren has resigned as Chief Executive Officer and as a member of the Company's Board of Directors, effective today. Kenneth J. Hall, currently Executive Vice President, Chief Financial Officer and Treasurer, has been appointed Chief Executive Officer.

David S. Oros, Chairman of NexCen Brands, stated, "We are pleased to have Ken take on the role of CEO. Ken has been instrumental in completing the restructuring of the Company's financing arrangements and we are confident in his ability to lead NexCen as the Company continues to execute the business restructuring plan initiated in May, which focuses on the franchising business."

Mr. Hall is a seasoned executive with more than 25 years of cross-functional operating, strategic and financial leadership experience. He has driven growth and bottom-line results for public and private companies across a variety of industries. As an executive of middle-market global companies with revenues up to $1 billion, his experience has spanned all core operations and market sectors. He has held executive leadership positions with NYSE- and NASDAQ-listed companies as well as private companies, including Global DirectMail, Icon CMT Corp., the National Football League, and Mercator Software, where he helped lead its financial turnaround following a financial restatement and SEC investigation. Prior to joining NexCen, Mr. Hall most recently served as Chief Financial Officer and Treasurer of Seevast Corp, a leading online-media holding company comprised of ad networks, Pulse 360 and Kanoodle, as well as a domain asset management company, Moniker, for which Mr. Hall led the successful sale.

Mr. Hall holds a B.S. in Finance from Lehigh University and a M.B.A. from Golden Gate University. He is a member of the National Association of Corporate Directors.

The Company plans to commence a search for a new Chief Financial Officer.

### About NexCen Brands

NexCen acquires and manages global brands, generating revenue through licensing and franchising. We currently own and license the Bill Blass and Waverly brands, as well as seven franchised brands. Two franchised brands - The Athlete's Foot and Shoebox New York - sell retail footwear and accessories. Five are quick-service restaurants - Marble Slab Creamery, MaggieMoo's, Pretzel Time, Pretzelmaker, and Great American Cookies.

---

## Forward-Looking Statement Disclosure

*This press release contains "forward-looking statements," as such term is used in the Securities Exchange Act of 1934, as amended. Such forward-looking statements include those regarding expected cost savings, expectations for the future performance of our brands or expectations regarding the impact of recent developments on our business. When used herein, the words "anticipate," "believe," "estimate," "intend," "may," "will," "expect" and similar expressions as they relate to the Company or its management are intended to identify such forward-looking statements. Forward-looking statements are based on current expectations and assumptions, which are subject to risks and uncertainties. They are not guarantees of future performance or results. The Company's actual results, performance or achievements could differ materially from the results expressed in, or implied by, these forward-looking statements. Factors that could cause or contribute to such differences include: (1) the restructuring of the bank credit facility may not provide our business with needed liquidity, (2) we may not be able to generate sufficient cash flow to make interest and principal payments on our amended and restated credit facility, (3) our ability to comply with negative and affirmative covenants and the effects of restrictions imposed by such covenants may have on our ability to operate our business, (4) our ability to sell one or more of our business may not be successful or may not generate sufficient proceeds which may lead to increased obligations, financial and otherwise, under our amended and restated credit facility, (5) the businesses that we have acquired may not be successful, may involve unanticipated costs or difficulties or delays in being integrated with our existing operations, or may disrupt our existing operations, (6) we may not be successful in operating or expanding our brands or integrating our acquisitions into our overall business strategy, (7) any failure to meet our debt obligations would adversely affect our business and financial conditions, and our need for additional near-term liquidity could result in a sale of one or more of our businesses at less than an optimal price or an inability to continue to operate one or more of our businesses, (8) our marketing, licensing and franchising concepts and programs may not result in increased revenues, expansion of our franchise network or increased value for our trademarks and franchised brands, (9) we depend on the success of our licensees and franchisees for future growth, (10) our near-term liquidity needs and the impact of our failure to file our required periodic reports on a timely basis may adversely affect our ability to retain existing, or attract new, employees, franchisees, and licenses, (11) our near term liquidity needs may be higher or lower than our current expectations and (12) other factors discussed in our filings with the Securities and Exchange Commission. The Company undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

---

Created by Morningstar Document Research   documentresearch.morningstar.com

Source: NexCen Brands, Inc., 8-K, August 19, 2008