

Morningstar® Document Research℠

# FORM 10-K/A

## NexCen Brands, Inc. - NEXC

**Filed: August 11, 2009 (period: December 31, 2007)**

Amendment to a previously filed 10-K

# Table of Contents

10-K/A

## PART I

| | |
|---|---|
| Item 1 | Business 1 |
| ITEM 1. | BUSINESS |
| ITEM 1A. | RISK FACTORS |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS |
| ITEM 2. | PROPERTIES |
| ITEM 3. | LEGAL PROCEEDINGS |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS |

## PART II

| | |
|---|---|
| ITEM 5. | MARKET FOR REGISTRANT S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES |
| ITEM 6. | SELECTED FINANCIAL DATA (As Restated) |
| ITEM 7. | MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE |
| ITEM 9A. | CONTROLS AND PROCEDURES (AS RESTATED) |
| ITEM 9(B). | OTHER INFORMATION |

## PART III

| | |
|---|---|
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE |
| ITEM 11. | EXECUTIVE COMPENSATION |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES |

## PART IV

| | |
|---|---|
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES |

SIGNATURES
EX-10.9 (Material contracts)

EX-10.16 (Material contracts)

EX-21.1 (Subsidiaries of the registrant)

EX-23.1 (Consents of experts and counsel)

EX-31.1 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)
EX-31.2 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)
EX-32.1 (Certifications required under Section 906 of the Sarbanes-Oxley Act of 2002)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## FORM 10–K/A

### AMENDMENT NO. 2

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007
OR**
☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934
COMMISSION FILE NUMBER: 000–27707**

# NEXCEN BRANDS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| **DELAWARE** | **20-2783217** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification Number) |
| **1330 Avenue of the Americas, New York, N.Y.** | **10019-5400** |
| (Address of principal executive offices) | (Zip Code) |

(Registrant's telephone number, including area code): **(212) 277–1100**

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT: NONE
SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, par value $.01** | **Pink OTC Markets, Inc.** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the Form 10–K or any amendment of this Form 10–K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐ No ☒

The aggregate market value of the voting stock held by nonaffiliates of the registrant was $28,157,525 ($0.56 per share) as of June 30, 2008.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

As of June 30, 2009, 56,951,730 shares of the registrant's common stock, $.01 par value per share, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
None.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**NEXCEN BRANDS, INC.**
**AMENDMENT NO. 2 TO ANNUAL REPORT ON FORM 10-K/A**
**FOR THE YEAR ENDED DECEMBER 31, 2007**

**INDEX**

| | | |
|---|---|---|
| Explanatory Note | | i |

**PART I**

| | | |
|---|---|---|
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 13 |
| Item 1B | Unresolved Staff Comments | 20 |
| Item 2 | Properties | 20 |
| Item 3 | Legal Proceedings | 20 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 22 |

**PART II**

| | | |
|---|---|---|
| Item 5 | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| Item 6 | Selected Financial Data | 26 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 31 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| Item 8 | Financial Statements and Supplementary Data | 43 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 92 |
| Item 9A | Controls and Procedures | 92 |
| Item 9B | Other Information | 96 |

**PART III**

| | | |
|---|---|---|
| Item 10 | Directors, Executive Officers and Corporate Governance | 97 |
| Item 11 | Executive Compensation | 104 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 118 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 119 |
| Item 14 | Principal Accounting Fees and Services | 120 |

**PART IV**

| | | |
|---|---|---|
| Item 15 | Exhibits, Financial Statement Schedules | 122 |

**Explanatory Note**

The terms "NexCen," "we," "us," "our," and the "Company" refer to NexCen Brands, Inc. and our subsidiaries, unless otherwise indicated by context. We also use the term NexCen Brands to refer to NexCen Brands, Inc. alone whenever a distinction between NexCen Brands, Inc. and our subsidiaries is required or aids in the understanding of this filing.

As previously disclosed in a Current Report on Form 8-K filed on May 19, 2008, in preparing our Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, we determined that certain aspects of a January 2008 amendment to our bank credit facility (the "January 2008 Amendment") were not adequately discussed in our prior public filings, including the Current Report on Form 8-K filed on January 29, 2008 or the Annual Report on Form 10-K for the fiscal year ended December 31, 2007, which was originally filed with the Securities and Exchange Commission on March 21, 2008 (the "Original 10-K") and subsequently amended by Amendment No. 1 filed on April 29, 2008 (the "First Amendment"). We further concluded that the effect of the January 2008 Amendment on the Company's financial condition and liquidity raised substantial doubt about our ability to continue as a going concern. The Audit Committee of our Board of Directors retained independent counsel to conduct an investigation into these matters on behalf of the Board of Directors. Simultaneously, management, with the supervision of the Board of Directors, commenced a comprehensive review of our financial condition and business strategy and began taking actions to restructure our business. The results of the Audit Committee's investigation, as well as changes to our senior management team, were disclosed in a Current Report on Form 8-K filed on August 19, 2008. In Part I, Item 1 – *Business*, and in other applicable sections of this Amendment No. 2 to the Annual Report on Form 10-K/A (the "Second Amendment"), we have revised the disclosure that appeared in the Original 10-K and the First Amendment to take account of the changes that we have made to our business, our strategy, our senior management and our bank credit facility since the end of 2007.

**Adjustments Related to the January 2008 Amendment**

The January 2008 Amendment was entered into and went into effect in 2008 and therefore did not affect the amounts reported in the Consolidated Financial Statements as of December 31, 2007. Nonetheless, the Original 10-K contained discussions of the January 2008 Amendment in the Notes to the Consolidated Financial Statements related to "Long-Term Debt" and "Subsequent Events." Moreover, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in the Original 10-K contained discussions regarding the Company's financial condition and liquidity. In this Second Amendment, we have revised the disclosure that appeared in these portions of the Original 10-K to reflect our subsequent reconsideration of the terms of the January 2008 Amendment and their effect on the Company's financial condition and liquidity as of the filing date of our Original 10-K, before the credit facility was restructured on August 15, 2008 and further amended in late 2008 and 2009. (The August 15, 2008 restructuring and the subsequent amendments are discussed in this Second Amendment in Part II, Item 7 – *MD&A* under the caption, "Financial Condition," and in Note 9 – *Long-Term Debt (As Restated)* and Note 25 – *Subsequent Events (As Restated)* to the Consolidated Financial Statements.) We have concluded that there was substantial doubt about our ability to continue as a going concern as of December 31, 2007. Our Consolidated Financial Statements, however, assume that we will continue as a going concern, and do not contain any adjustments that might result if we were unable to continue as a going concern.

We also have restated Part II, Item 9A – *Controls and Procedures (As Restated)*, to revise the assessment contained in the Original 10-K of the effectiveness of our disclosure controls and procedures and internal control over financial reporting as of December 31, 2007 and to provide a discussion of our remediation efforts to date. Our management and the Audit Committee have concluded that the Company's failure to adequately discuss the January 2008 Amendment in our relevant Current Report on Form 8-K and the Original 10-K was unintentional and that material weaknesses in our internal controls contributed to this error. Some of these material weaknesses were previously identified in our Original 10-K, and some have been identified subsequently. As a result, management has revised its assessment in Item 9A of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007.

**Other Adjustments**

Management engaged in a comprehensive review of our Original 10-K and First Amendment in order to ensure their accuracy and completeness and to be able to provide the certifications provided herein. Accordingly, this Second Amendment also corrects accounting and financial reporting errors, some of which were previously identified but not considered to be material and others of which were identified in the restatement process. The Company has concluded that the corrections are not material either individually or in the aggregate. The Company's net loss per share is not impacted by the restatement.

The effect of all restatement adjustments on our Consolidated Statement of Operations for the year ended December 31, 2007 is as follows:

i

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

| Increase in net loss | $ | (0.2) million or 4.7% |
|---|---|---|

A summary of adjustments to the Company's Consolidated Statement of Operations for the year ended December 31, 2007 is as follows:

| Increase in total revenues | $ | 0.3 million |
|---|---|---|
| Increase in selling, general and administrative expenses | $ | (0.3) million |
| Increase in other operating expenses | $ | (0.2) million |
| Decrease in operating income | $ | (0.2) million |
| Increase in loss from continuing operations | $ | (0.3) million |
| Increase in net loss | $ | (0.2) million |

The effect of all restatement adjustments on our Consolidated Balance Sheet as of December 31, 2007 is as follows:

| Increase in total assets | $ | 0.4 million or 0.1% |
|---|---|---|
| Increase in total liabilities | $ | 0.3 million or 0.2% |
| Increase in total equity | $ | 0.1 million or 0.1% |

The effect of all restatement adjustments on our Consolidated Statement of Cash Flows as of December 31, 2007 is as follows:

| Decrease in net cash used in operating activities | $ | 0.7 million or 17.9% |
|---|---|---|
| Increase in net cash used in investing activities | $ | 0.1 million or 0.0% |
| Decrease in net cash provided by financing activities | $ | 0.5 million or 0.4% |

(See Note 2 to the Consolidated Financial Statements included in Part II, Item 8 of this Second Amendment for further explanation of the restatement of NexCen's Consolidated Financial Statements.)

The effect of all restatement adjustments on the Summary Compensation Table in Part III, Item 11 – *Executive Compensation*, is as follows:

| Net decrease in "All Other Compensation" paid to Robert D'Loren | $ | 45,056 or 56% |
|---|---|---|

Our management and the Audit Committee have concluded that the errors in our Consolidated Financial Statements and in the Summary Compensation Table were unintentional. In conjunction with the Audit Committee, we have determined that the errors in our Consolidated Financial Statements and in the Summary Compensation Table were a result of material weaknesses in our internal control over financial reporting, some of which were identified in our Original 10-K.

