## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

As of December 31, 2007, we leased a total of approximately 49,500 square feet of office space for our operations comprised of: (1) our principal executive office located in New York, New York, totaling 10,250 square feet; (2) a showroom for our Waverly licensing business located in New York totaling 7,150 square feet; (3) a showroom for our Bill Blass licensing business located in New York totaling 11,700 square feet; and (4) a centralized facility for our franchised brands located in Norcross, Georgia totaling approximately 20,400 square feet.

As of December 31, 2007, we were also obligated under a lease for space in Marlborough, Massachusetts that we used for a communications business that we sold in 2005. We sublet this office space to BIO-Key International, Inc., the company that purchased the business ("BIO-Key"), and the lease expired by its terms on August 31, 2008. In addition, in February 2007, we assumed leases for office space in connection with our acquisitions of MaggieMoo's and Marble Slab Creamery. We negotiated a release from the MaggieMoo's lease for a one-time payment of $330,000 which was made in January 2008. We sublet the Marble Slab Creamery office in Houston, Texas to a third party through the lease expiration in April 2009.

As of December 31, 2007, we did not own or lease property used by our franchisees, but in connection with certain acquisitions we are obligated under leases and guarantees for certain franchise location leases.

In January 2008, in connection with the acquisition of Great American Cookies, we acquired a cookie dough manufacturing facility. The facility is located on approximately four acres of land in Atlanta, Georgia and totals 37,400 square feet. The acquisition of the cookie dough manufacturing facility was financed under the January 2008 Amendment to the Original BTMUCC Credit Facility and consequently is subject to BTMUCC's security interest.

Notwithstanding the sales of Waverly and Bill Blass in late 2008, we remain obligated on the lease for the Waverly showroom, but sublet the space to third parties through the lease expiration on February 27, 2019. We also remained obligated on a lease for the Bill Blass showroom which expires in January 2014, but, on June 11, 2009, we assigned to a third party that lease for a one-time payment of approximately $230,000. We assumed the lease for office space in New York totaling 4,950 square feet in connection with our acquisition of the Bill Blass Couture business on July 11, 2008. That lease expired as of December 31, 2008.

## ITEM 3. LEGAL PROCEEDINGS

<u>Securities Class Action.</u> A total of four putative securities class actions have been filed in the United States District Court for Southern District of New York against NexCen Brands and certain of our former officers and current director for alleged violations of the federal securities laws. These actions are captioned: *Mark Gray v. NexCen Brands, Inc., David S. Oros, Robert W. D'Loren & David Meister,* No. 08-CV-4906 (filed on May 28, 2008); *Ghiath Hammoud v. NexCen Brands, Inc., Robert W. D'Loren, & David B. Meister,* No. 08-CV-5063 (filed on June 3, 2008); *Ronald Doty v. NexCen Brands, Inc., David S. Oros, Robert W. D'Loren & David Meister,* No. 08-CV-5172 (filed on June 5, 2008); and *Frank B. Falkenstein v. NexCen Brands, Inc., David S. Oros, Robert W. D'Loren, David Meister,* No. 08-CV-6126 (filed on July 3, 2008).

Although the formulations of the allegations differ slightly, plaintiffs allege that defendants violated federal securities laws by misleading investors in the Company's public filings and statements. The complaints assert claims under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and also assert that the individual defendants are liable as controlling persons under Section 20(a) of the Exchange Act. Plaintiffs seek damages and attorneys' fees and costs.

On March 5, 2009, the court consolidated the actions and appointed Vincent Granatelli as lead plaintiff and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as lead counsel. Under the Stipulation and Order entered by the Court on June 19, 2009, the plaintiff shall file an Amended Consolidated Complaint on or before August 24, 2009 and the Company shall file a responsive pleading on or before October 8, 2009, with any opposition and reply briefing due on November 23, 2009 and December 23, 2009, respectively.

20

<u>Shareholder Derivative Action</u>. A federal shareholder derivative action premised on essentially the same factual assertions as the federal securities actions also has been filed in the United States District Court for Southern District of New York against the directors or former directors of NexCen. This action is captioned: *Soheila Rahbari v. David Oros, Robert W. D'Loren, James T. Brady, Paul Caine, Jack B. Dunn IV, Edward J. Mathias, Jack Rovner, George Stamas & Marvin Traub* , No. 08-CV-5843 (filed on June 27, 2008). In this action, plaintiff alleges that NexCen's Board of Directors breached its fiduciary duties in a variety of ways, mismanaged and abused its control of the Company, wasted corporate assets, and unjustly enriched itself by engaging in insider sales with the benefit of material non-public information that was not shared with shareholders. Plaintiff further contends that she was not required to make a demand on the Board of Directors prior to bringing suit because such a demand would have been futile, due to the board members' alleged lack of independence and incapability of exercising disinterested judgment on behalf of the shareholders. Plaintiff seeks damages, restitution, disgorgement of profits, attorneys' fees and costs, and miscellaneous other relief. On November 18, 2008, the court agreed to stay the derivative case until at least May 18, 2009, on which date the court scheduled a status conference. After holding the status conference on May 18, 2009, the court stayed the derivative case until the filing of this Second Amendment and ordered plaintiff to file its amended complaint within two weeks after the filing of this Second Amendment. On June 9, 2009, plaintiff requested transfer of the derivative case to the court presiding over the securities class action case. This request was denied.

<u>California Litigation</u>. A direct action was filed in Superior Court of California, Marin County against NexCen Brands and certain of our former officers by a series of limited partnerships or investment funds. The case is captioned: *Willow Creek Capital Partners, L.P., et al. v. NexCen Brands, Inc.* , Case No. CV084266 (Cal. Superior Ct., Marin Country) (filed on August 29, 2008). Predicated on substantially similar factual allegations as the federal securities actions, this lawsuit is brought under California law and asserts both fraud and negligent misrepresentation claims. Plaintiffs seek compensatory damages, punitive damages and costs.

The California state court action was served on NexCen on September 2, 2008. Plaintiffs in the California action served NexCen with discovery requests on September 19, 2008. On October 17, 2008, NexCen filed two simultaneous but separate motions in order to limit discovery. First, NexCen filed a motion in the United States District Court for Southern District of New York to stay discovery in the California actions pursuant to the Securities Litigation Uniform Standards Act of 1998. Second, NexCen filed a motion in the California court to dismiss the California complaint on the ground of *forum non conveniens*, or to stay the action in its entirety, or in the alternative to stay discovery, pending the outcome of the federal class actions.

The California state court held a hearing on NexCen's motion on December 12, 2008. At the hearing, the court issued a tentative ruling from the bench granting defendants' motion to stay. On December 26, 2008, the court entered a final order staying the California action in its entirety pending resolution of the putative class actions pending in the Southern District of New York. A case management conference is scheduled for September 16, 2009.

<u>SEC Investigation</u>. We voluntarily notified the Enforcement Division of the SEC of our May 19, 2008 disclosure. The Company has been cooperating with the SEC and voluntarily provided documents and testimony, as requested. On or about March 17, 2009, we were notified that the SEC had commenced a formal investigation of the Company as of October 2008.

<u>Legacy Aether IPO Litigation</u>. The Company is among the hundreds of defendants named in a series of class action lawsuits seeking damages due to alleged violations of securities law. The case is being heard in the United States District Court for the Southern District of New York. The court has consolidated the actions by all of the named defendants that actually issued the securities in question. There are approximately 310 consolidated cases before Judge Scheindlin, including this action, under the caption *In Re Initial Public Offerings Litigation*, Master File 21 MC 92 (SAS).

As to NexCen, these actions were filed on behalf of persons and entities that acquired the Company's stock after our initial public offering in October 20, 1999. Among other things, the complaints claim that prospectuses, dated October 20, 1999 and September 27, 2000 and issued by the Company in connection with the public offerings of common stock, allegedly contained untrue statements of material fact or omissions of material fact in violation of securities laws. The complaint alleges that the prospectuses allegedly failed to disclose that the offerings' underwriters had solicited and received additional and excessive fees, commissions and benefits beyond those listed in the arrangements with certain of their customers, which were designed to maintain, distort and/or inflate the market price of the Company's common stock in the aftermarket. The actions seek unspecified monetary damages and rescission.

After initial procedural motions and the start of discovery in 2002 and 2003, plaintiffs voluntarily dismissed without prejudice the officer and director defendants of each of the 310 named issuers, including NexCen. Then in June 2003, the Plaintiff's Executive Committee announced a proposed settlement with the issuer-defendants, including NexCen, and the officer and director defendants of the issuers (the "Issuer Settlement"). A settlement agreement was signed in 2004 and presented to the court for approval. The proposed Issuer Settlement did not include the underwriter-defendants, and they continued to defend the actions and objected to the proposed settlement. (One of the defendant-underwriters signed a memorandum of understanding in April 2006 agreeing to a $425 million settlement of claims against it.)

21

The district court granted preliminary approval of the proposed Issuer Settlement in 2005 and held a fairness hearing on the matter in April 2006. In December 2006, before final action by the court on the proposed Issuer Settlement, the United States Court of Appeals for the Second Circuit issued a ruling vacating class certification for certain plaintiffs in the actions against the underwriter-defendants (the "Miles Decision"). Plaintiffs filed a petition in early 2007 seeking rehearing of this decision and/or a rehearing en banc. On April 6, 2007, the Second Circuit denied the petition for rehearing in an opinion. After careful consideration by the parties of the effect of the Miles Decision on the proposed settlement (i.e., whether in light of the Miles Decision no class may be certified in these actions, even a settlement class), plaintiffs and the issuer-defendants executed a stipulation and proposed order terminating the proposed Issuers' Settlement on June 22, 2007. The district court "so ordered" the stipulation and proposed order, terminating the proposed Issuers' Settlement shortly thereafter.

Discovery in the actions resumed, and plaintiffs filed amended complaints in the focus cases shortly thereafter. Defendants moved to dismiss the amended complaints. Plaintiffs filed motions for class certification in the focus cases. Defendants filed papers opposing class certification.

In 2008, the Plaintiff's Executive Committee resumed settlement discussions with the issuer-defendants, including NexCen, and the officer and director defendants of the issuers. The parties reached a preliminary settlement in which NexCen would have to contribute no out-of-pocket amount to the settlement. The parties filed their motion for preliminary approval of the settlement on April 2, 2009, which was granted by the district court on June 9, 2009. The court hearing on final approval is scheduled for September 10, 2009.

Legacy Aether Litigation. On March 13, 2006, a complaint, captioned *Geologic Solutions, Inc., v. Aether Holdings, Inc.,* was filed against the Company in the Supreme Court for the State of New York, New York County. The complaint alleged that plaintiff Geologic was damaged as a result of certain alleged breaches of contract and fraudulent inducement arising out of the Company's alleged misrepresentations and failure to disclose certain information in connection with the asset purchase agreement dated as of July 20, 2004 for the purchase and sale of the transportation segment of our discontinued communications business. In July 2007, the Company settled all claims with plaintiff for a payment of $600,000. The case has been dismissed with prejudice. The Company's costs in connection with the defense of this case have been recorded against discontinued operations, further increasing the loss on the sale of the transportation segment, and decreasing the amount of cash we have available for acquisitions and operations. The settlement amount also has been recorded against discontinued operations.

