UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE NEXCEN BRANDS, INC.
SECURITIES LITIGATION

This document relates to:  all actions

Master File No. 1:08-cv-04906-AKH

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' FOUR MOTIONS TO DISMISS**

**COHEN MILSTEIN SELLERS
& TOLL PLLC**

Catherine A. Torell (CT-0905)
150 East 52nd Street
Thirtieth Floor
New York, New York 10022
Tel: (212) 838-7797
Fax: (212) 838-7745

Lisa M. Mezzetti (LM-5105)
Anna K. Ryon-Walthall
(*pro hac vice*)
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel:  (202) 408-4600
Fax: (202) 408-4699

*Lead Counsel for Lead Plaintiff*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................ 4

      A.    Beginning With NexCen's Announcement of Entry into the Credit
            Facility, Defendants Intentionally Misled Investors About NexCen's
            Business, Its Operations and Plans, and the Sufficiency of Cash Available
            to the Company ................................................................................................ 4

      B.    Defendants Misled Investors About the Terms of the Amendment to the
            Credit Facility and the Company's Ability to Continue as a Going
            Concern ............................................................................................................. 7

      C.    NexCen Admitted That It Failed to Disclose Material Information ..................... 9

III.  ARGUMENT ......................................................................................................... 10

      A.    The Complaint Surpasses the Pleading Requirements that Guide Courts at
            the Motion to Dismiss Stage ........................................................................... 10

      B.    The Complaint Pleads Viable Section 10(b) Claims ......................................... 12

            1.    Defendants Made False and Misleading Statements, and Failed to
                  Reveal Material Facts, Throughout the Class Period............................... 12

                  a.    Statements Concerning the Acquisition Plan and Cash Flow
                        Were False and Misleading, And Were Not Merely
                        Opinions ................................................................................ 13

                  b.    Defendants' Statements Are Not Puffery ................................. 19

                  c.    The Internal Controls Statements Were False and
                        Misleading.............................................................................. 21

                  d.    Defendants' Presentations of EBITDA Were Misleading .......... 23

                  e.    Defendants Failed to State Facts They Had a Duty to
                        Disclose.................................................................................. 24

                  f.    Defendants' Misstatements and Omissions Were Material
                        to Investors............................................................................. 25

                  g.    Defendants' Statements Are Not Protected By the Reform
                        Act's Safe Harbor Provision .................................................... 27

                        (1)    The Challenged Statements Are Not Forward-
                               Looking Statements and Thus Are Not Protected........... 28

                        (2)    Defendants' Purported Warnings Were Vague,
                               Meaningless, and Irrelevant .......................................... 30

                        (3)    Defendants Had No Reasonable Basis for the
                               Challenged Statements When They Made Them............. 33

# TABLE OF CONTENTS
(continued)

Page

2. The Complaint Adequately Alleges that the Defendants Acted With Scienter ........................................................................ 34

    a. The Requirements for Pleading Scienter .................................... 34

    b. The Motive, Opportunity and Insider Trading Allegations Give Rise to a Strong Inference of Scienter................................ 36

    c. The Complaint's Allegations of Recklessness Give Rise to a Strong Inference of Scienter..................................................... 42

C. The Complaint Sufficiently Alleges Claims Against, and the Liability of, the Individual Defendants .................................................................... 50

    1. The Misstatements and Omissions in NexCen's SEC Filings and Press Releases Are Attributable to Mr. Oros ........................... 50

    2. The Control Person Claims Are Well-Pled............................... 52

D. The Complaint Sufficiently Alleges Loss Causation........................... 56

E. Plaintiff Should Be Granted Leave to Amend ..................................... 59

IV. CONCLUSION.................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................39

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)............................................................................................31

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).................................................................................10, 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)........................................................................54, 55, 59

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007).....................................................................................10, 11

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998)..........................................................................54, 55

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)..........................................................43, 44

*Campo v. Sears Holdings Corp.*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009)..........................................................12, 16

*Central Laborers Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) .......................................................................40, 41

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)..........................................................................38, 59

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................16

*Coronel v. Quanta Capital Holdings Ltd.*,
   No. 07 Civ. 1405, 2009 U.S. Dist. LEXIS 6633 ...............................................35

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................... passim

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) ............................................................................41

*Fishbaum v. Liz Claiborne, Inc.,*
No. 98-9396, 1999 WL 568023 (2d Cir. July 27, 1999).....................................41, 42

*Fitzer v. Sec. Dynamics Techs, Inc.,*
119 F. Supp. 2d 12 (D. Mass. 2000) ...............................................................21

*Fort Worth Employers' Ret. Fund v. Biovail Corp.,*
615 F. Supp. 2d 218 (S.D.N.Y. 2009).............................................................28

*Fouad v. Isilon Sys., Inc.,*
No. C07-1764, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)..........................49

*Ganino v. Citizens Utility Co.,*
228 F.3d 154 (2d Cir. 2000)......................................................26, 35, 54, 55

*Garber v. Legg Mason, Inc.,*
537 F. Supp. 2d 597 (S.D.N.Y. 2008)..............................................................27

*Glazer v. Formica Corp.,*
964 F.2d 149 (2d Cir. 1992).........................................................................24

*Glazer Capital Mgmt., LP v. Magistri,*
549 F.3d 736 (9th Cir. 2008) .......................................................................23

*Glickman v. Alexander & Alexander Servs.,*
No. 93-CIV-7594, 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ..............................38

*Goldman v. Belden,*
754 F.2d 1059 (2d Cir. 1985)........................................................................11

*Greebel v. FTP Software, Inc.,*
194 F.3d 185 (2d Cir. 1999).........................................................................39

*Hall v. The Children's Place Retail Stores, Inc.,*
580 F. Supp. 2d 212 (S.D.N.Y. 2008).......................................................... passim

*Halperin v. eBanker USA.com Inc.,*
295 F.3d 352 (2d Cir. 2002)....................................................................31, 32

*Harborview Master Fund, LP v. LightPath Techs.,*
601 F. Supp. 2d 537 (S.D.N.Y. 2009)..............................................................20

*Heller v. Goldin Restructuring Fund, L.P.,*
590 F. Supp. 2d 603 (S.D.N.Y. 2008)..........................................................29, 32

*Higginbotham v. Baxter Int'l., Inc.,*
495 F.3d 753 (7th Cir. 2007) .......................................................................16

iv

*Horizon Asset Mgmt., Inc. v. H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ......................................................................37, 38

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)...............................................................................32

*In re Adaptive Broadband Sec. Litig.*,
    No. C 01-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...........................48, 49

*In re Adelphia Commc'ns Corp. Sec. and Deriv. Litig.*,
    398 F. Supp. 2d 244 (S.D.N.Y. 2005)..................................................................51

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................46

*In re Am. Express Co. Sec. Litig.*,
    No. 02 Civ. 5533 (WHP), 2008 U.S. Dist. LEXIS 74372 (S.D.N.Y. Sept. 26, 2008).......16, 37

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)..................................................................34

*In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)........................................................29, 30, 33

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)..................................................................56

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................................45

*In re Biogen Idec, Inc. Sec. Litig.*,
    No. 05-10400-WGY, 2008 WL 4810045 (D. Mass. Oct. 25, 2008) ................40, 41

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)............................................................34, 35

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................21

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..............................................................................27

*In re Cardinal Health Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ...............................................................38

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000)..................................................................................35

*In re Citigroup Inc. Shareholder Deriv. Litig.*,
    964 A.2d 106 (Del. Ch. 2009)..................................................................................46

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825, 2008 WL 2795927 (E.D.N.Y. July 18, 2008).............................55

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................27

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007)...............................................................14, 15

*In re Duane Reade, Inc. Sec. Litig.*,
    No. 02 CIV 6478 NRB, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)................37

*In re ECVI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)................................................................32, 33

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..............................................................20, 45

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................................................24

*In re Focus Enhancements, Inc. Sec. Litig.*,
    309 F. Supp. 2d 134 (D. Mass. 2001) ......................................................................39

*In re Gildan Activewear, Inc.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)..............................................................20, 41

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................................51

*In re Health Mgmt., Inc. Sec. Litig.*,
    970 F. Supp. 192 (E.D.N.Y. 1997) ..........................................................................42

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)........................................................... passim

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................................54

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................45

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) .....................................................................42

vi

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................24, 50

*In re Mercator Software, Inc.*,
    161 F. Supp. 2d 143 (D. Conn. 2001)..........................................................................48

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)....................................................................57, 59

*In re Microstrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ..........................................................................39

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................................16, 19, 50, 59

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..........................................................................41

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................40, 41

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)....................................................19, 32, 35

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004)............................................................................21

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)..........................................................................57

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................50, 51, 53

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    51 F. Supp. 2d 290 (S.D.N.Y. 1999)............................................................................47

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)....................................................52, 54, 56

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008)..........................................................................50

*In re Proquest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007)..................................................................39, 47

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996)............................................................................32, 33

*In re PXRE Group, Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ....................................................13, 16, 37, 39

*In re QLT Inc. Sec. Litig.*,
    312 F. Supp. 2d 526 (S.D.N.Y. 2004) ................................................................15

*In re Quintel Entm't Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999) ................................................................37

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ....................................................42, 50, 52

*In re Rhodia S.A. Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007) ................................................................11

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ..........................................................................54, 55

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................48

*In re Sierra Wireless, Inc., Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ................................................................20

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................ passim

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ............................................................................24, 26

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2008) ............................................................17, 18

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................48

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................ passim

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..............................................14, 15, 19, 43

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..............................................................20

*In re Worldcom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ..............................................40, 52, 54, 56

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)............................................................................37, 38, 46

*Katz v. Image Innovations Holdings, Inc.*,
  542 F. Supp. 2d 269 (S.D.N.Y. 2008)..........................................................................53

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y.)............................................................................14, 42

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)........................................................................................12

*Leykin v. AT&T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006)..........................................................................11

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wa. 2006) ......................................................................21

*Makor Issues and Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ......................................................................................17

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007)..........................................................................41

*Marbury Mgmt., Inc. v. Kohn*,
  629 F.2d 705 (2d Cir. 1980)..................................................................................54, 55

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 ................................................................................................................27

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990)................................................................................23, 24

*Medis Investor Group v. Medis Tech. Ltd.*,
  586 F. Supp. 2d 136 (S.D.N.Y. 2008)..........................................................................45

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  No. CV 06-6863, 2008 U.S. Dist. LEXIS 68419...................................................48

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
  523 F.3d 75 (1st Cir. 2008).........................................................................................41

*Nadoff v. Duane Reade, Inc.*,
  107 Fed. Appx. 250, No. 03-9352, 2004 WL 1842801 (2d Cir. Aug. 17, 2004)...................20

*New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*,
  No. Civ. A 1:98-CV-99-MD, 1999 WL 33295037 (W.D. Ky. Aug. 16, 1999)......................39

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000)..................................................................... passim

*Oran v. Stafford*,
　　226 F.3d 275 (3d Cir. 2000)............................................................................27

*Patane v. Clark*,
　　508 F.3d 106 (2d Cir. 2007)............................................................................10

*Payne v. DeLuca*,
　　433 F. Supp. 2d 547 (W.D. Pa. 2006)..............................................................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
　　446 F. Supp. 2d 163 (S.D.N.Y. 2006)........................................................39, 52

*Podany v. Robertson Stephens, Inc.*,
　　318 F. Supp. 2d 146 (S.D.N.Y. 2004)..............................................................15

*PR Diamonds, Inc. v. Chandler*,
　　364 F.3d 671 (6th Cir. 2004) ...........................................................................47

*Roth v. OfficeMax Inc.*,
　　527 F. Supp. 2d 791 (N.D. Ill. 2007) ...............................................................21

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
　　75 F.3d 801 (2d Cir. 1996)........................................................................20, 38

*Schottenfeld Qualified Assoc. v. Workstream, Inc.*,
　　No. 05-CV-7092, 2006 WL 4472318 (S.D.N.Y. May 4, 2006) ............................28

*SEC v. First Jersey Sec., Inc.*,
　　101 F.3d 1450 (2d Cir. 1996)..............................................................53, 54, 55

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
　　547 F.3d 406 (2d Cir. 2008).............................................................................49

*Stevelman v. Alias Research*,
　　174 F.3d 79 (2d Cir. 1999)...............................................................................40

*Suez Equity Investors L.P. v. Toronto-Dominion Bank*,
　　250 F.3d 87 (2d Cir. 2001)..........................................................................54, 55

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
　　531 F.3d 190 (2d Cir. 2008)........................................................................46, 50

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007).................................................................................10, 34

*United States v. York*,
  933 F.2d 1343 (7th Cir. 1991) ................................................................44

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).........................................................................14

*Varghese v. China Shenghuo Pharm. Holdings*,
  --- F. Supp. 2d ---, No. 1:08-cv-07422-VM, 2009 WL 4668579 (S.D.N.Y. Dec. 9,
  2009) .......................................................................................21, 47

**STATUTES**

15 U.S.C. § 77o...................................................................................54

15 U.S.C. § 78u-4 .......................................................................27, 34, 56

15 U.S.C § 78u-5(b)(2)(A)....................................................................27

**OTHER AUTHORITIES**

Black's Law Dictionary (2d Pocket Ed. 2001) .............................................54

Federal Rule of Civil Procedure 8(a) ......................................................52

Federal Rule of Civil Procedure 9(b)...........................................4, 12, 51, 59

Federal Rule of Civil Procedure 12(b)(6) .............................................10, 11

Lead Plaintiff Vincent Granatelli ("Plaintiff") respectfully submits this memorandum of law in opposition to the four motions to dismiss filed by each of Defendants NexCen Brands, Inc. ("NexCen" or the "Company"), Robert W. D'Loren ("D'Loren"), David B. Meister ("Meister"), and David S. Oros ("Oros") (D'Loren, Meister, and Oros, collectively, the "Individual Defendants" and, together with NexCen, "Defendants").  For purposes of efficiency and the convenience of the Court, Plaintiff is submitting this consolidated memorandum on all motions.

## I.    <u>INTRODUCTION</u>

NexCen is a brand acquisition and management company with a focus on companies operating in the consumer-branded products and franchise industries.  In November 2006, NexCen began a series of major cash-intensive acquisitions with its first major brand acquisition – The Athlete's Foot.  This acquisition mode was led and driven by NexCen's Chief Executive Officer and Chief Financial Officer, Mr. D'Loren and Mr. Meister, and other management who lacked an understanding of the franchise business.  Without any reasonable basis for the statements, the Defendants informed investors that the Company planned to acquire three to five companies each year and had sufficient liquidity to complete those acquisitions while also sustaining existing operations.  What investors did not know is that the Company did not enjoy such liquidity, and that over the Class Period even its substantial debt or credit facility did not provide enough cash for operations and such acquisitions.  Indeed, the Company's strategy actually sacrificed liquidity and sustainability in order to bulk-up the Company's numbers in the short-term to inflate the stock price and to hit performance targets to allow Mr. D'Loren to receive millions of dollars for stock sales from a merger of his earlier company with NexCen.

