# EXHIBIT

# 1

Morningstar® Document Research℠

# FORM 8-K

## NexCen Brands, Inc. - NEXC

**Filed: May 19, 2008 (period: May 15, 2008)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

Item 1.01     Entry Into a Material Definitive Agreement

Item 2.02     Results of Operations and Financial Condition

Item 2.03     Creation of a Direct Financial Obligation or an Obligation under an
              Off-Balance Sheet Arrangement of a Registrant

Item 3.01     Notice of Delisting or Failure to Satisfy a Continued Listing Rule or
              Standard; Transfer of Listing

Item 4.02     Non-Reliance on Previously Issued Financial Statements or a
              Related Audit Report or Completed Interim Review

Item 8.01     Other Events

Item 9.01     Financial Statements and Exhibits

SIGNATURES
EX-10.1 (Material contracts)

EX-99.1 (Exhibits not specifically designated by another number and by investment
companies)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): May 15, 2008

NEXCEN BRANDS, INC.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

| 000-27707 | 20-2783217 |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |

| 1330 Avenue of the Americas, 34th Floor, New York, NY | 10019-5400 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

(212) 277-1100

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry Into a Material Definitive Agreement**

A discussion of certain features of January 2008 amendments to the Company's bank credit facility with BTMU Capital Corporation, as agent, are discussed below in Item 8.01 of this Current Report.

**Item 2.02 Results of Operations and Financial Condition**

On May 19, 2008, NexCen Brands, Inc. issued a press release that included an announcement of certain preliminary financial results for the first quarter ended March 31, 2008. A copy of the press release, which also discussed other matters addressed in this Current Report, is furnished herewith as Exhibit 99.1 and is incorporated by reference herein. This information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 2.03  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

A discussion of certain features of January 2008 amendments to the Company's bank credit facility with BTMU Capital Corporation, as agent, are discussed below in Item 8.01 of this Current Report.

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**

On May 19, 2008, the Company will notify The Nasdaq Stock Market that it will not timely file its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008 with the Securities and Exchange Commission. The Company also will notify the Nasdaq of the matters discussed in Item 4.02 of this Current Report. As a result, the Company will not be in compliance with the Nasdaq Marketplace Rule 4310(c)(14) as of May 20, 2008. The Nasdaq requires, among other things, that the Company timely file all required reports with the Securities and Exchange Commission. The Company intends to file its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008, and expects to complete any required amendments to its Annual Report on Form 10-K for the fiscal year ended December 31, 2007, as promptly as possible following the resolution of the matters discussed below in Item 4.02 of this Current Report.

The Company expects that the Nasdaq will notify the Company that the delay in filing the Form 10-Q constitutes noncompliance with the Nasdaq's listing requirements. Upon receipt of such notification, the Company will initiate the appeal process by requesting a hearing before the Nasdaq Listing Qualifications Panel. The Company expects that, pending a decision by the panel, the securities of the Company will remain listed on the Nasdaq.

---

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

(a) On May 15, 2008, authorized officers of the Company, after a review of the Company's prior public filings and the terms of the January 2008 amendments to its bank credit facility, concluded that disclosures regarding certain features of the January 2008 amendments to its bank credit facility in connection with the acquisition by one of the Company's wholly-owned subsidiaries of substantially all of the assets of Great American Cookie Franchising, LLC and Great American Manufacturing LLC (the "Cookie Acquisition") were neither contained in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on January 29, 2008 nor the Company's Annual Report on Form 10-K for the year ended December 31, 2007, as originally filed with the Securities and Exchange Commission on March 21, 2008. In the Annual Report on Form 10-K, the January 2008 amendments to the bank credit facility were discussed in two footnotes to the Company's audited financial statements for the fiscal year ended December 31, 2007 (Note 8(a), regarding the credit facility and Note 24, regarding subsequent events) and descriptions of the Company's bank borrowings in other portions of the Annual Report, including descriptions of the bank credit facility described in Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "*Liquidity and Capital Resources.*" These features of the January 2008 amendments, which are discussed below in Item 8.01 of this Current Report, have raised significant concerns about the Company's liquidity and capital resources. Based on information that has become known to us between the filing of our Annual Report and the date of this Current Report on Form 8-K, we currently believe that there is substantial doubt about the Company's ability to continue as a going concern and, pending completion of the independent review discussed below, substantial doubt also may have existed at the time the Company filed its Annual Report. This independent review will, among other things, assess what the facts were at the time of the filing of the Annual Report. While the Company is continuing to review all of the relevant facts and circumstances, due to uncertainties surrounding the going concern issue, and in light of the disclosure considerations that affect two of the footnotes to the Company's audited financial statements, the authorized officers of the Company concluded that the Company's audited financial statements for the fiscal year ended December 31, 2007, as contained in the Annual Report, should no longer be relied upon. After discussion with KPMG, no reliance should be placed on KPMG's audit report dated March 20, 2008 on the Company's consolidated financial statements as of December 31, 2007 and 2006 and each of the years in the three-year period ended December 31, 2007 or its report dated March 20, 2008 on the effectiveness of internal control over financial reporting as of December 31, 2007, as contained in the Annual Report.

To assist the Company in evaluating and resolving the circumstances surrounding the going concern issue, public disclosures regarding the January 2008 amendments to the Company's bank credit facility and the need to reevaluate the effectiveness of the Company's disclosure controls and procedures, the audit committee of the Company's board of directors has retained independent counsel to conduct an independent review of the situation. Upon completion of the independent review, the audit committee expects to discuss the findings with KPMG. Management, together with the audit committee, will then determine what changes will be required to be made to the Annual Report. The changes to the Annual Report may include (1) additional footnote disclosure regarding the January 2008 amendments to the Company's bank credit facility; (2) footnote disclosure regarding going concern considerations; (3) revisions to certain of the disclosures contained in the Annual Report that relate to the Company's bank credit facility, as amended in January 2008, the Company's prospective liquidity concerns, and financial condition and risks related to such liquidity concerns; and (4) a revised audit report from KPMG. The Company also is further evaluating the effect of these matters on management's assessment of internal control over financial reporting as of December 31, 2007.