This Second Amendment also reflects the restatement of related information contained in the MD&A in Part I, Item 7, as well as the following footnotes within Part II, Item 8 – *Financial Statements and Supplementary Data*: Note 2 – *Restatement*; Notes 3(d) – *Cash and Cash Equivalents (As Restated)*; Note 3(e) – *Trade Receivables and Allowance for Doubtful Accounts (As Restated)*; Note 6 – *Property and Equipment (As Restated)*; Note 7 – *Goodwill, Trademarks and Intangible Assets (As Restated)*; Note 8 – *Accounts Payable and Accrued Expenses (As Restated)*; Note 9 – *Long-Term Debt (As Restated)*; Note 10 – *Income Taxes (As Restated)*; Note 12 – *Stock Based Compensation (As Restated)*; Note 14(a) and 14(d) – *Commitments and Contingencies (As Restated)*; Note 15 – *Discontinued Operations (As Restated)*; Note 16 – *Quarterly Financial Information (As Restated) (Unaudited)*; Note 19 – *Acquisition of Bill Blass (As Restated)*; Note 20 – *Acquisitions of Marble Slab Creamery and MaggieMoo's (As Restated)*; Note 21 – *Acquisition of Waverly (As Restated)*; Note 22 – *Acquisition of Pretzel Time and Pretzelmaker (As Restated)*; Note 23 – *Pro Forma Information Related To The Acquisitions (As Restated) (Unaudited)*; Note 24 – *Segment Reporting (As Restated)* and Note 25 – *Subsequent Events (As Restated)*.

Except as specifically set forth in this Second Amendment, the Original 10-K and the First Amendment have not been amended or updated to reflect events occurring after December 31, 2007. Additionally, as required by Rule 12b-15 under the Securities Act of 1934, as amended ("Exchange Act"), this Second Amendment also includes the certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

ii

The Company will file its delayed Annual Report on Form 10-K for the fiscal year ended December 31, 2008 and its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2009 and June 30, 2009 as soon as practicable. All future filings will include restated 2007 information affected by these restatements. No other previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q are affected by these restatements.

## FORWARD-LOOKING STATEMENTS

In this Second Amendment, we make statements that are considered forward-looking statements within the meaning of the Exchange Act. The words "anticipate," "believe," "estimate," "intend," "may," "will," "expect", and similar expressions often indicate that a statement is a "forward-looking statement." Statements about non-historic results also are considered to be forward-looking statements. None of these forward-looking statements are guarantees of future performance or events, and they are subject to numerous risks, uncertainties and other factors. Given the risks, uncertainties and other factors, you should not place undue reliance on any forward-looking statements. Our actual results, performance or achievements could differ materially from those expressed in, or implied by, these forward-looking statements. Factors that could cause or contribute to such differences include those discussed in Item 1A of this Second Amendment under the heading "Risk Factors," as well as elsewhere in this Second Amendment. Forward-looking statements reflect our reasonable beliefs and expectations as of the time we make them, and we have no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

iii

PART I

ITEM 1. BUSINESS

### General Development of Business

NexCen is a strategic brand management company that currently owns and manages a portfolio of seven franchised brands. Five of our brands (Great American Cookies, Marble Slab Creamery, MaggieMoo's, Pretzel Time and Pretzelmaker) are in the quick service restaurant ("QSR") industry. The other two brands (The Athlete's Foot and Shoebox New York) are in the retail footwear and accessories industry. All seven franchised brands are managed by NexCen Franchise Management, Inc. ("NFM"), a wholly owned subsidiary of NexCen Brands.

In 2008, we narrowed our business model to focus only on our franchised brands. Previously, we had owned and licensed the Bill Blass consumer products brand in the apparel industry and the Waverly consumer products brand in the home goods industry. We sold the Waverly brand on October 3, 2008 and the Bill Blass brand on December 24, 2008.

We commenced our brand management business in June 2006 when we acquired UCC Capital Corporation ("UCC Capital"), an investment banking firm that provided financial advisory services, particularly to companies involved in monetizing intellectual property assets. The founder and president of UCC Capital, Robert D'Loren, became our chief executive officer upon completion of the acquisition in June 2006, and other members of his team also joined our Company. In acquiring UCC Capital, our strategy was to begin building a brand management business by acquiring and operating businesses that own valuable brand assets and other intellectual property and that earn revenues primarily from the franchising or licensing of their intellectual property. UCC Capital had worked with companies whose value was represented primarily by their intellectual property. As described below, our franchise businesses (and the Waverly and Bill Blass businesses that we sold in 2008) earn revenues primarily through the licensing of their valuable brands and related intellectual property.

In building our portfolio of brands and their related franchising and licensing businesses, NexCen consummated nine acquisitions in fourteen months from November 2006 through January 2008.

- In November 2006, we acquired our first retail franchised brand The Athlete's Foot by purchasing Athlete's Foot Brands, LLC, along with an affiliated company and certain related assets.
- In February 2007, we acquired the Bill Blass consumer products brand by purchasing Bill Blass Holding Co., Inc. and two affiliated licensing businesses.
- Also in February 2007, we acquired two QSR franchised brands, MaggieMoo's and Marble Slab Creamery, by purchasing MaggieMoo's International, LLC and the assets of Marble Slab Creamery, Inc., respectively.
- In May 2007, we acquired another consumer products brand, Waverly, by acquiring all of the intellectual property and license contracts related to that brand and the related Gramercy and Village brands.
- In August 2007, we acquired two additional QSR franchised brands, Pretzel Time and Pretzelmaker, by purchasing substantially all of the assets of Pretzel Time Franchising, LLC and Pretzelmaker Franchising, LLC, respectively.
- In January 2008, we acquired the trademarks and other intellectual property of The Shoe Box, Inc. in a joint venture with third parties in order to franchise the Shoebox's high-fashion footwear concept domestically and internationally under the Shoebox New York brand.
- In January 2008, we acquired Great American Cookies, another QSR franchised brand, by purchasing substantially all of the assets of Great American Cookie Company Franchising, LLC. Along with the franchising business of Great American Cookies, we also acquired substantially all of the assets of Great American Manufacturing, LLC, including a manufacturing facility that produces cookie dough for, and supplies other products to, franchisees of the Great American Cookies brand.

### Financial Information about Operating Segments

We restructured our Company during 2008 to operate in only one business segment, Franchising. Prior to this restructuring, based on our holdings and our plans to acquire additional brands, we previously provided financial information for fiscal year 2007 in four segments: QSR Franchising, Retail Franchising, Consumer Branded Products and Corporate. Consistent with our prior reports for 2007, financial information for these four business segments is provided in the MD&A in Part II, Item 7, and in the related Consolidated Financial Statements and footnotes in Part II, Item 8.

1

**Narrative Description of Business**

*General*

Through our seven franchised brands, the Company franchises a system of retail stores and licenses branded products that are distributed primarily through franchised retail stores. Additionally, the Company manufactures and supplies cookie dough and other products to our Great American Cookies franchisees. Our franchise network, across all of our brands, consists of approximately 1,800 retail stores in approximately 40 countries. A listing of the states in which our franchisees operated as of December 31, 2008 is set forth below.

**Total Domestic Franchised Stores:  1334**

| Location | Franchised Stores | Location | Franchised Stores |
|---|---|---|---|
| Alabama | 39 | Missouri | 24 |
| Alaska | 1 | Montana | 4 |
| Arizona | 14 | Nebraska | 5 |
| Arkansas | 12 | Nevada | 12 |
| California | 60 | New Hampshire | 3 |
| Colorado | 24 | New Jersey | 23 |
| Connecticut | 19 | New Mexico | 1 |
| Delaware | 4 | New York | 62 |
| District of Columbia | 4 | North Carolina | 65 |
| Florida | 101 | North Dakota | 4 |
| Georgia | 81 | Ohio | 31 |
| Hawaii | 8 | Oklahoma | 22 |
| Idaho | 3 | Oregon | 4 |
| Illinois | 44 | Pennsylvania | 23 |
| Indiana | 20 | Rhode Island | 0 |
| Iowa | 25 | South Carolina | 46 |
| Kansas | 11 | South Dakota | 4 |
| Kentucky | 14 | Tennessee | 61 |
| Louisiana | 47 | Texas | 235 |
| Maine | 1 | Utah | 16 |
| Maryland | 29 | Vermont | 0 |
| Massachusetts | 10 | Virginia | 41 |
| Michigan | 25 | Washington | 11 |
| Minnesota | 8 | West Virginia | 8 |
| Mississippi | 11 | Wisconsin | 9 |
|  |  | Wyoming | 5 |

2

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

A listing of the jurisdictions outside the United States in which our franchisees operated as of December 31, 2008 is set forth below.

**Total International Franchised Stores:  492**

| Location | Franchised Stores | Location | Franchised Stores |
|---|---|---|---|
| Antigua | 1 | Palau | 1 |
| Aruba | 1 | Panama | 1 |
| Australia | 126 | Peru | 3 |
| Bahamas | 2 | Philippines | 9 |
| Bahrain | 5 | Poland | 39 |
| Canada | 95 | Portugal | 11 |
| China | 3 | Puerto Rico | 3 |
| Curacao | 1 | Qatar | 1 |
| Denmark | 1 | Russia | 3 |
| Ecuador | 5 | Saipan | 2 |
| Guam | 3 | Saudi Arabia | 11 |
| Guatemala | 1 | South Korea | 38 |
| India | 1 | Spain | 3 |
| Indonesia | 30 | St. Kitts/Nevis | 1 |
| Kuwait | 12 | Sweden | 1 |
| Lebanon | 1 | Trinidad & Tobago | 2 |
| Mexico | 39 | United Arab Emirates | 18 |
| New Zealand | 10 | Venezuela | 5 |
| Oman | 1 | Vietnam | 1 |
| Pakistan | 1 | | |

In 2008, international franchise revenues represented approximately 7.1% of our total franchise revenues, of which approximately 4.0% of total franchise revenues or 56.3% of international franchise revenues were generated from stores located in Australia, Canada, Kuwait and the United Arab Emirates. For additional information about our geographic sources of revenue, see Note 24 – *Segment Reporting (As Restated)* to our Consolidated Financial Statements.

*The Franchised Brands*

The following is a brief description of each of our franchised brands.