Legacy UCC Capital Litigation. UCC Capital and Mr. D'Loren, our former chief executive officer in his capacity as president of UCC Capital, were parties along with unrelated parties to litigation resulting from a default on a loan to The Songwriter Collective, LLC ("TSC"), which loan UCC Capital had referred to a third party. A shareholder of TSC filed a lawsuit in the United States District Court for the Middle District of Tennessee, captioned *Tim Johnson v. Fortress Credit Opportunities I, L.P., et al.,* in which plaintiff alleged that certain misrepresentations by TSC and its agents (including UCC Capital and Mr. D'Loren) induced the shareholder to contribute certain rights to musical compositions to TSC. UCC Capital and Mr. D'Loren filed cross-claims claiming indemnity against TSC and certain TSC officers. TSC filed various cross and third-party claims against UCC Capital, Mr. D'Loren and another TSC shareholder, Annie Roboff. Roboff filed a separate action in the Chancery Court in Davidson County, Tennessee, captioned *Roboff v. Mason, et al.,* as well as claims in the federal court lawsuit, against UCC Capital, Mr. D'Loren, TSC and the other parties. The parties reached a global settlement on December 19, 2007, with UCC Capital contributing a total of $125,000 to the settlement amount, which amount has been included in discontinued operations. The case has been dismissed with prejudice.

Other. NexCen Brands and our subsidiaries are subject to other litigation in the ordinary course of business, including contract, franchisee, trademark and employment-related litigation. In the course of operating our franchise systems, occasional disputes arise between the Company and our franchisees relating to a broad range of subjects, including, without limitation, contentions regarding grants, transfers or terminations of franchises, territorial disputes and delinquent payments.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

22

# PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### PRICE RANGE OF COMMON STOCK

Our common stock was quoted on NASDAQ under the symbol NEXC from November 1, 2006 until January 13, 2009. Prior to November 1, 2006, starting with our initial public offering on October 20, 1999, the Company's common stock was quoted on NASDAQ under the symbol AETH. As a result of noncompliance with NASDAQ listing requirements, our common stock was suspended from trading on NASDAQ effective at the opening of trading on January 13, 2009 and was delisted from NASDAQ on February 13, 2009. Starting on January 13, 2009, the Company's common stock been traded under the symbol NEXC.PK on the Pink OTC Markets, formerly known as the Pink Sheets.

The following table sets forth, for the periods indicated, the high and low prices per share of the common stock as reported on NASDAQ for 2008, 2007 and 2006.

| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| QUARTER ENDED | HIGH | LOW | HIGH | LOW | HIGH | LOW |
| March 31 | $ 4.82 | $ 2.83 | $ 11.04 | $ 7.42 | $ 3.85 | $ 3.13 |
| June 30 | $ 3.49 | $ 0.41 | $ 12.98 | $ 9.98 | $ 5.50 | $ 3.75 |
| September 30 | $ 0.67 | $ 0.24 | $ 11.41 | $ 5.56 | $ 6.33 | $ 5.54 |
| December 31 | $ 0.30 | $ 0.07 | $ 7.37 | $ 3.89 | $ 7.42 | $ 5.71 |

### APPROXIMATE NUMBER OF EQUITY SECURITY HOLDERS

As of June 30, 2009, the approximate number of stockholders of record of NexCen's common stock was 248.

### DIVIDENDS

We have never declared or paid any cash dividends on our common stock. For the foreseeable future, we expect to utilize earnings, if any, to reduce our indebtedness, rather than pay periodic cash dividends.

### SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS

The following table sets forth, as of December 31, 2007, information concerning compensation plans under which our securities are authorized for issuance. The table does not reflect grants, awards, exercises, terminations or expirations since that date.

| Plan Category | Plan Name | Number of securities to be issued upon exercise of outstanding options, and restricted stock | Weighted-average exercise price of outstanding options, and restricted stock | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 1999 Equity Incentive Plan | 3,915,464 | $ 4.31 | — |
| | 2006 Equity Incentive Plan | 1,973,666 | $ 7.34 | 1,526,334 |
| Equity compensation plans not approved by security holders | Acquisition Incentive Plan | 89,127 | $ 2.71 | |
| Total | | 5,978,257 | $ 5.29 | 1,526,334 |

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

### The 1999 Plan

In September 1999, the Company adopted the 1999 Equity Incentive Plan, as amended on September 5, 2005 (the "1999 Plan"). It was approved by the Company's sole stockholder prior to the Company's initial public offering on October 20, 1999. The 1999 Plan provided for the issuance of NexCen common stock, pursuant to grants of stock options or restricted stock, in an amount that adjusted automatically to equal 20% of the Company's outstanding shares. On September 2, 2005, the Company filed a registration statement with the SEC on Form S-8 registering an additional 973,866 shares under the 1999 Plan. A participant immediately forfeits any and all unvested options and forfeits all unvested restricted stock at the time of separation from NexCen, unless the award agreement provides otherwise. No participant is permitted to exercise vested options after the 90th day from the date of termination from NexCen, unless the award grant provides otherwise.

### The 2000 Plan

Effective December 15, 2000, the Company adopted the Acquisition Incentive Plan (the "2000 Plan") to provide options or direct grants to all employees (other than directors and officers), consultants and certain other service providers of the Company and our related affiliates, without shareholder approval. NexCen's Board of Directors authorized the issuance of up to 1,900,000 shares of NexCen common stock under the 2000 Plan, in connection with the grant of stock options or restricted stock. All options granted under the 2000 Plan were required to be nonqualified stock options.

### The 2006 Plan

Effective October 31, 2006, the Company adopted the 2006 Equity Incentive Plan (the "2006 Plan") to replace the 1999 Plan and the 2000 Plan. The Company's stockholders approved the adoption of the 2006 Plan at the annual meeting held on October 31, 2006. The 2006 Plan is now the sole plan for providing stock-based compensation to eligible employees, directors and consultants. The 1999 Plan and the 2000 Plans remain in existence solely for the purpose of addressing the rights of holders of existing awards already granted under those plans. No new awards have been or will be granted under the 1999 Plan and the 2000 Plan.

A total of 3.5 million shares of common stock were initially reserved for issuance under the 2006 Plan, which represented approximately 7.4% of NexCen's outstanding shares at the time of adoption. Options under the 2006 Plan expire after ten years from date of grant and are granted at an exercise price no less than the fair value of the common stock on the grant date. In the event of a "change of control" as such term is defined in the 2006 Plan, awards of restricted stock and stock options became fully vested or exercisable, as applicable, to the extent the award agreement granting such restricted stock or options provides for such acceleration. A participant immediately forfeits any and all unvested options and forfeits all unvested restricted stock at the time of separation from NexCen, unless the award agreement provides otherwise. No participant is permitted to exercise vested options after the 90th day from the date of termination from NexCen, unless the award grant provides otherwise.

### Stock Option Cancellation Program

On November 12, 2008, in light of the dwindling number of shares available for future issuance under the 2006 Plan, the Company instituted a stock option cancellation program for vested or unvested stock options issued under the 2006 Plan for certain eligible directors and employees (the "Stock Option Cancellation Program"). The Stock Option Cancellation Program was a voluntary, non-incentivized program. The Company provided no remuneration or consideration of any kind for the cancellation of stock options. In addition, to ensure that the program was in no way coercive or perceived to be coercive, we limited it to directors and executives at the level of vice president or above. As of December 31, 2008, the Company recaptured 856,666 options through this program.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

## PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS

The following table presents shares surrendered by employees to exercise stock options and to satisfy tax withholding obligations on vested restricted stock and stock option exercises during the period covered by this Second Amendment.

| Period | Total Number of Shares Purchased | Average Price Paid for Shares | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans and Programs |
|---|---|---|---|---|
| January 1 - January 31, 2007 | - | - | - | - |
| February 1 - February 28, 2007 | - | - | - | - |
| March 1 - March 31, 2007 | - | - | - | - |
| April 1 - April 30, 2007 | - | - | - | - |
| May 1 - May 31, 2007 | - | - | - | - |
| June 1 - June 30, 2007 | 4,000 | $ 3.75 | - | - |
| July 1 - July 31, 2007 | - | - | - | - |
| August 1 - August 31, 2007 | - | - | - | - |
| September 1 - September 30, 2007 | - | - | - | - |
| October 1 - October 31, 2007 | - | - | - | - |
| November 1 - November 30, 2007 | - | - | - | - |
| December 1 - December 31, 2007 | 2,000 | $ 3.75 | - | - |
| Total | 6,000 | $ 3.75 | - | - |

25

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**ITEM 6. SELECTED FINANCIAL DATA (As Restated)**

The table that follows presents portions of our Consolidated Financial Statements and is not a complete presentation in accordance with U.S. generally accepted accounting principles (GAAP). You should read the following Selected Financial Data together with our Consolidated Financial Statements and related notes and with our MD&A included in Item 7 of this Second Amendment. The financial data for 2007 was restated as described in MD&A and in Note 2 to the Consolidated Financial Statements. The financial data for prior years have not changed.

Our Selected Financial Data and our Consolidated Financial Statements assume that we will continue as a going concern, and do not contain any adjustments that might result if we were unable to continue as a going concern. However, based on the effect of the January 2008 Amendment on the Company's financial condition and liquidity before the credit facility was restructured on August 15, 2008, we have concluded that there was substantial doubt about our ability to continue as a going concern as of December 31, 2007.

The results of operations in the following Selected Financial Data, as well as in our Consolidated Financial Statements, present the results of our brand management business as continuing operations. The results of the mobile and data communications business that we sold during 2004 and the mortgage-backed securities (MBS) business that we sold in 2006 are reported as discontinued operations. We began operating the brand management business in 2006, but we owned only one brand, TAF, in 2006 (and only for the last seven weeks of that fiscal year). In fiscal 2007, we acquired six additional brands, namely, Bill Blass, Marble Slab Creamery, MaggieMoo's, Waverly, Pretzel Time and Pretzelmaker. We then acquired the Great American Cookies brand and an interest in the Shoebox New York brand, respectively, in January 2008. We sold the Bill Blass brand in December 2008 and the Waverly brand in October 2008. As a result of the reclassification of our former MBS business to discontinued operations as of December 31, 2006, the results presented in these Selected Financial Data differ from the results that we presented in reporting periods prior to the fourth quarter of 2006. In addition, as a result of the reclassification of our Bill Blass and Waverly businesses to discontinued operations during the year ended December 31, 2008, the results presented in these Selected Financial Data also will differ from the results that we will present in reporting periods after the fourth quarter of 2007. Accordingly, the historical results presented below are not indicative of the results to be expected for any future fiscal year.

|  | Year Ended December 31, | | | | |
|  | (IN THOUSANDS, EXCEPT FOR PER SHARE AMOUNTS) | | | | |
|  | 2007 (As Restated)[1] | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Royalty revenues | $ 15,722 | $ 1,175 | $ - | $ - | $ - |
| Licensing revenues | 15,399 | - | - | - | - |
| Franchise fee revenues | 3,447 | 749 | - | - | - |
| Corporate revenues | - | - | - | - | - |
| **Total revenues** | 34,568 | 1,924 | - | - | - |
| | | | | | |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses: | | | | | |
| Brands | (14,651) | (453) | - | - | - |
| Corporate | (12,991) | (7,261) | (3,645) | (8,569) | (16,707) |
| Professional fees: | | | | | |
| Brands | (1,696) | (115) | - | - | - |
| Corporate | (1,606) | (1,034) | (1,444) | (2,808) | - |
| Depreciation and amortization | (1,660) | (471) | (159) | (2,212) | (2,672) |
| Restructuring charges | - | (1,079) | 7 | (1,054) | (306) |
| Impairment of other assets | - | - | - | - | (1,367) |
| Other expense | - | - | - | - | (744) |
| **Total operating expenses** | (32,604) | (10,413) | (5,241) | (14,643) | (21,796) |
| | | | | | |
| **Operating income (loss)** | 1,964 | (8,489) | (5,241) | (14,643) | (21,796) |