Throughout 2007 and into 2008, Defendants told the public no less than six times that they had sufficient liquidity to continue their acquisition spree.  This was false and the falsity

was not revealed to the market until the end of the Class Period with May 2008 disclosures. Plaintiff alleges that all along, the Company and all Defendants knew or recklessly disregarded the fact that it would never be able to accomplish its acquisition business plan under its current operations or credit facility, but did not disclose this to the public.  But for material amendments to its credit facility (for example, a $31 million increase in its limits), NexCen would face a severe cash shortfall – indeed, even after amendments were made to the credit facility, it did suffer a severe cash shortfall.

In the Fall of 2007, after Mr. D'Loren had earned his extra payout, the unsustainability of the scheme became internally evident, and the Company faced a liquidity crisis.  Defendants continued to assure investors that the Company was on track to continue business as usual despite internal warnings about serious problems on the most basic issues for the Company including, for example: cash shortages, lack of information about the number of restaurants in a franchise, franchisees failing to pay their fees and NexCen's inability to track this, and unknowledgeable accounting management and staff.  None of this was revealed to the public.  At the same time, the Company apparently became desperate, borrowing $19 million from the credit facility in November for the sole purpose of sustaining operations, instead of using it to acquire additional brands.  Then, Defendants continued to mortgage the future but specifically did not tell the stockholders:  they entered into an amendment to a credit facility with a balloon payment that was impossible for the Company to make, all the while misleading investors about the terms of the modification and even on the Company's results.  It was not (Plaintiff contends) any coincidence that the Company issued financial reports using Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") – which excludes many of the costs of acquisitions – because that painted a better picture of the Company's status while it repeated its mantra of

growth by acquisition and sufficient liquidity for those acquisitions while sustaining current operations.

Ultimately, the breadth and scope of the securities fraud Defendants perpetrated became too great to conceal. On May 19, 2008, the Company announced that: (1) the amendment to the credit facility included an accelerated redemption feature, requiring a balloon payment of $30 million in October 2008, which NexCen would be unable to pay; (2) in addition to the balloon payment, the Company would face a cash shortage of $7-10 million quite quickly, in July 2008; (3) the Company's 2007 financial results no longer could be relied upon; and (4) there was "substantial doubt" about the Company's ability to continue as a going-concern. The Defendants ultimately *admitted* that they should have publicly revealed (among other things) the balloon payment during the Class Period, but had not, and that the going-concern doubts existed at least as of the end of 2007. They knew this, but the public did not. Thus, it is not an overstatement to say that the news shocked the market: the Company's share price fell 77.08% on that same day, to $0.58 per share, on unusually heavy trading volume.

The May 2008 disclosures revealed important, material, adverse information on the Amended Credit Facility that had been kept from the public, but also disclosed much more, including that the many statements made all through the Class Period (and delineated in the Complaint) that the Company would have sufficient liquidity and access to cash to carry out its business plan and carry on operations were false. These were numerous, consistent and ultimately the mantra of the Company. This is what was also corrected with the May 19 announcement.

Defendants argue that the Consolidated Amended Class Action Complaint fails to state a claim because (1) a number of the statements are neither false nor material; (2) scienter is

insufficiently alleged; and (3) there is no causal connection between the 2007 statements and the

2008 stock price drop and thus the losses suffered by the Class Members.  But this is based only

on their parsed reading of the Complaint and their own interpretation of the facts and, indeed,

their attempts to explain the facts away in their briefs.  What they say now, on these motions,

about the facts and their intentions, or their knowledge at the time, cannot be considered here.

Plaintiff knows that he must meet the standards of Rule 9(b) and the scienter rules, and he has

done so.  Yet, even with the analysis the Court must undertake to confirm so, it cannot make

factual findings or accept Defendants' version of (and indeed, sometimes embellishments on) the

facts.  It also should not accept as true the Defendants' views of or defenses to the matter.  The

Complaint meets all the applicable requirements and sets forth a logical, detailed explanation of

the alleged fraud, with specifics on it and substance behind the allegations of falsity and scienter.

It alleges and shows the causal connection between the Defendants' statements in 2007 and 2008

and the stock price drop.  The motions should be denied.

## II.    STATEMENT OF FACTS

### A.    Beginning With NexCen's Announcement of Entry into the Credit Facility, Defendants Intentionally Misled Investors About NexCen's Business, Its Operations and Plans, and the Sufficiency of Cash Available to the Company

On March 13, 2007 (the beginning of the alleged fraud), NexCen announced that it had

entered into a $150 million Credit Facility ("Credit Facility") with BTMU Capital Corporation

("BTMU") and immediately made a draw of $26.5 million from it.  ¶ 4.[1]  The Credit Facility was

ostensibly a mechanism to achieve the Company's stated goal of acquiring three to five

companies or brands per year while sustaining existing operations.  ¶ 3, 5.  Defendants portrayed

their business plans as a sustainable business model, explaining that the Company used an "IP

---

[1]    Paragraphs in the Consolidated Amended Class Action Complaint, filed on Aug. 24, 2009, Dkt. No. 76, are referred to as "¶ __."

business" model that did not require substantial operating costs, and that allowed the Company to maintain "maximum operational and financial flexibility." ¶ 3. However, the stated plans of acquiring three to five brands per year and the accompanying statements of sufficient liquidity (financing and revenue/cash) to fund both the acquisitions and to sustain operations were false, ¶ 174, and lacked a reasonable basis when made because the Company's stated course of business was not sustainable. ¶ 174(a).

To the contrary, NexCen's course of business was designed not as a strategy to reach the plans the Company touted, nor to sustain the Company's operations, but instead to inflate NexCen's stock price and also to put additional money in Mr. D'Loren's pocket. ¶ 7. In June 2006, NexCen's predecessor – Aether Holdings, Inc. ("Aether") – acquired UCC Capital Corp. ("UCC"), of which D'Loren was the Chief Executive Officer ("CEO"). ¶ 31. After the merger, D'Loren replaced Mr. Oros as CEO of Aether, ¶¶ 30, 31, and was given a compensation package consisting of a base salary, a potential annual bonus of cash and stocks, and stock options. ¶ 182. D'Loren had also been a majority owner of UCC, beneficially owning over 80% of UCC stock. ¶ 33. As consideration for his shares of UCC stock, D'Loren was initially paid over $8 million. ¶ 31. In addition to this initial consideration, D'Loren and other UCC shareholders had the potential to earn an additional $10 million along with 2.5 million shares of Aether (later named NexCen) stock if the Company met certain performance targets, most of which would go to D'Loren. ¶¶ 32, 36. The target goals required the Company's stock to remain above $10 per share for a specified time period, and for the Company's Adjusted EBITDA to exceed $2.5 million in a quarter. ¶ 71. The Company's stock price reached its benchmark figures in late July 2007, and in August 2007, NexCen reported an Adjusted EBITDA of $2.6 million for the three months ending June 30. ¶ 71. On September 5, 2007, NexCen's Board of Directors determined

that the performance targets in the UCC acquisition had been met, and authorized payment of the cash and 2.5 million shares of Company stock, for a total payout of approximately $27.2 million, to UCC shareholders with the 80% going to D'Loren. ¶ 77. Only two days later, the Company announced that it was borrowing $16 million from the Credit Facility to make the acquisition of Pretzel Time and Pretzelmaker. ¶ 78.

The remarkable speed with which NexCen reached the benchmarks for the additional payout under the UCC merger agreement was possible only due to the Company's excessively rapid acquisition pace, which bolstered earnings, and false statements about the Company's ability to continue acquiring companies at that pace. ¶¶ 6, 55-58, 62, 64-67. In fact, Mr. D'Loren and other executives at NexCen did not understand the franchise business, nor the appropriate pace at which to make acquisitions, nor how to manage brands once acquired. ¶ 56. As a result, their public statements about the Company's operations, future acquisitions and sufficient liquidity to buy them and also to sustain operations lacked a reasonable basis when made. ¶ 174(a).

The effects of NexCen's undisclosed reckless acquisition strategy began to be known within the Company in the Fall of 2007. At that time, although NexCen had owned Marble Slab for a year, the Company still did not know how many restaurants it had. ¶ 91. NexCen also failed to collect over $13 million in franchise fees relating to Marble Slab and Maggie Moo, a figure that was reported to Defendants D'Loren and Meister during weekly conference calls. ¶¶ 29, 93. Additionally, approximately 30% of Marble Slab and The Athlete's Foot franchisees were delinquent in paying their franchise fees, while other franchisees were deliberately withholding franchise payments due to a lack of support from NexCen. ¶¶ 95, 96. In November 2007, NexCen made a $19 million draw on the Credit Facility that was not related to any

acquisition, and served no purpose other than to sustain the Company's operations, yet when directly questioned on it, management (including Mr. Meister) declined to explain to investors why the draw was made.  ¶ 82.  By December, the Company's liquidity crisis had become so severe that it was in danger of not making payroll, a fact that Messrs. Meister and D'Loren knew. ¶ 90.

At the same time, despite the egregious problems with internal accounting controls and procedures, when CW7 (the CFO of NexCen Franchise Management) alerted Mr. Meister to NexCen's need for better accounting systems and staff, he refused to make any changes.  ¶ 101. Compounding the problem, Defendant D'Loren limited the methods by which material information about the Company's financial circumstances, and specifically cash flow, could be provided to the Board:  he declared that only he would do so.  ¶ 102.  Yet, in contrast with their conduct, Defendants reassured the public that they had "established disclosure controls and procedures to ensure that material information relating to the Company . . . is made known to the . . . members of senior management and the Board of Directors."  ¶ 48, *see also* ¶¶ 49, 52, 59, 61, 68, 70, 84, 86, 120, 122.  Information about the Company's liquidity crisis and lack of internal controls was thus concealed from the public as NexCen continued to reassure investors that the Company's acquisition plans and statements on growth continued to be accurate and feasible, and that the Company had sufficient liquidity to make those acquisitions and maintain operations for the foreseeable future.  ¶¶ 109, 111, 112, 115, 116, 117.

**B.      Defendants Misled Investors About the Terms of the Amendment to the Credit Facility and the Company's Ability to Continue as a Going Concern**

On January 29, 2008, NexCen made its largest acquisition yet, acquiring the Great American Cookie Company in a transaction valued at more than $93 million.  ¶ 104.  Because the Company did not have sufficient cash and credit available to finance the acquisition, it

entered into a modification of the Credit Facility (the "Amendment"), and immediately drew

down tens of millions of dollars.  ¶¶ 104, 105, 117.  Defendants D'Loren and Meister (each of

whom is a certified public accountant, ¶¶ 23, 24) negotiated the modification to the Credit

Facility and Meister signed the terms of the modification.  ¶ 105.  The Company announced that

the Credit Facility had been modified to increase the borrowing limit from $150 million to $181

million and that, with a couple of other minor changes, the terms were "substantially the same"

as the original terms of the Credit Facility.  ¶¶ 106, 107.  In fact, several terms of the

modification were substantially different from the original terms of the Credit Facility, including,

among others:  (1) an accelerated-redemption feature requiring $35 million of the loan to be

reduced to $5 million by October 17, 2008 (the "Accelerated Redemption Feature") – thus, the

Company would need $30 million cash within 10 months for the Great American Cookie

purchase alone; (2) a requirement that previously-accrued but unpaid interest (a substantial

figure) be paid; and (3) specifically applying to whether NexCen would have the cash to pay

these two elements and also be able to operate the Company's business: terms restricting cash

flow from revenue so that it was not available to fund operating expenses.  ¶ 9.  Nonetheless,

Defendants repeatedly publicly that the terms were the same from the time of the modification

until the details were eventually disclosed on May 19, 2008.  ¶¶ 108, 110, 118.

During the first five months of 2008, Defendants continued to make the same misleading

statements about the Company's acquisition plans and the sufficiency of its access to cash.  ¶¶

109, 111, 112, 115, 116, 117.  These statements failed to reveal that the Company was facing a

cash shortage that eventually amounted to $7-10 million in the Summer of 2008, even before

taking into consideration the Accelerated Redemption Feature of the modification to the Credit

Facility.  ¶ 175(b).  While the Company told investors that it had sufficient access to cash to

continue making acquisitions and funding continuing operations for the next year, the truth of its financial situation was quite the opposite, with the direness of the situation raising doubts about the Company's ability to continue as a going concern. ¶ 126.

**C.     NexCen Admitted That It Failed to Disclose Material Information**

Finally, at the end of the Class Period, NexCen issued the May 19, 2008 press release *admitting* that it had failed to disclose the Accelerated Redemption Feature of the modification to the public; it also admitted it did not reveal several other features that reduced the cash available to the Company for general use. ¶ 125. The Company also acknowledged for the first time that there was a substantial doubt about NexCen's ability to continue as a going concern. ¶ 126. In fact, it admitted that this doubt had probably existed for at least months (¶ 126), and ultimately acknowledged that it went back to at least December 2007. ¶ 150. This announcement caused the Company's stock to fall $1.95 per share on May 19, 2008, or 77% from its closing price of $2.53 per share the previous trading day, on heavy volume. ¶ 132.

In the wake of this revelation, a number of high-ranking executives and directors left the Company. In May 2008, the Company terminated two executive vice presidents (¶ 134); in August 2008, Defendant D'Loren left the Company (¶ 138), and several Directors departed in the Fall of 2008 (¶ 139). (Mr. Meister had been terminated in March 2008. ¶ 138.) The Company also took drastic measures to stay afloat, including downsizing its operations, with a 25% reduction of its New York workforce (¶ 136) and an 8% reduction of its Norcross, Georgia workforce (¶ 137). Because its previous strategy was unsustainable, the Company also had to sell two of its brands and negotiate numerous modifications to the Credit Facility in order to stay afloat. ¶¶ 144-149.

As to the Individual Defendants, the Complaint alleges their positions, work in the Company, statements they signed or that they made, the reasons they are responsible for the

Company's statements and their knowledge or ability to know and reckless disregard of the falsity of the Company's statements.  ¶¶ 176, 177, 180, 181, 184, 185, 186, 189.

### III.    ARGUMENT

**A.    THE COMPLAINT SURPASSES THE PLEADING REQUIREMENTS THAT GUIDE COURTS AT THE MOTION TO DISMISS STAGE**

As an initial matter, Defendants' attacks on the overall articulation of Plaintiff's claims are not well-taken on a dismissal motion.  Defendants' attempts to argue the facts or claim that the Complaint does not set forth a "logic" – apart from being wrong – cannot support dismissal of the Complaint under Federal Rule of Civil Procedure 12(b)(6).

Courts must accept the factual allegations in a plaintiff's complaint as true and draw all reasonable inferences in a plaintiff's favor on a Rule 12(b)(6) motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (reaffirming applicability of traditional dismissal motion analysis in securities fraud actions).[2]  Moreover, in ruling on a motion to dismiss, a court should not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007); *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007).