In addition, until the independent review is completed and the Company amends its Annual Report on Form 10-K for the year ended December 31, 2007, the Company does not intend to file the Quarterly Report on Form 10-Q for the quarter ended March 31, 2008.

Because these matters relate to amendments to the Company's bank credit facility, which were effected in January 2008, they are treated as a subsequent event with respect to the fiscal year ended December 31, 2007. These bank credit facility amendments affect footnote disclosures in the Company's financial statements and the audit report thereon of KPMG. The Company does not expect to change the reported financial results contained in the financial statements that were included in the Annual Report.

The authorized officers of the Company have discussed the matters disclosed in this Item 4.02 with KPMG.

A discussion of matters relating to the January 2008 amendments to the Company's bank credit facility and resulting liquidity considerations are discussed below in Item 8.01 of this Current Report.

**Item 8.01 Other Events**

The Company amended its existing bank credit facility with BTMU Capital Corporation in January 2008 in connection with the Cookie Acquisition. As previously reported in a Current Report on Form 8-K filed on January 29, 2008, the amendments were entered into to allow the Company to borrow an additional $70 million to finance a portion of the purchase price for the Cookie Acquisition. The total amount outstanding under the facility as of March 31, 2008 was $178 million.

The January 2008 amendments were effected through a series of documents, including an Omnibus Amendment. In addition, Company subsidiaries involved in the Cookie Acquisition entered into a Security Agreement Supplement, dated January 29, 2008, which amended the Security Agreement that was signed when the bank credit facility was originally established in March 2007. In light of first quarter 2008 performance and revised, preliminary cash flow forecasts prepared in May 2008 following the hiring of a new Chief Financial Officer in late March 2008, management focused attention on terms of the amendments that had not been discussed in the Company's prior public filings. Specifically, these terms included various changes to the priority of cash distributions from "lockbox accounts" established in connection with the bank credit facility, as well as an accelerated redemption feature applicable to $35 million of the $70 million that was borrowed in January 2008 in connection with the Cookie Acquisition. (We refer to this $35 million borrowing as the "Factory Note" because it is secured by the cookie dough factory that was acquired in the Cookie Acquisition.)

---

Pursuant to the bank credit facility, substantially all of the revenues earned by the Company's franchise and brand management businesses are collected in "lockbox accounts" and are disbursed on a periodic basis pursuant to the terms of the Security Agreement (as it has been supplemented since March 2007). Such distributions to the Company were intended to cover ordinary course operating expenses of the Company's franchise and brand management businesses. The January 2008 amendments subordinated a portion of these distributions to the Company to the payment of certain amounts to the bank lenders, including accrued but unpaid interest and required principal amortization payments under the bank credit facility. In addition, the January 2008 amendments provided that after payment of this subordinated amount to the Company, all remaining collected cash from the Company's franchise businesses and the cookie dough factory not needed to operate those businesses (and without regard to corporate overhead or expenses of the Company's brand management businesses) would be applied to reduce the then-outstanding principal amount of the Factory Note until the Factory Note is repaid in full.

These changes to the cash distribution priorities in the bank credit facility were intended to provide the lenders with greater assurance of receiving regular interest and principal amortization payments and to accelerate repayment of the Factory Note (which matures in January 2013). In addition, they have the effect of substantially reducing the amount of operating cash flow from the Company's franchise businesses and the cookie dough factory that will be available to the Company prior to repayment of the Factory Note for payment of corporate overhead and other expenses not directly incurred by the Company's franchise businesses and the cookie dough factory.

The Security Agreement Supplement also provides that if the outstanding amount of the Factory Note is more than $5 million on October 17, 2008, a principal payment will be required to reduce the outstanding principal amount to $5 million. (The Security Agreement Supplement gives the lender the option to extend this accelerated principal repayment obligation to July 2009.) As of March 31, 2008, the outstanding principal amount of the Factory Note was approximately $33 million.

The foregoing description of the terms of the January 2008 amendments is qualified in its entirety by the terms and conditions of the Omnibus Amendment, which was filed as Exhibit 10.4 to the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on January 29, 2008, and the Security Agreement Supplement, dated January 29, 2008, which is filed as Exhibit 10.1 to this Current Report.

Based on preliminary projections as of the date of this Current Report on Form 8-K, the Company expects that without changes to the frequency of the lockbox account disbursements under its bank credit facility or other measures that might enhance its liquidity, the Company could face a cash shortfall in mid- to late-June 2008 and again in August 2008. Based on these projections, which include the Company making its scheduled debt service payments, the Company estimates that the maximum amount of the cash deficiency could be approximately $7-10 million through October 17, 2008 (prior to the principal repayment on the Factory Note). The Company also will need additional cash to make the required principal payment on the Factory Note on October 17, 2008, and the Company currently estimates that such payment will be approximately $21 million. The Company is continuing to review and refine its cash forecasts, and the amounts outlined above are subject to changes, uncertainties and risks, including the uncertainties of future events.

---

The Company is actively exploring options to enhance its liquidity, including potential capital market transactions, the possible sale of one or more of its businesses, discussions with the Company's lender regarding possible additional amendments to the bank credit facility, and our other strategic options. The Company has engaged FTI Consulting, Inc. to review the Company's cash flows and projections to help it develop a near-term liquidity plan to address the Company's short-term liquidity needs. As disclosed in our existing filings, one of our directors, Jack Dunn, is also Chairman and Chief Executive Officer of FTI. The Board has determined that Mr. Dunn remains an independent director under the standard for independence set forth in our corporate governance guidelines, in view of the fact that the services being provided by FTI are immaterial to FTI. In addition, pursuant to the Company's policies and procedures with respect to related party transactions, the Nominating and Corporate Governance Committee has determined that the arrangement with FTI is in the best interests of the Company and its shareholders. The Company also expects to retain an investment bank to provide advice on its strategic options.