Great American Cookies®

Great American Cookies was founded in Atlanta, Georgia in 1977 on the strength of an old family chocolate chip cookie recipe. For over 30 years, Great American Cookies has maintained the heritage and integrity of its products by producing original cookie dough exclusively from its plant in Atlanta. Great American Cookies is also known for its signature Cookie Cakes, signature flavors and menu of gourmet products baked fresh in store. Great American Cookies has approximately 300 franchised stores in the United States, Canada, Guam, and Bahrain.

MaggieMoo's®

Each MaggieMoo's Ice Cream & Treatery features a menu of freshly made super-premium ice creams, mix-ins, smoothies, sorbets and custom ice cream cakes. MaggieMoo's is known as the innovator of the ice cream cupcake and consistently has been awarded blue ribbons by the National Ice Cream Retailers Association for the quality of its ice creams. MaggieMoo's is the franchisor of approximately 170 stores located across the United States and in Puerto Rico.

Marble Slab Creamery®

Marble Slab Creamery is a purveyor of super-premium hand-mixed ice cream. It was founded in 1983 and was the innovator of the frozen slab technique. All Marble Slab Creamery ice cream is made in small batches in franchise locations using some of the finest ingredients from around the world and fresh dairy from local farms. Marble Slab Creamery has an international presence with approximately 370 locations in the United States, Canada, United Kingdom, Bahrain, Kuwait, Lebanon, and the United Arab Emirates.

3

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

Pretzelmaker® and Pretzel Time®

Pretzelmaker and Pretzel Time are franchised concepts that specialize in offering hand-rolled soft pretzels, innovative soft pretzel products, dipping sauces and beverages. The brands were founded independently of each other in 1991, united under common ownership in 1998, and beginning in 2009 will be consolidated to become the new Pretzelmaker. Collectively, Pretzelmaker and Pretzel Time are the second largest soft pretzel franchise in the U.S. by store count with approximately 360 franchised stores located domestically and in Canada, Guam, Panama and Guatemala.

The Athlete's Foot® (TAF)

The Athlete's Foot (TAF) is the world's first franchisor of athletic footwear stores and is recognized today as a leader in athletic footwear franchising. Robert and David Lando opened the first The Athlete's Foot store in 1971 in Pittsburgh, Pennsylvania. It was the first athletic footwear specialty store of its kind in the United States. Soon thereafter, The Athlete's Foot began franchising domestically with the first store opening in Oshkosh, Wisconsin. The first international franchised store opened in 1978 in Adelaide, Australia. TAF now has approximately 560 franchised stores in approximately 35 countries.

Shoebox New York®

The Shoebox New York concept had its genesis from The Shoe Box, one of New York's premier women's multi-brand retailers for high-fashion footwear, handbags and accessories. Established in 1954 and known for its vast product assortment and trend-setting styles from top European and American designers, The Shoe Box garnered a dedicated following of sophisticated women. We continue this tradition by offering high-quality, high-fashion shoes and accessories under the Shoebox New York franchised brand in 9 stores in the United States and 6 stores internationally in Vietnam, South Korea and Kuwait.

*Franchising Operations*

NexCen currently generates revenue from franchising and other commercial arrangements related to our seven brands. In connection with Great American Cookies, we also operate a cookie dough manufacturing facility that manufactures and supplies cookie dough to our franchisees and supplies ancillary products sold through our Great American Cookies franchised stores. The proprietary dough that is manufactured at the facility is considered a key factor in the product differentiation of Great American Cookies. Other than the Great American Cookies franchise system, we rely on franchisees and other business partners or suppliers to produce, warehouse and distribute branded products and incur the associated capital costs.

Generally, our franchise arrangements consist of the following types of agreements under which franchisees are required to pay an initial franchise or development fee and an on-going royalty on net sales. The royalty varies from 1% to 7%, depending on the market and the brand. In addition, most domestic franchisees must contribute to an advertising and marketing fund in amounts that range from 0.6-2.0% of net sales.

*Domestic Development Agreements.* Our domestic franchise development agreements provide for the development of specified number of stores for a specified brand within a defined geographic territory. Generally, these agreements call for the development of the stores over a specified period of time, with targeted opening dates for each store. Our developers typically pay an initial development fee of up to $39,900 per store, depending on the franchise brand, size of territory and number of total stores to be developed. These development fees typically are paid in part when the agreement is executed and in part when each subsequent lease is developed. These development fees typically are paid in part when the agreement is executed and in part when each subsequent lease for a store is executed or on a date specified on the development schedule, whichever is sooner. The initial fee typically is non-refundable. Depending on the market and the brand, limited sub-franchising rights also may be granted.

*International Development Agreements.* Our international franchise development agreements are similar to our domestic franchise development agreements, although the development time frames can be longer and the development fees generally are higher. Depending on the market and the brand, limited sub-franchising rights also may be granted.

*Domestic Franchise Agreements.* Our domestic franchise agreements convey the right to operate a specific store for a specified brand in a particular geographic territory. Franchisees may enter into a domestic franchise agreement either singly or pursuant to a domestic development agreement. If for a single store, our franchisees typically pay an initial franchise fee of up to $39,900, depending on the franchise brand, which typically is non-refundable and paid when the agreement is executed. If pursuant to a domestic development agreement, our franchisees typically pay a fee when a lease for a store is executed or on a date specified on the development schedule, whichever is sooner. The fee typically is non-refundable.

4

*International Franchise Agreements.* The terms of our international franchise agreements are substantially similar to those included in our domestic franchise agreements, except that these agreements may be modified to reflect the multi-national nature of the transaction and to comply with the requirements of applicable local laws. Our current international franchise agreements generally are pursuant to an international development agreement and provide for payment of a nominal fee per store opened. In addition, the effective royalty rates may be lower than those included in domestic franchise agreements due to the more limited support services that we may provide to our international franchisees.

*Cobranding Agreements.* We offer a co-branding program with respect to our QSR brands whereby franchisees are permitted to offer food products under two or more of our QSR brands. The amount of initial franchise fees under a co-branding agreement depends on the configuration of the co-branding arrangement (*e.g.*, adjacent stores offering different brands sharing a common storefront or a display case offering a brand within a store primarily offering a different brand).

All of our franchise agreements require that our franchisees operate stores in accordance with our defined operating procedures, adhere to the menu or product mix established by us, and meet applicable quality and service standards. We may terminate the franchise rights of any franchisee that does not comply with these standards and requirements.

In order to provide on-going support to our franchise systems and our franchisees, in 2007, we built a centralized training, research, development and operations center in Norcross, Georgia, which we call NexCen University. We believe NexCen University provides our Company with the infrastructure to operate and grow our current franchise systems and integrate additional franchise systems, all in a cost efficient manner. The following graphic provides a summary of the services that NexCen University provides across all of our franchise systems:



NexCen University allows us to achieve cost savings and operational efficiencies by consolidating back office functionalities such as IT, HR, Legal and Accounting, as well as front end drivers such as research and development, marketing and sales. We believe that NexCen University also provides franchisees with the tools, training and support needed to optimize their performance in the marketplace.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

*Diversification and Growth*

With our portfolio of franchised brands, we operate a business that is diversified in several ways:

- across multiple categories, ranging from footwear to baked goods to ice cream;
- across channels of distribution, ranging from mall-based stores to strip shopping centers to stand-alone stores;
- across consumer demand categories, ranging from premium to mass-market;
- across franchisees/licensees ranging from individuals to multi-unit developers to a large publicly traded company;
- across geographies (both within the United States and internationally); and
- across multiple demographic groups.

We believe that multi-category diversification may help reduce potential volatility in financial results.

We believe that our business also offers a multi-tiered growth opportunity. Our businesses can grow both domestically and internationally through organic growth and synergistically through cross-selling and co-branding across our multiple franchise systems.

*Our Business Strategy*

NexCen faced a number of challenges in 2008, both internal and external. In May 2008, we disclosed issues related to our debt structure that placed the future of the Company in doubt. Simultaneously, the domestic and international economy and financial markets underwent significant slowdown and volatility due to uncertainties related to, among other factors, availability of credit, difficulties in the banking and financial services sectors, softness in the housing market, severely diminished market liquidity, geopolitical conflicts, falling consumer confidence and rising unemployment rates. Since May 2008, we have developed a strategic plan to improve our business, in light of both the specific and general economic/financial factors affecting our Company. Although our plan takes into account the current and anticipated economic conditions, a longer or more severe downturn in the economy than we have anticipated in our plan may adversely impact our ability to successfully execute our strategy and may adversely impact our business, financial condition and results of operations. See Item 1A – *Risk Factors*, under the captions "Risks Related to Our Financial Condition" and "Risks of Our Business," and Item 7 – *MD&A* under the caption "Financial Condition."

The first phase of our two-phase strategic plan sought to address the immediate financial and operational challenges that we faced in the following four ways: (1) divest our non-core businesses; (2) enhance the Company's cash flow, including by reducing operating expenses; (3) improve our corporate infrastructure and internal control environment; and (4) execute on initiatives to grow the franchised brands. We believe we have made substantial progress on all of these initiatives.

*Sale of Consumer Products Brands*: Starting in late May 2008, we began a review of our strategic alternatives. We then instituted an asset sale process in order to allow us to exit the licensing business associated with our consumer products brands, Bill Blass and Waverly. In the fourth quarter of 2008, we completed the sale of these businesses, despite a difficult mergers and acquisition environment and in advance of continuing deterioration of the market for home and apparel brands. The sale of Waverly and Bill Blass has enabled us to streamline the Company to focus solely on our seven franchised brands. Additionally, the divestitures allowed us to reduce our outstanding indebtedness by approximately $33.4 million. We discuss the sale of these businesses in more detail in Note 25 – *Subsequent Events (As Restated)* to our Consolidated Financial Statements.