26

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**(Selected Financial Data - Continued)**

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Non-operating income (expense): | | | | | |
| Interest income | 2,115 | 2,637 | 1,478 | 3,955 | 6,037 |
| Interest expense | (5,116) | - | - | (7,917) | (10,427) |
| Other income, net | 288 | 700 | 231 | (60) | (97) |
| Minority interest | (269) | - | - | - | - |
| Loss on early extinguishment of subordinated notes | - | - | - | (2,419) | - |
| Investment gain (loss), net | - | - | (19) | (3,559) | 587 |
| Total non-operating income (expense) | (2,982) | 3,337 | 1,690 | (10,000) | (3,900) |
| | | | | | |
| Loss from continuing operations before income taxes | (1,018) | (5,152) | (3,551) | (24,643) | (25,696) |
| Income taxes: | | | | | |
| Current | (283) | (81) | - | - | - |
| Deferred | (3,019) | - | - | - | - |
| | | | | | |
| **Loss from continuing operations** | (4,320) | (5,233) | (3,551) | (24,643) | (25,696) |
| | | | | | |
| Discontinued operations: | | | | | |
| Income (loss) from discontinued operations, net of tax expense of $64 and $75 for 2006 and 2003, respectively | (548) | 2,358 | 225 | (44,510) | (23,756) |
| Gain (loss) on sale of discontinued operations | - | 755 | (1,194) | 20,825 | - |
| | | | | | |
| **Net loss** | $ (4,868) | $ (2,120) | $ (4,520) | $ (48,328) | $ (49,452) |
| | | | | | |
| Other comprehensive loss: | | | | | |
| Foreign currency translation adjustment | - | - | - | (3,830) | 108 |
| Unrealized holding gain (loss) on investments available for sale | - | - | - | 67 | (1,757) |
| | | | | | |
| Comprehensive loss | $ (4,868) | $ (2,120) | $ (4,520) | $ (52,091) | $ (51,101) |
| | | | | | |
| **Loss per share:** | | | | | |
| Loss per share (basic and diluted) from continuing operations | $ (0.08) | $ (0.11) | $ (0.08) | $ (0.57) | $ (0.60) |
| Income (loss) per share (basic and diluted) from discontinued operations | (0.01) | 0.07 | (0.02) | (0.54) | (0.56) |
| Net loss per share - basic and diluted | $ (0.09) | $ (0.04) | $ (0.10) | $ (1.11) | $ (1.16) |
| | | | | | |
| Weighted average shares outstanding - basic and diluted | 51,889 | 45,636 | 44,006 | 43,713 | 42,616 |

(1) See Note 2 of Notes to Consolidated Financial Statements for an explanation of the restatement.

27

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

| | | | Year Ended December 31, | | | |
| | | | (IN THOUSANDS) | | | |
| CONSOLIDATED BALANCE SHEET DATA | 2007 (As Restated)[1] | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash & cash equivalents | $ 46,569 | $ 83,536 | $ 1,092 | $ 60,723 | $ 26,222 |
| Mortgage-backed securities, at fair value - discontinued operations | - | - | 253,900 | 62,184 | - |
| Accounts receivable, net of allowances | 7,201 | 2,042 | | | |
| Other receivables | 2,677 | 511 | 1,174 | 356 | 1,567 |
| Restricted cash | 5,174 | - | - | 8,832 | |
| Prepaid expenses and other current assets | 3,867 | 2,210 | 954 | 4,124 | 1,173 |
| **Total current assets** | 65,488 | 88,299 | 257,120 | 136,219 | 28,962 |
| | | | | | |
| Property and equipment, net | 4,225 | 389 | 255 | 367 | 2,608 |
| Goodwill | 66,441 | 15,607 | - | - | - |
| Trademarks | 211,308 | 49,000 | - | - | - |
| Other intangible assets, net of amortization | 7,565 | 3,792 | - | - | - |
| Deferred financing costs, net of other assets | 2,927 | | - | - | - |
| Investments available for sale | - | - | - | - | 220,849 |
| Net assets from discontinued operations | - | - | - | - | 127,633 |
| Other assets | - | - | - | - | 4,593 |
| Restricted cash | 1,656 | 1,298 | 8,633 | - | 13,460 |
| **Total Assets** | $ 359,610 | $ 158,385 | $ 266,008 | $ 136,586 | $ 398,105 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Accounts payable and accrued expenses | $ 8,689 | $ 3,235 | $ 2,972 | $ 5,737 | $ 7,808 |
| Repurchase agreements and sales tax liabilities - discontinued operations | - | 1,333 | 135,592 | - | - |
| Restructuring accruals | 13 | 145 | - | 259 | 1,407 |
| Deferred revenue | 4,033 | 40 | - | - | - |
| Current portion of long-term debt | 6,340 | - | - | - | - |
| Acquisition related liabilities | 7,360 | 4,484 | - | - | - |
| **Total current liabilities** | 26,435 | 9,237 | 138,564 | 5,996 | 9,215 |
| | | | | | |
| Long-term debt | 103,238 | - | - | - | 154,912 |
| Deferred tax liability | 26,607 | 218 | - | - | - |
| Acquisition related liabilities | 3,915 | - | - | - | - |
| Net liabilities from discontinued operations | - | - | - | - | 54,604 |
| Other long-term liabilities | 3,412 | 2,317 | 1,057 | - | 73 |
| **Total liabilities** | 163,607 | 11,772 | 139,621 | 5,996 | 218,804 |
| Minority Interest | 3,040 | | | | |
| Stockholders' equity: | | | | | |
| Preferred stock | - | - | - | - | - |
| Common stock | 557 | 481 | 440 | 440 | 429 |
| Additional paid-in capital | 2,668,289 | 2,615,742 | 2,593,085 | 2,592,977 | 2,589,608 |
| Treasury stock | (1,757) | (352) | | | |
| Foreign currency translation adjustment | - | - | - | - | 3,830 |
| Unrealized loss on investments available for sale | - | - | - | (216) | (283) |
| Accumulated deficit | (2,474,126) | (2,469,258) | (2,467,138) | (2,462,611) | (2,414,283) |
| **Stockholders' equity** | 192,963 | 146,613 | 126,387 | 130,590 | 179,301 |
| **Total liabilities and stockholders' equity** | $ 359,610 | $ 158,385 | $ 266,008 | $ 136,586 | $ 398,105 |

(1) See Note 2 of Notes to Consolidated Financial Statements for an explanation of the restatement.

28

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

The following table presents the effects of the restatement of Selected Financial Data as of and for the year ended December 31, 2007. See Note 2 of Notes to Consolidated Financial Statements for further explanation of the restatement.

| (IN THOUSANDS, EXCEPT FOR PER SHARE AMOUNTS) | 2007 As Previously Reported | Adjustments | As Restated | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|
| CONSOLIDATED STATEMENT OF OPERATIONS DATA: | | | | | | | |
| Royalty revenues | $ 15,289 | $ 433 | $ 15,722 | $ 1,175 | $ - | $ - | $ - |
| Licensing revenues | 15,542 | (143) | 15,399 | 749 | | - | - |
| Franchise fee revenues | 3,464 | (17) | 3,447 | | - | | - |
| Total revenues | 34,295 | 273 | 34,568 | 1,924 | - | - | - |
| Total operating expenses | (32,105) | (499) | (32,604) | (10,413) | (5,241) | (14,643) | (21,796) |
| Operating income | 2,190 | (226) | 1,964 | (8,489) | (5,241) | (14,643) | (21,796) |
| Total non-operating expense | (2,950) | (32) | (2,982) | 3,337 | 1,690 | (10,000) | (3,900) |
| Loss from continuing operations before income taxes: | (760) | (258) | (1,018) | (5,152) | (3,551) | (24,643) | (25,696) |
| Income taxes: | | | | | | | |
| Current | (236) | (47) | (283) | (81) | - | - | - |
| Deferred | (3,067) | 48 | (3,019) | - | | | |
| Loss from continuing operations | (4,063) | (257) | (4,320) | (5,233) | (3,551) | (24,643) | (25,696) |
| Income (loss) from discontinued operations, net of tax (benefit) or expense of ($38), $64 and $75 for 2007, 2006 and 2003, respectively | (586) | 38 | (548) | 2,358 | 225 | (44,510) | (23,756) |
| Gain (loss) on sale of discontinued operations | - | - | - | 755 | (1,194) | 20,825 | - |
| Net loss | $ (4,649) | $ (219) | $ (4,868) | $ (2,120) | $ (4,520) | $ (48,328) | $ (49,452) |
| Loss per share: | | | | | | | |
| Loss per share (basic and diluted) from continuing operations | $ (0.08) | $ - | $ (0.08) | $ (0.11) | $ (0.08) | $ (0.57) | $ (0.60) |
| Income (loss) per share (basic and diluted) from discontinued operations | (0.01) | - | (0.01) | 0.07 | (0.02) | (0.54) | (0.56) |
| Net loss per share - basic and diluted | $ (0.09) | $ - | $ (0.09) | $ (0.04) | $ (0.10) | $ (1.11) | $ (1.16) |
| Weighted average shares outstanding - basic and diluted | 51,889 | - | 51,889 | 45,636 | 44,006 | 43,713 | 42,616 |

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**CONSOLIDATED BALANCE SHEET DATA:**

| (IN THOUSANDS) | As Previously Reported | Adjustments | As Restated | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|
| | 2007 | | | | | | |
| Cash and cash equivalents (including restricted cash of $7 and $1 million in 2007 and 2006, respectively) | $ 53,275 | $ 124 | $ 53,399 | $ 84,834 | $ 9,725 | $ 69,555 | $ 39,682 |
| Investments available for sale - discontinued operations | $ - | $ - | $ - | $ - | $ - | $ - | $ 220,849 |
| Trademarks and goodwill | $ 278,048 | $ (299) | $ 277,749 | $ 64,607 | $ - | $ - | $ - |
| Mortgage-backed securities, at fair value, discontinued operations | $ - | $ - | $ - | $ - | $ 253,900 | $ 62,184 | $ - |
| Total assets | $ 359,207 | $ 403 | $ 359,610 | $ 158,385 | $ 266,008 | $ 136,586 | $ 398,105 |
| Repurchase agreements related to discontinued operations | $ - | $ - | $ - | $ - | $ 133,924 | $ - | $ 154,942 |
| Total debt | $ 109,578 | $ - | $ 109,578 | $ - | $ - | $ - | $ - |
| Total liabilities | $ 163,354 | $ 253 | $ 163,607 | $ 11,772 | $ 139,621 | $ 5,996 | $ 218,804 |
| Stockholders' equity | $ 192,813 | $ 150 | $ 192,963 | $ 146,613 | $ 126,387 | $ 130,590 | $ 179,301 |

Year ended December 31,

30

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion of the results of operations and financial condition of NexCen Brands should be read in conjunction with the information contained in the Consolidated Financial Statements and related Notes, which appear in Item 8 of this Second Amendment.

RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS

As previously reported, in May 2008 we determined that certain aspects of the January 2008 Amendment to the Original BTMUCC Credit Facility, which provided NexCen with financing for our acquisition of the Great American Cookies business, were not adequately discussed in our prior public filings. We further concluded that the effect of the January 2008 Amendment on the Company's financial condition and liquidity raised substantial doubt about our ability to continue as a going concern. The Audit Committee of our Board of Directors retained independent counsel to conduct an investigation into these matters on behalf of the Board of Directors. Simultaneously, management, with the supervision of the Board of Directors, commenced a comprehensive review of our financial condition and business strategy and began taking actions to restructure our business. Upon conclusion of the investigation, the Company developed a plan to remediate the circumstances that contributed to these matters and implemented numerous management, corporate governance and internal control enhancements.

Adjustments Related to the January 2008 Amendment

The January 2008 Amendment was entered into and went into effect in 2008 and therefore did not affect the amounts reported in the Consolidated Financial Statements as of December 31, 2007. Nonetheless, the Original 10-K contained discussions of the January 2008 Amendment in the Notes to the Consolidated Financial Statements related to "Long-Term Debt" and "Subsequent Events." Moreover, the MD&A in the Original 10-K contained discussions regarding the Company's financial condition and liquidity. In this Second Amendment, we have revised the disclosure that appeared in these portions of the Original 10-K to reflect our subsequent reconsideration of the terms of the January 2008 Amendment and their effect on the Company's financial condition and liquidity as of the filing date of our Original 10-K, before the credit facility was restructured on August 15, 2008 and further amended in late 2008 and 2009. (The August 15, 2008 restructuring and the subsequent amendments are discussed in this MD&A under the caption "Financial Condition," in Note 9 – *Long-Term Debt (As Restated)* and Note 25 – *Subsequent Events (As Restated)* to the Consolidated Financial Statements.) We have concluded that there was substantial doubt about our ability to continue as a going concern as of December 31, 2007. Our Consolidated Financial Statements, however, assume that we will continue as a going concern, and do not contain any adjustments that might result if we were unable to continue as a going concern.

We also have restated Part II, Item 9A – *Controls and Procedures (As Restated)*, to revise the assessment contained in the Original 10-K of the effectiveness of our disclosure controls and procedures and internal control over financial reporting as of December 31, 2007 and to provide a discussion of our remediation efforts to date. Our management and the Audit Committee have concluded that the Company's failure to adequately discuss the January 2008 Amendment in our relevant Current Report on Form 8-K and the Original 10-K was unintentional and that material weaknesses in our internal control contributed to this error. Some of these material weaknesses were previously identified in our Original 10-K, and some have been identified subsequently. As a result, management has revised its assessment in Item 9A of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007.

Other Adjustments

Management engaged in a comprehensive review of our Original 10-K and First Amendment in order to ensure their accuracy and completeness and to be able to provide the certifications provided herein. Accordingly, this Second Amendment also corrects accounting and financial reporting errors, some of which were previously identified but not considered to be material and others of which were identified in the restatement process. The Company has concluded that the corrections are not material either individually or in the aggregate. The Company's net loss per share is not impacted by the restatement.

The effect of all restatement adjustments on our Consolidated Statements of Operations for the year ended December 31, 2007 is as follows:

| | | |
|---|---|---|
| Increase in net loss | $ | (0.2) million or 4.7% |

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

A summary of adjustments to the Company's Consolidated Statement of Operations for the year ended December 31, 2007 is as follows:

| | | |
|---|---|---|
| Increase in total revenues | $ | 0.3 million |
| Increase in selling, general and administrative expenses | $ | (0.3) million |
| Increase in other operating expenses | $ | (0.2) million |
| Decrease in operating income | $ | (0.2) million |
| Increase in loss from continuing operations | $ | (0.3) million |
| Increase in net loss | $ | (0.2) million |

The effect of all restatement adjustments on our Consolidated Balance Sheet as of December 31, 2007 is as follows:

| | | |
|---|---|---|
| Increase in total assets | $ | 0.4 million or 0.1% |
| Increase in total liabilities | $ | 0.3 million or 0.2% |
| Increase in total equity | $ | 0.1 million or 0.1% |

The effect of all restatement adjustments on our Consolidated Statement of Cash Flows as of December 31, 2007 is as follows:

| | | |
|---|---|---|
| Decrease in net cash used in operating activities | $ | 0.7 million or 17.9% |
| Increase in net cash used in investing activities | $ | 0.1 million or 0.0% |
| Decrease in net cash provided by financing activities | $ | 0.5 million or 0.4% |

(See Note 2 to the Consolidated Financial Statements included in Part II, Item 8 of this Second Amendment for further explanation of the restatement of NexCen's Consolidated Financial Statements.)

Our management and the Audit Committee have concluded that the errors in our Consolidated Financial Statements were unintentional. In conjunction with the Audit Committee, we have determined that the errors in our Consolidated Financial Statements and in the Summary Compensation Table were a result of material weaknesses in our internal control, some of which were identified in our Original 10-K. We note that the greatest percentage changes, although not material, are related to the Company's accounting for accrued liabilities, a material weakness in our internal control over financial reporting identified in our Original 10-K. See further explanation of the material weaknesses and our remediation efforts in Part II, Item 9A – *Controls and Procedures (As Restated)*, of this Second Amendment.

<u>OVERVIEW</u>

As discussed in detail in Item 1– *Business*, we commenced our brand management business in June 2006, when we acquired UCC Capital, an investment banking firm that provided financial advisory services, particularly to companies involved in monetizing intellectual property assets. In acquiring UCC Capital, our strategy was to begin building a brand management business by acquiring and operating businesses that own valuable brand assets and other intellectual property and that earn revenues primarily from the franchising or licensing of their intellectual property. In 2007, we earned revenues primarily through the licensing of our valuable brands and related intellectual property to third parties. These third parties paid us licensing, franchising and other contractual fees and royalties for the right to use our intellectual property on either an exclusive or non-exclusive basis. We received licensing, franchising and other contractual fees that included a mixture of upfront payments, required periodic minimum payments (regardless of sales volumes), and volume-dependent periodic royalties (based upon the number or dollar amount of branded products sold). Accordingly, our revenues reflected both recurring and non-recurring payment streams.

Our principal assets are, and were as of December 31, 2007, intangible assets (the trademarks and other intellectual assets and associated goodwill related to the brands and businesses that we acquired, manage and develop) and our people. We did not have substantial tangible assets, as our business model was not designed to require significant capital investment in tangible assets.

Through the date of the Original 10-K, we had acquired nine brands, as follows:

<u>QSR Franchising</u>

- MaggieMoo's (acquired February 28, 2007)

- Marble Slab Creamery (acquired February 28, 2007)

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

- Pretzel Time (acquired August 7, 2007)

- Pretzelmaker (acquired August 7, 2007)

- Great American Cookies (acquired January 29, 2008)

Retail Franchising

- The Athlete's Foot (acquired November 7, 2006)

- Shoebox New York (joint venture interest acquired January 15, 2008)

Consumer Branded Products

- Bill Blass (acquired February 15, 2007 and subsequently sold on December 24, 2008)

- Waverly (acquired May 2, 2007 and subsequently sold on October 3, 2008)

Our operating segments as of December 31, 2007 are discussed in Note 24 – *Segment Reporting (As Restated)* to our Consolidated Financial Statements included in this Second Amendment. Based on our brand holdings, as of December 31, 2007, and our plans to acquire additional brands, we previously provided financial information for fiscal years 2007 in four segments: QSR Franchising, Retail Franchising, Consumer Branded Products and Corporate. Because we owned only one brand in 2006 (and then only for the last seven weeks of that year) and did not operate in four business segments until the first quarter of 2007, we do not include any discussion of period-to-period comparisons for the results of the four business segments in the discussion that follows. As previously discussed, we restructured our Company in 2008 to operate in only one business segment, Franchising.

Before transitioning to our brand management business, we managed a leveraged portfolio of MBS. We liquidated our MBS portfolio and exited that business in the fourth quarter of 2006. We also previously owned and operated various mobile and wireless communications businesses, which we sold in 2004. For the periods reflected in our financial statements, the MBS business and related assets and liabilities, as well as anything related to our former mobile and wireless communications businesses, are reported as discontinued operations. The results of our brand management business are reported as our continuing operations for purposes of this Second Amendment.

In reviewing our results for the fiscal year ended December 31, 2007, you should keep in mind the following factors:

- Comparisons to prior periods are not meaningful, because we did not initiate our current brand management business until the second half of 2006 and did not begin to earn royalties or license and franchise fees until halfway through the fourth quarter of 2006, when we acquired TAF.

- The MD&A discussion is based on the brands that we owned as of December 31, 2007. Additionally, of the intellectual property brands we owned and operated as of December 31, 2007, we owned only one — TAF — for the entire year of 2007. Our results through December 31, 2007 include Bill Blass, MaggieMoo's and Marble Slab Creamery for approximately ten months, Waverly for approximately eight months, and Pretzel Time and Pretzelmaker for approximately five months. In addition, MaggieMoo's, Marble Slab Creamery, Pretzel Time and Pretzelmaker revenue streams are subject to seasonal fluctuations.

- In future periods, because we disposed of the Bill Blass and Waverly businesses that comprised our Consumer Branded Products segment, those businesses will be reported as discontinued operations. Our franchising business, which now constitutes our only segment, will be reported as continuing operations.

33

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

DISCONTINUED OPERATIONS AS OF DECEMBER 31, 2007

In November 2006, we exited the MBS business by selling our remaining $75.5 million of MBS investments from which we recognized a gain of $755,000. Earlier in 2006, we sold $140 million of our MBS investments and used the proceeds primarily to repay indebtedness under repurchase agreements that had been incurred to purchase our MBS portfolio. In 2007, we settled litigation and other claims related to the mobile and wireless communications businesses we sold in 2004, which amounts were charged to discontinued operations. These settlements are discussed in Note 14 to our Consolidated Financial Statements.

CRITICAL ACCOUNTING POLICIES

Our critical accounting policies affect the amount of income and expense we record in each period, as well as the value of our assets and liabilities and our disclosures regarding contingent assets and liabilities. In applying these critical accounting policies, we must make estimates and assumptions to prepare our financial statements, which, if made differently, could have a positive or negative effect on our financial results. We believe that our estimates and assumptions are both reasonable and appropriate, and in accordance with United States generally accepted accounting principles. However, estimates involve judgments with respect to numerous factors that are difficult to predict and are beyond management's control. As a result, actual amounts could materially differ from estimates.

Management believes that the following accounting policies represent "critical accounting policies," which the SEC defines as those that are most important to the portrayal of a company's financial condition and results of operations and require management's most difficult, subjective, or complex judgments, often because management must make estimates about uncertain and changing matters.

- Valuation of deferred tax assets - We have deferred tax assets as a result of years of accumulated tax loss carry-forwards. Management is developing plans to achieve profitable operations in future years that may enable us to recover the benefit of our deferred tax assets. The ultimate realization of deferred tax assets is primarily dependent upon the generation of future taxable income during periods in which those temporary differences become deductible. We presently do not have sufficient objective evidence that the Company will generate future taxable income. Accordingly, we maintain a full valuation allowance for our net deferred tax assets. We adopted the provisions of FASB Interpretation No, 48, "*Accounting for Uncertainty in Income Taxes*" ("FIN 48"), effective January 1, 2007. FIN 48 creates a single model to address accounting for uncertainty in tax positions and clarifies accounting for income taxes by prescribing a minimum recognition threshold that a tax position is required to meet before being recognized in the financial statements.