The Supreme Court clarified the contours of *Twombly's* "plausibility" requirement in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009):  "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

---

[2]    The *Tellabs* Court reiterated the importance of private securities litigation in enforcing the antifraud provisions of the federal securities laws, writing:  "This court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities Exchange Commission (SEC)."  *Id.* at 313.

The Court is not required, at this stage, to "believe" Plaintiff's allegations, only to accept them as true. *Twombly*, 550 U.S. at 556 (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.")); *see also* (for earlier renditions of this rule) *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 543 (S.D.N.Y. 2007) (on a motion to dismiss, "a court should not 'assay the weight of the evidence which might be offered in support thereof'") (quoting *Geilser v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, (S.D.N.Y. 2006) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (a court's function on a motion to dismiss is "'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'")).  Indeed, even if a complaint "strikes a savvy judge that actual proof of [its] facts is improbable" and "that a recovery is very remote and unlikely," all *Twombly* requires is "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing.  *Twombly*, 550 U.S. at 556. Plaintiffs must only "nudge[] their claims across the line from conceivable to plausible."  *Id.* at 570.[3]

Here, the Complaint more than satisfies *Twombly*.  As detailed below, the Complaint alleges with particularity that (1) Defendants made public statements that emphasized growth by acquisition but concealed NexCen's inability to sustain the growth projected, the ineffectiveness of NexCen's internal controls, the nature of its financial crisis, and – as Defendants admit – failed to disclose the terms of the Amendment to the Credit Facility that were specifically

---

[3]    Justice Souter, dissenting in *Iqbal*, noted that *Twombly* (which Justice Souter authored) "does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true.  [The Supreme Court] made it clear, on the contrary, that *a court must take allegations as true, no matter how skeptical the court may be*. . . . The *sole exception* to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel.  That is not what we have here."  129 S. Ct. at 1959 (Souter, J., dissenting) (citations omitted) (emphasis added).

applicable to this growth; (2) Defendants knew of or recklessly disregarded the futility of the

acquisition plan, their ineffective internal controls, Nexcen's financial liquidity crisis, and all of

the terms of the Amendment to the Credit Facility; and (3) the market price for NexCen stock

was inflated because of these misrepresentations, and, when the truth was disclosed, fell and thus

injured Plaintiff and Class Members who purchased overpriced NexCen securities.

### B.    THE COMPLAINT PLEADS VIABLE SECTION 10(b) CLAIMS

The parties agree that to state a claim for securities fraud under Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Plaintiff must allege

that the Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3)

in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that

plaintiffs' reliance was the proximate cause of their injury."  *Campo v. Sears Holdings Corp.*,

635 F. Supp. 2d 323, 330 (S.D.N.Y. 2009) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d

161, 172 (2d Cir. 2005)).  Defendants apparently concede that Plaintiff's allegations satisfy the

third and fourth elements of a Section 10(b) cause of action.  The analysis of Defendants' attacks

on the first, second, and fifth elements of Plaintiff's claims set forth below unequivocally

demonstrates that these elements are likewise satisfied.

### 1.    Defendants Made False and Misleading Statements, and Failed to Reveal Material Facts, Throughout the Class Period

Plaintiff alleges, and more than sufficiently pleads, that Defendants made numerous

actionable misstatements and failed to state material facts.  For such misstatements to be

actionable, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal

Rule of Civil Procedure 9(b) require that the Complaint's allegations: "(1) specify the statements

that [the] plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when

the statements were made, and (4) explain why the statements were fraudulent."  *In re*

12

*IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) (internal quotations omitted); *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 524 (S.D.N.Y. 2009). As detailed below, the Complaint contains sufficient detail to satisfy these pleading requirements.

### a. Statements Concerning the Acquisition Plan and Cash Flow Were False and Misleading, And Were Not Merely Opinions

Defendants argue that they did not make any false or misleading statements about NexCen's acquisition plans or cash flow on the grounds that (they claim) certain of the statements they made were "true." NexCen Br. at 13.[4] Defendants' argument must fail because it decontextualizes and ignores Plaintiff's well-pled allegations that these statements were false and misleading.

Beginning on March 13, 2007, NexCen presented its business strategy as a concrete, sustainable plan. The Company's expressions of this plan were consistent statements of a specific number of acquisitions the Company was going to make, as well as the size of those acquisitions. Specifically, the Company pronounced that its plans were to acquire three to five brands per year, with a total transaction value of over $50 million. ¶¶ 47, 62, 64, 75, 111, 112, 116.

With respect to the 2007 statements concerning sustainability, the Complaint alleges that the Company "had no reasonable basis for such projections due to, among other things, increasing operating expenses, and insufficient franchisee revenue." ¶ 174(a). This was ultimately shown by the fact that the Company acknowledged it could not sustain the plan specifically because of high operating expenses and insufficient cash flow, due to amendments to its only source of financing and insufficient revenues from its franchisees. ¶¶ 125-126. Further, Defendants' descriptions of the Credit Facility was misleading at best, as they overstated the

---

[4]     Citations to "NexCen Mem." refer to the Memorandum of Law in Support of Defendant NexCen Brands, Inc.'s Motion to Dismiss the Consolidated Amended Class Action Complaint, filed on Oct. 8, 2009, Dkt. No. 93.

viability of the facility as a long-term financing source.  ¶ 44 (the Credit Facility "is enabling our company to move quickly"); ¶¶ 66, 78 (the Credit Facility "will continue to give us the ability to grow and execute our business plan"); ¶ 75 (the Credit Facility "will enable us to execute our current acquisition plan").

Thus, Plaintiff alleges that Defendants knew when they discussed their plans for the acquisition spree that such a plan could not be sustained under the terms of their only source of financing given the hidden realities of the Company's prospects for future revenue and liquidity. These were direct, concrete statements that were misrepresentations, shown by facts alleged in the Complaint.  Yet, Defendants argue that their statements concerning expectations for the Company's access to liquidity were only opinions and therefore are not actionable.  NexCen Mem. at 41-42.  However, where defendants could not have genuinely believed the alleged misrepresentations when made, those statements are actionable; in addition, so-called statements of opinion are actionable when "the defendants did not genuinely or reasonably believe the positive opinions" or when "the opinions imply certainty."  *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y.); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) ("conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (complaint sufficiently alleged a lack of reasonable basis for opinion representations that the defendant company was financially stable, and these were actionable when defendants were "aware of the financial precipice on which it stood").  Specifically, misrepresentations concerning a company's sustainability and the strength of its balance sheet have been held to be actionable opinions.  *In*

*re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 569 (S.D.N.Y. 2007) (quoting *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004).

Here, the statements on liquidity and the acquisition plan were both too specific to be opinions and could not reasonably be believed, and ultimately are disputed by facts alleged in the Complaint. They are sufficiently alleged, and are actionable. *See, e.g., Vivendi*, 381 F. Supp. 2d at 181 (post-class period reports that "confirm what a defendant should have known during the class period" with respect to the company's liquidity crisis sufficiently alleged falsity).

The requirement that an opinion not be sincerely held when made "essentially collapses into the scienter requirement." *DRDGOLD*, 472 F. Supp. 2d at 569. As one court in this district has explained, "Essentially, proving the falsity of the statement 'I believe this investment is sound' is the same as proving scienter." *Podany*, 318 F. Supp. 2d at 154; *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004) (a complaint has met the requirements for pleading falsity when it has sufficiently alleged scienter).

As discussed in more detail below (*see infra* Part III.B.2.), the Complaint sufficiently alleges a strong inference of scienter dating to the beginning of the scheme, and therefore sufficiently alleges falsity with respect to the so-called opinions. *See QLT*, 312 F. Supp. 2d at 533. With regard to Mr. D'Loren, for example, the Complaint notes his positions and involvement with all the operations of the Company, and that he stood to receive millions of dollars as additional consideration for sales of his UCC stock as a result of the merger involving NexCen's predecessor. ¶ 7. Plaintiff alleges that a motivation to obtain this bonus payout led D'Loren to push an unsustainable rapid-growth strategy on the Company in order to ramp up its stock price and EBITDA, ¶ 7, and most certainly to not miss the benchmarks for his additional payout, despite what this might do to the Company. This was only further fueled by the failings

of Mr. D'Loren and other NexCen executives in knowledge and understanding of franchise

businesses and management. ¶ 56. As a result, their statements about the sustainability of the

Company's plans lacked a reasonable basis when made and could not be genuinely believed by

Defendants. ¶ 174(a).

By September, 2007, when NexCen's Board of Directors approved the $27.2 million

payout to Mr. D'Loren and others (¶¶ 7, 77), the falsity of the statements about the sustainability

of the Company's plan was becoming clear within the Company, as employees recognized that

NexCen's business was not sustainable and repeatedly warned Messrs. D'Loren and Meister

about the problems. These facts support Plaintiff's allegations of falsity. *See In re Moody's*

*Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y. 2009) (falsity sufficiently alleged when

employees posed questions raising doubt about the accuracy of the alleged misrepresentations).

Specifically, the unsustainability of the scheme, and thus the lack of a reasonable basis for the

statements concerning its sustainability, was clearly seen in the following:

- CW3 stated that the Company was "dying for cash" at the end of 2007 (¶ 90);[5]

---

[5]    The Second Circuit has held that plaintiffs may rely on confidential witnesses "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also Campo*, 635 F. Supp. 2d at 329-30; *PXRE*, 600 F. Supp. 2d at 526; *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533 (WHP), 2008 U.S. Dist. LEXIS 74372, at *19 (S.D.N.Y. Sept. 26, 2008). The Complaint describes the confidential witnesses with the requisite particularity and shows how strong their standing within the Company was, bolstering the strength of the Complaint:  (1)  CW1 served as director of business-to-business transactions in NexCen Franchise Management, Inc. ("NexCen Franchise") from September 2007 through June 2008 and participated in weekly executive meetings with D'Loren and Meister; ¶ 29; (2) CW2 served as Vice President, General Merchandising Manager of The Athlete's Foot from November 2006 through June 2008 and participated in certain of the weekly executive meetings; ¶ 29; (3) CW3 worked in accounts receivable at NexCen Franchise from December 2007 through July 2008 and reported to the CFO of NexCen Franchise; ¶ 29; (4) CW4 served as a senior financial analyst in mergers and acquisitions from July 2006 through August 2008; in December 2007, CW4 assumed additional functions including cash flow and credit facility analysis – the exact issues at the core of the Complaint; ¶ 29; (5) CW5 worked in accounts receivable  from February through March 2008; ¶ 29; (6) CW6 was a financial analyst from July 2007 through July 2008; ¶ 29; and (7) CW7 served as CFO of NexCen Franchise from June 2007 through June 2008 and reported directly to Mr. Meister.  ¶ 29.  Mr. Meister cites only to a discredited case from another circuit to suggest that the testimony of confidential witnesses should be discounted at the pleadings stage.  *See* Meister Mem. at 12 (citing *Higginbotham v. Baxter Int'l., Inc.*, 495 F.3d 753, 757 (7th Cir. 2007); *see also, e.g.*, *PXRE*, 600 F. Supp. 2d at 526 n.18 (declining to follow *Higginbotham*); *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F.

- CW1 stated that the Company did not have accurate cash flow reporting, and by December 2007, the Company did not have enough money to make payroll (¶ 90, 94);

- According to CW3 and CW5, in the Fall of 2007, NexCen was unable to identify all of the Marble Slab restaurants it owned (¶ 91);

- CW3 determined that NexCen had failed to collect over $13 million in franchise fees from Marble Slab and Maggie Moo's (¶ 93);

- CW7 reported that approximately 30% of Marble Slab and Athlete's Foot franchises were delinquent in paying their franchise fees (¶ 96); and

- In the midst of this cash crisis, the Company borrowed an additional $19 million from the Credit Facility, with no relationship to any acquisitions, and no explanation to investors of the reason for the draw.  (¶¶ 81-82).

Thus, ample facts are alleged to show that the Company's statements were false when made and that Defendants had no reasonable basis to believe that they were true, or could not genuinely believe their statements about the Company, its plans and its results.[6]

NexCen also argues (using its own hindsight) that the fact that the Company has continued to do business demonstrates that it accurately predicted that it had sufficient liquidity to remain in operation and therefore the 2007 statements concerning liquidity are inactionable. NexCen Mem at 18-20.  In support of this argument, NexCen relies on *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678 (S.D.N.Y. 2008), but ignores the complete contents of the statements and the notable distinctions between this case and the facts in *Ultrafem*.  There, the company

---

Supp. 2d 464, 474 (S.D.N.Y. 2008) (same); *Makor Issues and Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711-712 (7th Cir. 2008) (limiting *Higginbotham's* holding to the facts of that case and crediting confidential witnesses "who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify.").

      Citations to "Meister Mem." refer to Defendant David B. Meister's Memorandum of Law in Support of His Motion to Dismiss the Consolidated Amended Class Action Complaint, filed on October 8, 2009, Dkt. No. 89.

[6/]     Defendants' contention that the truth of these statements is supported by the Company's balance sheet is unpersuasive.  *See* Meister Mem. at 11, n.6.  The Company's cash on hand had decreased from $84 million at the end of 2006 (¶ 40) to $46 million at the end of 2007 (¶ 117), and only $19 million on March 14, 2008 (¶ 10) while its operating expenses had increased from $10.4 million at the end of 2006 to $32.6 million in 2007 (¶ 99).  Thus, the fact the Company had cash on hand at the end of 2007 does not necessarily mean that the cash on hand was sufficient to support continuing operations, let alone acquire additional companies.

simply stated that an initial offering would provide sufficient working capital for twelve months. *Id.* at 700.  The court found that the company's working capital lasted for fifteen months after the initial offering, and therefore that the statements were true.  *Id.*  NexCen's representations about the sufficiency of the Company's liquidity were more detailed – indicating that it had sufficient "cash on hand and available borrowings" to support both "current operations and planned business growth" for the next twelve months – and all proved to be false.  ¶¶ 48, 58, 83.  Indeed, the mere fact of the Amendment to the Credit Facility – the fact that the Company needed the Amended Facility and its increase in borrowings – demonstrates the falsity of NexCen's statements that cash on hand and available borrowings were sufficient for its acquisitions and operations.  Additionally, NexCen was unable to support its "current operations," and in fact was able to survive only by laying off large numbers of people, including 25% of its New York workforce and 8% of its Norcross, Georgia workforce (¶¶ 136, 137); selling several of its brands (¶¶ 146, 147), and renegotiating the terms of the Credit Facility multiple times (¶¶ 144, 147, 148, 149), all of which demonstrate that the cash on hand and available borrowings simply were not sufficient to maintain operations and engage in the expansion plan.