*This Current Report on Form 8-K contains "forward-looking statements," as such term is used in the Securities Exchange Act of 1934, as amended. Such forward-looking statements include those regarding expectations for the development of our business, plans to expand the offerings of our brands and businesses, expectations for the future performance of our brands and comments about estimated or anticipated future financial results. When used herein, the words "anticipate," "believe," "estimate," "intend," "may," "will," "expect" and similar expressions as they relate to the Company or its management are intended to identify such forward-looking statements. Forward-looking statements are based on current expectations and assumptions, which are subject to risks and uncertainties. They are not guarantees of future performance or results. The Company's actual results, performance or achievements could differ materially from the results expressed in, or implied by, these forward-looking statements. Factors that could cause or contribute to such differences include: (1) as a result of our inability to file our Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 within the required timeframe and the possible need to amend our Annual Report on Form 10-K for the year ended December 31, 2007, it is possible that we may be subject to the Nasdaq delisting proceedings, governmental investigations and third-party claims, (2) our acquisitions may not be successful, may involve unanticipated costs or difficulties or delays in being integrated with our existing operations, or may disrupt our existing operations, (3) we may not be successful in operating or expanding our brands or integrating our acquisitions into our overall business strategy, (4) any failure to meet our debt obligations would adversely affect our business and financial conditions, and our need for additional near-term liquidity could result in a sale of one or more of our businesses at less than an optimal price or an inability to continue to operate one or more of our businesses, (5) our marketing, licensing and franchising concepts and programs may not result in increased revenues, expansion of our franchise network or increased value for our trademarks and franchised brands, (6) we depend on the success of our licensees and franchisees for future growth, (7) our near-term liquidity needs and the impact of our failure to file our required periodic reports on a timely basis may adversely affect our ability to retain existing, or attract new, employees, franchisees, and licenses, (8) our near-term liquidity needs may be higher or lower than our current expectations and (9) other factors discussed in our filings with the Securities and Exchange Commission. The Company undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

---

Source: NexCen Brands, Inc., 8-K, May 19, 2008

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits

10.1    Security Agreement Supplement, dated January 29, 2008, by and among NexCen Holding  Corporation, GAC Manufacturing, LLC, GAC Supply, LLC and BTMU Capital  Corporation.

99.1    Press release, dated May 19, 2008.

---

## SIGNATURES

According to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on May 19, 2008.

NEXCEN BRANDS, INC.

/s/ Robert W. D'Loren
By:    Robert W. D'Loren
Its:   Chief Executive Officer and President

EXECUTION COPY

## SECURITY AGREEMENT SUPPLEMENT

This SECURITY AGREEMENT SUPPLEMENT (this "Supplement"), is dated as of January 29, 2008, and is by and among NEXCEN HOLDING CORPORATION, a Delaware corporation, (the "Issuer"), GAC MANUFACTURING, LLC, a Delaware limited liability company ("GAC Manufacturing"), GAC SUPPLY, LLC, a Delaware limited liability company ("GAC Supply", and each of GAC Manufacturing and GAC Supply, an "Additional Borrower", and together the "Additional Borrowers"), and BTMU Capital Corporation, a Delaware corporation (the "Agent").

## WITNESSETH

WHEREAS, this Supplement is being executed and delivered in accordance with Section 4.1 of the Security Agreement, dated as of March 12, 2007, among the Issuer, the Subsidiary Borrowers from time to time parties thereto as Co-Issuers, and the Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Security Agreement"; unless otherwise defined herein, terms defined in the Security Agreement are used herein as therein defined, provided, if any such definitions were amended or otherwise modified in any Security Agreement Supplement, or if defined terms were added therein, such terms shall be used as amended, modified or defined therein); and

WHEREAS, each Additional Borrower wishes to become a Co-Issuer party to the Security Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

## ARTICLE I.

## JOINDER

1.1    By executing and delivering this Supplement, each Additional Borrower confirms the representations and warranties set forth in the Security Agreement applicable to it as a Co-Issuer thereunder (including such representations and warrants as have been amended by this Supplement or any other Security Agreement Supplement); provided, however, that GAC Manufacturing does not make the representation in Section 12.9(ee) of the Security Agreement and makes the representation in Section 12.9(ff) of the Security Agreement subject to the conditions in Section 2.8(b)(1) - (4) of this Supplement.

1.2    By executing and delivering this Supplement, each Additional Borrower confirms to and agrees with the Issuer, each Co-Issuer and the Agent that it will perform all of the obligations which, by the terms of the Security Agreement, are required to be performed by it as a Co-Issuer party.

1.3    Concurrently with the execution and delivery hereof, the Additional Borrowers will deliver to the Issuer, the Co-Issuers and the Agent an executed Joinder Supplement in the form of Exhibit A to the Note Funding Agreement.

NYCDMS/1073816.7                                  1

Source: NexCen Brands, Inc., 8-K, May 19, 2008

**EXECUTION COPY**

1.4    Concurrently with the execution and delivery hereof, GAC Manufacturing will execute, file and record the Security Deed attached to this Supplement Exhibit A.

1.5    Each of the parties to this Supplement agrees and acknowledges that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement.