*Improved Cash Flow*: As a result of the comprehensive restructuring of our credit facility on August 15, 2008 and subsequent amendments in late 2008 and 2009, as well as actions taken to restructure the Company and reduce its recurring operating expense structure, we improved our cash flow and, in general, the Company's financial condition. We restructured our credit facility to defer to 2011 and thereafter much of our principal repayment obligations and certain of our interest obligations. We also have realized to date a meaningful reduction in interest expense in 2009 based on (i) the Company's reduced debt level following the sale of Waverly and Bill Blass in late 2008 and further paid down debt in August 2009, (ii) the amendment to the bank credit facility, as detailed below, that reduced the fixed interest rate applicable to some of the Company's debt, and (iii) the low variable rates currently applicable to certain portions of our debt. We also restructured our credit facility to provide us with monthly, rather than quarterly, cash distributions from operating revenues that are remitted to certain "lockbox accounts," controlled by our lender. We use these distributions, which are net of required debt service payments, to pay our operating expenses and for other purposes permitted by the terms of our bank credit facility. Starting in May 2008, we also took immediate actions to reduce the Company's recurring operating expenses, including a headcount reduction of non-essential staff. As a result of these changes, we have access to more cash more frequently to cover our reduced operating expenses and to pay principal payments on our debt over a longer period of time. We discuss our overall liquidity in Item 7 – MD&A under the caption, "Financial Condition" and provide further detail regarding our bank credit facility in Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements.

6

*Strengthening of Corporate Infrastructure and Internal Control Environment*: NexCen made substantial changes to our management team and management structure; centralized and clarified management responsibility; improved board communication and corporate governance; made changes to and increased the number of dedicated full-time accounting personnel; consolidated control and oversight of the Company's legal issues and outside counsel; and enhanced internal control policies and procedures. We made these changes in our effort to improve the Company's ability to ensure compliance with our legal, financial, and regulatory requirements and to satisfy our public reporting obligations on a timely basis. We discuss these matters further in Item 9A – *Controls and Procedures (As Restated)*.

*Initiatives to Grow the Franchised Brands:* In 2008, our franchisees, with our assistance, opened 97 franchised QSR and 67 franchised retail footwear and accessories stores. Moreover, in line with our strategy to expand our franchised stores internationally, we signed agreements for our respective brands to enter new markets such as Bahrain, Canada, Guam, Kuwait, Lebanon, Mexico, Oman, South Korea, St. Lucia and Vietnam. NexCen also continued a re-branding campaign for TAF; established an online Cookie Cake ordering program at Great American Cookies; introduced new packaging for pints and quarts at MaggieMoo's; launched a new in-store presentation with a new menu board program at Marble Slab Creamery; gained the first significant national media coverage for Pretzelmaker and Pretzel Time; and opened our first international Shoebox New York franchised store.

In 2009, we have moved to the second phase of our strategic plan which is to drive revenue growth by (1) strengthening each of NexCen's seven franchised brands; (2) completing the integration of the franchised brands into the NFM operating infrastructure; (3) enhancing profitability of NexCen franchisees; and (4) leveraging NexCen University, our franchising platform. As part of this plan and, in line with specific growth objectives for each of our franchised brands, the Company commenced implementation of the following strategic initiatives:

- Integrate Pretzel Time and Pretzelmaker, thus creating the second largest pretzel brand in the United States by market share;

- Improve inventory management for MaggieMoo's franchisees to lower operating costs;

- Execute a rebranding and remodeling program for Marble Slab Creamery stores to strengthen the Marble Slab Creamery brand;

- Create a new branding plan to update the look and feel of the Great American Cookies brand;

- Institute a new training platform for TAF franchisees; and

- Further expand the Shoebox New York brand domestically and internationally.

With these initiatives, the Company seeks to support our franchisees to grow our franchised brands and ultimately to increase our revenues.

## Changes to Our Business

As discussed above, we commenced our brand management business in June 2006, when we acquired UCC Capital and Mr. D'Loren became the Company's chief executive officer. Under Mr. D'Loren's leadership, we acquired nine brands and related licensing and franchising businesses from November 2006 through January 2008.

We financed these acquisitions with a combination of cash on hand, equity and borrowings. All of the borrowings, with the exception of the borrowings used to finance the acquisition of Great American Cookies, were pursuant to a series of note funding, security, management and related agreements, originally entered into on March 12, 2007 (the "Original BTMUCC Credit Facility") by BTMU Capital Corporation ("BTMUCC") and certain of its subsidiaries, on the one hand, and by NexCen Brands, NexCen Holding Corp. (the "Issuer"), formerly known as NexCen Acquisition Corp., a wholly-owned subsidiary of NexCen Brands, and certain of our subsidiaries, on the other hand.

In January 2008, in order to finance the acquisition of Great American Cookies, the Company and BTMUCC entered into an amendment to the Original BTMUCC Credit Facility (the "January 2008 Amendment"). Under the January 2008 Amendment, the Company pledged the Great American Cookies assets (including the trademarks, franchise agreements, manufacturing facility and supply business assets) as collateral in a legal, securitized structure that was similar to the Original BTMUCC Credit Facility. The January 2008 Amendment allowed us to borrow an additional $70 million and increased the maximum aggregate amount of borrowings under the credit facility to $181 million. However, the January 2008 Amendment increased debt service payments to BTMUCC, required a $30 million reduction in outstanding principal amounts through prepayments out of excess cash flow or proceeds of a refinancing by October 17, 2008, and generally reduced the amount of cash flow available to the Company to cover operating expenses. See Note 9 – *Long-Term Debt (As Restated)* to the Consolidated Financial Statements for a more detailed discussion of the January 2008 Amendment.

7

In May 2008, following the appointment of a new chief financial officer and during the course of preparing our Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, management conducted a review of the Company's prior public filings, including the disclosures related to the January 2008 Amendment. We concluded that disclosures regarding the accelerated-redemption feature of the January 2008 Amendment, as well as other changes that reduced the amount of cash available to the Company for general use, were not contained in the Original 10-K or the Current Report on Form 8-K filed on January 29, 2008 in connection with the acquisition of Great American Cookies. We further concluded that the January 2008 Amendment's effect on the Company's financial condition and liquidity also raised substantial doubt about our ability to continue as a going concern.

After discussions with the Company's independent registered public accounting firm, management raised these matters with the Audit Committee of the Board of Directors. On May 16, 2008, the Audit Committee retained Paul, Weiss, Rifkind, Wharton & Garrison LLP as independent counsel to conduct an investigation into the matters described above on the Board of Director's behalf. To address the financial aspects of the credit facility and NexCen's general financial condition, the Board of Directors formed a special Restructuring Committee, comprised of David Oros (chairman of the board), George Stamas (a senior partner of the law firm of Kirkland & Ellis, LLP) and James Brady (the Chairman of the Audit Committee and a former managing partner of the Baltimore, Maryland office of the accounting firm of Arthur Andersen LLP). The Restructuring Committee was charged with overseeing, on behalf of the Board of Directors, NexCen's efforts to improve our financial condition and evaluate our restructuring alternatives. (On May 12, 2009, the Restructuring Committee was disbanded after the Board's determination that this ad hoc committee was no longer needed in light of the progress made to date by the Company in its restructuring efforts and the reduced number of members on the Board.)

We disclosed these matters in a Current Report on Form 8-K filed on May 19, 2008. We also announced that our 2007 financial statements should no longer be relied upon and no reliance should be placed upon KPMG LLP's audit report dated March 20, 2008 or its report dated March 20, 2008 on the effectiveness of internal control over financial reporting as of December 31, 2007, as contained in the Company's Original 10-K. In addition, we announced that we would delay the filing of our Quarterly Report on Form 10-Q for the quarter ended March 31, 2008.

*Class Action Litigation, Government Investigation and NASDAQ Delisting*

Following our May 19, 2008 disclosure of the previously undisclosed terms of the January 2008 Amendment, the substantial doubt about our ability to continue as a going concern, our inability to timely file our periodic report and our expected restatement of our Original 10-K, four purported class action lawsuits, a shareholder derivative lawsuit and a direct lawsuit were filed against the Company and certain current and former officers and directors of the Company, asserting various claims under the federal securities laws and certain state statutory and common laws. These lawsuits are discussed below in Item 3 – *Legal Proceedings*.

We voluntarily notified the Enforcement Division of the Securities and Exchange Commission ("SEC") of our May 19, 2008 disclosure. The Company has been cooperating with the SEC and voluntarily provided documents and testimony, as requested. In March 2009, we were notified that the SEC had issued an order commencing a formal investigation on October 21, 2008.

As a result of noncompliance with the listing requirements of The Nasdaq Stock Market ("NASDAQ") including delays in filing our periodic reports, our common stock was suspended from trading on NASDAQ effective at the opening of trading on January 13, 2009 and was delisted from NASDAQ on February 13, 2009. The Company's common stock began trading under the symbol NEXC.PK on the Pink OTC Markets, formerly known as the Pink Sheets, starting on January 13, 2009.

*Audit Committee Investigation*

The Audit Committee directed independent counsel to review the events and circumstances surrounding the January 2008 Amendment to the Original BTMUCC Credit Facility and the public disclosures regarding that amendment.

Upon completion of the independent counsel's comprehensive inquiry, which included numerous interviews and a review of relevant documents, the Audit Committee reached the following key conclusions:

8

- Certain members of the Company's senior management (i) failed to advise the Board of Directors of material changes in the terms of the financing of the Great American Cookies acquisition after the Board of Directors had approved terms previously presented to it and (ii) made serious errors with respect to public disclosures regarding the terms of the financing and their impact on the Company's financial condition that were contained in the Company's Current Report on Form 8-K filed with the SEC on January 29, 2008 and in the Company's Original 10-K, filed with the SEC on March 21, 2008.

- Independent counsel did not find evidence that led it to conclude that there was an intentional effort to keep information concerning the terms of the financing from the Board, the Company's independent auditing firm or the public.

The Company disclosed these conclusions in our Current Report on Form 8-K filed on August 19, 2008.