- Valuation of goodwill, trademarks and intangible assets - The Company accounts for recorded goodwill and other intangible assets in accordance with Statement of Financial Accounting Standards ("SFAS") No. 142, "*Goodwill and Other Intangible Assets.*" This standard classifies intangible assets into three categories: (1) goodwill; (2) intangible assets with indefinite lives not subject to amortization; and (3) intangible assets with definite lives subject to amortization. In accordance with SFAS No. 142, we do not amortize goodwill and indefinite-lived intangible assets. We evaluate the remaining useful life of an intangible asset that is not being amortized each reporting period to determine whether events and circumstances continue to support an indefinite useful life. If an intangible asset that is not being amortized is subsequently determined to have a finite useful life, we amortize the intangible asset prospectively over its estimated remaining useful life. Amortizable intangible assets are amortized on a straight-line basis.

  In accordance with the requirements of SFAS No. 142, goodwill has been assigned to reporting units for purposes of impairment testing. Our reporting units are our operating segments in 2007. We evaluate goodwill for impairment on an annual basis or more often if an event occurs or circumstances change that indicate impairment might exist. Goodwill impairment tests consist of a comparison of each reporting unit's fair value with its carrying value. Fair value is the price a willing buyer would pay for a reporting unit, which we estimate using multiple valuation techniques. These include an income approach, based upon discounted expected future cash flows from operations, and a market approach, based upon business enterprise multiples of comparable companies. The discount rate used is our estimate of the required rate of return that a third-party buyer would expect to receive when purchasing from us a business that constitutes a reporting unit. We believe the discount rate is commensurate with the risks and uncertainty inherent in the forecasted cash flows.

  If the carrying value of a reporting unit exceeds its fair value, goodwill is written down to its implied fair value. The implied fair value of goodwill is determined by allocating the fair value of the reporting unit to all of its assets and liabilities other than goodwill. The remaining value, after the fair value of the reporting unit has been allocated to the identifiable assets, is the implied fair value of goodwill.

  No impairment charges related to goodwill were recorded in 2007. During 2008, we evaluated our goodwill for impairment at multiple time periods based upon the existence of indicators of impairment. As of December 31, 2008, all of the Company's recorded goodwill has been written off.

34

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

In accordance with SFAS No. 144, "*Accounting for Impairment or Disposal of Long-Lived Assets,*" for indefinite-lived intangible assets, our impairment test consists of a comparison of the fair value of an intangible asset with its carrying amount. Fair value is an estimate of the price a willing buyer would pay for the intangible asset and is generally estimated by discounting the expected future cash flows associated with the intangible asset. Similar to goodwill, we evaluate indefinite lived assets for impairment on an annual basis or more often if an event occurs or circumstances change that indicate impairment might exist. No impairment charges related to indefinite-lived intangibles were recorded in 2007. However, impairment charges were recorded in the second and third quarters of 2008.

Our definite-lived intangible assets are evaluated for impairment whenever events or changes in circumstances indicate that the carrying amount of the intangible asset may not be recoverable. An intangible asset that is deemed impaired is written down to its estimated fair value, which is generally based on replacement cost. For purposes of our impairment analysis, we update the costs that were initially used to value the definite-lived intangible asset to reflect our current estimates and assumptions over the asset's future remaining life. No impairment charges related to definite-lived intangible assets were recorded in 2007. However, impairment charges related to definite-lived intangibles were recorded in the second and third quarters of 2008.

We discuss impairments in more detail in Note 25 – *Subsequent Events (As Restated)* to the Consolidated Financial Statements.

- Valuation of stock-based compensation – Under the provisions of SFAS No. 123R "*Share-Based Payment,*" share-based compensation cost is measured at the grant date, based on the calculated fair value of the award, and is recognized as an expense over the employee's requisite service period (generally the vesting period of the equity grant). SFAS No. 123R also requires the related excess tax benefit received upon exercise of stock options or vesting of restricted stock, if any, to be reflected in the statement of cash flows as a financing activity rather than an operating activity.

  We used the Black-Scholes option pricing model to value the compensation expense associated with our stock option awards under SFAS No. 123R. In addition, we estimated forfeitures when recognizing compensation expense associated with our stock options, and adjusted our estimate of forfeitures when they were expected to differ. Key input assumptions used to estimate the fair value of stock options included the market value of the underlying shares at the date of grant, the exercise price of the award, the expected option term, the expected volatility (based on historical volatility) of our stock over the option's expected term, the risk-free interest rate over the option's expected term, and the expected annual dividend yield, if any.

- Valuation of Allowance for Doubtful Accounts - We maintain an allowance for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. In evaluating the collectability of accounts receivable, we consider a number of factors, including the age of the accounts, changes in status of the customers' financial condition and other relevant factors. Estimates of uncollectible amounts are revised each period, and changes are recorded in the period they become known.

## RECENT ACCOUNTING PRONOUNCMENTS

In September 2006, the FASB issued SFAS No. 157, "*Fair Value Measurements,*" which applies to any other accounting pronouncements that require or permit fair value measurements. SFAS No. 157 provides a common definition of fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants. The new standard also provides guidance on the methods used to measure fair value and requires expanded disclosures related to fair value measurements. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007. The impact of adopting SFAS No. 157 is immaterial to the Company's Consolidated Financial Statements.

In February 2007, the FASB issued SFAS No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities.*" SFAS No. 159 permits entities to choose to measure most financial instruments and certain other items at fair value that are currently required to be measured at historical costs. Adoption of SFAS No. 159 is optional. The Company did not adopt SFAS No. 159.

In December 2007, the FASB issued SFAS No. 141 (Revised 2007), "*Business Combinations.*" Under Statement SFAS No. 141R, acquiring entities will recognize assets acquired and liabilities assumed in connection with business combinations at fair market value with limited exception. Among its provisions, SFAS No. 141R requires that: (a) acquisition costs will generally be expensed as incurred and not capitalized, (b) contingent consideration will be recognized at estimated fair value at the time of acquisition, and (c) noncontrolling interests will be valued at the fair value at the acquisition date. SFAS No. 141R is effective for annual periods beginning on or after December 15, 2008. SFAS No. 141R will impact the Company's accounting for future acquisitions, if any.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

In December 2007, the FASB issued SFAS No. 160, "*Noncontrolling Interests in Consolidated Financial Statements- An Amendment of ARB No. 51.*" SFAS No. 160 provides that noncontrolling interests in a subsidiary (minority interests) are to be recorded as a component of equity, separate from the parent's equity. SFAS No. 160 also provides for changes in the way minority interest expense is recorded in the income statement, and will require expanded disclosure regarding the interests of the parent and its noncontrolling interest. SFAS No. 160 is effective for years and interim periods beginning on or after December 15, 2008. The Company adopted SFAS No. 160 as of January 1, 2009. SFAS No. 160 will impact the presentation and disclosure of minority interest, if any, in the Company's Consolidated Financial Statements.

In April 2008, the FASB issued FSP No. 142-3, "*Determination of the Useful Life of Intangible Assets.*" FSP No. 142-3 will improve the consistency between the useful life of a recognized intangible asset under SFAS No. 142 and the period of expected cash flows used to measure the fair value of the asset under SFAS No. 141R, and other U.S. generally accepted accounting principles. FSP No. 142-3 is effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years. The Company has adopted this standard as of January 1, 2009. The impact of adopting FSP No. 142-3 is expected to be immaterial to the Company's Consolidated Financial Statements.

In May 2008, the FASB issued SFAS No. 162, "*The Hierarchy of Generally Accepted Accounting Principles.*" SFAS No. 162 identifies the sources of accounting principles and the framework for selecting the principles to be used in the preparation of financial statements of nongovernmental entities that are presented in conformity with U.S. generally accepted accounting principles. SFAS No. 162 is effective 60 days following the SEC's approval of the Public Company Accounting Oversight Board amendments to Auditing Interpretations ("AU") Section 411, "*The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles.*" The Company will adopt this standard when effective.

RESULTS OF CONTINUING OPERATIONS FOR YEARS ENDED DECEMBER 31, 2007, 2006 AND 2005

*Loss from Continuing Operations before Income Taxes*

Loss from continuing operations before income taxes was approximately $1.0 million (as restated) in 2007, decreasing by $4.2 million, or 80%, from a loss of $5.2 million in 2006. Our 2007 operating results reflect the implementation of our brand management business. No revenues were earned in the first ten months of 2006 in connection with our brand management business.

Loss from continuing operations before income taxes of $5.2 million in 2006 increased $1.6 million, or 45% in 2006, from a loss of $3.6 million in 2005. The increase in the amount of the loss primarily reflects increases in SG&A costs and stock based compensation following the acquisition of UCC Capital and increased restructuring charges related to the relocation of our headquarters from Baltimore, Maryland to New York City, partially offset by $1.9 million of royalty and franchise revenues and increases in interest income and other income. As discussed above, we recorded revenue from continuing operations for only seven weeks of 2006 (after the November 7, 2006 acquisition of TAF), while we incurred expenses for the entire year and also incurred expenses associated with the process of transitioning to a new senior management team (following the completion of the UCC Capital acquisition).

*Royalty, Licensing and Franchise Fee Revenues*

We recognized $34.6 million (as restated) in revenues in 2007 as compared to $1.9 million in revenues for 2006. The increase in revenues reflects full-year operating revenues for TAF and partial year operating revenues for Bill Blass (acquired in February 2007), Waverly (acquired in and May 2007), MaggieMoo's (acquired in February 2007), Marble Slab Creamery (acquired in February 2007), Pretzel Time (acquired in August 2007) and Pretzel Maker (acquired in August 2007), compared to our ownership of only TAF in 2006 for a total of seven weeks. Of the $34.6 million (as restated) in revenues recognized in 2007, $15.7 million (as restated) related to royalty revenues, $3.5 million (as restated) related to franchise fees, and $15.4 million (as restated) related to licensing revenues. In 2006, $1.2 million in revenues were from royalty revenues and $749,000 was from franchise fees. Royalty and licensing revenues are recorded as they are earned and become receivable from franchisees. Franchise fee revenue is recognized when all initial services are performed, which is generally considered to be upon the opening of the applicable store under a single-store franchise agreement or upon the opening of the first store under a multi-store development agreement.

As discussed above, all revenues from the MBS and the mobile and wireless communications businesses that we sold have been reclassified to discontinued operations and are included in income (loss) from discontinued operations. As a result, we do not compare revenue in 2006 to 2005.

*Total Operating Expenses*

Operating expenses of $32.6 million (as restated) in 2007 reflect an increase of $22.2 million, or 213%, from $10.4 million in 2006. The increase in operating expenses is primarily due to a $19.9 million increase in SG&A expenses, a $2.2 million increase in professional fees, a $1.2 million increase in depreciation and amortization, all reflecting the impact of the acquisitions we made in 2007, partially offset by a $1.1 million decrease in restructuring charges from 2006 related to the relocation of our headquarters from Baltimore, Maryland to New York City and the transition of our senior management team.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

Operating expenses of $10.4 million in 2006 increased $5.2 million, or 99% in 2006, from $5.2 million in 2005. The increase primarily reflects an increase in SG&A costs and stock based compensation following the acquisition of UCC Capital, and increased restructuring charges.