The 2008 statements also are specifically alleged (and shown) to be false.  First, the Complaint alleges that the Company's statements about its acquisition plan and the sufficiency of cash on hand were false because "the Company expected to face a cash shortage in the summer of 2008 of $7-10 million".  ¶ 175(b).  Additionally, the Complaint alleges: "The Company failed to disclose that there was a significant doubt regarding the Company's ability to continue as a going concern."  ¶ 175(c).  Notably, with respect to the 2008 statements about the sustainability of its operations, the Company *admitted* falsity in its restatement of financial statements, on August 11, 2009 (the "Restatement") when it stated, "We have concluded that

18

there was a substantial doubt about our ability to continue as a going concern as of December 31, 2007." ¶ 150, Martin Decl. Ex. J at i.

### b.     Defendants' Statements Are Not Puffery

Defendants also argue that the challenged statements are only puffery. NexCen Mem. at 23-25. However, when statements of a company's intent are specific or imply certainty, they are not considered to be puffery. *Moody's*, 599 F. Supp. 2d at 509. Indeed, representations about the viability of an undertaking are "too specific to be considered mere puffery." *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301-02 (S.D.N.Y. 2009). Additionally, when existing facts contradict optimistic statements, those statements are actionable. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" or "under control" were actionable). The opinion in *Vivendi Universal, S.A. Securities Litigation* is instructive on this point: there, the defendant painted a "rosy picture" of its finances, and assured investors that it was "confident of its capacity to meet its anticipated obligations over the next 12 months." 381 F. Supp. 2d at 180, 181. In contrast to these representations, the company was actually facing a liquidity crisis, of which the CEO and CFO were aware. *Id.* at 180. The court found the company's statements about its "very strong position" and the sufficiency of its cash to sustain operations for twelve months to be actionable. *Id.* at 182.

NexCen's statements about the Company's cash flow and acquisition plans were not vague or amorphous, or simply optimistic statements about possible growth; they were specific and spoke of the Company's balance sheet and business plan, and how they would allow the Company to proceed in the future. Indeed, they were very similar to those in *Vivendi*. As noted above, Plaintiff has alleged that the Company's statements through the Class Period were oft-repeated statements on the number of acquisitions the Company was going to make and the dollar amount. ¶¶ 47, 62, 64, 75, 111, 112, 116. Statements about the Credit Facility, likewise,

were not general statements of optimism, but specific factual statements about the central role the Credit Facility played in the Company's business plan.  ¶¶ 44, 66 75, 78 ("enabling our company" and "will continue to give us the ability to grow and execute…"). The misleading statements about the sustainability of the Company's plan were bolstered by its discussions of the alleged benefits of the business model, which supposedly transferred the financial risks to third parties.  ¶ 46 ("We believe that this business model mitigates – or transfers to third parties – the risks related to working capital"); ¶ 115 ("This model does not require us to incur substantial operating or capital costs in running our business.").  The sustainability of the Company's plan was further misrepresented in the Company's repeated statements that it had sufficient liquidity – in the form of cash on hand and available borrowing under the Credit Facility – to "meet current operations and planned business growth for at least the next twelve months."  ¶¶ 48, 58, 83; see also ¶ 117 (the Company stated it had sufficient liquidity "to meet the expenses of operations, including our debt service obligations, for at least the next twelve months.").  Such statements are not puffery, and in all events the facts belying them are alleged in the Complaint.[7]

---

[7]     NexCen cites to a string of cases as support for its contention that the statements at issue are puffery. NexCen Mem. at 23-25.  However, the statements discussed in those cases all contained vague, nonspecific statements of optimism, unlike the statements at issue here, which contained specific targets – three to five acquisitions per year with values of $50 million (¶¶ 47, 62, 64, 75, 111, 112, 116) – and represented the Credit Facility as the mechanism by which that plan would be met (¶¶ 44, 66, 75, 78). *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements that company was "highly disciplined" and had a reputation for "integrity" were inactionable); *Nadoff v. Duane Reade, Inc.*, 107 Fed. Appx. 250, 252, No. 03-9352, 2004 WL 1842801 (2d Cir. Aug. 17, 2004) (finding statements inactionable when not stated as guarantees and accompanied by adequate cautionary language); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that the company was "optimistic" and expected to "perform well" were not actionable); *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 274 (S.D.N.Y. 2009) (statements that the company would "maximize production" were inactionable); *Harborview Master Fund, LP v. LightPath Techs.*, 601 F. Supp. 2d 537, 549 (S.D.N.Y. 2009) (stating that general announcements expressing optimism are inactionable, and noting that the announcements in that case had factual support); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (statements that the company was "pleased," "excited," and seeing "signs of improvement" were inacationable); *In re Sierra Wireless, Inc., Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) (statements that company was "strong" and "healthy" were too vague to be actionable); *IAC/InterActiveCorp*, 478 F. Supp. 2d at 594 (statements that the quarter was "strong" and that the company was investing "aggressively" were not actionable); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 286 (S.D.N.Y. 2006) (statements that company was "excited" and "extremely encouraged" about "widespread adoption" of "innovative solutions" were too vague to be actionable); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 599

c.    **The Internal Controls Statements Were False and Misleading**

Defendants contend that the Complaint fails to allege the falsity of the Company's statements on its internal controls, but overlook the paragraphs containing those allegations and the numerous facts supporting them. NexCen Mem. at 21-23, 43-44; Meister Mem. at 12-14. Such statements regarding internal controls are actionable when sufficient factual allegations support them. *See Varghese v. China Shenghuo Pharm. Holdings*, --- F. Supp. 2d ---, No. 1:08-cv-07422-VM, 2009 WL 4668579 at *6 (S.D.N.Y. Dec. 9, 2009) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

The Complaint specifically alleges that the Company "had material weaknesses that caused its internal control over financial reporting to be ineffective." ¶¶ 174(c), 175(d). Additionally, Defendants D'Loren and Meister signed Sarbanes Oxley ("SOX") certifications stating that they had designed or caused to be designed controls over dislosures and financial reporting so that NexCen's financial reports were reasonably accurate in accordance with GAAP, and that they had disclosed all material deficiencies and weaknesses in the design or operation of internal controls over financial reporting. ¶¶ 52, 61, 70, 86.[8] Factual support for these allegations is also provided in the Complaint's reports from the Confidential Witnesses, including:

---

(W.D. Pa. 2006) (statements about the company's "excellent reputation" and "broad and sophisticated skill base" were inactionable); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004) (puffery included statements that the company was "proud" of its performance, but the court noted that the statements became actionable at the point where the complaint alleged that defendants had knowledge that the statements were contrary to the company's actual situation); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 559 (S.D.N.Y. 2004) (statements that a product was "potentially" one of the most important advances in cancer treatment and that the company would be "surprised" if the FDA did not approve it were not actionable); *Fitzer v. Sec. Dynamics Techs, Inc.*, 119 F. Supp. 2d 12, 24 (D. Mass. 2000) (statement about "continued market demand" without specific figures was too vague to be actionable).

[8]    Materially false and misleading SOX certifications are actionable. *See, e.g.*, *Roth v. OfficeMax Inc.*, 527 F. Supp. 2d 791, 798 (N.D. Ill. 2007) ("[T]he Sarbanes-Oxley certifications stating that the Company had no internal control problems may be actionable."); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1158-59 (W.D. Wa. 2006) (finding liability for false statements in SOX certifications).

21

- The Company could not identify how many franchised stores it owned, as explained by CW3, who was told "we've owned Marble Slab for a year and I don't know how many restaurants we have," and supported by CW5, who stated that in the year following the acquisition of Marble Slab, accountants were "finding stores that were not on [the Company's] ledger." (¶ 91);

- Franchisees were withholding significant payments because the Company was not providing sufficient support (¶ 95);

- Approximately 30% of franchises were behind on paying their franchise fees (¶ 96);

- The Company's management did not understand the franchise business, and according to CW1 had "no handle on any of its brands" (¶ 94);

- Senior management was made aware of accounting problems during weekly meetings, but failed to disclose these problems (¶¶ 92-93);

- Despite knowing about the Company's accounting problems, Defendant Meister refused to allow any action to ameliorate them (¶ 101);

- Defendant D'Loren refused to allow any employees other than himself to communicate information about the finances, specifically cash flow, to the Board of Directors. (¶ 102).

With respect to the 2008 internal controls statements and SOX certifications, the falsity of the Company's representations is even clearer, as the Restatement contained an *admission* that the Company had not disclosed all of its internal control weaknesses in its original 2007 Form 10-K. ¶ 175(d)(ii). Specifically, the Restatement announced that "we have identified *additional reasons* why our disclosure controls and procedures were not effective as of December 31, 2007." *Id.* (emphasis added).

The explicit announcement of additional weaknesses in the Restatement belies Defendants' arguments that the internal control disclosure statements are not actionable because they had already been disclosed (NexCen Mem. at 43, Meister Mem. at 13-14).[9] Defendants' contention that internal control weaknesses were previously disclosed in the 2006 Form 10-K

---

[9]       NexCen admits this even in its Memorandum on this motion, noting that the internal investigation "uncovered additional control weaknesses, not initially included in the form 2007 10-K." NexCen Mem. at 44, n.32.

and 2007 Form 10-K misses the mark because the weaknesses reported in those Forms 10-K were not the same as those announced in the Restatement.  Specifically, the weaknesses Mr. Meister cites in the 2006 Form 10-K refer to potential disclosure control weaknesses at the businesses NexCen acquired, not at NexCen itself.  Meister Mem. at 13, Martin Decl. Ex. R at 13.[10]

Thus, Defendants D'Loren and Meister acted knowingly or were severely reckless in certifying the SOX statements and the Defendants acted knowingly or was severely reckless in issuing the Company's internal controls statements because they knew, or were reckless in not knowing, the falsity of the statements about internal disclosure controls and financial reports. *See infra* Part II.B.2.[11]

### d.     Defendants' Presentations of EBITDA Were Misleading

Defendants argue that EBITDA calculations presented in press releases were accurate and therefore are not actionable.  NexCen Mem. at 16-17.  In the Second Circuit, however, "some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).  Here, as the Complaint alleges, it was not the *accuracy* of the calculations that was misleading, but the *context and manner* in which the calculations were

---

[10]     Mr. Meister's argument that the internal control weaknesses were immaterial confuses the materiality of the size of financial adjustments contained in the Restatement with the materiality of the internal control weaknesses. *See* Meister Mem. at 14, *see also* NexCen Mem. at 16.  In fact, the Company admitted in the Restatement that the failure to contain all material information in the initial 2007 Form 10-K was due to "material weaknesses in our internal control over financial reporting as of December 31, 2007."  Martin Decl. Ex. J at 31.

[11]     Even if, *arguendo,* the SOX certifications were not themselves actionable, they are at a minimum indicative of scienter.  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (SOX certifications are probative of scienter when "'the person signing the certification was severely reckless in certifying the accuracy of the financial statements.'") (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).

presented that misled investors.  ¶ 73.  For example, the Company reported that EBITDA provides "a measure to demonstrate cash flow available for the payment of debt service."  ¶ 72. However, as the Complaint explains, EBITDA calculations ignore certain expenses that must be paid for a company to remain in business, such as taxes, interest, changes in working capital, and capital expenditures, making it a misleading indicator of the Company's cash flow.  ¶ 73. Indeed, *even the SEC chastised NexCen for this statement*, saying that it was "inappropriate" to present non-GAAP figures as measures of debt service capacity.  ¶ 74.  Consequently, even though the Company may have accurately calculated EBITDA, the accompanying statements that EBITDA was a fair measure of the Company's debt service capacity put those numbers in a context that was misleading, and therefore actionable under the securities laws.  *See McMahan*, 900 F.2d at 579.

### e.     Defendants Failed to State Facts They Had a Duty to Disclose

Omissions of material fact are actionable "when the corporation is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).  A corporation is under a duty to disclose "whenever secret information renders prior public statements materially misleading."  *Id.* at 268; *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).  In addition, "[o]nce defendants choose to speak about their company, they undertake a duty 'to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.'"  *Hall*, 580 F. Supp. 2d at 226 (quoting *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990)); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, (S.D.N.Y. 2008) (when a corporation makes a disclosure, "there is a duty to make it complete and accurate." (internal quotation omitted)).  In evaluating whether there is a

duty to disclose, "the concepts of materiality and duty, though technically distinct, 'coalesce.'" *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 263 (S.D.N.Y. 2008).

Here, Defendants chose to speak about critical aspects of the Company's business, including its business prospects, the acquisition plan, liquity, access to financing, revenues and management capability. However, they did not reveal all the information they knew, or spoke in half-truths, thus making actionable omissions.

As only one example, the Defendants chose to discuss some (but certainly not all) of the terms of the Amended Credit Facility and to explain in what ways those terms differed from the original Credit Facility. ¶¶ 107, 108, 110, 118. The Company's previous discussions of the Credit Facility indicated that every loan taken had a pay-back term of five years. ¶¶ 4, 44. The Amended Credit Facility changed this, the cash payment timing and other terms. ¶¶ 125, 128. The absence of a discussion of the Accelerated Redemption Feature, coupled with the statement that the terms were "substantially the same", was clearly misleading with respect to the repayment and other terms of the Amendment, and NexCen was under a duty to disclose that information. *Hall*, 580 F. Supp. 2d at 226.[12] The Defendants' other failures to reveal facts, or to partially reveal only what they chose, constitute violations of Section 10(b).

> **f.    Defendants' Misstatements and Omissions Were Material to Investors**

Defendants claim that certain of their statements are not actionable because they are "immaterial." NexCen Mem. at 12, 33. They are wrong. A fact is material if there is "'substantial likelihood that a reasonable shareholder would have considered it important.'" *ECA*

---

[12]    NexCen suggests that the failure to disclose the complete terms of the Amendment was acceptable if Defendants believed that NexCen could make the payment under the Accelerated Redemption Feature. NexCen Mem. at 34. Whether NexCen believed it could make the payment is not relevant to whether the terms of the Amendment were material, and whether NexCen had a duty to disclose them. In all events, this requires a finding of fact that the Court should not make on these motions.

*and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988); *see also Time Warner Inc. Sec. Litig.,* 9 F.3d at 267-68 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Further, the Second Circuit considers both quantitative and qualitative factors to determine the materiality of a statement pursuant to the SEC's guidance in Staff Accounting Bulletin ("SAB") No. 99. *JP Morgan Chase*, 553 F.3d at 197. The evaluation of qualitative factors is "intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large." *Id.* at 205 (citing *Ganino v. Citizens Utility Co.*, 228 F.3d 154, 163 (2d Cir. 2000)). One of the qualitative factors used to determine the materiality of a statement is the "significance of the misstatement in relation to the company's operations." *Id.* at 198.

Thus, contrary to the Company's groundless assertion – and its self-serving assessment that its Restatement of its 2007 financial statements was too few dollars to be material – the statements on and announcements of NexCen's finances were material to the public investors. Defendants' claim that the size of the Restatement – the *quantity* of the amount – insulates them from liability for the financial statements that they later restated (NexCen Mem. at 15) completely ignores the *qualitative* test of the Second Circuit.