1.6    Schedule I hereto sets forth the address of each Additional Borrower.

1.7    Schedule IIA attached hereto sets forth an accurate and complete list of all registered trade names, trademarks and service marks that are owned by the Additional Borrowers (for purposes of this section only, sometimes such entity referred to as the "Relevant Entity") and applications for registration of such Trademarks owned by the Relevant Entity (collectively, the "Trademarks"). Schedule IIB attached hereto sets forth an accurate and complete list of all unregistered trade names, trademarks and service marks owned by the Relevant Entity (collectively, "Unregistered Marks"). Schedule IIC sets forth an accurate and complete list of all copyrights and copyright applications owned by the Relevant Entity (collectively, the "Copyrights"). Schedule IID sets forth an accurate and complete list of all licenses in which the Relevant Entity is a party as licensor (collectively, the "Licenses"). Schedule IIE sets forth an accurate and complete list of all trade dress owned by the Relevant Entity (collectively, the "Trade Dress"). Schedule IIF sets forth an accurate and complete list of all domain names owned by the Relevant Entity (collectively, the "Domain Names"). Schedule IIG sets forth an accurate and complete list of all patents and patent applications owned by the Relevant Entity (collectively, the "Patents" and together with the Trademarks and Unregistered Marks, Copyrights, Licenses, Trade Dress, Domain Names, the "Intellectual Property"). Schedule IIH sets forth an accurate and complete list of all real property owned by the Relevant Entity (the "Real Property"). Schedule III sets forth an accurate and complete list of all property owned by the Relevant Entity in connection with the Real Property, including, but not limited to, any equipment and inventory (the "Real Property Assets"). The consummation of the transactions contemplated by each of the Transaction Documents, other than as specified therein, will not alter or impair the rights of either Relevant Entity to use the Intellectual Property, the Real Property or the Real Property Assets.

1.8    Schedule IV sets forth the Initial Asset Values of each Asset pledged hereby by the Additional Borrowers. Schedule V identifies any Material License Agreements. Schedule VI lists all actions, proceedings or investigations to which any Additional Borrower is a party. Schedule VII sets forth a complete list of all certificates of insurance, binders for insurance policies and insurance maintained by, or on behalf of, any Additional Borrower, under which such Additional Borrower is the beneficiary of coverage. Schedule VIII lists each state which each Additional Borrower is organized under and qualified to do business in. Schedule IX lists any liabilities, obligations or Indebtedness of any nature (other than any deferred income in accordance with GAAP), of any Additional Borrower whether liquidated, unliquidated, accrued, absolute, contingent or otherwise that are required by GAAP to be reflected or reserved against on a balance sheet or any notes thereto.

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

1.9    Relationships with Original Seller.   To the knowledge of the Issuer, the Additional Borrowers and any Support Fund, as applicable, none of Mrs. Fields Famous Brands, LLC, Great American Cookie Company Franchising, LLC, or Great American Manufacturing LLC (the "Original Sellers") or any Affiliates of the Original Sellers (i) has, or on the applicable Funding Date will have, any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to the business of the Issuer, the Additional Borrowers or any Support Fund, as applicable; (ii) owes any amounts to the Issuer, the Additional Borrowers or any Support Fund, as applicable; or (iii) has or on the applicable Funding Date will have any claim, express or implied, of any kind whatsoever against the Issuer, the Additional Borrowers or any Support Fund, as applicable, or any of its assets or properties. To the knowledge of the Issuer, the Additional Borrowers and any Support Fund, as applicable, none of the Original Sellers nor any Affiliates of the Original Sellers own, (of record or as a beneficial owner), an equity interest or any other financial or profit interest in a Person that has (x) had business dealings or a financial interest in any transaction with the Issuer, the Additional Borrowers or any Support Fund, as applicable.

1.10    Material Contacts.   Set forth on Schedule X is a description of all material contracts to which either Additional Borrower is a party (the "Co-Issuer Material Contracts"). The Additional Borrowers have made available to the Agent copies of each of the Co-Issuer Material Contracts and all amendments thereto. No condition exists or has occurred which, with the giving of notice or the lapse of time, or both, would constitute a default or breach by (i) any Additional Borrower, or (ii) to either of the Additional Borrowers' knowledge, any counterparty to the Co-Issuer Material Contracts. Each Co-Issuer Material Contract is valid and binding legal obligations of the related Additional Borrower, in accordance with its terms, except that the enforceability of such contracts and agreements may be limited by (A) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally and (B) equitable principles which may limit the availability of certain equitable remedies (such as specific performance).

1.11    Absence of Liabilities.   On the date hereof, there are no material liabilities, indebtedness or obligations of either Additional Borrower of any nature (other than any deferred income in accordance with GAAP), whether liquidated, unliquidated, accrued, absolute, contingent or otherwise that are required by GAAP to be reflected or reserved against on a balance sheet, except for those that are set forth in Schedule IX.

1.12    Bank Accounts.   Attached hereto as Schedule XI is a true and complete list of the name of each bank, savings and loan, or other financial institution in which either Additional Borrower has an account, and the account numbers and names of all persons authorized to draw thereon or having access thereto.

1.13    Obligor Rebate Amounts.   There are no Obligor Rebate Amounts with respect to any Contracts either Additional Borrower is a party to.

1.14    Support Fund.   Each of the Issuer and the Additional Borrowers acknowledges that the Additional Borrowers do not have any support funds and agrees that they will not establish any support fund with respect to the Additional Borrowers without the consent of the Agent, which consent shall not be unreasonably withheld.

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

1.15    (a)    Upon execution of this Supplement, each Additional Borrower shall be a Co-Issuer party under the Security Agreement and its Assets shall constitute part of the Collateral pledged thereunder. For the avoidance of doubt, all Collateral pledged under the Security Agreement (including the Assets pledged hereunder) shall be deemed to secure the obligations of the Issuer and all Co-Issuers under the Security Agreement.

(b)    Pursuant to clause (f) of the granting clause of the Security Agreement, the following items are added to the Grant and made part of the Collateral, and each item below shall be considered an Asset for all purposes under the Transaction Documents:

(1)    the Real Property;

(2)    the Real Property Assets;

(3)    any inventory, maintenance and operating supplies;

(4)    the Supply and License Agreement;

(5)    the Manufacturing Agreement; and

(6)    all contracts to which either Additional Borrower is a party or shall enter into, including, without limitation, any vendor agreements, supply agreements or leases.

## ARTICLE II.

### TERMS OF NOTE

2.1    Initial Note Principal Balance.    The Initial Note Principal Balance of the Note issued by the Issuer and the Additional Borrowers (the "Factory Note") is $35,000,000.

2.3    Initial Payment Date.    The initial Payment Date for the Factory Note is April 17, 2008.

2.4    Maturity Date.    The Maturity Date of the Factory Note issued by the Issuer and the Additional Borrowers is January 29, 2013.