*Changes to Company's Business and Restructuring of the Credit Facility*

Starting in May 2008, we engaged in a comprehensive review of our business strategy and began taking actions to focus on our franchised brands, restructure our corporate operations, reduce expenses and improve cash flow. We also suspended all activities related to further acquisitions, although, as discussed below, in late 2008, we completed a small acquisition of a Bill Blass licensee as part of our process to sell the Bill Blass business.

### a.    Reduction in Non-Essential Staff and Reduction of Other Recurring Expenses

Starting in May 2008, we took immediate actions to reduce the Company's recurring operating expenses, including a headcount reduction of non-essential staff. By May 31, 2008, we reduced the staff in our New York corporate office by 8 persons or 31% as compared to April 30, 2008. As of December 31, 2008, we further reduced the total number of our employees throughout the Company by an additional 21 persons, for a total reduction of 29 employees or 19% of total staff, and reduced other recurring expenses, thereby significantly decreasing our total monthly cash selling, general and administrative (SG&A) expenses as compared to April 30, 2008.

### b.    Restructuring of the Credit Facility

On August 15, 2008, we completed a comprehensive restructuring of the Original BTMUCC Credit Facility and the January 2008 Amendment by entering into amended and restated note funding, security, management and related agreements with BTMUCC (the "Amended Credit Facility"). We subsequently completed five additional amendments with BTMUCC on September 11, 2008, December 24, 2008, January 27, 2009, July 15, 2009 and August 6, 2009, respectively (the amendments together with the Amended Credit Facility, the "Current Credit Facility"). The Current Credit Facility replaced all of the agreements comprising both the Original BTMUCC Credit Facility and the January 2008 Amendment. See Note 9 — *Long-Term Debt (As Restated)* to the Consolidated Financial Statements for additional details regarding the Current Credit Facility.

### c.    Sale of Waverly

On September 29, 2008, the Company executed a definitive agreement with Iconix Brand Group, Inc. for the sale of our Waverly consumer products brand for $26.0 million. We closed the sale on October 3, 2008, and we used the proceeds from the sale, after payment of transaction expenses, to pay off all $21.3 million of the note associated with the Waverly business. We also used the remaining sales proceeds to pay down $2.6 million of principal of the $26.3 million note associated with the Bill Blass business. We acquired the Waverly business in May 2007 for approximately $34 million in cash. See Note 21 to our Consolidated Financial Statements for additional details regarding the purchase of the Waverly business and Note 25 for additional details regarding the sale of the Waverly business.

### d.    Sale of Bill Blass

In order to have greater control of the Bill Blass consumer products brand and conduct a more comprehensive sales process, the Company, through the wholly-owned subsidiary NexCen Fixed Asset Company, LLC, purchased Bill Blass Ltd., LLC on July 11, 2008. Bill Blass Ltd., LLC manufactured and distributed high-end, ready-to-wear women's clothing pursuant to a royalty–free trademark license with our Bill Blass licensing business ("Bill Blass Couture"). We paid nominal consideration, excluding amounts owed by Bill Blass, Ltd., LLC to the Company, in this transaction.

On December 24, 2008, we completed the sale of our Bill Blass licensing business to Peacock International Holdings, LLC for $10.0 million pursuant to an asset purchase agreement executed on the same day. We used the proceeds of the sale, net of certain transaction costs, to pay down a portion of the remaining principal on the note associated with the Bill Blass licensing business. We acquired the Bill Blass business in February 2007 for approximately $55 million in cash and stock. Because neither Peacock International Holdings, LLC nor any other party was interested in purchasing Bill Blass Couture, Bill Blass, Ltd. LLC filed for liquidation under Chapter 7 of the United States Bankruptcy Code on December 31, 2008. See Note 19 to our Consolidated Financial Statements for additional details regarding the purchase of the Bill Blass licensing business and Note 25 for additional details regarding the sale of the Bill Blass licensing business.

9

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

*Changes in Management, Management Structure and Corporate Governance*

The executive team that was in place in 2007 is no longer with the Company, except for Sue J. Nam, who joined the Company on September 24, 2007 and remains the Company's general counsel and secretary. Kenneth J. Hall, who joined the Company on March 25, 2008 after the filing of the Original 10-K as our chief financial officer, was appointed our chief executive officer on August 15, 2008. Mark E. Stanko, who joined the Company on April 30, 2008 as the chief financial officer of NFM, was appointed the Company's chief financial officer on November 12, 2008, while retaining his role as chief financial officer of NFM.

The Company also clarified lines of responsibility and altered our management structure. The chief financial officer now has responsibility for all aspects of financial, planning, analysis and reporting, whereas the Company previously had dual lines of responsibility for financial management. The corporate finance function now is more closely aligned with the corporate accounting function, so that those departments collaborate, under the direction of the chief financial officer, in the development and maintenance of financial models, cash flow projections, operating budgets and various analyses of financial performance. We also completed our transition to centralized control and oversight by our general counsel of the Company's material legal issues and the outside counsels working on those issues. Prior to September 2007, the Company did not have a general counsel, and oversight of legal issues and outside counsel relationships was dispersed among various members of senior management and was not consolidated under the general counsel until mid-2008.

In addition, we undertook efforts to improve our corporate governance and communications with our Board of Directors. We now have centralized responsibility for Board communication. The chief executive officer, in collaboration with the general counsel and the chief financial officer, is responsible for keeping the Board and the appropriate committees of the Board apprised of significant financial, legal, and operational developments and for obtaining the requisite approvals. We believe that this centralized responsibility for Board communication will ensure that the Board and the committees of the Board are informed of material information in a comprehensive and timely manner. We believe that the focusing of responsibility for Board communication materially strengthens our corporate governance and improves communications between management and our directors.

*Improvements to Disclosure Controls and Procedures and Internal Control over Financial Reporting*

Finally, as discussed in greater detail in Item 9A – *Controls and Procedures (As Restated)*, the Company completed a review and assessment of our disclosure controls and procedures and our internal control over financial reporting. We made changes to internal controls, policies and procedures, and continue to make changes, with the goals of (i) facilitating the Company's early identification, resolution and conclusions on accounting treatment of complex or non-routine transactions and (ii) improving the Company's ability to produce and report timely and accurate financial information for internal purposes, for third parties and for our public filings.

## Impact of the 2008 Events

The Company has spent considerable time, effort and expense in dealing with the events of 2008 and in making changes to its business to overcome the internal and external challenges facing the Company. Although our operations and financial condition have been materially and adversely affected, we believe that as a result of our actions the Company's core business remains intact and the Company is better positioned for future stability and growth.

## Competition

Our brands are all subject to extensive competition by numerous domestic and foreign brands, not only for end consumers but also for management, hourly personnel, suitable real estate sites and qualified franchisees. Each is subject to competitive risks and pressures within its specific market and distribution channels, including price, quality and selection of merchandise, reputation, store location, advertising and customer service. The retail footwear and retail food industries, in which the Company competes, are often affected by changes in consumer tastes; national, regional or local economic conditions; currency fluctuations; demographic trends; traffic patterns; the type, number and location of competing footwear and food retailers and products; and disposable purchasing power. Our success is dependent on the image of our brands to consumers and prospective franchisees and on our franchisees' ability to sell products under our brands. Competing brands may have the backing of companies with greater financial and operating stability and greater distribution, marketing, capital and other resources than we or our franchisees have.

10

## Trademarks

The Company owns numerous registered trademarks and service marks. The Company believes that many of these marks, including The Athlete's Foot®, Great American Cookies®, MaggieMoo's®, Marble Slab Creamery®, Pretzel Time®, Pretzelmaker®, and Shoebox New York® are vital to our business. Our policy is to pursue registration of our important marks whenever feasible and to oppose vigorously any infringements of our marks. The use of these marks by franchisees and licensees has been authorized in franchise and license agreements. Under current law and with proper use, the Company's rights in our marks generally can last indefinitely.

## Seasonality

The business associated with certain of our brands is seasonal. However, the seasonality of our brands is complementary, so that the Company's operations do not experience material seasonality on an aggregate basis. For example, average sales of our mall-based QSR's (Great American Cookies, Pretzel Time, and Pretzelmaker) are higher during the winter months, especially in December, whereas average sales of our ice cream brands (MaggieMoo's and Marble Slab Creamery) are lower during the winter months.

## Research and Development ("R&D")

Since January 2008, the Company has operated a R&D facility for our Great American Cookies brand in our cookie dough manufacturing facility in Atlanta, Georgia. In May 2009, independent suppliers provided equipment and other resources for the opening of a new R&D facility in the same location where we can develop new flavors, new offerings and new formulations of our food products across all of our QSR brands. From time to time, independent suppliers also conduct or fund research and development activities for the benefit of our QSR brands. In addition, we conduct consumer research to determine our end-consumer's preferences, trends and opinions.

## Supply and Distribution

The Company negotiates supply and distribution agreements with a select number of food, beverage, footwear and accessories, paper, packaging, distribution and equipment vendors for the purpose of providing the lowest prices for our franchisees while ensuring compliance with certain quality standards. We have begun aggregating the purchasing power of our franchisees across our multiple brands to leverage scale to drive savings and effectiveness in the supply and distribution function.

## Government Regulation

Many states and the Federal Trade Commission, as well as certain foreign countries, require franchisors to transmit disclosure statements to potential franchisees before granting a franchise. Additionally, some states and certain foreign countries require us to register our franchise offering documents before we may offer a franchise. Due to the scope of our business and the complexity of franchise regulations, we may encounter compliance issues from time to time. Significant delays in registering our franchise offering documents may prevent us from selling franchises in certain jurisdictions, which may have a material adverse effect on our business.

Local, state and federal governments have adopted laws and regulations that affect us and our franchisees including, but not limited to, those relating to advertising, franchising, health, safety, environment, zoning and employment. The Company strives to comply with all applicable existing statutory and administrative rules and cannot predict the effect on our operations from the issuance of additional requirements in the future.

## Employees

As of December 31, 2007, we employed a total of 107 employees. The number of our employees fluctuated over the course of 2008 due to acquisition and disposition of businesses, workforce reduction, hiring of personnel in the accounting department and natural attrition. As of December 31, 2008, we employed a total of 123 persons. We believe that our relations with our employees are good. None of our employees as of December 31, 2007 and December 31, 2008 are covered by a collective bargaining agreement.