*Selling, General and Administrative Expenses*

SG&A expenses consist primarily of compensation, stock compensation expense and personnel related costs, rent, facility related support costs, travel and advertising.

Corporate SG&A expenses increased $5.7 million, or 79%, to $13.0 million (as restated) in 2007 from $7.3 million in 2006. The increase primarily reflects additional costs resulting from the hiring of corporate staff to support our acquisition activity, stock compensation expense and growth of the Company. In accordance with accounting rules, included in Corporate SG&A expense for 2007 is $408,000 of state tax expense. This is included in SG&A because it is based on a capital tax and not income tax. Additionally, we recorded SG&A expenses for our brands of $14.7 million (as restated), an increase of $14.2 million from $0.5 million in 2006. Of the $14.7 million (as restated) of brand related SG&A expenses in 2007, $5.0 million related to our QSR segment, $5.7 million related to our Retail Franchising segment, and $4.0 million related to our Consumer Branded Products segment. Personnel employed by the Company increased from 36 employees to 107 employees as of December 31, 2007 as a result of our acquisitions.

SG&A expenses increased $4.1 million, or 112%, to $7.7 million in 2006 from $3.6 million in 2005. The increase primarily reflects additional costs resulting from our acquisitions of UCC Capital, TAF, and stock compensation expense. Excluding these acquisitions, SG&A expenses would have decreased $800,000. The primary drivers of the increase relate to personnel related costs at UCC Capital and TAF which we did not own in 2005. The personnel hired through the UCC Capital acquisition comprised the new executive and management team and the majority of our corporate staff as of December 31, 2007.

*Stock Compensation Expense*

We adopted SFAS No. 123R, *"Share-Based Payment,"* in the first quarter of 2006. Accordingly, we began to recognize compensation expense over the service period for the fair value of all equity based award grants issued after January 1, 2006, as well as expense attributable to the remaining service period for all prior grants that had not fully vested by that date. Stock based compensation expense is included in Corporate SG&A expenses.

Stock based compensation expense of $4.3 million (as restated) in 2007, an increase of $2.7 million as compared to an expense of $1.6 million in 2006, reflects the expense associated with granting options and warrants to purchase shares. The increase results from the granting of a total of approximately 7.1 million options and warrants in 2007 and 2006. Substantially all of the options granted in 2006 were granted from June through the end of the year, therefore the increase in stock compensation expense in 2007 over 2006 was due to the options being outstanding for a full year in 2007 and only a portion of the year in 2006. These options and warrants were issued to provide long-term incentive packages to new executives and other senior managers that we hired in 2007 and 2006, including individuals who were employed by UCC Capital, TAF, Bill Blass, Marble Slab Creamery, and Waverly prior to their acquisition by us and warrants to the sellers of TAF, Bill Blass, MaggieMoo's, Waverly, Pretzel Time and Pretzelmaker. Stock compensation expense of $1.6 million and $76,000 in 2006 and 2005, respectively, represents the cost associated with the grants of restricted stock and increased approximately $1.5 million from 2005 to 2006. In 2005, stock compensation expense was recorded using the intrinsic-value method. See Note 3 to our Consolidated Financial Statements.

*Professional Fees*

Corporate professional fees of $1.6 million (as restated), $1.0 million and $1.4 million in 2007, 2006 and 2005, respectively, represent the costs of outside professionals, primarily related to legal expenses associated with our public reporting, compliance, and corporate finance activities, and accounting fees related to auditing and tax services. Professional fees related to our brands of $1.7 million (as restated) in 2007, an increase of approximately $1.6 million from 2006, include accounting fees and legal expenses associated with franchising activities, trademark and copyright maintenance. The increase in professional fees reflects the increased costs of compliance and auditing associated with the growth of the Company and the integration of acquisitions.

*Depreciation and Amortization*

Depreciation expenses arise from property and equipment purchased for use in our operations. Amortization costs arise from intangible assets acquired in acquisitions.

Depreciation and amortization increased $1.2 million (as restated), or 252%, to $1.7 million in 2007 from $0.5 million in 2006. The increase primarily reflects the amortization of intangible assets related to a non-compete agreement with our former chief executive officer, and amortization of intangibles of franchise agreements, license agreements, and master development agreements related to the TAF, Bill Blass, Marble Slab Creamery, MaggieMoo's, Waverly, Pretzel Time and Pretzelmaker acquisitions.

37

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

*Interest Income*

Interest income of $2.1 million (as restated) in 2007, a decrease of $0.5 million, or 20%, from $2.6 million in 2006, primarily reflects the interest earned on our cash balances. Interest income increased $1.1 million or 78% to $2.6 million in 2006 from $1.5 million in 2005. The amounts recognized in each year reflect interest earned on our cash balances. In part of 2006 and in all of 2005, most of our available cash was invested in MBS, and earnings on such investments are reported in the results of discontinued operations.

*Interest Expense*

Interest expense was $5.1 million (as restated) in 2007 reflecting interest incurred in connection with our borrowings under the Original BTMUCC Credit Facility (see Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements), and $186,000 of imputed interest related to a long-term agreement liability assumed with the TAF acquisition, which expires in 2028. We had no outstanding borrowings under the Original BTMUCC Credit Facility prior to 2007. The Company did not incur interest expense in 2006 or 2005.

*Other Income (Expense)*

Other income of $288,000 (as restated) in 2007, a decrease of $412,000 from $700,000 in 2006, primarily reflects loan servicing revenue. The Company acquired UCC Capital in June 2006, and UCC Capital serviced a portfolio of loans. As a result, the Company's operating results for the second half of 2006 and all of 2007 include loan servicing revenue derived from loans initiated and/or serviced by UCC Capital. Other income in 2007 also includes recoveries of $49,000 received from a venture capital investment, which had been written off in 2002. We record these recoveries as we receive them as the extent of future payments, if any, cannot be readily determined. Other income of $700,000 in 2006 primarily reflects $525,000 of payments received from a venture capital investment, which we wrote-off in 2002. We also recorded $148,000 of loan servicing revenue received by UCC Capital in 2006. The loan servicing activity ceased in 2008 as the underlying loans were repaid.

*Minority Interest*

Minority interest expense of $269,000 for 2007 represents approximately 10% of the after tax net income attributable to the Bill Blass licensing business which was owned 90% by NexCen Holding Corp. and 10% by Designer Equity Holdings, LLC ("DEHC"). DEHC is an affiliate of Designer License Holding, LLC, a licensee of the Bill Blass trademark. We acquired the Bill Blass licensing business in February 2007. In February 2008, the Company repurchased one half of DEHC's minority interest in Bill Blass Jeans. In December 2008, the Company sold the Bill Blass licensing business. See Note 25 – *Subsequent Events (As Restated)* to the Consolidated Financial Statements for additional information.

*Income Taxes*

We recorded a current income tax expense in 2007 of $283,000 (as restated). This reflects approximately $255,000 (as restated) of foreign taxes withheld on franchise royalties received from franchisees located outside of the United States in accordance with tax treaties between the United States and the respective foreign countries, and $28,000 (as restated) of state income tax expense. The combined federal and state deferred tax expense of $3.0 million (as restated) for 2007 results primarily from timing differences relating to the amortization of trademarks. Trademarks are amortized over fifteen years for tax purposes. However, under GAAP, there is no amortization for book purposes. The Company is not permitted to offset this deferred tax expense against the deferred tax assets that we accumulated because the deferred tax expense relates to an indefinite-lived asset that is not anticipated to reverse in the same period. The Company expects that cash paid for income taxes for 2007 and in future years will be lower due to the amortization of trademarks for tax purposes, interest expense and the availability of net operating loss carry-forwards. The Company anticipates that we will be subject to foreign taxes withheld at the source, which are based on gross revenue, and certain state and local income taxes.

Under GAAP, we are not able to offset our deferred tax liabilities relating to amortization differences with our deferred tax assets attributable primarily to our tax loss carry-forwards until such time as we have satisfied GAAP requirements that there exists objective evidence of our ability to generate sustainable taxable income from our operations. As we have a history of losses, we have not satisfied this requirement as of December 31, 2007 or as of December 31, 2008. Even if we are able to report net income in 2009 and beyond, we may not satisfy this accounting requirement over the next several quarters (and perhaps longer) since continued amortization of trademarks in future periods may generate additional tax losses. Deferred income tax expense is not a cash expense, but is required to be recorded under GAAP to reflect tax assets or liabilities resulting from timing differences in determining net income and taxable income under GAAP. We are able to use our accumulated net tax loss carry-forwards in preparing our tax returns to reduce or eliminate our current cash tax obligations. When we are permitted under GAAP to offset the deferred tax liability against the deferred tax asset resulting from our accumulated tax loss carry-forwards, we will do so.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

As discussed in Item 1 – *Business*, under the caption "Tax Loss Carry-forwards and Limits on Ownership of Our Common Stock," our net tax loss carry-forwards also may not offset state, local and foreign tax liabilities, and we may remain subject to federal alternative minimum taxes. Our state, local and foreign tax position is discussed in Note 10 to our Consolidated Financial Statements, and the $283,000 expense for 2007 reflects primarily the net amount of current state, local and foreign taxes incurred in 2007. Our continuing operations were not subject to any alternative minimum tax in 2007. If our continuing operations generate taxable income in the future, we expect to record current tax liabilities for state, local, foreign and federal alternative minimum taxes, as our net tax loss carry-forwards may not offset all of such tax liabilities. We cannot yet estimate the effective tax rate that would result from these taxes, though we expect them to result in a modest overall effective tax rate.

Our income (loss) from discontinued operations included no net tax expense in 2005 as there was a net loss in that year, a net tax expense of $64,000 in 2006 attributable to the application of the alternative minimum tax, and a net tax benefit of $38,000 in 2007 resulting from a refund relating to prior years.

*Discontinued Operations*

During 2007, net losses from discontinued operations of $548,000 (as restated), or a loss of $0.01 per share, reflects settlement costs, legal fees and other costs of $508,000 incurred in connection with litigation related to the transportation business sale, partially offset by the reversal of $647,000 in sales tax liabilities where the statute of limitations has expired and includes tax settlements with three states related to income tax and voluntary disclosure events, related to our former mobile and wireless communications businesses. In 2007, the Company recorded settlements in the amount of $600,000 relating to the transportation business sale and $125,000 relating to a legacy UCC Capital litigation, both of which are discussed in Note 13 to our Consolidated Financial Statements.

## FINANCIAL CONDITION

*Historic Sources and Uses of Cash*

Since 2005, our primary sources of funding have been cash flows from operations and borrowings under long-term debt agreements. Funds were used for working capital requirements, capital expenditures and business acquisitions.

Although we had $83.5 million of cash on hand as of December 31, 2006, we concluded that securing an additional source of liquidity was important to ensure our continued ability to fund acquisitions and the expansion of our business. Accordingly, on March 12, 2007 we entered into the Original BTMUCC Credit Facility for a total of $150 million, the terms of which are discussed in Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements.