Similarly, the misrepresentations and omissions about the terms of the Amendment to the Credit Facility was highly significant in relation to NexCen's operations. The BTMU Credit Facility was the primary vehicle through which NexCen financed its central mission of acquiring additional companies and brands, and was the only credit used by NexCen when making acquisitions. The 2008 Amendment was made in order to finance NexCen's largest acquisition, making the Credit Facility and its Amendment critical to NexCen's corporate functions. *See*

¶¶ 44, 66, 104, 105. There could not be a more important subject on which the Company was required to report. It was central, and therefore material. Yet, the Company did not provide truthful, or full, information on it.

That reasonable investors believed all of this information (and the other facts alleged in the Complaint) were material is buttressed by the market reaction to the disclosure. The Complaint, for example, causally links the large stock drop and trading volume to the May 19, 2008 announcement. ¶¶ 13, 132. *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997); *cf McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 230 (2d Cir. 2008) (disclosures related to cigarettes should cause prices to drop if they are material). Thus, materiality is alleged and shown under the applicable standards.[13]

> ### g. Defendants' Statements Are Not Protected By the Reform Act's Safe Harbor Provision

Preliminarily, even assuming *arguendo* that some of the alleged misstatements in the Complaint are forward-looking (they are not), the PSLRA safe harbor for forward-looking statements does not apply to forward-looking statements (with or without cautionary statements), "included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C § 78u-5(b)(2)(A); *see In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008) ("Thus, to the extent that any challenged statements were made in Forms 8-K or 10-K filed with the SEC, the safe harbor does not apply.") (citations omitted); *In*

---

[13] In all events, materiality is a mixed question of law and fact that is ordinarily left for the trier of fact to determine. *See, e.g.*, *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008) (standard for dismissal on grounds of materiality is high). The Court should reject Defendants' assertions regarding the materiality of their misstatements to investors and leave that question to the ultimate trier of fact.

*re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) ("Indeed, because several of defendants' challenged statements were contained in Veeco's 10-Qs and other SEC filings, they fall outside the scope of the safe harbor provision."). Thus, even if the misstatements alleged in NexCen's SEC filings (¶¶ 58, 59, 83 on Form 10-Qs; ¶¶ 46, 47, 48, 115, 116, 117 on Form 10-Ks; and ¶¶ 44, 62, 66, 78, 79, 112 on Form 8-Ks) are forward-looking, the safe harbor provision does not apply to them.

Further, the PSLRA provides a safe harbor for certain statements only if they are forward-looking and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232 (S.D.N.Y. 2009). Forward-looking statements also are not protected by the safe harbor provision when defendants "'had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality.'" *Hall*, 580 F. Supp. 2d at 226 (quoting *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003)). In this case, any forward-looking statements were not accompanied by meaningful cautionary language and lacked a reasonable basis when made.

### (1)    The Challenged Statements Are Not Forward-Looking Statements and Thus Are Not Protected

As an initial matter, the challenged statements must be forward-looking statements in order to qualify for the protection of the safe harbor provision, which does not apply to misrepresentations of present or historical fact. *See IAC/InterActiveCorp.*, 478 F. Supp. 2d at 586. When a statement contains present and historical facts as well as future predictions, it is not protected by the PSLRA's safe harbor provision. *Schottenfeld Qualified Assoc. v. Workstream, Inc.*, No. 05-CV-7092, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006). As one court has

noted, "It is well recognized that when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004) (internal quotations omitted). Specifically, statements that contain a representation of the company's "existing financial condition" are not forward-looking statements. *Id.* at 223.

Here, many of the statements that Defendants contend are forward-looking statements contain representations of NexCen's existing financial condition, and therefore are not protected by the safe harbor provision. *See id.* at 222-23. The statements that Defendants contend are forward-looking discussed three main subjects: (1) NexCen's internal controls; (2) the sufficiency of available cash to sustain operations; and (3) plans to acquire three to five business per year. *See* Meister Mem. at 18 (identifying the statements contained in ¶¶ 174(a) & (c); 175(b) & (d) as forward-looking). However, the statements identified in ¶¶ 174(c) & 175(d) concerning the Company's internal controls specifically reference past actions that the Company (purportedly) had taken to establish and maintain adequate internal controls. ¶¶ 51, 52, 59, 61, 68, 70, 84, 86, 120, 122. These historical statements are not forward-looking statements. *See IAC/InterActiveCorp.*, 478 F. Supp. 2d at 586.[14]

The statements identified in ¶¶ 174(a) & 175(c) concerning the sufficiency of NexCen's access to cash to sustain operations also do not qualify for safe harbor protection because they encompass present facts concerning the Company's existing financial condition. *See AOL Time Warner*, 381 F. Supp. 2d at 222-23. Specifically, the statements are based on existing facts about the amount of cash on hand and the amount available for borrowing under the Credit Facility, as

---

[14]/    For the same reasons, the judicially-created bespeaks caution doctrine does not apply. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008) (bespeaks caution doctrine does not apply to "misrepresentations or omissions of present or historical fact.").

well as the costs of current operations.  ¶¶ 48, 58, 83, 117.  These facts represent the Company's "existing financial condition" and are "not contingent on future events."  *AOL Time Warner*, 381 F. Supp. 2d at 223.  Therefore, they are not protected by the safe harbor provision of the PSLRA.  *See id.*

Finally, the Company's statements about its plans to acquire three to five businesses a year combine current facts with projections, and therefore do not qualify for the safe harbor.  *See id.*  For example, the 2006 Form 10-K, filed on March 16, 2007, couples its statement that the Company planned to acquire three to five business a year with the statement:  "Since June, 2006, we have acquired four IP-centric companies.  We have also been (and expect to continue to be) in active discussion with other potential acquisition candidates."  ¶ 47.  Likewise, during a conference call on January 30, 2008, D'Loren stated, "We're on plan.  The plan for NexCen has been three to five acquisitions per year."  ¶ 111.  These statements reflect not only NexCen's plans for the future, but indicate the Company's purported past and current progress on that plan, therefore containing statements of present fact, and disqualifying the statements for protection under the safe harbor provision.  *See AOL Time Warner*, 381 F. Supp. 2d at 222-23.

### (2)    Defendants' Purported Warnings Were Vague, Meaningless, and Irrelevant

The purportedly "cautionary" language to which Mr. Meister points (Meister Mem. at 18) fails to insulate Defendants from liability for their misstatements and omissions for two reasons: the boilerplate language is so vague as to be meaningless, and the language does not warn of the undisclosed risks that brought about the losses.  Finally, any cautionary language was not meaningful because the risks were already occurring.  The PSLRA does not protect defendants whose warnings to the investing public were generic and irrelevant.

The purpose of the Exchange Act was "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972). Thus, when cautionary language is included with public statements, courts evaluate the materials in their entirety to determine whether a reasonable investor would have been misled. *Halperin v. eBanker USA.com Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor." *Id.*

The cautionary language included in NexCen's financial statements is so vague as to be no better than *caveat emptor*. For example, the cautionary language includes the following:

- "we may not be successful in implanting the our new IP strategy (*sic*)." Martin Decl. Ex. T at 22;

- "we will be subject to risks associated with incurring indebtedness . . and these could have a negative impact on our business and results." Martin Decl. Ex. T at 22;

- "we may encounter unanticipated difficulties or challenges as we work to implement our new business strategy." Martin Decl. Ex. R at 9;

- "the trading price of our common stock could change significantly over short periods of time in response to actual or anticipated variations in our quarterly operating results, announcements by us or by third parties on whom we rely or against whom we compete, factors affecting the markets in which we do business or changes in national or regional economic conditions." Martin Decl. Ex. R at 9.

Each of these statements could generally apply to nearly any company. To be effective, risk factor disclosures must be described with particularity and meaning so as to truly apprise investors of the risks. *See eBanker USA.com Inc.*, 295 F.3d at 359. Generic risk factors such as the ones here are useless to investors and unacceptable as a defense under the securities laws.

Second, these warnings do not expressly warn of, or relate to, the risk that brought about the losses in this case. Cautionary language is not sufficient if it "did not expressly warn of or

did not directly relate to the risk that brought about plaintiffs' loss." *Id.*; *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 728-29 (2d Cir. 1998); *NovaGold*, 629 F. Supp. 2d at 291; *Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 265.[15]  The risks that should have been disclosed, but were not, included (i) the Company's executives would knowingly or recklessly engage in an unsustainable course of business while misleading investors about its sustainability, and (ii) that the Company's internal disclosure controls would be insufficient to ensure that the conduct of management was adequately disclosed to the Board and investors.  Thus, the cautionary language does not qualify the misrepresentations for the safe harbor protections of the PSLRA.  *See Heller*, 590 F. Supp. 2d at 618 (holding that cautionary language that does not address the specific content of the fraudulent misrepresentations does not qualify the statements for safe harbor protection).

Furthermore, even assuming, *arguendo*, that the cautionary language did relate to the risks faced by the Company, the cautionary language was not meaningful because those risks were already occurring.  *In re ECVI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006) (cautionary statements were not meaningful when "the risk factors were not merely hypothetical (i.e., they 'could' happen), but were in fact happening"); *see also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only for the unfavorable events to happen when they have already happened is deceit.").  In this case, although the Company continued to reassure investors that it was operating successfully, NexCen was actually not successful in implanting its business strategy (*see, e.g.*, ¶¶ 89-103), which was known to its management and Defendants (¶¶ 90, 93, 101).  Any cautionary language

---

[15/]    Here, too, the bespeaks caution doctrine does not apply because it also requires accompanying meaningful cautionary language.  *Heller*, 590 F. Supp. 2d at 618.

warning that these risks *could* occur was, therefore, deceit, because they were, in fact, happening. *See ECVI*, 469 F. Supp. 2d at 102.

### (3)    Defendants Had No Reasonable Basis for the Challenged Statements When They Made Them

Even assuming, *arguendo*, the cautionary language is sufficient in a particular circumstance, "'no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.'" *AOL Time Warner*, 381 F. Supp. 2d at 223 (quoting *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999)). In other words, cautionary language does not shield from liability "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Prudential Secs. Inc.*, 930 F. Supp. at 72.

As described above (*supra* Part III.B.1.a.), the Complaint specifically, and sufficiently, alleges Defendants' knowledge that there was no reasonable basis for their statements about acquiring additional companies and the sufficiency of access to cash due to, among other things, their knowledge of or reckless disregard for increasing operating expenses and insufficient franchisee revenue. ¶ 174(a). Mr. D'Loren's motive to receive the many millions of dollars from the payout is also set forth, as are its results and effects on the Company. ¶¶ 7, 77. The fact that management did not have the knowledge or talent to run the Company are set forth, ¶ 56, as is the fact that Defendants D'Loren and Meister had reason to understand the accounting issues since each is a CPA. ¶¶ 23, 24. As a result, Defendants knew that their statements about the sustainability of the Company's plans had no basis in truth when made. ¶ 174.

When Mr. D'Loren and his colleagues received the extra payout in September 2007 (¶¶ 7, 77), the falsity of the statements about the sustainability of the Company's plan was clear, as

employees recognized that problems existed at all levels and on several subjects and that the

Company's business was not sustainable.  They repeatedly warned Defendants D'Loren and

Meister about the problems, as seen in the multiple statements of confidential witnesses who

worked for NexCen at the time.  ¶¶ 90, 91, 93, 94, 96.

The 2008 statements also lacked a reasonable basis, since the Company admitted that

"there was substantial doubt about our ability to continue as a going concern as of December 31,

2007."  Martin Decl. Ex. J at i.  Even without taking the Amendment to the Credit Facility into

consideration, the Company later announced that it expected to face a cash shortage of $7-10

million in the Summer of 2008 (¶ 175(b)), demonstrating that the basis for statements about the

Company's sustainability and available liquidity were faulty.

### 2. THE COMPLAINT ADEQUATELY ALLEGES THAT THE DEFENDANTS ACTED WITH SCIENTER

#### a. The Requirements for Pleading Scienter

Under the PSLRA, a complaint alleging violations of Section 10(b) of the Exchange Act

must state "facts giving rise to a strong inference that the defendant acted with the required state

of mind."  15 U.S.C. § 78u-4(b)(2).  In *Tellabs*, the Supreme Court made clear that scienter is

sufficiently pled where the inference of fraud is *equally as likely* as any non-culpable

justification for a defendant's alleged conduct.  551 U.S. at 328 n.5.  The Supreme Court held

that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the

smoking-gun genre, or even the most plausible of competing inferences."  *Id.* at 324 (rejecting

the Sixth Circuit standard)); *see also In re Amaranth Natural Gas Commodities Litig.*, 587 F.

Supp. 2d 513, 543 n.199 (S.D.N.Y. 2008) ("in close cases, ties go to the plaintiff").  The

Supreme Court further explained that "the court's job is not to scrutinize each allegation in

isolation but to assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326; *see also In re*

*Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 166 (S.D.N.Y. 2008) ("a court should

examine all of the facts alleged collectively or 'holistically' (without parsing individual

allegations)").  Specifically, a court should ask, "[w]hen the allegations are accepted as true and

taken collectively, would a reasonable person deem the inference of scienter at least as strong as

any opposing inference?"  *Id.*

Scienter may be established by showing either that defendants had motive and

opportunity to commit the fraud or through "strong circumstantial evidence of conscious

misbehavior or recklessness."  *JP Morgan Chase Co.*, 553 F.3d at 198 (citing *Ganino*, 228 F.3d

at 168-69; *Novak*, 216 F.3d at 307)).  Circumstantial evidence supporting a "strong inference" of

scienter can be demonstrated by alleging facts showing recklessness, which is "conduct which is

highly unreasonable and which represents an extreme departure from the standards of ordinary

care to the extent that the danger was either known to the defendants or so obvious that the

defendants must have been aware of it."  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39

(2d Cir. 2000) (citation omitted).  Recklessness may also be alleged and shown when there was

"'[a]n egregious refusal to see the obvious, or to investigate the doubtful.'"  *NovaGold*, 629 F.

Supp. 2d at 298 (quoting *Novak*, 216 F.3d at 308).  A strong inference of scienter is created when

plaintiffs sufficiently allege that defendants "(1) benefitted in a concrete and personal way from

the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to

information suggesting that their public statements were not accurate; or (4) failed to check

information they had a duty to monitor."  *JP Morgan Chase Co.*, 553 F.3d at 199 (internal

quotation marks omitted).  This standard is clearly met where plaintiffs allege that defendants

"knew facts or had access to information suggesting that their public statements were not

accurate" or "failed to check information they had a duty to monitor." *Coronel v. Quanta Capital*

*Holdings Ltd.*, No. 07 Civ. 1405, 2009 U.S. Dist. LEXIS 6633, at **73-74 (S.D.N.Y. Jan. 23,

2009) (citing *Novak*, 216 F.3d at 311); *accord Veeco*, 235 F.R.D. at 232 (holding that scienter is

adequately pled where facts are alleged that defendants knew of or recklessly ignored a series of

accounting improprieties).