2.5    Initial Note Interest Rate.    The initial Note Interest Rate of the Factory Note issued by the Issuer and the Additional Borrowers is 6.7505%.

2.6    Additional Representations and Warranties.

(a)    As of the date hereof, each of GAC Supply and GAC Manufacturing, as applicable, is currently a party to or has the benefit of such agreements, contracts or pricing arrangements, whether written or oral, and has appropriate arrangements for the staffing, inventory and operation of its business, as are necessary or prudent to conduct the business of GAC Supply and GAC Manufacturing, as applicable.

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

(b)     On or prior to the date hereof, the Agent has been given the final version of that certain asset purchase agreement (the "Asset Purchase Agreement"), dated as of January 29, 2008, by and among NexCen Asset Acquisition, LLC, Great American Cookie Company Franchising, LLC, Great American Manufacturing, LLC, NexCen Brands, Inc. and Mrs. Fields Famous Brands, LLC.

(c)     Prior to any funding pursuant to this Supplement, all conditions precedent to the closing of the Asset Purchase Agreement and the transactions contemplated thereunder have been satisfied (other than the payment of the purchase price thereunder) and the Agent has been advised of any waiver thereto or departures therefrom.

2.7     Additional Covenants.

(a)     Each of GAC Supply and GAC Manufacturing, as applicable, shall cause the Supply Manager to enter into or have the benefit of such agreements and contracts, whether written or oral, as is necessary or prudent to conduct the business of GAC Supply or GAC Manufacturing, as applicable.

(b)     Neither GAC Supply nor GAC Manufacturing, as applicable, shall amend or waive any provisions of the Supply and License Agreement, the Manufacturing Agreement or the Back-Up Manufacturing Agreement, and each shall comply with its obligations under each such agreement, as applicable.

(c)     All payments made pursuant to Section 6 of that certain settlement and release agreement, dated as of January 29, 2008, by and among NexCen Brands, Inc., Great American Cookie Company Franchising, LLC, Mrs. Fields Famous Brands, LLC, Mrs. Fields' Original Cookies, Inc. and each of the franchisees party thereto, and received by GAC Supply or GAC Manufacturing shall be deposited to the GAC Franchising, LLC Co-Issuer Collection Account.

2.8     Post Funding Conditions.

(a)     GAC Supply shall have, within 90 days of the date hereof, executed back-up manufacturing agreement (the "Back-Up Manufacturing Agreement") in form and substance acceptable to the Agent, with either Brill or Countryside or such other back-up manufacturer of cookie dough acceptable to the Agent.

(b)     GAC Manufacturing shall have, within 60 days of the date hereof, obtained the following:

1.     Certificate of Registration to be issued by the State of Georgia Department of Revenue Sales and Use Tax Division to GAC Manufacturing, LLC.

2.     Food Sales Establishment License to be issued by Georgia Department of Agriculture Consumer Protection Division to GAC Manufacturing, LLC.

3.     Business Occupational Tax Certificate to be issued by Fulton County to GAC Manufacturing, LLC.

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

4.    Department of Public Works Industrial Wastewater Discharge Permit to be issued by Fulton County Sewer, to GAC Manufacturing, LLC.

(c)    GAC Manufacturing shall, or shall cause the Manager to, replace the waste water filter at its manufacturing facility within 60 days of the date hereof and shall deliver, or cause the Supply Manager to deliver, reasonable evidence of the completion thereof (including the issuance of any permits) to the Agent.

(d)    GAC Supply shall cause, within 5 Business Days from the date hereof, the Supply Manager to enter into a written employment contract (the "Employment Contract") with Michael Curtis which contains provisions providing for (i) the Agent to be a third-party beneficiary of the Employment Contract, (ii) Michael Curtis's consent to the assumption of the Employment Contract by the Agent, at the Agent's sole discretion, at any time following a Manager Termination Event, upon demand by the Agent, except that the Agent shall provide prompt notification of such assumption to Michael Curtis, and (iii) the provisions of the Employment Contract described in subclauses (i) and (ii) above cannot be amended, modified or waived without the prior written consent of the Agent, which consent may not be unreasonably withheld.

(e)    GAC Manufacturing shall cause the Security Deed to be filed in the appropriate recording office in Georgia and shall pay the related intangible recording tax within 90 days of the date hereof.

(f)    The Supply Manager's form of Manager's Report shall be delivered to the Agent within five days from the date hereof in a form reasonably acceptable to Agent in both form and substance.

2.9    Failure to Satisfy Post Funding Conditions.    In the event that Additional Borrowers fail to satisfy the conditions set forth in Section 2.8 of this Supplement, such event shall constitute an Event of Default.

## ARTICLE III.

## ESTABLISHMENT OF ACCOUNTS

3.1    Co-Issuer Collection Accounts.    The Additional Borrowers shall establish with Wilmington Trust Company and Wilmington Trust Company shall maintain segregated trust accounts (the "Co-Issuer Collection Accounts"), which shall be in the names of the Additional Borrower, and be subject to a blocked account agreement in favor of the Agent "as secured party on behalf of the Holders of the NexCen Holding Notes," and which shall be in an Eligible Financial Institution, for the receipt of, and there shall be deposited into the Co-Issuer Collection Accounts, payments to be deposited therein as provided in the Security Agreement. If the bank with which the Co-Issuer Collection Accounts are maintained ceases to be an Eligible Financial Institution, the Additional Borrowers shall transfer the Co-Issuer Collection Accounts to an account maintained with an Eligible Financial Institution selected by the Additional Borrowers (unless an Event of Default shall have occurred and not been waived, in which case, such Eligible Financial Institution shall be selected by the Agent). The Co-Issuer Collection Accounts shall relate solely to the transactions contemplated in this Agreement and the Security Agreement, and funds in such account shall not be commingled with any other monies. All

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

monies deposited from time to time in the Co-Issuer Collection Accounts shall be part of the related Collateral as therein provided. Funds on deposit in the Co-Issuer Collection Accounts shall be invested in Eligible Investments at the written direction of the related Additional Borrower. The maximum permissible maturity or, if applicable, the latest redemption date of any Eligible Investments made with amounts on deposit in the Co-Issuer Collection Accounts shall be not later than the last Business Day of the related Collection Period.