11

## Historical Operations

Until late 2004, the Company owned, acquired and operated a number of mobile and wireless communications businesses. These businesses never became profitable, and during 2004 we sold these businesses and started a mortgage-backed securities, or MBS, business. During 2004 and 2005, we assembled a leveraged portfolio of MBS investments. However, market conditions for the MBS business changed significantly during 2005 and into 2006, and the profitability of our leveraged MBS portfolio declined. In light of these changing market conditions, in late 2005 and into 2006, we began to explore additional and alternative business strategies that we thought could help us become profitable more quickly and create shareholder value. These efforts resulted in our decision to acquire UCC Capital in June 2006. On October 31, 2006, at the 2006 annual meeting of stockholders, our stockholders approved the sale of our MBS portfolio for the purpose of discontinuing our MBS business and allocating all cash proceeds from such sale to the growth and development of our brand management business. Our stockholders also approved a change of our Company name from Aether Holdings, Inc. to NexCen Brands. We sold our MBS investments in November 2006, and since that time, we have focused entirely on our brand management business.

## Tax Loss Carry-Forwards and Limits on Ownership of Our Common Stock

As a result of the substantial losses incurred by our predecessor businesses through 2004, as of December 31, 2007, we had federal net operating loss carry-forwards of approximately $782 million that expire on various dates between 2011 and 2026. In addition, we had capital loss carry-forwards of approximately $188 million that expire between 2008 and 2011. If we have an "ownership change" as defined in Section 382 of the Internal Revenue Code of 1986, as amended ("IRC"), our net operating loss carry-forwards and capital loss carry-forwards generated prior to the ownership change would be subject to annual limitations, which could reduce, eliminate, or defer the utilization of these losses.

To help guard against a change of ownership occurring under Section 382, shares of our common stock are subject to transfer restrictions contained in our certificate of incorporation. In general, the transfer restrictions prohibit any person from acquiring 5% or more of our stock without our consent. Persons who owned 5% or more of our stock prior to May 4, 2005 are permitted to sell the shares owned as of May 4, 2005 without regard to the transfer restrictions. Shares acquired by such persons after May 4, 2005 are subject to the transfer restrictions. Our Board of Directors has the right to waive the application of these restrictions to any transfer.

To date, we do not believe that we have experienced an ownership change (as defined under Section 382) that would result in any limitation on our future ability to use these net operating loss and capital loss carry-forwards. However, we also have not generated sufficient taxable income or capital gains to enable us to realize value, in the form of tax savings, from our accumulated tax loss carry-forwards, and there are significant uncertainties as to our ability to realize any tax savings in the future. In addition, we expect to remain subject to certain state, local, and foreign tax obligations, as well as to a portion of the federal alternative minimum tax for which the use of our tax loss carry-forwards may be limited. We discuss income taxes in Note 10 – *Income Taxes (As Restated)* to our Consolidated Financial Statements. For a discussion on the risks associated with our tax loss carry-forwards and the limits on ownership of our common stock, please refer to Item 1A – *Risk Factors*, under the caption "Risks of Our Business."

## General Corporate Matters

Our executive offices are located at 1330 Avenue of the Americas, 34th Floor, New York, NY 10019. Our telephone number is (212) 277-1100 and our fax number is (212) 277-1160.

## Availability of Information

We maintain a website at www.nexcenbrands.com, which provides a wide variety of information on each of our brands. You may read and copy any materials we file with the Securities and Exchange Commission at the SEC's Public Reference Room at 100 F Street, N.E., Washington, DC 20549. For further information concerning the SEC's Public Reference Room, you may call the SEC at 1-800-SEC-0330. Some of this information also may be accessed on the SEC's website at www.sec.gov. We also make available free of charge, on or through our website, our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished to the SEC pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. We also maintain the following sites for each of the Company's brands and operations: www.theathletesfoot.com, www.greatamericancookies.com, www.maggiemoos.com, www.marbleslab.com, www.pretzeltime.com, www.pretzelmaker.com, and www.shoeboxny.com. We are providing the address of our internet websites solely for the information of investors. We do not intend the internet addresses to be active links, and the contents of these websites are not incorporated into, and do not constitute a part of, this Second Amendment.

12

## ITEM 1A. RISK FACTORS

You should carefully consider the following risks along with the other information contained in this Second Amendment. All of the following risks could materially and adversely affect our business, financial condition or results of operations. In addition to the risks discussed below and elsewhere in this Second Amendment, other risks and uncertainties not currently known to us or that we currently consider immaterial could, in the future, materially and adversely affect our business, financial condition and financial results.

### *Risks Related to Our Financial Condition*

**Our substantial indebtedness may severely limit cash flow available for our operations, and we may not be able to service our debt or obtain additional financing, if necessary.**

We are highly leveraged. As of December 31, 2008, we had approximately $142 million of debt outstanding with BTMUCC. See Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements for additional details. Under our Current Credit Facility, substantially all revenues earned by the Company are remitted to "lockbox accounts," and the terms of our Current Credit Facility limit the amount of cash flow from operations that may be distributed to NexCen for operating expenses, capital expenditures and other general corporate purposes. The Current Credit Facility also prohibits us from securing any additional borrowings without the prior written consent of BTMUCC. Thus, our indebtedness could, among other things:

- increase our vulnerability to general adverse economic and industry conditions;
- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, research and development efforts and other general corporate purposes;
- limit our flexibility in planning for, or reacting to, changes in our business and the industries in which we operate;
- place us at a competitive disadvantage if any of our competitors have less debt; and
- limit our ability to borrow additional funds.

We are subject to numerous prevailing economic conditions and to financial, business, and other factors beyond our control. As a result, we cannot provide any assurances that we will be able to generate sufficient cash flow to service our interest and principal payment obligations under our outstanding debt, or that cash flow, future borrowings or equity financing will be available for the payment or refinancing of our debt. To the extent we are not successful in repaying or renegotiating renewals of our borrowings or in arranging new financing, our business, results of operations and financial condition will be materially and adversely affected.

**Doubt about our ability to continue as a going concern could adversely impact our business, financial condition and results of operations.**

Our future success depends in large part on the support of our current and future investors, lenders, franchisees, business partners and employees. Uncertainties with respect to our corporate viability and financial condition may discourage investors from purchasing our stock, lenders from providing additional capital, current and future franchisees from renewing existing agreements or executing new agreements with us, vendors and service providers from dealing with us without prepayment or other credit assurances, and/or current and future employees from committing to us, any or all of which could adversely affect our business, financial condition and results of operations.

**Any failure to meet our debt obligations would adversely affect our business and financial condition.**

Our Current Credit Facility contains numerous affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, fundamental changes, asset sales, acquisitions, capital and other expenditures, common stock repurchases, dividends and other payments affecting subsidiaries and sale and leaseback transactions. The Company's failure to comply with financial and other restrictive covenants relating to our indebtedness could result in a default under the indebtedness, which could then trigger among other things the lender's right to accelerate principal payment obligations, foreclose on virtually all of the assets of the Company and take control of all of the Company's cash flow from operations. These restrictions also may limit our ability to operate our businesses and may prohibit or limit our ability to enhance our operations or take advantage of potential business opportunities as they arise.

13

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**We are vulnerable to interest rate risk with respect to a substantial portion of our debt.**

As of December 31, 2008, approximately 61% of our current aggregate debt fluctuates with the 30-day London Interbank Offering Rate ("LIBOR"). Any increase in LIBOR will increase our interest expense and could negatively impact our business, liquidity and financial condition. See Item 7A – *Quantitative and Qualitative Disclosure about Market Risk*, under the caption "Interest Rate Risk."

**We may need additional funds in the future to continue and/or improve our operations, but we face uncertainties with respect to access to working capital that could materially adversely impact our business, financial condition and results of operations.**

We anticipate that cash generated from operations will provide us with sufficient liquidity to meet the expenses related to ordinary course operations, including our debt service obligations, for at least the next twelve months. Nonetheless, market and economic conditions may worsen and negatively impact our franchisees and our ability to sell new franchises. Accordingly, there can be no assurance that our current cash on hand and cash from operations after debt service will continue to satisfy our working capital requirements in the future. We may require future working capital in order to operate, implement our revised business plan and/or further improve operations. We have no committed sources of working capital and do not know whether additional financing will be available when needed, or, if available, that the terms will be favorable. Our Current Credit Facility prohibits us from securing any additional borrowings without the prior written consent of our lender and limits the amount of cash flow from operations that may be used for operating expenses, capital expenditures, and other general corporate purposes. The failure to satisfy our working capital requirements will adversely affect our business, financial condition and results of operations.

We may seek additional funding through strategic alliances or private or public sales of our securities. There can be no assurance, however, that we can obtain additional funding on reasonable terms, or at all, and such funding, if available, may significantly dilute existing shareholders and trigger an ownership change that would limit our ability to utilize our tax loss carry-forwards assuming we have taxable income. If we cannot obtain adequate funds, we may need to significantly curtail our expenses, which may adversely affect our business, financial condition and results of operations.

**Our ability to access capital markets may be constrained.**

We failed to timely file with the SEC our Quarterly Reports on Form 10-Q for periods ended March 31, 2008, June 30, 2008, September 30, 2008, our Annual Report on Form 10-K for the fiscal year ended December 31, 2008, and our Quarterly Report on Form 10-Q for the period ended March 31, 2009. Until we are timely in our filings for a period of 12 months, we will be precluded from registering any securities with the SEC on Form S-3, the most simplified registration form used by the SEC. In addition, we are limited under our Current Credit Facility from raising equity in both private and public markets unless certain conditions are met to protect our lender's interest. As a result, our ability to access the capital markets may be constrained, which may adversely affect our liquidity.