The following table reflects use of net cash for operations, investing, and financing activities:

| (IN THOUSANDS) | 2007 (As Restated) | 2006 | 2005 |
|---|---|---|---|
| Net cash (used in) provided by operating activities | $ (3,407) | $ (890) | $ 2,128 |
| Net cash (used in) provided by investing activities | (146,173) | 217,609 | (195,708) |
| Net cash provided by (used in) financing activities | 112,613 | (134,275) | 133,949 |
| Net (decrease) increase in cash and cash equivalents | $ (36,967) | $ 82,444 | $ (59,631) |

Net cash used in operating activities was $3.4 million (as restated) in 2007, compared to net cash used in operating activities of $890,000 and net cash provided by operating activities of $2.1 million for 2006 and 2005, respectively. The cash used in operating activities in 2007 is primarily a result of increases in trade receivables, prepaid expenses and other assets reflecting growth in the businesses we acquired. The cash used in and provided by operating activities in 2006 and 2005 reflected the results of our discontinued operations and our corporate expenses (primarily in 2006 and entirely in 2005). In 2006, we owned UCC Capital for six months and TAF for seven weeks.

Net cash used in investing activities was $146.2 million (as restated) in 2007 and primarily resulting from the acquisitions of Bill Blass, Marble Slab Creamery, MaggieMoo's, Waverly, Pretzel Time, and Pretzelmaker. Net cash provided by investing activities of $217.6 million for 2006, primarily reflects $253.6 million of MBS sales and principal repayments, partially offset by $43.2 million of cash used in the acquisitions of UCC Capital and TAF. Net cash used in investing activities of $195.7 million for 2005, primarily related to $387.4 million used to purchase MBS, partially offset by $84.8 million of principal repayments on our MBS and proceeds from the sale of $107.0 million of MBS.

Net cash provided by financing activities in 2007 of $112.6 million (as restated) primarily reflects borrowing on the Original BTMUCC Credit Facility which is discussed in Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements, as well as the funds received by the Company from the sale of minority interest in Bill Blass Jeans, LLC as discussed in Note 19 to our Consolidated Financial Statements. Net cash used in financing activities in 2006 of $134.3 million primarily reflects the repayment of short-term repurchase agreements that were used to fund MBS investments. Net cash provided by financing activities in 2005 of $133.9 million primarily related to the funding we received through repurchase agreements to purchase MBS.

39

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

As of December 31, 2007, we had available cash and cash equivalents on hand of approximately $46.6 million (as restated).

In January 2008, we used approximately $20.0 million of this balance in connection with the acquisition of Great American Cookies. For the remaining purchase price, the Company and BTMUCC entered into the January 2008 Amendment. As discussed in detail in Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements, the January 2008 Amendment allowed us to borrow an additional $70 million but increased debt service payments to BTMUCC and reduced the amount of cash flow available to the Company to cover operating expenses. Specifically, the amendment required $35 million of the principal amount of the additional borrowings to be reduced to $5 million by October 17, 2008. The increased debt service obligations and the accelerated redemption feature of the January 2008 Amendment raised significant concerns about the Company's liquidity and capital resources and led us to believe that there was substantial doubt about the Company's ability to continue as a going concern. Based on preliminary projections as of May 2008, the Company expected that, without changes to the terms of the January 2008 Amendment or other measures that would have enhanced our liquidity, the Company would have faced a cash shortfall of approximately $7-10 million by October 2008 and also would have needed additional cash to make the required principal payment on October 17, 2008 then estimated to be approximately $21 million. As discussed immediately below, the Company took several steps to restructure the Original BTMUCC Credit Facility and the January 2008 Amendment to address the Company's financial position and specifically the liquidity concerns associated with the January 2008 Amendment.

*Current Liquidity and Capital Resources*

As a result of the August 15, 2008 comprehensive restructuring of the Original BTMUCC Credit Facility and the January 2008 Amendment and subsequent amendments in 2008 and 2009, as well as actions taken to restructure the Company and reduce our recurring operating expenses, we improved our cash flow and, in general, the Company's financial condition. Under the Current Credit Facility, we deferred to 2011 and thereafter much of our principal repayment obligations and certain of our interest obligations. We also anticipate a meaningful reduction in interest expense in 2009 based on (i) the Company's reduced debt level following the sales of Waverly and Bill Blass in late 2008 and the further paydown of debt in August 2009 (ii) the amendment to the bank credit facility in early 2009 that reduced the fixed interest rate applicable to certain Company debt, and (iii) the low variable rates currently applicable to other portions of our debt. We also restructured our credit facility to provide us with monthly, rather than quarterly, cash distributions from our operating revenues that are held in lock-box accounts until distributed pursuant to the terms of the Current Credit Facility. We use these distributions, which are net of required debt service payments, to pay our operating expenses and for other purposes permitted by the terms of our Current Credit Facility. Any excess monies after paying operating expenses and capital expenses permitted under the Current Credit Facility are required to be applied to pay down the outstanding principal under our Current Credit Facility. Starting in May 2008, we also took immediate actions to reduce the Company's recurring operating expenses, including a headcount reduction of non-essential staff, thereby significantly decreasing our monthly cash SG&A expenses as compared to April 30, 2008. As a result of these changes, we have access to more cash more frequently to cover our reduced recurring operating expenses and pay principal payments on our debt. See Note 9 – *Long-Term Debt (As Restated)* to the Consolidated Financial Statements for details regarding our Current Credit Facility.

As of December 31, 2008, we had approximately $8.3 million cash on hand. We anticipate that cash generated from operations will provide us with sufficient liquidity to meet the expenses related to ordinary course operations, including our debt service obligations, for at least the next twelve months. Nonetheless, market and economic conditions may worsen and negatively impact our franchisees and our ability to sell new franchises. As a result, our financial condition and liquidity as of December 31, 2008 raise substantial doubt about our ability to continue as a going concern. We are highly leveraged; we have no additional borrowing capacity under the Current Credit Facility; and the cash generated by operations is subject to lock-box restrictions. Accordingly, we continue to have uncertainty with respect to our ability to meet non-ordinary course expenses or expenses beyond certain total limits, which are not permitted to be paid out of cash generated from operations under the terms of the Current Credit Facility, but instead must be paid out of cash on hand. If we are not able to generate sufficient cash from operations to pay our debt service obligations and all of our expenses, we would defer, reduce or eliminate our expenditures, which may negatively impact our operations. Alternatively, we would seek to restructure or refinance our debt, but there can be no guarantee that BTMUCC would agree to any further restructuring or refinancing plans.

Our Current Credit Facility also contains numerous affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, fundamental changes, asset sales, acquisitions, capital and other expenditures, common stock repurchases, dividends and other payments affecting subsidiaries, and sale and leaseback transactions. The Company's failure to comply with the financial and other restrictive covenants could result in a default under our Current Credit Facility, which could then trigger among other things BTMUCC's right to accelerate all payment obligations, foreclose on virtually all of the assets of the Company and take control of all of the Company's cash flow from operations. (See Note 9 – *Long-Term Debt (As Restated)* to the Consolidated Financial Statements for details regarding the security structure of the debt.) In addition, our Current Credit Facility contains provisions whereby our lender has the right to accelerate all principal payment obligations upon a "material adverse change," which is broadly defined as the occurrence of any event or condition that, individually or in the aggregate, has had, is having or could reasonably be expected to have a material adverse effect on (i) the collectability of interest and principal on the debt, (ii) the value or collectability of the assets securing the debt, (iii) the business, financial condition, or operations of the Company or its subsidiaries, individually or taken as a whole, (iv) the ability of the Company or its subsidiaries to perform its respective obligations under the loan agreements, (v) the validity or enforceability of any of the loan documents, and (iv) the lender's ability to foreclose or otherwise enforce its interest in any of the assets securitizing the debt. To date, BTMUCC has not invoked the "material adverse change" provision or otherwise sought acceleration of our principal payment obligations.

40

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

We believe that we have a good relationship with our lender, and the Company has received waivers and/or amendments from BTMUCC (without concessions from the Company) since the restructuring of the debt in August 2008, including reduction of interest rates, deferral of scheduled principal payment obligations and certain interest payments, waiver and extension of time related to the obligations to issue dilutive warrants, allowance of certain payments to be excluded from debt service obligations, as well as relief from debt coverage ratio requirements, certain capital and operating expenditure limits, certain loan-to-value ratio requirements, certain free cash flow margin requirements, and the requirement to provide financial statements by certain deadlines. In light of these amendments and waivers, we believe it is unlikely that the Company will need to seek additional material waivers or amendments or otherwise default on our Current Credit Facility through June 30, 2010.

*Contractual Obligations*

The following table reflects our contractual commitments, including our future minimum lease payments as of December 31, 2007. The only adjustment that this chart reflects from the chart included in the Original 10-K is in the amount of an earn-out associated with the acquisition of MaggieMoo's, which is included in Purchase Obligations (restated).

| | | Payments due by period (in thousands) | | | |
|---|---|---|---|---|---|
| Contractual Obligations | Total | Less than 1 year | 1-3 Years | 3-5 Years | More than 5 years |
| Long-Term Debt(a) | $ 109,578 | $ 6,340 | $ 30,017 | $ 65,856 | $ 7,365 |
| Capital Lease Obligations(b) | 48 | 27 | 21 | | |
| Operating Leases (c) | 16,303 | 1,821 | 3,679 | 3,731 | 7,072 |
| Purchase Obligations (Restated) (d) | 5,970 | 5,970 | - | - | - |
| Other Long-Term Liabilities Reflected on the Registrant's Balance Sheet under GAAP (e) | 3,815 | 1,562 | 869 | 49 | 1,335 |
| Total | $ 135,714 | $ 15,720 | $ 34,586 | $ 69,636 | $ 15,772 |

(a)    Amounts included in this chart are based on long-term indebtedness as of December 31, 2007, which relates to the outstanding borrowings under the Original BTMUCC Credit Facility. We entered into the January 2008 Amendment increasing our indebtedness by $70 million, then comprehensively restructured the facility in August 2008, partially paid down the facility with the proceeds from the sales of the Bill Blass and Waverly businesses in late 2008 and further paid down debt in August 2009, and entered into amendments to the facility in late 2008 and 2009, all of which impacted our long-term debt obligations. See Note 9 – *Long-Term Debt (As Restated)* to our Consolidated Financial Statements. Accordingly, the amounts shown above do not reflect events subsequent to December 31, 2007, which have increased our payment obligations and altered maturities. See Note 9 – *Long-Term Debt (As Restated)* under the caption "Subsequent Events" for details regarding the amount and maturity dates of our outstanding indebtedness under the Current Credit Facility.

(b)    Capital Lease Obligations includes primarily a lease for computer hardware assumed pursuant to the MaggieMoo's acquisition.

(c)    Operating lease obligations includes primarily our real estate leases for our corporate headquarters, our Bill Blass showroom located in New York City (for which we remained obligated until we assigned the lease on June 11, 2009), our Waverly showroom located in New York City (which we have subleased through the lease expiration) and our Norcross, Georgia franchise management facility. We also remained obligated as of December 31, 2007 under certain leases for facilities we no longer use in Houston, Texas (which we subleased through the lease expiration) and Marlborough, Massachusetts (which we subleased and which lease expired by its terms on August 31, 2008). See Item 2 – *Properties* for additional information.