      Here, the Complaint satisfies these standards for alleging scienter because Plaintiff has

alleged and shown a basis for motive and opportunity on the part of Messrs. D'Loren and Oros,

knowledge or recklessness on the part of all Defendants in claiming that the Company could

continue acquiring additional brands and sustaining its operations while the Company was

actually facing a liquidity crisis, and knowledge or recklessness in misrepresenting facts about

the Amendment to the Credit Facility.  In each instance, Defendants had access to information

suggesting that their public statements were not accurate and/or failed to check information that

they had a duty to monitor.

        **b.**     **The Motive, Opportunity and Insider Trading Allegations**
                   **Give Rise to a Strong Inference of Scienter**

      The Complaint alleges facts creating a strong inference that Defendant D'Loren had

motive and opportunity to engage in securities fraud.  As noted, a strong inference of motive and

opportunity is created when defendants "'benefitted in some concrete and personal way'" from

the fraud.  *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307-08).  Mr.

D'Loren was motivated to perpetrate the fraud in order to earn the extra payout on the UCC

shares he sold when NexCen's predecessor acquired UCC, from which he benefitted in a

concrete and personal way.  ¶¶ 32, 33.  As the beneficial owner of over 80% of the UCC shares

transferred in its acquisition by the Company, D'Loren stood to gain most of the $10 million in

cash and 2.5 million shares of NexCen stock when the Company reached performance targets;

this resulted in a total payout worth over $21.5 million on September 5, 2007.  ¶ 77.  In order to

reach the performance targets required to get the payout, NexCen had to sustain a trading price over $10 a day for a specified time period and have an EBITDA of at least $2.5 million for a quarter. ¶ 71. This extra payout was completely additional consideration for the shares he sold as part of the Company's acquisition of UCC, and was entirely distinct from D'Loren's compensation as an executive, and therefore is unique. ¶ 182. In sum, Mr. D'Loren reaped over $8 million in cash and $13.75 million in stock from the "success" of NexCen's unsustainable scheme during the Class Period.

A corporate insider's motive to inflate stock prices for compensation of this magnitude under circumstances that are unique to that defendant are sufficient to allege motive. *Horizon Asset Mgmt., Inc. v. H & R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009) (scienter is sufficiently alleged when a complaint alleges a benefit to an individual defendant that is "unusual"); *In re Duane Reade, Inc. Sec. Litig.*, No. 02 CIV 6478 NRB, 2003 WL 22801416, at *8 (S.D.N.Y. Nov. 25, 2003) ("The benefit alleged must be one that will accrue to the individual defendants."). The additional consideration for the sale of his UCC shares provides a motive for D'Loren that is sufficiently unique, because it is not possessed generally by corporate insiders. *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (motive must provide a "specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders.").[16] As noted, the bonus payout was not part of D'Loren's executive compensation, but was additional consideration for the merger shares ¶¶ 32, 33, 71, 77.[17] As

---

[16]    The cases Defendants cite for their contention that the consideration for his UCC shares is not sufficient basis for scienter are inapposite to Mr. D'Loren's unique motive, as they address compensation and other motives that are "generally possessed by most corporate directors and officers." *Kalnit*, 264 F.3d at 140; *see also PXRE*, 600 F. Supp. 2d at 530 (motives generally possessed by corporate insiders are insufficient); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999) (executive compensation based on stock price insufficient to establish motive); *In re Am. Express Co. Secs. Litig.*, No. 02 Civ. 5533, 2008 U.S. Dist. LEXIS 74372, at *16 (S.D.N.Y. Sept. 26, 2008) (incentive-based executive compensation insufficient to allege motive).

[17]    Even if, *arguendo*, the bonus payout were considered to be part of his executive compensation, the Complaint sufficiently alleges motive because eligibility for bonuses in the form of stock options may be indicative

such, the motive to obtain the payout is not one possessed generally by corporate insiders, but is unique to D'Loren, and gives rise to a strong inference of scienter. *Horizon Asset Mgmt.*, 580 F.3d at 766 (holding that "unusual" bonuses may be indicative of scienter and noting that bonuses of $630,000 and $355,000 had been held large enough to create an inference of scienter); *Kalnit*, 264 F.3d at 140.

To determine when a unique motive is sufficient, courts look to see that "the alleged fraud is closely tied, logically and temporally, to the alleged motive." *Glickman v. Alexander & Alexander Servs.*, No. 93-CIV-7594, 1996 WL 88570, at *11 (S.D.N.Y. Feb. 29, 1996). Here, the fraudulent scheme concerning the sustainability of NexCen's business plan is closely tied, logically and temporally, to Mr. D'Loren's motive. The scheme began in Spring 2007, with the Credit Facility providing a primary mechanism for carrying it out (¶¶ 3, 4, 5), and continued at rampant pace through the point at which D'Loren obtained the UCC payout in September 2007. ¶ 77. At that point, although D'Loren's primary motive had been fulfilled, the Company continued to issue false statements about the sustainability of the plan despite indications that it was not sustainable. *See supra* Part III.B.1.a.

The opportunity element of motive and opportunity is clearly satisfied where, as here, the individual defendants are officers and directors of the corporate defendant. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris*, 75 F.3d 801, 813 (2d Cir. 1996) (finding opportunity existed for the chair of the board, CEO, CFO, chief operating officer, and chair of the executive committee because they

---

of scienter when the determination of an award of a bonus is based primarily on a company's financial performance. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 737-38 (S.D. Ohio 2006) (finding an inference of scienter where an executive's bonus was related to the defendant's financial condition); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (same). This is met here since, for Mr. D'Loren to obtain the bonus payout, NexCen had to meet specified financial benchmarks, including certain stock prices, providing him with motive to inflate the stock price.

"held the highest positions of power and authority within the company."); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) (courts assume that corporate officers have the opportunity to commit fraud); *PXRE*, 600 F. Supp. 2d at 529-30 (holding that the CEO, CFO, and chief operating officer had opportunity).

Insider trading also supports a strong inference of scienter when the stock sales are unusual or suspicious. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). To determine if trading is unusual, courts evaluate the trading pattern of the seller. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98 (2d Cir. 1999). Specifically, when an insider sells a large percentage of its stock, the sale is generally found to be suspicious. *Am. West Holding*, 320 F.3d at 939 (sales of 88-100% of shares probative of scienter); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (inference of scienter created when CEO sold 100% of his stock shortly before retiring and continuing to serve on the board of directors); *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 163 (D. Mass. 2001) (sales of 37%, 83%, and 100% of insiders' stocks creates inference of scienter); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (sales of 56-91% of shares probative of scienter); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, No. Civ. A 1:98-CV-99-MD, 1999 WL 33295037, at *9 (W.D. Ky. Aug. 16, 1999) (sales of 80-100% of shares probative of scienter). Furthermore, with regard to timing, an important factor is whether the sale was timed to maximize profit. *Greebel*, 194 F.3d at 206 (not finding scienter when sales were not made "at the high points of the stock price"). Contrary to Defendants' suggestion, the sale need not occur at the end of the Class Period for the timing to be suspicious, because "the statements that continued to be made after the sales that followed the earlier statements could well be probative of an intent to keep the stock price high in order to avoid detection of the

alleged fraud." *Stevelman v. Alias Research*, 174 F.3d 79, 86 (2d Cir. 1999).  Finally, courts

consider the amount of profit earned by the insider from class period sales.  *In re Worldcom, Inc.*

*Sec. Litig.*, 294 F. Supp. 2d 392, 412 (S.D.N.Y. 2003).  In this case, the Complaint adequately

alleges that sales by Mr. Oros were unusual because they constituted 100% of the stock owned

by NexGen Technologies, LLC, of which Oros was the managing member and were the only

sales of NexCen stock completed by NexGen in 2007, making them stand out from his pattern of

holding the stocks.  ¶ 191.  Additionally, the sales were timed to maximize profit, with the final

sales occurring on the final three days that NexCen's stock topped $13.00 per share, garnering

him more than $15 million in total profits.  ¶ 191.

　　　　With regard to Mr. Oros' argument that his sales are protected by a 10b5-1 plan (Oros

Mem. at 9),[18] the circumstances surrounding his 10b5-1 plan actually *contribute to* an inference

of scienter in this case, because the plan was created during the Class Period, on March 23, 2007

(Martin Decl. Ex. W), when Defendants had already begun their fraudulent scheme to inflate

stock prices.  *Central Laborers Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554

(5th Cir. 2007) (holding that 10b5-1 plans created during the class period contribute to an

inference of scienter); *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008)

(concluding that  creation of plan during the class period contributes to an inference of scienter);

*In re Biogen Idec, Inc. Sec. Litig.*, No. 05-10400-WGY, 2008 WL 4810045, at *14 (D. Mass.

Oct. 25, 2008) (refusing to make inferences in defendants' favor when 10b5-1 plans were created

during the class period).  Additionally, courts have concluded that even 10b5-1 plans created

outside of the class period do not necessarily negate an inference of scienter at the motion to

dismiss stage because the details cannot be admitted as evidence, and without the details, it is

---

[18/]　　　　Citations to "Oros Mem." refer to the Memorandum of Law on Behalf of David S. Oros and in Support of His Motion to Dismiss the Claims in the Consolidated Amended Class Action Complaint, filed on October 8, 2009, Dkt. No. 92.

impossible to determine "when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans." *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 92 (1st Cir. 2008); *see also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) (refusing to use 10b5-1 plans to negate scienter at the motion to dismiss phase "because issues of fact remain with regard to the trading plans").[19]

Defendants also argue that they bought the Company's stock during the Class Period and that this vitiates a showing of scienter. However, this argument fails because the vast majority of stock acquired during the Class Period was Mr. D'Loren's acquisition as a result of the extra consideration for his UCC shares. *See* Meister Mem. at 9; D'Loren Mem. at 3, 36; NexCen Mem. at 36.[20] Defendants' argument and supporting cases rest on the assumption that when insiders *pay for* stock during the class period, they stand to lose just as much as the class members when the price drops. *See Malin*, 499 F. Supp. 2d at 152 ("All of the defendants *purchased* stock" (emphasis added)); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 463 (S.D.N.Y. 2000) (noting that defendants lost a total of $27.8 million). However, in this case, Mr. D'Loren had already provided consideration for this acquisition, so he stood to gain from the acquisition even if the stock price dropped. ¶ 71. Additionally, the fact that the Company's stock was inflated at the time of the acquisition cannot negate scienter because D'Loren would

---

[19] The majority of cases cited by Defendants for the proposition that 10b5-1 plans negate an inference of scienter are inapposite because they either presume creation of the 10b5-1 plan before the start of the class period or are silent as to the timing of the creation of the 10b5-1 plan. *See Gildan Activewear*, 636 F. Supp. 2d at 272 (silent as to timing of creating of 10b5-1 plan); *Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (silent as to timing of creating of 10b5-1 plan); *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (explaining that trades pursuant to a 10b5-1 plan are not suspicious when they are "prescheduled"). The one case that is the exception is *IAC/InterActiveCorp*, 478 F. Supp. 2d at 604, which goes against the weight of other district court cases that find the creation of the 10b5-1 plan during the class period contributes to an inference of scienter, and in which the issue of the timing of the plan's creation was not raised or considered by the court. *See Integrated Elec. Servs.*, 497 F.3d at 554; *New Century*, 588 F. Supp. 2d at 1232; *Biogen*, 2008 WL 481005, at *14.

[20] Citations to "D'Loren Mem." refer to Defendant Robert W. D'Loren's Memorandum of Law in Support of His Motion to Dismiss the Consolidated Amended Class Action Complaint, filed Oct. 8, 2009, Dkt. No. 85.

only receive the shares after the price had been maintained at a sufficient level, requiring him to drive the price up in order to get any extra payout.  ¶ 71.[21]

### c.    The Complaint's Allegations of Recklessness Give Rise to a Strong Inference of Scienter

A strong inference of conscious misbehavior or recklessness is made when a complaint alleges that defendants had "knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308; *see also Goldman Sachs*, 506 F. Supp. 2d at 242 (finding recklessness sufficiently alleged when defendants "had access to information" that contradicted their public statements).  Specifically, when defendants ignore red flags about accounting issues, a strong inference of recklessness is created.  *In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("scienter may be found where there are specific allegations of various reasonably available facts, or red flags, that should have put the officers on notice" (internal quotations omitted); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (defendants' "ignorance of all of these 'red flags' present evidence of its fraudulent intent.").  Messrs. D'Loren's and Meister's knowledge about the Company's dire financial circumstances is established by their positions, their background, and by the testimony of the Confidential Witnesses, who described both the flow of information among the officers and the content of the information relayed to these Defendants, pointing out numerous red flags to them.  Specifically,

---

[21]    The Court should also discount Defendants' suggestion that acquisitions of NexCen stock by other insiders during the Class Period negate scienter because they are minor in comparison to the quantity of stock sold.  *See* Meister Mem. at 9, n.4; NexCen Mem. at 30; *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) (finding that "net acquisition" of shares negates an inference of scienter); *Fishbaum*, 1999 WL 568023, at * 3 ("inferences of scienter can be undermined when an insider's sales of stock are offset by *even larger* stock acquisitions during the relevant time period" (emphasis added).  Insiders sold a total of 1,454,699 shares (¶ 192), but only acquired a total of 153,000 shares (Meister Mem. at 9, n.4, Martin Decl. Ex. X-EE).  Likewise, Mr. Oros' purchase of 30,000 shares (Oros Mem. at 9, Martin Decl. Ex. Y, Z) is dwarfed by his sale of 1,209,699 shares (¶ 191).

the Confidential Witnesses stated that Defendants D'Loren and Meister participated in weekly

meetings with employees who were knowledgeable about the management of NexCen's

franchises (¶ 29); that Defendants Meister and D'Loren were made aware of over $13 million in

uncollected franchise fees during those weekly meetings (¶ 93); that Defendant Meister had been

told about inadequacies in the accounting staff (¶ 99); and that Defendants Meister and D'Loren

knew that the Company was facing a liquidity crisis in December 2007 (¶ 90).  These repeated

warnings are sufficient to give rise to a strong inference of recklessness.  *See Vivendi*, 381 F.

Supp. 2d at 185 (scienter was sufficiently alleged for CEO and CFO who knew of company's

liquidity crisis).