### 3.1.1  Disbursement of Monies out of Co-Issuer Collection Accounts.

(a)    On the first Business Day after each Collection Period, as directed by the applicable Manager (or, if such direction is not given by the applicable Manager, then as directed by the Agent), monies in the Co-Issuer Collection Accounts (including any income or other realized gain from Eligible Investments in such Co-Issuer Collateral Accounts) shall be withdrawn and deposited into the Issuer Collection Account.

(b)    Monies in the GAC Supply Co-Issuer Collection Account may be withdrawn on a monthly basis, as directed by its Manager, to make payments to GAC Manufacturing in accordance with the terms of the Manufacturing Agreement or the Back-Up Manufacturing Agreement, as the case may be, and to make payments to GAC Franchising, LLC in accordance with the terms of the Supply and License Agreement.

(c)    Monies in the GAC Manufacturing Co-Issuer Collection Account may be withdrawn on a monthly basis, as directed by its Manager, to make deposits to the GAC Manufacturing Operating Account to reimburse such account in amount equal to the Cost of Goods for the related month.

3.2    Co-Issuer Lockbox Account. GAC Supply shall establish with Bank of America, and Bank of America shall maintain a segregated trust account which shall be in the name of GAC Supply, to be subject to a blocked account agreement in favor of the Agent "as secured party for benefit of the Holders of the NexCen Holding Notes", from time to time (the "Co-Issuer Lockbox Account") as part of, for the purposes of administering the payments to, the GAC Supply Co-Issuer Collection Account as remitted by the Obligors under the Collateral. The Eligible Financial Institution at which the Co-Issuer Lockbox Account is established shall be under standing instructions from GAC Supply to the effect that funds on deposit in the Co-Issuer Lockbox Account in excess of $10,000, if any, at the end of each Business Day, shall be deposited into GAC Supply's Co-Issuer Collection Account at such time.

3.3    GAC Manufacturing Operating Account. GAC Manufacturing has a bank account with Bank of America (the "GAC Manufacturing Operating Account"), which is an Eligible Financial Institution and which account is subject to a blocked account agreement in favor of the Agent "as secured party for benefit of the Holders of the NexCen Holding Notes". GAC Manufacturing shall have the right to withdraw all monies deposited from time to time in the GAC Manufacturing Operating Account in its discretion, provided, that if an Event of Default has occurred and is continuing, then the Agent shall have the right to send a notice to Bank of America which, under the terms of the blocked account agreement, shall give the Agent exclusive control of the GAC Manufacturing Operating Account.

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

As of the date hereof, the GAC Manufacturing Operating Account has a balance of $1,000,000. If bank with which the GAC Manufacturing Operations Account is held ceases to be an Eligible Financial Institution, GAC Manufacturing shall within five days of obtaining actual knowledge of such cessation, transfer the GAC Manufacturing Operations Account to an account maintained with a replacement Eligible Financial Institution selected by GAC Manufacturing (unless an Event of Default shall have occurred and not been waived, in which case, such Eligible Financial Institution shall be selected by the Agent). GAC Manufacturing shall promptly (within two Business Days) notify the Agent of any such selection. Funding in the GAC Manufacturing Operations Account shall be invested in Eligible Investments at the written direction of GAC Manufacturing. The maximum permissible maturity or, if applicable, the latest redemption date of any Eligible Investments made with amounts on deposit in the GAC Manufacturing Operations Account shall not be later than the Business Day preceding the next succeeding Payment Date or Redemption Date. All deposits into, and withdrawals from, the GAC Manufacturing Operating Account shall be documented in the related Manager Report, along with a list of the actual expenditures made with respect to such flow of funds.

3.4    Unless a Default or an Event of Default has occurred and is continuing, the Agent shall not send any notice to Bank of America or Wilmington Trust Company which, under the terms of the related blocked account agreement, shall give the Agent exclusive control over the related accounts.

## ARTICLE IV.

## ADDITIONAL REDEMPTIONS AND LIMITATIONS ON REDEMPTIONS

(a)    If, on October 17, 2008, the Note Principal Balance of the Factory Note is greater than $5,000,000 after giving effect to all principal payments made on or prior to that date, the Factory Note shall be repaid by making a principal payment thereon to the Lender on such date so that the outstanding Note Principal Balance equals $5,000,000 after giving effect to such payment; provided, however, that the Agent shall have the option, in its sole and absolute discretion to extend such date to July 17, 2009, subject to the payment of the extension fee referenced in the Amendment No. 2 to Fee Letter dated as of the date hereof, by giving written notice thereof to the Issuer and the Additional Borrowers. The failure to make such repayment on October 17, 2008 or July 17, 2009, if so extended by the Agent, shall constitute an Event of Default on such date due to the failure to pay principal when due.

(b)    Notwithstanding anything to the contrary in Articles XI or XIII of the Security Agreement but subject to all of the other terms and conditions with respect to repayments, releases, sales or divestures therein and in the other Transaction Documents, the Assets related to the Factory Note (including, without limitation, the equity of either of the Additional Borrowers), whether or not the Factory Note has been redeemed in whole or in part, may only be released, sold or divested (in whole or in part) if the then current outstanding Note Principal Balance of the note issued by the Issuer, GAC Franchising, LLC and GAC Franchise Brands, LLC (the "Franchise Note") is equal to the lesser of (i) $25,000,000 and (ii) four times the positive difference between (A) all Collections included in the calculation of DSCR for the previous 12 months related to the Franchise Note and (B) the Management Fees for such months related to GAC Franchising, LLC and GAC Franchise Brands, LLC; provided, for any month occurring

NYCDMS/1073816.7                                     8

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

prior to the Funding Date of the Franchise Note that is included in such calculation, Collections included in the calculation of DSCR for any such month will be based on historical information for the predecessor business prepared by the Issuer and reasonably acceptable to the Agent, and the Management Fee will be calculated as if it was payable in each such month hereunder based on such historical information.