### *Risks Related to Our Pending Litigation and Governmental Investigations*

**Any adverse outcome of the investigation being conducted by the SEC could adversely affect our business, financial condition, results of operations and cash flows.**

In March 2009, the Company received notice that a formal investigation had been commenced by the SEC in October 2008. We cannot predict the outcome of the investigation. The legal costs of such investigation and any negative outcome from the investigation could have a material adverse effect on our business, financial condition, results of operations and cash flows.

**Several lawsuits have been filed against us involving our past public disclosures, and the outcome of these lawsuits may have a material adverse effect on our business, financial condition, results of operations and cash flows.**

Several purported class action lawsuits, a shareholder derivative lawsuit and a direct lawsuit have been filed against us, as well as certain of our former officers and current and former directors, relating to, among other things, allegations of violations of the securities laws. We cannot predict the outcome of these lawsuits. Substantial damages or other monetary remedies assessed against us could have a material adverse effect on our business, financial condition, results of operations and cash flows, and any requirement to issue additional stock could be dilutive. See Item 3 – *Legal Proceedings*, for a discussion of these lawsuits.

**We may not have sufficient insurance to cover our liability in our pending litigation claims and future claims due to coverage limits, as a result of insurance carriers seeking to deny coverage of such claims, or because the insurance carrier is unable to provide coverage, which in any case could have a material adverse effect on our business and financial condition.**

We maintain third party insurance coverage against various liability risks, including securities and shareholder derivative claims, as well as other claims that form the basis of litigation matters pending against us. While we believe these insurance arrangements are an effective way to ensure against liability risks, the potential liabilities associated with the litigation matters pending against us, or that could arise in the future, could exceed the coverage provided by such arrangements. Our insurance carriers may also seek to rescind or deny coverage with respect to pending or future actions. In addition, our primary insurance carrier for securities and shareholder derivative claims is American Insurance Group, Inc., which has faced significant financial difficulties. If we do not have sufficient coverage under our policies, or if the insurance companies are successful in rescinding or denying coverage to us, or if our insurance

carrier is unable to provide coverage, our business, financial condition, results of operations and cash flows would be materially and adversely affected.

14

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**Our potential indemnification obligations and limitations on our director and officer liability insurance could have a material adverse effect on our business, results of operations and financial condition.**

Certain of our present and former directors, officers and employees are the subject of lawsuits. Under Delaware law, our bylaws and other contractual arrangements, we may have an obligation to indemnify our current and former directors, officers and employees in relation to completed investigations or pending and/or future investigations and actions. Indemnification payments that we make may be material and, in such event, would have a negative impact on our results of operations and financial condition to the extent insurance does not cover our costs. The insurance carriers that provide our directors' and officers' liability policies may seek to rescind or deny coverage with respect to pending and future investigations and actions, or we may not have sufficient coverage under such policies. If the insurance companies are successful in rescinding or denying coverage to us and/or some of our current and former directors, officers and employees, or we do not have sufficient coverage under our policies, our business, financial condition, results of operations and cash flows may be materially adversely affected.

**The uncertainty of the outcome of the pending litigation and the SEC investigation may have a material adverse effect on our business.**

The uncertainty and risks of the pending litigation and the SEC investigation may cause our stock price to be more volatile or lower than it otherwise would be and may affect our ability to retain and/or attract franchisees, business partners, investors and/or employees.

*Risks of Our Business*

**Acquisitions involve numerous risks that we may not be able to address or overcome and that may negatively affect our business and financial results.**

We have built our brand management business through acquisitions. Our acquisitions may not deliver the benefits we anticipated. Excessive expenses may result if we do not successfully integrate the acquired businesses, or if the costs and management resources we expend in connection with the integrations exceed our expectations. We expect that our previous acquisitions will have a continuing, significant impact on our business, financial condition and operating results. The value of some of the businesses that we acquired are less than the amount we paid, and our financial results may be adversely affected if we fail to realize anticipated benefits from our acquisitions, including various synergies and economies of scope and scale. Risks associated with our past acquisitions include, among others:

- overpaying for acquired assets or businesses;

- being unable to license, market or otherwise exploit the assets that we acquired on anticipated terms or at all;

- negative effects on reported results of operations from acquisition-related expenses, amortization or impairment of acquired intangibles and impairment of goodwill;

- diversion of management's attention from management of day-to-day operational issues;

- failing to maintain focus on, or ceasing to execute, core strategies and business plans as our brand portfolio grew and became more diversified;

- failing to achieve synergies across our diverse brand portfolio;

- failing to acquire or hire additional successful managers, or being unable to retain critical acquired managers;

- failing to integrate acquired businesses with our existing businesses due to unanticipated costs and difficulties, which may disrupt our existing businesses or delay or diminish our ability to realize financial and operational benefits from those acquisitions; and

- underlying risks of the businesses that we acquired, which differ depending on the brand and its associated business and market, including those related to entering new lines of business or markets in which we have little or no prior experience.

15

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**Our business strategy to focus on our franchised brands may not be successful.**

The Company's efforts to focus on the franchise business as our core business may not be successful and may not improve the performance of the Company. We may not be successful in effectively executing our strategy or in generally operating or expanding our brands or integrating them into an efficient overall business strategy. We may not be able to retain existing or attract new investors, franchisees, business partners and employees.

**We may fail to reach our sales and expense projections, which may negatively impact our business, results of operations and financial condition.**

We establish sales and expense projections each fiscal year based on a strategy of new market development, further penetration of existing markets and tight control over operating expenses against a backdrop of current and anticipated economic conditions. In addition to driving our financial results, these sales and expense projections are provided to our lender, and our progress in meeting projections on a monthly and quarterly basis affect our ability to meet debt and covenant obligations and negotiate any waivers and/or amendments we may need under our Current Credit Facility. Our ability to meet our sales and expense projections is dependent on our ability to locate and attract new franchisees and area developers; maintain and enhance our brands; maintain satisfactory relations with our franchisees; monitor and audit the reports and payments received from franchisees; maintain or increase same store sales in existing markets; achieve new store openings and control expenses – all of which are dependent on factors both within and outside our control. Our failure to reach our sales and expense goals, which may be exacerbated by current volatile economic conditions, may negatively impact our business, financial condition, results of operation and cash flow.

**Our business depends on market acceptance of our brands in highly competitive industries.**

Continued market acceptance of our franchised brands is critical to our future success and subject to great uncertainty. The retail footwear and retail food industries in which we compete are extremely competitive, both in the United States and overseas. Accordingly, we and our current and future franchisees, licensees and other business partners face and will face intense and substantial competition with respect to marketing and expanding products under our franchised brands. As a result, we may not be able to attract franchisees, licensees, and other business partners on favorable terms or at all. In addition, franchisees, licensees and other third parties with whom we deal may not be successful in selling products that make use of our brands. They (and we) also may not be able to expand the distribution of such products and services into new markets.

In general, competitive factors include quality, price, style, selection of merchandise, reputation, name recognition, store location, advertising and customer service. The retail footwear and retail food industries are often affected by changes in consumer tastes; national, regional or local economic conditions; currency fluctuations; demographic trends; traffic patterns; the type, number and location of competing footwear and food retailers and products; and disposable purchasing power. Competing brands may have the backing of companies with greater financial and operational stability and greater distribution, marketing, capital and other resources than we or our franchisees and other business partners have. This may increase the obstacles that we and they face in competing successfully. Among other things, we may have to spend more on advertising and marketing or may need to reduce the amounts that we charge franchisees, licensees and other business partners. This could have a negative impact on our business, financial condition, and results of operations.

**Deterioration of general economic conditions and declines in consumer spending can negatively affect our business.**

Our business is sensitive to consumer spending patterns and preferences. Market and general economic conditions affect the level of discretionary spending on the merchandise we and our franchisees offer, including general business conditions, interest rates, taxation, the availability of consumer credit and consumer confidence in future economic conditions. Any unfavorable occurrences in these economic conditions on a local, regional, national or multi-national level may adversely affect our growth, sales and profitability. Given the significance of our domestic business, the likely negative impact of the current recession in the general economy in the United States or the general decline in domestic consumer spending may not be wholly mitigated by our business outside the United States, especially as the economic downturn has become more global in nature.

Many of our franchisees' stores are located in shopping malls, particularly in the United States. Our franchisees derive revenue, in part, from the high volume of traffic in these malls. As a result of deteriorating economic conditions, the inability of mall *"anchor"* tenants and other area attractions to generate consumer traffic around our franchised stores or the decline in popularity of malls as shopping destinations could reduce our franchising revenue dependent on sales volume.

16

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**Our operating results are closely tied to the success of our franchisees, over which we have limited control.**

As a result of our franchising programs, our operating results are dependent upon the sales volumes and viability of our franchisees. Any significant inability of our franchisees to operate successfully could adversely affect our operating results, and the quality of franchised operations may be impacted by factors that are not in our control. We provide training and support to our franchisees, but do not exercise day-to-day control over them. Franchisees may not successfully operate their businesses in a manner consistent with our standards and requirements, or may not hire and train qualified managers and other store personnel. In addition, franchisees may not be able to find suitable sites on which to develop stores, negotiate acceptable leases for the sites, obtain the necessary permits or government approvals or meet construction schedules. Any of these problems could negatively impact our business, could slow our planned growth and negatively impact our business, results of operations and financial condition.

**The current disruptions in the availability of financing for current and prospective franchisees may adversely affect our business, results of operations and financial condition.**

As a result of steep declines in the capital markets and the severe limits on credit availability, current and prospective franchisees may not have access to the financial or management resources that they need to open or continue operating the units contemplated by franchise or development agreements. Our franchisees generally depend upon financing from banks or other financial institutions in order to construct and open new units. Especially in this tight credit environment, financing has been difficult to obtain for some of our current and prospective franchisees. The continued difficulties with franchisee financing could reduce our store count, franchise fee revenues and royalty revenues, slow our planned growth, and negatively impact our business, results of operations and financial condition.