41

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

(d)  Purchase obligations represent cash consideration in the amount of (i) $5.0 million (in the form of two promissory notes excluding interest) payable on February 29, 2008 with respect to the acquisition of Marble Slab Creamery, (ii) approximately $840,000 (restated) pursuant to an earn-out provision with respect to the acquisition of MaggieMoo's, payable on March 31, 2008 and (iii) $130,000 of MaggieMoo's initial cash consideration held back for certain potential post-acquisition adjustments, payable on March 31, 2008. With respect to the Marble Slab Creamery purchase obligation, $4.75 million of the $5.0 million (excluding interest) of previously unpaid consideration was paid in 2008 pursuant to a settlement agreement as a full and final resolution of the disputes between the parties. The earn-out with respect to the acquisition of MaggieMoo's has not yet been paid due to on-going disputes between the parties. The MaggieMoo's earn-out was previously calculated at $526,581 but has been revised as a result of the adjustments to our Consolidated Financial Statements which affected the earn-out calculation. The $130,000 of MaggieMoo's deferred cash consideration was paid in March 2009.

(e)  Other long–term liabilities include: (a) the expected net present value of guaranteed lease obligations we assumed in connection with our acquisition of MaggieMoo's, related to the leases of franchisees that we guarantee and (b) the net present value of a long-term compensation arrangement with a franchisee of TAF. We have not included contracts for maintenance support on hardware or software that we own because we generally pay in advance for these services and have the option of choosing whether or not to renew these services each year.

*Off Balance Sheet Arrangements*

The Company maintains advertising funds in connection with our franchised brands ("Marketing Funds"). The Marketing Funds are funded by franchisees pursuant to franchise agreements. These Marketing Funds are considered separate legal entities from the Company and are used exclusively for marketing of the respective franchised brands. Athletes Foot Marketing Support Fund, LLC ("TAF MSF") is a Marketing Fund for the TAF brand. Historically, on an as needed basis, the Company advanced funds to the TAF MSF under a loan agreement. The terms of the loan agreement include a borrowing rate of prime (on the date of the loan) plus 2%, and repayment by the TAF MSF with no penalty, at any time. As of December 31, 2007 and 2006, the Company had receivable balances of $1.4 million and $350,000 from the TAF MSF, respectively. The Company does not consolidate this or other Marketing Funds under FIN-46(R) – *"Variable Interest Entities."* For further discussion of Marketing Funds, see Note 3(m) to our Consolidated Financial Statements.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company is exposed to certain market risks, which exist as part of our ongoing business operations. The following discussion about our market risk disclosures involves forward-looking statements. Actual results could differ materially from those projected in these forward-looking statements.

*Interest Rate Risk*

Our primary exposure to market risk is to changes in interest rates on our long-term debt. As of December 31, 2008, the Company had outstanding borrowings of $142.2 million with BTMUCC in three separate tranches: (1) approximately $86.3 million of Class A Franchise Notes, (2) approximately $41.7 of Class B Franchise Notes and (3) $14.2 million of a Deficiency Note. On August 6, 2008, the Company paid down $5 million of the Class B Franchise Notes. (For additional information regarding the debt as of December 31, 2008 and as of the date of this Second Amendment, see Note 9 – *Long-Term Debt (As Restated)* and Note 25 – *Subsequent Events (As Restated)* to the Consolidated Financial Statements.) The Class B Franchise Notes and the Deficiency Note both bear a fixed interest rate. However, the Class A Franchise Notes, representing approximately 61% of the outstanding debt, bear interest at LIBOR plus 3.75% per year through July 31, 2011 and then LIBOR plus 5% per year thereafter until maturity on July 31, 2013. Although LIBOR rates fluctuate on a daily basis, our LIBOR rate resets monthly on the 15th day of each month.

We are subject to interest rate risk on our rate-sensitive financing to the extent interest rates change. Our fixed and variable rate debt as of December 31, 2008 and 2007 is shown in the following table (in millions).

|  | As of December 31, | | | | |
|---|---|---|---|---|---|
|  | 2008 | % of Total | | 2007 | % of Total |
| Fixed Rate Debt | $   55.9 | 39% |  | - | 0% |
| Variable Rate Debt | 86.3 | 61% | $ | 109.6 | 100% |
| Total long-term debt | $   142.2 | 100% | $ | 109.6 | 100% |

The estimated fair value of the Company's long-term debt as of December 31, 2008 was approximately $101 million. As of December 31, 2007, the estimated fair value of debt approximated the carrying value.

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

A change in LIBOR can have material impact on our interest expense and cash flows. Based upon the principal balance as of December 31, 2008, a 1% increase in LIBOR would result in additional $0.9 million in interest expense per year, while a 1% decrease in LIBOR would reduce interest expense per year by $0.9 million interest per year. We did not in 2007 or 2008, and do not currently, utilize any type of derivative instruments to manage interest rate risk. If our lender requests it, however, we will be obligated to hedge the interest rate exposure on our outstanding debt if LIBOR exceeds 3.5%.

*Foreign Exchange Rate Risk*

The Company is exposed to fluctuations in foreign currency on a limited basis due to our international franchisees that transact business in currencies other than the U.S. dollar. However, the overall exposure to foreign exchange gains and losses is not expected to have a material impact on the consolidated results of operations. Because international development fees and store opening fees are paid in U.S. dollars, our primary foreign currency exchange exposure involves continuing royalty revenue from our international franchisees, which as of December 31, 2008 was approximately $3.0 million or 6.4% of our total revenues.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

TABLE OF CONTENTS

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 44 |
| Consolidated Balance Sheets as of December 31, 2007 and 2006 | 45 |
| Consolidated Statements of Operations for the years ended December 31, 2007, 2006, and 2005 | 46 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2007, 2006 and 2005 | 47 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2007, 2006 and 2005 | 48 |
| Notes to Consolidated Financial Statements | 49 |

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
NexCen Brands, Inc.:

We have audited the accompanying consolidated balance sheets of NexCen Brands, Inc. and subsidiaries (the Company) as of December 31, 2007 and 2006, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2007. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of NexCen Brands, Inc. and subsidiaries as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 2 to the consolidated financial statements, the consolidated financial statements as of and for the year ended December 31, 2007, have been restated.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the consolidated financial statements, the Company faces certain liquidity uncertainties that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 3. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 20, 2008, except for the material weakness related to the management structure lacking sufficient clarity as to the roles and responsibilities of senior management that is identified in Management's Report on Internal Control over Financial Reporting (as restated), as to which the date is August 11, 2009, expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

New York, New York
March 20, 2008, except for Note 2, as to which the date is August 11, 2009

44

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

### NEXCEN BRANDS, INC.
### CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS, EXCEPT SHARE DATA)

| | DECEMBER 31, | |
|---|---|---|
| | 2007 (As Restated (A)) | 2006 |
| **ASSETS** | | |
| Cash and cash equivalents | $ 46,569 | $ 83,536 |
| Trade receivables, net of allowances of $1,401 and $530 | 7,201 | 2,042 |
| Other receivables | 2,677 | 511 |
| Restricted cash | 5,174 | — |
| Prepaid expenses and other current assets | 3,867 | 2,210 |
| Total current assets | 65,488 | 88,299 |
| Property and equipment, net | 4,225 | 389 |
| Goodwill | 66,441 | 15,607 |
| Trademarks | 211,308 | 49,000 |
| Other intangible assets, net of amortization | 7,565 | 3,792 |
| Deferred financing costs, net and other assets | 2,927 | — |
| Restricted cash | 1,656 | 1,298 |
| Total Assets | $ 359,610 | $ 158,385 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Accounts payable and accrued expenses | $ 8,689 | $ 3,235 |
| Repurchase agreements and sales tax liabilities - discontinued operations | — | 1,333 |
| Restructuring accruals | 13 | 145 |
| Deferred revenue | 4,033 | 40 |
| Current portion of long-term debt | 6,340 | — |
| Acquisition related liabilities | 7,360 | 4,484 |
| Total current liabilities | 26,435 | 9,237 |
| Long-term debt | 103,238 | — |
| Deferred tax liability | 26,607 | 218 |
| Acquisition related liabilities | 3,915 | — |
| Other long-term liabilities | 3,412 | 2,317 |
| Total liabilities | 163,607 | 11,772 |
| Commitments and Contingencies | | |
| Minority Interest | 3,040 | — |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value; 1,000,000 shares authorized; 0 shares issued and outstanding as of December 31, 2007 and 2006, respectively | — | — |
| Common stock, $0.01 par value; 1,000,000,000 shares authorized; 55,517,475 and 47,966,085 shares issued and outstanding as of December 31, 2007 and 2006, respectively | 557 | 481 |
| Additional paid-in capital | 2,668,289 | 2,615,742 |
| Treasury stock | (1,757) | (352) |
| Accumulated deficit | (2,474,126) | (2,469,258) |
| Total stockholders' equity | 192,963 | 146,613 |
| Total liabilities and stockholders' equity | $ 359,610 | $ 158,385 |

(A) Restated as described in Note 2 of the Consolidated Financial Statements.

See accompanying notes to consolidated financial statements.

45

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009

**NEXCEN BRANDS, INC.**
CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2007 (As Restated (A)) | 2006 | 2005 |
| *Revenues:* | | | |
| Royalty revenues | $ 15,722 | $ 1,175 | $ — |
| Licensing revenues | 15,399 | — | |
| Franchise fee revenues | 3,447 | 749 | |
| Total revenues | 34,568 | 1,924 | — |
| | | | |
| *Operating expenses:* | | | |
| Selling, general and administrative expenses: | | | |
| Brands | (14,651) | (453) | — |
| Corporate | (12,991) | (7,261) | (3,645) |
| Professional fees: | | | |
| Brands | (1,696) | (115) | — |
| Corporate | (1,606) | (1,034) | (1,444) |
| Depreciation and amortization | (1,660) | (471) | (159) |
| Restructuring charges | — | (1,079) | 7 |
| Total operating expenses | (32,604) | (10,413) | (5,241) |
| | | | |
| Operating income (loss) | 1,964 | (8,489) | (5,241) |
| | | | |
| *Non-operating income (expense):* | | | |
| Interest income | 2,115 | 2,637 | 1,478 |
| Interest expense | (5,116) | — | — |
| Other income, net | 288 | 700 | 231 |
| Minority interest | (269) | — | — |
| Investment loss, net | — | — | (19) |
| Total non-operating income (expense) | (2,982) | 3,337 | 1,690 |
| | | | |
| Loss from continuing operations before income taxes | (1,018) | (5,152) | (3,551) |
| Income taxes: | | | |
| Current | (283) | (81) | — |
| Deferred | (3,019) | — | — |
| | | | |
| Loss from continuing operations | (4,320) | (5,233) | (3,551) |
| | | | |
| Discontinued operations: | | | |
| Income (loss) from discontinued operations, net of tax expense of $64 for 2006 | (548) | 2,358 | 225 |
| Gain (loss) on sale of discontinued operations | — | 755 | (1,194) |
| | | | |
| Net loss | $ (4,868) | $ (2,120) | $ (4,520) |
| | | | |
| Loss per share (basic and diluted) from continuing operations | $ (0.08) | $ (0.11) | $ (0.08) |
| Income (loss) per share (basic and diluted) from discontinued operations | (0.01) | 0.07 | (0.02) |
| Net loss per share – basic and diluted | $ (0.09) | $ (0.04) | $ (0.10) |
| | | | |
| Weighted average shares outstanding - basic and diluted | 51,889 | 45,636 | 44,006 |

(A)  Restated as described in Note 2 of the Consolidated Financial Statements.

See accompanying notes to consolidated financial statements.

46

Source: NexCen Brands, Inc., 10-K/A, August 11, 2009