With respect to the 2008 Amendment to the Credit Facility, scienter is clearly alleged on

the part of Mr. Meister, who signed the agreement modifying the terms, and therefore had actual,

contemporaneous knowledge of facts that contradicted the Company's public statements about

the Amendment.  ¶ 105; Torell Decl. Ex. 1, at Ex. 10.1 "Security Supplement Agreement," p.10

Amendment to the Credit Facility[22]; *see also Novak*, 216 F.3d at 308 (knowledge of facts

contradicting public statements satisfies the scienter requirement).  Additionally, the Complaint

alleges that both Defendants Meister and D'Loren were involved with the negotiation of the

terms of the Amendment, which is supported by the statements of CW6.  ¶ 105.  NexCen's

reliance on *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007) is misplaced, as

is the argument it supports that NexCen did not realize that it would not be able to pay down the

Accelerated Redemption Feature with the profits from Great American Cookies.  NexCen Mem.

at 34-36.  In *Caiafa*, the court found that the complaint contained no allegations that the

defendants had any knowledge that the inventory reports that served as the basis for their public

---

[22]/    Citations to "Torell Decl." refer to the Declaration of Catherine A. Torell in Support of Plaintiff's
Memorandum in Opposition to Defendants' Four Motions to Dismiss, submitted herewith.

statements were incorrect.  *Caiafa*, 525 F. Supp. 2d at 413.  In this case, however, there is clear evidence that the Company, and both D'Loren and Meister, had actual knowledge of facts contradicting the Company's public statements.  ¶ 105.  Their involvement in the Amended Credit Facility gave them knowledge that the terms it contained were significantly different from the Company's statements, which only reiterated that the terms of the Amendment were "substantially the same" as the terms of the original Credit Facility.  ¶¶ 107, 110, 118.  Indeed, Messrs. D'Loren's and Meister's knowledge of the true details of the Amended Credit Facility is corroborated by the Company's own admission.  In the May 19, 2008 Form 8-K, NexCen admitted the "Certain members of the Company's *senior management* (i) failed to advise the board of directors of material changes in the terms of the financing of [the Amended Credit Facility] after the board had approved terms previously presented it to it."  ¶140 (emphasis added).  Stated differently, NexCen's *senior management* lied to the Company's board about the Accelerated Redemption Feature.[23]  Whether NexCen realized that it would not be able to pay down the Accelerated Redemption Feature or any other term of the Amended Credit Facility bears no relationship to the fact that the Defendants had actual knowledge contradicting the Company's public statements, and that they had a duty to disclose that information, as described above in Part III.B.5.[24]

---

[23]/      It simply is not plausible that D'Loren and Meister, both Certified Public Accountants, who negotiated the amendment of the Credit Facility, mistakenly overlooked the fact that the Company had to pay back $30 million ten months later.  Nor is it plausible that D'Loren and Meister would continue to make the same "mistake" in making further misstatements and issuing false reassurances about how the Company's did not anticipate problems accessing capital, and that the global credit crisis would not impact the Company's ability to obtain additional funding but, remarkably, would help it. ¶¶ 109, 111, 112, 115, 116, 117.  *See United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991), *cert. denied*, 502 U.S. 916, *overruled on other grounds, Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999) ("Dean Wigmore's 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves; the recurrence of a similar result . . . tends to establish  . . . the presence of the normal, *i.e.* criminal, intent accompanying such an act.") (internal quotes and citation omitted).

[24]/      In fact, NexCen's suggestion that it merely made a "mistake" because the additional revenue from the Cookie Acquisition could have been sufficient to pay down the Accelerated Redemption Feature would require that

Additionally, knowledge of the fraud may be attributed to a corporation and its key officers "when the defendant's misstatements pertain to subject-matter critical to key corporate functions." *Medis Investor Group v. Medis Tech. Ltd.*, 586 F. Supp. 2d 136, 145 (S.D.N.Y. 2008); *see also Take-Two*, 551 F. Supp. 2d at 274 (it is appropriate to attribute knowledge of basic facts concerning a company's major products to executives); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006) (when the subject-matter of a misstatement is significant to a company, "it may be possible for knowledge of contradictory information (and thus, scienter) to be imputed to individual defendants even in the absence of specific information contradicting their public statements."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) (when information is at the core of a company's buisiness, it may be properly ascribable to senior officers); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (attributing knowledge of defendant's core operations to its "key officers"). Acquiring and managing franchised brands was NexCen's *sole* corporate function, and as such, knowledge about the acquisition and management of the Company's franchises and the effect on the Company may be attributed to Messrs. D'Loren and Meister. Specifically, as shown above, knowledge about the Company's problems with its franchise management and liquidity crisis can be attributed to them. Further, the core role of the BTMU Credit Facility in NexCen's mission creates a strong inference of scienter on the part of the Company's management, who can reasonably be attributed with knowledge of the terms of the financing of the Company's acquisitions. *See Medis*, 586 F. Supp. 2d at 145 (attributing knowledge of the terms of a sale of the defendant corporation's primary product to the corporation's CEO).

NexCen have had knowledge about the Accelerated Redemption Feature, giving rise to a strong inference of scienter. NexCen Mem. at 34-35; *see also Novak*, 216 F.3d at 308.

Scienter can also be established by alleging facts showing conduct that was "highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142 (internal quotation omitted). Specifically, an inference of recklessness is created when the complaint alleges that defendants "failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). The Individual Defendants had a duty to be informed about the Company's franchise acquisitions because as the Chairman, CEO and CFO, they had a "duty to familiarize themselves with the facts relevant to the core operations" of NexCen, and acquiring franchises was the Company's primary purpose and the Credit Facility was its prime method for doing so. *In re Alstom SA*, 406 F. Supp. 2d 433, 459 (S.D.N.Y. 2005). Any failure of the Individual Defendants to monitor the acquisitions and the terms of the Credit Facility, therefore, constitutes reckless behavior creating a strong inference of scienter. *See Dynex*, 531 F.3d at 194.

As a Director and the Chairman of the Board, Defendant Oros had a duty of oversight, which required him to implement and monitor reporting and information systems within the Company. *See, e.g.*, *In re Citigroup Inc. Shareholder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009). The Complaint alleges that Mr. Oros "failed to establish reporting and information systems and failed to review information he was required to review". ¶ 189. That he failed in this duty is seen in the Company's admission in the Restatement that it had material weaknesses in its disclosure controls: "the Company did not have sufficiently detailed written policies and procedures to ensure that the preparation and review of reports filed with or submitted to the SEC included all material information." ¶ 175(d)(ii). Therefore, the Complaint sufficiently alleges that Mr. Oros failed to check information that he had a duty to monitor. *See Dynex*, 531 F.3d at 194.

Poor internal controls have been found to be highly indicative of scienter. *E.g.*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 695 (6th Cir. 2004) (poor internal controls contribute to scienter when they demonstrate an "egregious refusal to see the obvious." (internal quotations omitted)); *China Shenghuo Pharm.*, 2009 WL 4668579 at *7; *ProQuest*, 527 F. Supp. 2d at 742-43, 745; *Veeco*, 235 F.R.D. at 232 ("a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999). In *ProQuest*, the court held that when the internal controls were glaringly deficient, SOX certifications that falsely attested to the Defendants' assessment of the quality of the company's internal controls were among "[t]he most significant evidence of scienter." *ProQuest*, 527 F. Supp. 2d at 745. This is consistent with the concept that scienter is sufficiently alleged when a complaint alleges that Defendants failed to check information they had a duty to monitor. *JP Morgan Chase*, 553 F.3d at 199.

NexCen's internal controls raised numerous red flags, as attested to by the Confidential Witnesses, all of whom were in positions that gave them credibility and reason to know the facts they provide. These red flags were particularly relevant to the Company's liquidity crisis, as seen in the Company's difficulty making payroll (¶ 90); the failure to collect $13 million in franchise from Marble Slab and Maggie Moo's franchisees(¶ 93); and the 30% of Marble Slab and The Athlete's Foot stores that were delinquent on franchise fees (¶ 96). The problems with the accounting systems and staff were brought to the attention of at least Mr. Meister, but no changes were made. ¶ 101. Additionally, the Company repeated (and Messrs. D'Loren and Meister certified in the SOX certifications) that it had developed disclosure controls "to ensure that material information relating to the Company . . . is made known to . . . members of senior management and the Board of Directors." ¶ 49, *see also* ¶¶ 52, 59, 61, 68, 70, 84, 86, 120, 122.

47

Yet, Mr. D'Loren explicitly prevented cash flow information from going to the Board other than through him. ¶ 102. The Defendants' willful refusal to remediate the Company's deficient systems and controls when issuing public attestations to their sufficiency is indicative of scienter. *See Veeco Instruments, Inc.,* 235 F.R.D. at 232.

These facts, when combined with the others alleged in the Complaint (and viewed holistically, as required), show that Plaintiff has adequately alleged a strong inference of scienter. Mr. Meister's departure as CFO at the same time as the announcement of the true terms of the Amended Credit Facility and the doubts about the Company's ability to continue as a going concern, along with the subsequent exodus of other executives and directors, provides circumstantial evidence of scienter when taken as a whole with the other scienter allegations set forth above. *Hall*, 580 F. Supp. 2d at 233 (CEO's forced resignation adds "to the overall pleading of circumstantial evidence of fraud" where defendants fail to suggest a plausible opposing inference); *In re Scottish Re Group Sec. Litig.,* 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (resignations, "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud"); *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863, 2008 U.S. Dist. LEXIS 68419, at **24-25 (C.D. Cal. July 10, 2008) ("Although Morse's resignation is not sufficient alone to raise a strong inference of scienter, it is highly probative of scienter"); *In re Mercator Software, Inc.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (announcement of firing of CFO and VP of finance on same day as announcement of restatement contributed to an inference of scienter); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092, 2002 WL 989478, *14 (N.D. Cal. Apr. 2, 2002) (resignation of multiple officers as the company was restating its financials and conducting an internal investigation contributed to finding an inference of scienter); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal.

2009) ("[T]he Court finds that the proximity of Defendants' departures to the financial restatements and investigations adds one more piece to the scienter puzzle.") (internal quotation marks omitted).[25]  Given the timing of Mr. Meister's departure, and the fact that it was a "termination" (¶ 138; Meister Mem. at 2), a reasonable inference can be drawn that his resignation was related to the nearly simultaneous revelations about the Credit Facility and the Company's going concern doubts.[26]  *Adaptive Broadband*, 2002 WL 989478, at *14 (finding that suspicious circumstances surrounding the departure of a CFO "add one more piece to the scienter puzzle").  NexCen faced additional departures in the wake of the May 18, 2008 announcement, including:

- the termination of two Executive Vice Presidents in May 2008; ¶ 134;

- Mr. D'Loren's departure in August 2008; ¶ 138; and

- the departure of three directors between August and December 2008.  ¶ 139.

The quantity of departures coinciding with the announcement of the Restatement and the internal investigation contribute further to the suspicious circumstances, and give rise to a strong inference of scienter.  *See Adaptive Broadband*, 2002 WL 989478, at *14.

Finally, to the extent not already shown above, scienter for NexCen is sufficiently alleged because corporate scienter is sufficiently alleged when the facts "create a strong inference that

---

[25]    Likewise, the fact that these departures occurred at the same time that the Company was conducting an internal investigation contributes to a strong inference of scienter.  *Fouad v. Isilon Sys., Inc.*, No. C07-1764, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008).  Defendants' suggestion that the Company's statement about the results of the internal investigation negates an inference of scienter should carry no weight because statements about the results of the internal investigation do not provide information about the process used in the investigation or the standards used to reach that conclusion, specifically whether or not those standards bear any relationship to a legal analysis of scienter.

[26]    Defendant's suggestion that Meister's resignation was unrelated to issues raised in the Complaint or the Restatement should not be given any weight because this suggestion is based on the content of an SEC filing, which may not be considered for the truth of the matter asserted therein.  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (judicially noticed documents are not to be considered for the truth of their assertions, but "for the purpose of establishing that the information in the various documents was publicly available.").  Defendant is also asking the Court to believe his version of the story, now, and this is untimely.

someone whose intent could be imputed to the corporation acted with the requisite scienter." Scienter for a corporate defendant "can be derived from its employees." *Dynex*, 531 F.3d at 195. Specifically, "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *Moody's*, 599 F. Supp. 2d at 515-16 (citing *Marsh*, 501 F. Supp. 2d at 481). Given scienter has been sufficiently alleged as to the Individual Defendants, two of whom were management-level employees and the other the Chairman of its Board, their scienter may thus be attributed to NexCen. *See id.*

### C.   THE COMPLAINT SUFFICIENTLY ALLEGES CLAIMS AGAINST, AND THE LIABILITY OF, THE INDIVIDUAL DEFENDANTS

#### 1.   The Misstatements and Omissions in NexCen's SEC Filings and Press Releases Are Attributable to Mr. Oros

Defendant Oros argues that he cannot be held liable for the alleged misstatements and omissions in NexCen's SEC filings and press releases because he himself did not make a misstatement or omission. Oros Mem. at 3-5. This argument is contrary to law, because the misstatements and omissions alleged in NexCen's SEC filings and press releases are attributable to him.

The group pleading doctrine allows a plaintiff to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (quotation and citations omitted). Judge Lynch explained that "[a]lleging direct involvement in the company's everyday business is critical to support the presumption." *Refco*, 503 F. Supp. 2d at 644 (quotation and citation omitted). Additionally, the "the group pleading doctrine is 'alive and well' following the passage of the [PSLRA]." *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 638 (S.D.N.Y. 2008) (citations omitted).

The Complaint more than adequately alleges Mr. Oros' direct involvement with the Company's day-to-day affairs and/or the misconduct at issue to invoke the group pleading presumption.  The Complaint asserts that during the Class Period, Mr. Oros, as Chairman of Board, was involved in the following ways:

- he signed the Company's annual reports filed on Forms 10-K (¶ 189);[27]

- he "participated in the creation . . . and reporting of the Company's . . . reports" (¶ 208);

- he was involved in the misconduct at issue (¶ 188);

- he "approved and participated in the acts and practices that created a false impression of cash flow, adequate internal controls, and non-material amendments to the Credit Facility" (¶ 188); and

- he breached his duty as Chairman by failing to oversee NexCen's internal control over financial reporting (¶ 189).

Additionally, according to the Company's annual reports for 2007 and 2008, after stepping down as the Company's CEO in June 2006, and while Chairman, Mr. Oros continued "to provide advice and guidance to [defendant D'Loren]."  Torell Decl. Ex. 2 at 69 (2006 Form 10-K/A, Apr. 30, 2007); Ex. 3 at 23 (2007 Form 10-K/A, Apr. 29, 2008); Martin Decl. Ex. J at 118.  Moreover, while Defendant Oros was Chairman, he continued to be an employee of the Company and he was admittedly not an independent member of NexCen's board.  Torell Decl. Ex. 2 at 69, Ex. 3 at 23; Martin Decl. Ex. J at 118; Oros Mem. at 1 n.1.

These allegations are sufficient to invoke the group pleading presumption against Mr. Oros.  *See, e.g., In re Adelphia Commc'ns Corp. Sec. and Deriv. Litig.*, 398 F. Supp. 2d 244, 250

---

[27]/    Mr. Oros' citation to district court authorities from California (Oros Mem. at p. 4) does not help him because they are contrary to the law in this Circuit.  For example, Oros cites *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007), for the proposition that signing an SEC filing is insufficient to meet the requirements of Rule 9(b).  However, the *Hansen* decision turned on that court's finding that the "group pleading doctrine can no longer be used in pleading cases under the PSLRA," which is contrary to the law of this Circuit.  *Id.* at 1154, *see also Oxford Health Plans*, 187 F.R.D. at 142.  In any event, as explained here, Plaintiff does not rely solely on the fact of Oros' signing of the Company's Forms 10-K for the allegations against him.