## ARTICLE V.

## GOVERNING LAW

THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

NYCDMS/1073816.7                        9

Source: NexCen Brands, Inc., 8-K, May 19, 2008

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers as of the date set forth above.

GAC MANUFACTURING, LLC,
as Additional Borrower

By:
Name: _Jonas Itzen_
Title: _Vice President_

GAC SUPPLY, LLC,
as Additional Borrower

By:
Name: _Jonas Itzen_
Title: _Vice President_

NEXCEN HOLDING CORPORATION, as Issuer

By:
Name: _David D. Meister_
Title: _Secretary_

BTMU CAPITAL CORPORATION, as Agent

By:
Name:
Title:

NYCDMS/1013816

Signature Page, Security Agreement Supplement (GAC Manufacturing & GAC Supply)

Source: NexCen Brands, Inc., 8-K, May 19, 2008

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers as of the date set forth above.

GAC MANUFACTURING, LLC,
as Additional Borrower

By: _____
       Name:
       Title:

GAC SUPPLY, LLC,
as Additional Borrower

By: _____
       Name:
       Title:

NEXCEN HOLDING CORPORATION, as Issuer

By: _____
       Name:
       Title:

BTMU CAPITAL CORPORATION, as Agent

By: *Cheryl A. Behan*                    wAH
       Name:  Cheryl A. Behan
       Title:  Senior Vice President

Source: NexCen Brands, Inc., 8-K, May 19, 2008

EXECUTION COPY

EXHIBIT A

SECURITY DEED

[See attached]

Source: NexCen Brands, Inc., 8-K, May 19, 2008

Space Above Reserved for Recording Information

| Prepared By and After Recording, Please Return To: | Property Location: | Please Cross-Reference: |
|---|---|---|
| Richard Rudder, Esq.<br>Baker & McKenzie<br>1114 Avenue of the Americas<br>New York, New York 10036 | Fulton County, Georgia | |

### DEED TO SECURE DEBT, ASSIGNMENT OF RENTS, LEASES AND PROFITS, AND SECURITY AGREEMENT

THE INDEBTEDNESS SECURED HEREBY IS SECURED, INTER ALIA, BY REAL PROPERTY LOCATED IN THE STATE OF GEORGIA IN FULTON COUNTY. AN ORIGINAL OF THIS INSTRUMENT HAS BEEN FILED WITH THE CLERK OF THE SUPERIOR COURT IN THE AFORESAID COUNTY. THE ENTIRE GEORGIA INTANGIBLE RECORDING TAX DUE IN CONNECTION WITH THE INDEBTEDNESS SECURED HEREBY HAS BEEN PAID IN FULTON COUNTY, GEORGIA IN ACCORDANCE WITH OFFICIAL CODE OF GEORGIA ANNOTATED SECTION 48-6-69(b).

THIS DEED TO SECURE DEBT, ASSIGNMENT OF RENTS, LEASES AND PROFITS, AND SECURITY AGREEMENT CONSTITUTES A SECURITY AGREEMENT UNDER THE GEORGIA UNIFORM COMMERCIAL CODE.

NYCDMS/1073105.3A

Source: NexCen Brands, Inc., 8-K, May 19, 2008

THIS DEED TO SECURE DEBT, ASSIGNMENT OF RENTS, LEASES AND PROFITS, AND SECURITY AGREEMENT (as the same may be supplemented, amended, modified or extended from time to time, this "Security Deed") is made as of January 29, 2008, by GAC Manufacturing, LLC, having an address at c/o NB Supply Management Corp., 1346 Oakbrook Drive, Suite 170, Norcross, GA 30093 ("GAC Manufacturing") to BTMU Capital Corporation (the "Agent"), having an address at 111 Huntington Avenue, Suite 400, Boston, MA 02199-9000, as the Agent for Victory Receivables Corporation (the "Lender") under the Security Agreement referred to below for the benefit of the Secured Parties described therein.

### WITNESSETH:

WHEREAS, this Security Deed is being executed and delivered in accordance with a Security Agreement Supplement, dated as of January 29, 2008, being delivered in accordance with Section 4.1 of the Security Agreement, dated as of March 12, 2007, among NexCen Holding Corporation (the "Issuer"), the Subsidiary Borrowers from time to time parties thereto as Co-Issuers, and the Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Security Agreement"; unless otherwise defined herein, terms defined in the Security Agreement are used herein as therein defined, provided, if any such definitions were amended or otherwise modified in any Security Agreement Supplement, or if defined terms were added therein, such terms shall be used as amended, modified or defined therein);

WHEREAS, this Security Deed is made in compliance with the provisions of Section 44-14-60, et seq. of the Official Code of Georgia Annotated, as amended, for the purpose of securing the obligations of GAC Manufacturing under the Security Agreement, together with interest thereon from maturity as prescribed thereunder, any advances made by the Agent to protect the Property or to pay taxes or other assessments, and also for the purpose of securing such other and further indebtedness as may now be, or from time to time hereafter shall become owing to the Agent and any of the secured creditors by GAC Manufacturing, which indebtedness shall include reasonable attorney's fees as provided for in the Security Agreement, and also any contingent indebtedness owing to the Agent and any of the secured creditors by GAC Manufacturing, as surety, guarantor or endorser, it being the purpose and intention of this conveyance that in the event, in addition to the indebtedness specifically described below, GAC Manufacturing may now be otherwise indebted or may from time to time hereafter become otherwise indebted to the Agent through overdrafts or other loans from the Agent or contingently as surety, guarantor, or endorser, then any and all such indebtedness shall be secured by this conveyance, as well as the specific debt first described below;