**We depend on our franchisees to provide timely and accurate information about their sales and operations, which we rely upon to effectively manage the franchised brands.**

Franchisees are contractually obligated to provide timely and accurate information regarding their sales and operations, and we rely on this information to collect royalties and manage the franchised brands. Most of franchisees are required to report on a weekly basis. However, the franchise agreements for our TAF brand require reporting on a monthly or quarterly, versus weekly, basis. This delay in reporting reduces our visibility into the results of operations for the TAF brand. In addition, a significant number of our franchisees are not consistently compliant with their reporting obligations. Our inability to collect timely and accurate information from our franchisees may adversely affect our business and results of operation.

**Significant delays in registering our franchise offering documents may adversely affect our business, results of operations and financial condition.**

Many states and the Federal Trade Commission, as well as certain foreign countries, require franchisors to transmit disclosure statements to potential franchisees before granting a franchise. Additionally, some states and certain foreign countries require us to register our franchise offering documents before we may offer a franchise. Due to the scope of our business and the complexity of franchise regulations, we may encounter compliance issues from time to time. Significant delays in registering our franchise offering documents may prevent us from selling franchises in certain jurisdictions, which may have a material adverse effect on our business, results of operations and financial condition.

**We operate a global business that exposes us to additional risks that may adversely affect our business, results of operations and financial condition.**

Our franchisees operate in approximately 40 countries. As a result, we are subject to risks associated with doing business globally. We intend to continue to pursue growth opportunities for our franchised brands outside the United States, which could expose us to greater risks. The risks associated with our franchise business outside the United States include:

- Political and economic instability or civil unrest;
- Armed conflict, natural disasters or terrorism;
- Health concerns or similar issues, such as a pandemic or epidemic;
- Multiple foreign regulatory requirements that are subject to change and that differ between jurisdictions;
- Changes in trade protection laws, policies and measures, and other regulatory requirements effecting trade and investment;
- Differences from one country to the next in legal protections applicable to intellectual property assets, including trademarks and similar assets, enforcement of such protections and remedies available for infringements;
- Fluctuations in foreign currency exchange rates and interest rates; and

17

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

- Adverse consequences from changes in tax laws.

The effects of these risks, individually or in the aggregate, could have a material adverse impact on our business, results of operations and financial condition.

**We may not be able to adequately protect our intellectual property, which could harm the value of our brands and adversely affect our business.**

We believe that our trademarks and other intellectual property rights are vital to our success, the success of our brands and our competitive position. Accordingly, we devote substantial resources to the development and protection of our trademarks and other intellectual property rights. However, the actions taken by us may be inadequate to prevent infringement or other unauthorized use of our intellectual property by others, which may thereby dilute our brands in the marketplace and/or diminish the value of our proprietary rights. We also may be unable to prevent others from claiming infringement or other unauthorized use of their trademarks and intellectual property rights by us. Our rights to our trademarks may in some cases be subject to the common law or statutory rights of any person who filed an application and/or began using the trademark (or confusingly similar mark) prior to the date of our application and/or our first use of such trademarks in the relevant territory. We cannot provide assurances that third parties will not assert claims against our trademarks and other intellectual property rights or that we will be able to successfully resolve such claims, which could result in our inability to use certain trademarks or other intellectual property in certain jurisdictions or in connection with certain goods or services. Future actions by third parties, including franchisees or licensees, may diminish the strength of our trademarks or other intellectual property rights, injure the goodwill associated with our business and decrease our competitive strength and performance. We also could incur substantial costs to defend or pursue legal actions relating to the use of our trademarks and other intellectual rights, which could have a material adverse effect on our business, results of operations or financial condition.

**We may be required to recognize additional impairment charges for goodwill, trademarks and other intangible assets with indefinite or long lives.**

As a result of our acquisition strategy, we recorded a material amount of trademark, goodwill and other intangible assets with indefinite or long lives on our balance sheet. We assess these assets as and when required by U.S. generally accepted accounting principles (GAAP) to determine whether they are impaired. Based on our reviews in fiscal years 2007 and 2008, we recorded no impairments in 2007, but recorded impairments totaling approximately $242 million in 2008 with respect to our acquired assets. If market conditions continue to deteriorate or if operating results decline unexpectedly, we may be required to record additional impairment charges. Additional impairment charges would reduce our reported earnings for the periods in which they are recorded. Those reductions could be material and, in such event, would adversely affect our financial results.

**We determined that we had material weaknesses in disclosure controls and procedures and internal control over financial reporting. Any future material weaknesses could adversely affect our business, our financial condition and our ability to carry out our strategic business plan.**

As discussed in Item 9A – *Controls and Procedures (As Restated)*, we concluded that, as of December 31, 2007, our disclosure controls and procedures and internal control over financial reporting were not effective. We believe the deficiencies continued into 2008. We made substantial changes to our management team and management structure; improved board communication and corporate governance; made changes to and increased the number of dedicated full-time accounting personnel; and enhanced internal control policies and procedures. Nonetheless, if we are unsuccessful in our effort to remedy the weaknesses in our financial reporting mechanisms and internal controls and to maintain effective corporate governance practices, our business, our financial condition, our ability to carry out our strategic business plan, our ability to report our financial condition and results of operations accurately in a timely manner, and our ability to retain the trust of our franchisees, lender, business partners, investors, employees and shareholders could be adversely affected.

**The time, effort and expense related to internal and external investigations, litigation, the restatement of our Original 10-K, the completion of our other delinquent SEC filings, and the development and implementation of improved internal controls and procedures, may have an adverse effect on our business.**

Our management team has spent considerable time, effort and expense in dealing with the Audit Committee investigation, pending litigation, the SEC's investigation, completing the restatement of our Original 10-K and other delinquent SEC filings and in developing and implementing accounting policies and procedures, disclosure controls and procedures, and corporate governance policies and procedures. This has prevented management from devoting its full attention to our business and many of these matters may continue to distract management's attention in the future. The significant time, effort and expense spent have adversely affected our operations and our financial condition, and may continue to do so in the future.

18

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**Current and prospective investors, franchisees, business partners, and employees may react adversely to the restatement of our Original 10-K and our inability to file in a timely manner all of our SEC filings.**

The restatement of our Original 10-K and our inability to file on a timely basis all of our SEC filings has caused negative publicity about us, has resulted in the delisting of our common stock from NASDAQ, and has, and may continue to have, a negative impact on the market price of our common stock. In addition, the restatement of our Original 10-K and any future delays in our SEC filings could cause current and future investors, franchisees, business partners and employees to lose confidence in our Company, which may affect their willingness to remain in current relationships or enter into new relationship with us.

**Our stock trades on the over-the-counter "Pink Sheets" market, and our stock price may be volatile.**

On January 13, 2009, as a result of noncompliance with NASDAQ listing requirements, our common stock was suspended from trading from NASDAQ. Immediately thereafter, our stock began trading under the symbol NEXC.PK on the Pink OTC Markets, formerly known as the Pink Sheets. Although we plan to apply for relisting of our stock on NASDAQ as soon as we are in compliance with the listing requirements, we may not be successful in that effort. Our stock price has been volatile in the past and may continue to be volatile for the foreseeable future.

**Limits on ownership of our common stock could have an adverse consequence to you and could limit your opportunity to receive a premium on our stock.**

Under transfer restrictions that have been applicable to our common stock since 2005, acquisitions of 5% or more of our stock is not permitted without the consent of our Board of Directors. In addition, even if our Board of Directors consented to a significant stock acquisition, a potential buyer might be deterred from acquiring our common stock while we still have significant tax losses being carried forward, because such an acquisition might trigger an ownership change and severely impair our ability to use our tax losses against future income. Thus, this potential tax situation could have the effect of delaying, deferring or preventing a change in control and, therefore, could affect adversely our shareholders' ability to realize a premium over the then prevailing market price for our common stock in connection with a change in control.

The transfer restrictions that apply to shares of our common stock, although designed as a protective measure to avoid an ownership change, may have the effect of impeding or discouraging a merger, tender offer or proxy contest, even if such a transaction may be favorable to the interests of some or all of our shareholders. This effect might prevent our stockholders from realizing an opportunity to sell all or a portion of their common stock at a premium to the prevailing market price.

**Our ability to realize value from our tax loss carry-forwards is subject to significant uncertainty.**

As of December 31, 2007, we had federal net operating loss carry-forwards of approximately $782 million that expire between 2011 and 2026. In addition, we had capital loss carry-forwards of approximately $188 million that expire between 2008 and 2011. However, our ability to realize value from our tax loss carry-forwards is subject to significant uncertainty.

There can be no assurance that we will have sufficient taxable income or capital gains in future years to use the net operating loss carry-forwards or capital loss carry-forwards before they expire. This is especially true for our capital loss carry-forwards, because they expire over a shorter period of time than our net operating loss carry-forwards. The amount of our net operating loss carry-forwards and capital loss carry-forwards also has not been audited or otherwise validated by the IRS. The IRS could challenge the amount of our net operating loss carry-forwards and capital loss carry-forwards, which could result in an increase in our liability for income taxes.

If we have an "ownership change" as defined in Section 382 of the Internal Revenue Code, our net operating loss carry-forwards and capital loss carry-forwards generated prior to the ownership change would be subject to annual limitations, which could reduce, eliminate, or defer the utilization of these losses. Based upon a review of past changes in our ownership, as of the date of this Second Amendment, we do not believe that we have experienced an ownership change (as defined under Section 382) that would result in any limitation on our future ability to use these net operating loss and capital loss carry-forwards. However, we cannot assure you that the IRS or some other taxing authority may not disagree with our position and contend that we have already experienced such an ownership change, which would severely limit our ability to use our net operating loss carry-forwards and capital loss carry-forwards to offset future taxable income.

While we expect that the transfer restrictions on our stock will help guard against an ownership change from inadvertently occurring under Section 382 and the related rules, we cannot guarantee that these restrictions will prevent a change of ownership from occurring because we may decide (or need) to sell additional shares of our common stock in the future to raise capital for our business and because persons who held more than 5% of our stock prior to these restrictions taking effect can sell (and in some cases have sold) shares of our stock.

19

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009