(S.D.N.Y. 2005) (applying group pleading doctrine to members of the board with equity interest

and "access to information concerning the company's day-to-day-business."); *Take-Two*, 551 F.

Supp. 2d at 265-66 (applying group pleading presumption to directors who signed annual reports

and served on compensation committee, with respect to alleged options backdating allegations);

*Refco*, 503 F. Supp. 2d at 642 (applying presumption against directors who were members of

company's audit committee because directors were responsible for overseeing integrity of

issuer's financial statements, had access to accounting documents, and approved the financial

statements).

## 2.    The Control Person Claims Are Well-Pled

Under Section 20(a) "[p]laintiffs state a legally sufficient claim under [this statute] if they

plead (1) a primary violation by a controlled person and (2) control of the primary violator by the

defendant." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005); *WorldCom*,

294 F. Supp. 2d at 414. "Allegations of control are not averments of fraud and therefore need

not be pleaded with particularity." *Hall*, 580 F. Supp. 2d at 228 (quotation and citation omitted).

Control allegations are governed by the "short and plain" pleading requirements of Federal Rule

of Civil Procedure 8(a). *Id.* Moreover, to state a control person claim, a plaintiff need not

affirmatively allege scienter. *Banc of Am.*, 446 F. Supp. 2d at 190-91.

The Complaint thus adequately alleges control person liability against each Individual

Defendant. As explained above, a primary violation of the Exchange Act is adequately alleged

against NexCen. Defendants Meister and D'Loren do not challenge the "control" prong of

Section 20(a). *See* Meister Mem. at 23-24; D'Loren Mem. at 6. They concede that control is

adequately alleged against them.[28]   The Complaint also adequately alleges Mr. Oros' control

under the above standard, because it alleges that he was the Company's Chairman during the

Class Period (¶ 26), owned over 6% of the NexCen's stock (¶ 190), participated and was

involved in the creation of the documents that are alleged to be materially false and misleading

(¶¶ 188, 208), was duty-bound to monitor and oversee the Company's internal controls over

financial reporting (¶ 189), and actually signed the Company's Annual Reports (¶ 189).  He also

admittedly provided advice and guidance to NexCen after stepping down as the CEO.  Torell

Decl. Ex. 2 at 69, Ex. 3 at 23; Martin Decl. Ex. J at 118.  This is sufficient to allege Mr. Oros'

control.  *See e.g., Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y.

2008) (holding that control person claim was adequately alleged against directors that signed the

Form 10-K that contained the false statements and because of the duties of board membership)

(citing cases); *Oxford Health Plans*, 187 F.R.D. at 143 (complaint stated claims against directors

because they had equity interest in issuer and it was alleged they participated in the alleged

misconduct).

   Mr. Oros incorrectly suggests that the Court should adopt a bad faith and/or culpable

participant requirement[29] for *pleading* a control person claim.  He seizes upon the "culpable

participant" language of *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996),

wherein the Second Circuit explained that in order to *prove* a claim under Section 20(a) "a

plaintiff must show a primary violation by a controlled person and control of the primary violator

---

[28]/     In any event, Messrs. D'Loren and Meister cannot credibly challenge control, as they are alleged to have made specific misstatements and omissions, were top two officers of the Company, and participated in the alleged wrongdoing.  *See, e.g.,* ¶¶ 180-183, 184-187.

[29]/     Even assuming, *arguendo,* that Mr. Oros' statement of the law is correct (it is not), as set forth above in Part III.B.2., Plaintiffs have adequately alleged his scienter and/or bad faith.

by the targeted defendant" and show that the controlling person was a "culpable participant" in the primary violation. *First Jersey*, 101 F.3d at 1472.

Mr. Oros' reading of the case and Second Circuit precedent is wrong. Plaintiff need not *plead* that a controlling person acted in bad faith or with scienter, because the statute only allows for good faith or lack of knowledge to be asserted as an *affirmative defense. Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980) (a control person may rebut the presumption with a good faith defense at trial or on a motion for summary judgment by demonstrating that he or she "maintained and enforced a reasonable and proper system of supervision and internal control[s]"); *WorldCom*, 294 F. Supp. 2d at 414; 15 U.S.C. § 77o (control person shall be liable "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.").[30]

Since *First Jersey* was issued, the Second Circuit has "essentially rendered the 'culpable participation' requirement meaningless." *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 395 (S.D.N.Y. 2003); *Parmalat*, 375 F. Supp. 2d at 307-08. The Second Circuit has addressed Section 20(a) liability, although briefly, in five cases: *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *Ganino*, 228 F.3d at 170-71; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77-78 (2d Cir. 2001); *Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001); and *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Neither *First Jersey*, nor any of these Second Circuit cases, has overruled district courts

---

[30] Mr. Oros incorrectly assumes that the Second Circuit's "prima facie case" language is indicative that culpable participation must be pleaded by Plaintiff. According to Black's Law Dictionary, there are two definitions of "prima facie case," one of which is: "A party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *See* Black's Law Dictionary (2d Pocket Ed. 2001) (The other definition is "The establishment of a legally required rebuttable presumption."). This definition comports with *First Jersey*, because the Second Circuit referred to "prima facie case" in the context of an appeal for a bench trial and in holding that the defendant had the burden of showing his good faith, and the burden was not on plaintiff.

that found culpable participation was not a pleading requirement.  Nor has the Second Circuit

overruled *Marbury Management*, which held that the good faith clause of Section 20(a) only

provides that defendants may make an affirmative defense.  *See Marbury*, 629 F.2d at 716.  In

both *Ganino* and *Scholastic Corp.*, the Second Circuit reinstated Section 20(a) claims after

finding that primary violations were adequately pled and without addressing the pleading

requirements.  *Ganino*, 228 F.3d at 170-71; *Scholastic Corp.*, 252 F.3d at 77-78.  *Boguslavsky*

determined whether the plaintiff's claim of control person liability was barred by collateral

estoppel.  159 F.3d at 720-21.  While *Boguslavsky* reiterated the *First Jersey* elements of a *prima*

*facie* case, the court did not extend this discussion to the context of the pleadings.  *Id.*  Whereas

*ATSI Communications*, 493 F.3d at 108, also repeated the *First Jersey* elements of a *prima facie*

case, "the court found that the plaintiff had failed to properly allege a primary violation and

therefore did not reach the question of whether the plaintiff also had to allege culpable

participation."  *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825, 2008 WL 2795927, at *7

(E.D.N.Y. July 18, 2008) (the recitation of the elements of the § 20(a) claim "in *ATSI* constitutes

*dicta*").

     *Suez Equity Investors* is the only Second Circuit decision that has substantively addressed

the pleading requirements for a controlling person liability claim.  250 F.3d at 101.  Under *Suez*

*Equity Investors,* a complaint does not have to allege culpable participation.  On an appeal from a

motion to dismiss, the Second Circuit held that plaintiffs had sufficiently alleged control person

liability because control and the primary violation were clearly pled.  *Id.*  ("The complaint

alleges that DeRoziere was an officer of the Bank and that he had primary responsibility for the

dealings of that Bank and the other corporate defendants with SAM Group . . . . While somewhat

broad, this allegation is sufficient to plead controlling-person liability for the Bank derived from

DeRoziere, the purported primary violator." (internal citations omitted)).  Thus, at the pleading

stage, alleging control and the primary violation is enough to proceed to discovery based on a

Section 20(a) claim.  *See WorldCom*, 294 F. Supp. 2d at 414-19 (while culpable conduct is a

pleading requirement, Second Circuit precedents hold that it is satisfied when control and a

primary violation are alleged because "culpable participation" refers merely to the level of

control required and not to the controlling party's state of mind).  Any other reading of these

authorities would create the "illogical result . . . that once a plaintiff has proven culpable

participation, a defendant cannot conceivably prove good faith or lack of inducement."

*Parmalat*, 375 F. Supp. 2d at 308 (quotation and citations omitted).

### D.    THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION

The PSLRA requires a plaintiff to prove that a defendant's misrepresentations "caused

the loss for which the plaintiff seeks to recover."  15 U.S.C. § 78u-4(b)(4).  In *Dura Pharms.,*

*Inc. v. Broudo*, the Supreme Court elaborated on this requirement, holding that a plaintiff must

demonstrate that the "share price fell . . . after the truth became known."  544 U.S. 336, 347

(2005).  The Court cautioned, however, that this requirement was "not meant to impose a great

burden upon a plaintiff."  *Id.*  A plaintiff must only provide a defendant with "some indication of

the loss and the causal connection that the plaintiff has in mind."  *Id.; see also Take-Two*, 551 F.

Supp. 2d at 282-83 ("[A] given disclosure need not emanate from a particular source, take a

particular form [,] or be of a particular quality.") (quotation marks and citation omitted).  This is

the fundamental – and only – requirement of *Dura*.  The Second Circuit has interpreted *Dura* as

requiring complaints simply to allege that the "'misstatement or omission concealed something

from the market that, when disclosed, negatively affected the value of the security.'" *In re AOL*

*Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (quoting *Lentell*, 396

F.3d at 173).  Specifically, loss causation is established when the loss that occurred was "'within

the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed

investor.'" *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 359

(S.D.N.Y. 2008) (quoting *Lentell*, 396 F.3d at 173). Indeed, a disclosure "need not reflect every

detail of an alleged fraud," but must only "reveal some aspect of it." *In re Omnicom Group, Inc.*

*Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008).

In clear contradiction to Defendants' arguments (Meister Mem. at 19-23; NexCen Mem.

at 30-32), Plaintiff has more than satisfied the requirements of *Dura*. The May 2008 disclosures,

far from disclosing the truth only about the Amended Credit Facility as Defendants contend,

disclosed a much larger truth about the statements the Company had made for the 14 months of

the Class Period about:

- the Company's plan to grow by acquisition and its flexible and strong liquidity that was at the plan's basis, and that the original Credit Facility provided sufficient liquidity/access to cash to carry out that business plan and also run the growing operations;

- its purportedly sufficient internal controls; and

- its purportedly low-risk and viable business model and operations and knowledgeable, capable management to run them.

The larger truth was that all these statements were false and misleading. The market reacted

swiftly to this information, as NexCen's stock lost 77% of its value on that same day. ¶ 131.

Plaintiff has alleged facts showing that the "truth" that became known to the market was

directly linked with the topics of the challenged statements and thus "within the zone of risk

concealed by the misrepresentations and omissions…" and then that the disclosures led to the

market price drop. Some key components of the May 2008 disclosures were the following:

- NexCen had previously failed to disclose key features of the Amendment to the Credit Facility, including the Accelerated Redemption Feature (¶ 125);

- There was "substantial doubt about its ability to continue as a going concern" and that the doubt existed at least in March (and ultimately acknowledged that it

existed in 2007) ¶ 126; Martin Decl. Ex. J at i.[31]  This went straight to the heart of the falsity of the Company's statements about the sustainability of its operations; indeed, not only would the Company not be able to continue the acquisition plan it had touted during the Class Period, but it was unsure it would even be able to sustain its current operations.

- The Company's inadequate disclosures concerning the Amendment to the Credit Facility (¶ 125) and other issues were caused by a "failure" of its internal controls – in particular, its internal disclosure controls designed to ensure that material information was communicated between management, the Board, and investors, which had allowed the Company to enter into the Amendment to the Credit Facility without that information being communicated to investors.  ¶ 150.

- Even without taking into consideration the Accelerated Redemption Feature, NexCen faced a cash shortage of $7-10 million in the Summer of 2008, ¶ 128(a), and thus the Company never had any ability to avoid a cash shortfall.

Defendants' relentless statements – from the first day of the Class Period to the end – that the Company had sufficient cash on hand to sustain current, growing operations and carry out the acquisition strategy for at least a year at a time (2007 statements at ¶¶ 48, 58, 66, 75, 78, 83; 2008 statements at ¶¶ 112, 117), and the related statements on controls, operations and management of the Company – were therefore revealed to be false, causing serious loss to investors.

The May 2008 disclosures revealed several truths that were within the zone of risk concealed by the Defendants' many false and misleading statements – namely that (i) the Company's plan for acquisitions was not, in fact, sustainable; (ii) its management and internal financial and disclosure controls were ineffective; (iii) its operations were not adequately

---

[31]      Contrary to Defendants' contention, the May 19 announcement that the NexCen had a "substantial doubt about the Company's ability to continue as a going concern," did not attribute that doubt exclusively to the Amendment to the Credit Facility, but to "information that has become known to us between the filing of our Annual Report and the filing of this Current Report."  Torell Decl. Ex. 1 at Item 4.02 (Form 8-K, May 19, 2008); *see also* Meister Mem. at 22; NexCen Mem. at 31-32.  The claim that the Amendment to the Credit Facility was the exclusive cause of the doubt about the Company's ability to continue as a going concern is further belied by the Company's own admission that the doubt existed as of December 31, 2007, before the Company entered into the Amendment to the Credit Facility.  Martin Decl. Ex. J. at i.

supported financially; and (iv) its acquisition spree and plans were unsustainable fantasy – and Plaintiff has sufficiently alleged loss causation.  *See Merrill Lynch*, 568 F. Supp. 2d at 359.

### E.    PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND

If the Court grants Defendants' motions to dismiss in any respect, Plaintiff should be granted leave to amend, because any pleading defects the Court may identify can be cured and such an opportunity to amend a complaint, especially one like this in which valid and credible claims are asserted, "should be freely granted."  *Chill*, 101 F.3d at 271.  In particular, plaintiffs whose claims are dismissed for lack of specificity under Rule 9(b) are regularly granted leave to amend.  *ATSI Commc'ns, Inc.,* 493 F.3d at 108; *Moody's*, 599 F. Supp. 2d at 518; *IAC/InterActive*, 478 F. Supp. 2d at 596.

### IV.    CONCLUSION

For all the reasons set forth herein, Plaintiff respectfully submits that Defendants' four motions to dismiss the Complaint should be denied.  In the alternative, Plaintiff requests leave to file and serve an amended complaint to address any deficiencies identified by the Court.

Dated:  December 14, 2009                    Respectfully submitted,

                                          /s/    Catherine A. Torell                    _____
                                        Catherine A. Torell (CT-0905)
                                        COHEN MILSTEIN SELLERS & TOLL PLLC
                                        150 East 52nd Street, Thirtieth Floor
                                        New York, New York 10022
                                        Tel: (212) 838-7797
                                        Fax: (212) 838-7745

                                        [additional counsel on next page]

Lisa M. Mezzetti (LM-5105)
Anna K. Ryon-Walthall (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel:  (202) 408-4600
Fax: (202) 408-4699

*Lead Counsel for Lead Plaintiff*