NOW THEREFORE, in consideration of the making of the advance evidenced by the Note issued by the Issuer, GAC Manufacturing and GAC Supply, LLC (the "Factory Note"), and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and TO SECURE (i) the payment of all principal, interest and other sums due under the Factory Note in the aggregate original principal amount of $35,000,000 (Thirty Five Million Dollars), lawful money of the United States of America; and (ii) the payment and performance of all other covenants, obligations, liabilities or sums due or to become due under this Security Deed, the Factory Note or any other Transaction Document, including, without limitation, interest on said obligations, liabilities or sums now due or to become due under this

Source: NexCen Brands, Inc., 8-K, May 19, 2008

Security Deed, the Factory Note or any other Transaction Document; and (iii) any further or subsequent advances made by the Agent pursuant to this Security Deed, the Factory Note or any other Transaction Document to protect or preserve the Property (defined below) or the lien and security title created hereby, including all advances and costs incurred by the Agent to perform any obligation of GAC Manufacturing under the Transaction Documents and (iv) all costs of collection in connection with this Security Deed and the other Transaction Documents (items (i) through (iv), collectively, "Debt"), GAC Manufacturing does hereby irrevocably grant, bargain, sell, alien, remise, release, warrant, convey, assign, transfer, pledge, set over to the Agent forever (to the extent legally permitted), with power of sale, all right, title and interest of GAC Manufacturing in, to and under all of the following property, rights, interests and estates, whether now owned or hereafter acquired (collectively, and any part or portion thereof, "Property"):

FIRST, all plots, pieces or parcels of real property described in Exhibit A hereto ("Premises");

SECOND, all buildings, structures and improvements of every kind or nature now or hereafter located on the Premises (collectively, "Improvements");

THIRD, all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, wells, water courses, wells, water rights, ditches, reservoirs, air rights and development rights, lateral supports, foundations and drainage, and all estates, rights, interests, reversions, remainders, tenements, hereditaments and appurtenances of any nature whatsoever located on, under, above or pertaining to the Premises and Improvements;

FOURTH, all machinery, equipment, fittings, furniture, furnishings, fixtures (including, but not limited to, all heating, air conditioning, ventilating, waste disposal, irrigation, sprinkler and fire and theft protection equipment, plumbing, lighting, communications and elevator fixtures), building equipment, materials and supplies and all warranties and guaranties relating thereto, and all other property of every kind and nature whatsoever, now or hereafter located upon, in or used in connection with the Premises or the Improvements or appurtenant thereto (collectively, "Equipment");

FIFTH, all leases, tenancies, licenses, subleases, assignments and other agreements affecting the use, enjoyment or occupancy of all or any portion of the Premises or the Improvements now existing or hereafter entered into by GAC Manufacturing, as lessor, and all amendments, renewals and extensions thereto (collectively, "Leases"), together with all income, rents, issues, profits, revenues, issues, avails, royalties and other benefits derived or owned by GAC Manufacturing directly or indirectly therefrom, including, without limitation, sale proceeds from a disposition of the Property and any prepayment charge (collectively, "Rents"), and all security deposits, guarantees or other security held by GAC Manufacturing in connection therewith, and all other credits, rights, options, claims and causes of action of GAC Manufacturing in connection with any of the foregoing;

SIXTH, all proceeds, awards and payments, including interest thereon, which may hereafter be made with respect to all or any portion of the Property in connection with any Taking (defined herein), and all proceeds of, and any unearned premiums under, any insurance policies covering all or any portion of the Property, and all refunds or rebates of Taxes (defined

NYCDMS/1073895.3A

3

Source: NexCen Brands, Inc., 8-K, May 19, 2008

herein), impositions and Other Charges (defined herein) or in connection with other Property, and any interest thereon;

SEVENTH, all accounts, funds, deposits and reserves, and all accounts receivable and contract rights;

EIGHTH, all licenses, permits, building permits, certificates, certificates of occupancy, consents, authorizations, approvals, variances and land use entitlements for the construction, use, occupancy and operation of the Improvements and the Premises (collectively, "Licenses");

NINTH, all contracts, documents, agreements and arrangements to which GAC Manufacturing is a party or bound or which relate to the use, operation, ownership or enjoyment of the Property, including without limitation all service contracts, management agreements, zoning agreements, development agreements, utility agreements, parking arrangements, operating contracts, supply and maintenance contracts, equipment or other personal property leases, and all amendments thereto; and all income, revenue, rights of reimbursement and benefits therefrom, and all deposits, security, credits and advance payments in connection with any of the foregoing; and all books and records relating to the Property (collectively, "Contracts");

TENTH, all claims with respect to the Property, including without limitation, for loss or damage arising from any defect in or with respect to the design or construction of the Improvements or the Equipment; and the right to appear in and defend any action or proceeding, in the name and on behalf of GAC Manufacturing, brought with respect to any of the Property; and the right to commence any action or proceeding to protect the interest of the Agent in such Property;

ELEVENTH, all drawings, designs, architectural renderings, models, surveys, reports, studies, tests, plans and specifications for the design, development, construction, repair, improvement, ownership or operation of the Property;

TWELFTH, all oil, gas, minerals, timber and crops in, on, under or pertaining to the Premises and all royalties, revenues, leasehold and other rights and interests of GAC Manufacturing pertaining thereto, including, without limitation, any surface or subsurface entry rights to the Premises or any other property;

THIRTEENTH, all renewals, substitutions, improvements, accessions, attachments, additions, replacements and all proceeds to or of each of the foregoing, and all conversions of the security constituted thereby so that, immediately upon such acquisition, construction, assemblage, placement or conversion, as the case may be, and in each such case, the foregoing shall be deemed a part of the Property and shall automatically become subject to the lien and security title of this Security Deed as fully and completely and with the same priority and effect as though now owned by GAC Manufacturing and specifically described herein, without any further assignment or conveyance by GAC Manufacturing, and

FOURTEENTH, the right to assume the lessee's obligations under any leases, tenancies, licenses, subleases, assignments and other agreements affecting the use, enjoyment or occupancy

Source: NexCen Brands, Inc., 8-K, May 19, 2008